## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

FILED ___ ENTERED
___ RECEIVED

AUG 02 2019

AT ___
CLERK U.S. DISTRICT COURT
DISTRICT OF MARYLAND
BY: ___  DEPUTY

**IN re SANCTUARY BELIZE
LITIGATION**

\*
\*
\*
\*
\*
\*
\*
\*
\*

**Civil No. PJM 18-3309**

## MEMORANDUM OPINION IN SUPPORT OF PRELIMINARY INJUNCTION

On October 31, 2018, the Federal Trade Commission ("FTC") filed a Complaint in this Court, alleging that certain named Defendants were perpetrating a large-scale land sales scam on its consumer base of largely U.S. customers, seeking, as part of its requested relief, a Preliminary Injunction. Defendants are a web of corporate entities and individuals that, the FTC says, comprise, direct, and control what the FTC collectively terms the Sanctuary Belize Enterprise ("SBE"), located in Belize. The entities comprising SBE include Global Property Alliance, Inc. ("GPA"), Eco-Futures Development, Eco-Futures Belize, Ltd. ("Eco-Futures (BZ)"), Sittee River Wildlife Reserve ("SRWR"), Buy International, Inc. ("Buy International"), Buy Belize, LLC ("Buy Belize"), Foundation Development Management, Inc. ("FDM"), Power Haus Marketing ("Power Haus"), Ecological Fox, LLC ("Ecological Fox"), Belize Real Estate Affiliates, LLC ("BREA"), Southern Belize Realty, LLC ("SBR"), Exotic Investor, LLC ("EI"), Foundation Partners ("FP"), BG Marketing, LLC ("BG Marketing"), Prodigy Management Group, LLC ("Prodigy"), Newport Land Group, LLC, and the Sanctuary Belize Property Owners' Association ("SBPOA," aka "The Reserve Property Owners' Association"). The FTC also sued Atlantic International Bank, Ltd.

1

("AIBL"), located in Belize, for allegedly assisting in the deceptive telemarketing, sales, and development practices of SBE.[1]

The individual Defendants are Andris Pukke and Peter Baker, as well as Luke Chadwick, John Usher, Brandi Greenfield, Rod Kazazi, Frank Costanzo, and Michael Santos. The Complaint also names Angela Chittenden, Deborah Connelly, John Vipulis,[2] the Estate of John Pukke, and Beach Bunny Holdings, LLC ("Beach Bunny Holdings") as Relief Defendants. On February 13, 2019, Greenfield, Kazazi, Costanzo, Santos, Chittenden, Connelly, FP, BG Marketing, Ecological Fox, and Beach Bunny Holdings stipulated to the entry of the Preliminary Injunction.[3] ECF No. 195. Pukke and Baker have filed written oppositions to the Motion for Preliminary Injunction. No other individual Defendants have stipulated to the entry of a Preliminary Injunction, but none have filed oppositions to the Motion. Chadwick, however, has moved to dismiss the claims against him for lack of personal and subject matter jurisdiction. ECF No. 475.[4]

---

[1] On July 10, 2019, the FTC notified the Court that AIBL had agreed to settle the FTC's claims against it. The FTC also moved to stay all proceedings against AIBL for sixty (60) days so that the full Federal Trade Commission could review the settlement agreement. ECF No. 517. That same day, the Court granted the FTC's Motion to Stay as to AIBL. ECF No. 520. Should the full Commission approve the settlement agreement of the FTC's claims, the Court will await further instructions from the FTC and AIBL as to AIBL's status in the case.

[2] The FTC settled its claims against Vipulis on March 25, 2019, after Vipulis turned over approximately $4.1 million to the Receiver. ECF No. 352.

[3] On July 23, 2019, the FTC moved to stay all proceedings against Costanzo, Connelly, and Ecological Fox for sixty (60) days so that the full Federal Trade Commission could review a proposed settlement agreement with those Defendants. ECF No. 527. On July 26, 2019, the Court granted the FTC's Motion. ECF No. 532. Should the full Commission approve the settlement agreement of the FTC's claims, the Court will await further instructions from the FTC and Costanzo, Connelly, and Ecological Fox as to their status in the case.

[4] Chadwick waited some seven months after being served with process, and until _after_ the Preliminary Injunction hearing in March 2019, to file his Motion. The Court decides the personal jurisdiction argument raised in Chadwick's Motion on the papers without a hearing, Local Rule 105.6, as set forth in Section II of this Memorandum Opinion, beginning on page 12, _infra_. The Motion, as will be seen, is **DENIED**.

Chadwick also argues that the FTC's claims against him should be dismissed for lack of subject matter jurisdiction and for failure to state a claim upon which relief may be granted. ECF No. 475 at 1. Since there is no sanction to be imposed on Chadwick as part of the Preliminary Injunction, the Court will address his arguments in a separate Memorandum Opinion to be issued later.

From March 11 to March 22, 2019, the Court held an evidentiary hearing on the FTC's Motion. Based on the evidence, oral argument presented at the end of that hearing, and the Proposed Findings of Fact and Conclusions of Law submitted by various parties post-hearing, the Court **GRANTS** the FTC's Motion for Preliminary Injunction as to all Defendants who have not at this time settled their claims with the FTC.

## I.    Factual and Procedural Background

*A.    Alleged Concealment of the Belizean Parcel from the Receiver in* FTC v. AmeriDebt

The case involves a large mass of land in Southern Belize, roughly the size of Manhattan, where individual lots in a planned residential and commercial community have been marketed to thousands of consumers and sold to residents of the United States.

Some critical history precedes the current litigation.

In 2003, the FTC sued Pukke under Section 5 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45(a), in connection with what it alleged were fraudulent activities related to two credit counseling companies he owned and/or operated. Civ. No. PJM-03-3317, *FTC v. Ameridebt, Inc. et al* ("*AmeriDebt*;" since consolidated with the present case). The Court entered a preliminary injunction against Pukke and other defendants in that case, *FTC v. Ameridebt, Inc.*, 373 F. Supp. 2d 558 (D. Md. 2005), following which Pukke agreed to a Stipulated Final Judgment and Permanent Injunction. *AmeriDebt*, ECF Nos. 408, 411, 473. Pursuant to the Final Order of Judgment in *AmeriDebt*, the Court appointed a Receiver, Robb Evans & Associates, LLC,[5] to

---

[5] Robb Evans & Associates has also been functioning as the Receiver in the present litigation and, as the Court directed at the end of the hearing on Plan Management held on July 9, 2019, *see supra*, n. 34, will continue to do so until the merits phase of this case. For the sake of simplicity, the Court will refer to Robb Evans throughout as the "Receiver."

marshal and liquidate up to $35,000,000 of Pukke's assets in order to provide the FTC with funds to compensate Pukke's victims. *AmeriDebt*, ECF No. 473 at 13.

At the time of the *AmeriDebt* action, Pukke and Baker, along with several other associates and family members, owned interests in two Belizean entities: Dolphin Development, LLC ("Dolphin") and Sittee River Wildlife Reserve ("SRWR"). PX 358; PX 359; PX 361. Through Puck Key Investments L-8, LLC ("Puck Key 8"), an entity he wholly owned, Pukke held a 60% interest in Dolphin (Baker, his mother, and his stepfather held the remaining 40%). PX 358. While serving as an SRWR director, Pukke loaned it $1.5 million to buy 11,755 acres in southern Belize and loaned Dolphin $1.5 million to buy 350 adjacent acres. PX 356 ¶ 11. In May 2005, SRWR also bought a five-acre island, now known as "Sanctuary Caye." PX 378; PX 192 ¶ 3, Att. 24 at 11 (copy of the minutes of the 2016 Annual General Meeting of SRWR, signed by "Peter Baker, Chairman"). These land acquisitions collectively formed the parcel of land (the "Belizean Parcel") on which Pukke, Baker, and the other Defendants in the present case have collaborated to develop and market the community at issue today—Sanctuary Belize (also known as Sanctuary Bay Estates or the Reserve). In 2005, throughout the United States, Dolphin commenced telemarketing lots on the Belizean Parcel as part of the Sanctuary Belize residential and commercial development plan, and in August 2005 Dolphin sold its first lot in the development. PX 363 (lot sale contract for Dolphin, dated August 1, 2005).

After the Final Order of Judgment in the *AmeriDebt* case was entered, Pukke apparently retained control of the Reserve, but actively concealed his interest in the property from the Receiver. Pukke was alleged to have misrepresented to the Receiver both his ownership stake in and the fiscal solvency of Dolphin. Pukke also transferred Dolphin's development rights and a portion of the Belizean Parcel to two entities controlled by Baker in an apparent effort to make

4

SRWR appear to be without assets. PX 361; PX 371; PX 372; PX 373; PX 374; PX 375; PX 376; PX 377; PX 379; PX 380. When the Receiver became aware of this legerdemain, it moved to have both Pukke and Baker held in contempt of court for, among other things, refusing to turn over the land and for taking steps to remove it from the Receiver's control.

On March 30, 2007, following an evidentiary hearing held in February and March of 2007, the Court found Pukke and Baker in civil contempt for their refusal to turn over receivership assets and ordered them to immediately turn over control of the Belizean Parcel to the Receiver. *AmeriDebt*, ECF No. 571. To facilitate the Receiver's ability to control the Belizean Parcel, the Court issued a second order unwinding the alleged sales of Pukke's interests in Dolphin (i.e., his interests in Sanctuary Belize) and ordering these assets re-vested in Dolphin (which the Receiver controlled). *AmeriDebt*, ECF No. 572.

Pukke and Baker, however, failed to comply with the Court's Orders, i.e., to purge their contempt. Accordingly, on April 30, 2007, the Receiver moved to have both men incarcerated in order to coerce their compliance with the Court's Orders directing the turnover of their interests in the Belizean Parcel and related documents. [6] *AmeriDebt*, ECF Nos. 596, 597. On May 4, 2007, the Court again found Pukke and Baker in Contempt, remanded them to custody of the U.S. Marshal and had them incarcerated. *AmeriDebt*, ECF No. 604. Baker and Pukke were eventually released from custody after serving approximately two weeks and one month in custody, respectively. Their release was conditioned on cooperating in the turn-over of Pukke's assets to the Receiver, including the Belizean Parcel *AmeriDebt*, ECF Nos. 614, 622, which, in part at least, they did do.

---

[6] At approximately the same time, members of SRWR's Board of Directors connected to Pukke and Baker, including John Usher, met and terminated any rights Dolphin, Baker, or any of Baker's entities might have had in the Belizean Parcel. PX 380.

Approximately one year later, on March 27, 2008, realizing that it would be exceedingly difficult and costly to enforce its rights to control the Belizean Parcel, the Receiver undertook to cash out its claims to ownership over it. *AmeriDebt*, ECF No. 682. In consequence, an agreement was reached whereby the Receiver would sell the land to SRWR for $2 million. *Id.* No party objected to the sale, and on April 15, 2008 the Court approved it without comment. *AmeriDebt*, ECF Nos. 684, 686.

Notwithstanding the foregoing, the FTC alleges in the present litigation that it was Baker who raised the funds to purchase the Belizean Parcel from the Receiver, and that Pukke, through Baker, retained effective control of the development and marketing operations for Sanctuary Belize, which, after the Receiver's involvement terminated, allegedly continued to operate under the name Defendant Eco-Futures Belize, Ltd. PX 192 ¶ 3, Att. 24 at 12 (2016 SRWR General Annual Meeting minutes, detailing the 2008 purchase of the Belizean Parcel for $2 million from the *AmeriDebt* Receiver); PX 395 (emails between Baker and Greenfield discussing sales tours of the Reserve scheduled for February 2009, also forwarded to Pukke in 2011); Baker Dep. Tr., 2/19/19, 123:17–124:1 (Baker testifying that Pukke's ownership and involvement was reinstated "[a]s soon as we were ready to go to, call it, start marketing and sales").

In short, the FTC contends that at all relevant times Pukke effectively controlled the Belizean Parcel—the land on which Sanctuary Belize has been developed—as well as the associated marketing and sales operations, all the while concealing the fact of his affiliation with the enterprise from the *AmeriDebt* Receiver. The nexus between *FTC v. AmeriDebt* and the Belizean Parcel purportedly gave rise to a multitude of violations the FTC says characterize the present litigation.

6

## B. *Marketing and Development of Sanctuary Belize*

Through his control over the SBE entities, says the FTC, Pukke participated in and directed the fraudulent behavior of other individual Defendants in their capacities as principals of various SBE enterprises. The core of the FTC's allegations is that Defendants perpetrated an unlawfully deceptive telemarketing scheme through which they attempted to convince, and in many instances did convince, American consumers to buy lots at Sanctuary Belize. Those purchases were allegedly accomplished by making promises to consumers that Pukke, the SBE entities, and other Defendants knew to be false and contrary to the experiences of other lot purchasers. Beyond that, revenue from lot sales at Sanctuary Belize is alleged to have been redirected by several Defendants to their own personal use and for projects unrelated to the development of Sanctuary Belize.

The FTC identifies six "core claims" Defendants purportedly made to customers, knowing they were false and misleading: (1) that SBE's "no debt" business model made Sanctuary Belize a less risky investment than one in which the developer would have to make payments to mortgage lenders and creditors; (2) that in part because of the "no debt" model, every dollar the developer collected from lot sales would be reinvested in the development; (3) that this funding stream meant the developer would finish the development quickly, i.e., within two to five years; (4) that the finished development would boast luxury amenities including, among other things, a hotel, an American-caliber hospital, and a nearby airport; (5) that those amenities meant that the lots would appreciate in value from 200% to 300% within two to three years; and (6) that consumers would realize this rapid appreciation without difficulty because there would be a robust market for resale of the lots.

Since 2005, SBE has sold over 1,000 lots at the Belizean Parcel, including some that have been sold more than once. PX 816 at 20–23. SBE's marketing team has employed extreme

7

advertising techniques across the United States, including promotions on such television channels as Fox News and Bloomberg. PX 205 ¶ 13; PI Hrg Tr., 3/11/19 Afternoon, 82:8–16. SBE has also maintained websites to which consumers could and did navigate, which urged potential customers to submit contact information to SBE in order to learn more. PI Hrg Tr. 3/11/19 Morning, 48–49; PI Hrg Tr. 3/19/19 Afternoon, 59:9–12; PX 399.

The marketing process operated more or less as follows:

California-based telemarketers would call consumers who responded to SBE's initial various marketing efforts. PI Hrg Tr., 3/11/19 Afternoon, 82:17–24; PI Hrg Tr., 3/19/19 Afternoon 59:17–21. Pukke, in particular, but other SBE principals as well, coached sales employees to "create a sense of urgency" and a "fear of loss" on the part of prospective purchasers, techniques that the telemarketers then used in their calls with consumers. PX 207 ¶ 5 and Att. 3 at 1; PI Hrg Tr., 3/19/19 Afternoon, 60:22–61:10; PX 196 ¶ 10. After capturing the interest of prospective consumers, typically by touting as enticements the promises reflected in the Core Claims, SBE telemarketers encouraged consumers to participate in a webinar during which a higher-level sales agent would speak with them over the telephone, often transmitting slick development photos and graphics to the consumers' computers. PX 307; PX 308; PX 309; PX 310; PX 200 ¶¶ 8:5–6, 17:13; PX 186 ¶ 8; PX 205 ¶ 14; PX 336; PX 337; PX 186 ¶ 9:3 (attaching webinar). The presenters during the webinars varied, but at different points both Costanzo and Chadwick were definitely participants. PX 814 ¶ 8 PX 186 ¶ 9:3; PX 184, Att. 43 at 186 (notes on webinar taken by lot purchaser).

The purpose of the webinars was to persuade customers to travel to Belize and tour the Reserve in person. The consumer would pay his or her own airfare to and from Belize, but for $999, the consumer would receive an all-inclusive tour, including lodging at a resort nearby the

8

Reserve, free food, meals, drinks, and internal transportation. PX 184 ¶ 11; PX 186 ¶ 21; PX 191 ¶ 13; PX 193 ¶ 13; PX 194 ¶¶ 5, 6, 61; PX 195 ¶¶ 11, 46; PX 196 ¶ 17; PX 198 ¶ 8; PX 200 ¶¶ 12–13, 47; PI Hrg Tr., 3/11/19 Afternoon, 86:3–18; PI Hrg Tr., 3/11/19 Morning, 54–55; PX 182 ¶ 9; PX 202 ¶ 7; PX 183 ¶ 9; PI Hrg Tr., 3/11/19 Morning, 55; PI Hrg Tr., 3/11/19 Afternoon, 86:12–87:1; PI Hrg Tr., 3/19/19 Afternoon, 62:5–10. Before going to Belize to tour the Reserve, consumers were encouraged to sign "non-binding lot reservation agreements." PX 410; PX 205 ¶ 14; PX 605; PX 821; PI Hrg Tr., 3/11/19 Afternoon, 87:12–23. Pursuant to those agreements, again before departing, some consumers paid between $2,000 and $10,000 to SBE to obtain the right of first refusal on particular lots. PX 410; PX 181 ¶ 8:3 (attaching lot reservation agreement); PX 205 ¶ 18, Att. 17 (same); PX 186 ¶ 21; PX 198 ¶ 8; 5–6; PI Hrg Tr., 3/11/19 Afternoon, 87:12–88:7; PI Hrg Tr., 3/19/19 Afternoon, 61:11–16 (in at least one case a consumer made a $20,000 down payment on a lot and signed a memorandum of sale before visiting the property or meeting with a telemarketer face to face). Their deposits were either credited toward the purchase price of the reserved lot or the purchase of another lot, but would be refunded if the consumer decided not to complete the sale. PX 200 ¶ 13; PX 198 ¶ 25; PX 202 ¶ 7; PX 188 ¶ 8; PX 205 ¶ 18, Att. 17. Finally, some consumers, albeit a relative few, agreed to purchase lots outright either before going on the tour or without ever going on the tour. PX 254 ¶ 14 (authenticating PX 258, attachment 4 to the Batal Declaration, a sales script from 2012); PX 258 at 11 (SBE marketing script, stating "You have 4 choices: . . . Purchase a home site sight unseen (23% of our owners have done this)."); PX 819–828 (emails, lot purchase agreements, and SBE spreadsheets showing that some consumers purchased prior to a tour).

Tours in Belize typically gathered five to ten couples, who as a group toured the Reserve, visited lots, and attended sales presentations. During the sales presentations and tours, SBE

9

employees would reiterate promises incorporating one or more of the six Core Claims. PX 312; PX 198 ¶ 12, Atts. 9–10; PX 191 ¶ 16–26; PX 182 ¶ 15–24. PI Hrg Tr.. 3/19/19 Afternoon, 69:4–70:1. Presenters in Belize would vary, but at various times definitely included Usher, Chadwick, and Costanzo. PX 194 ¶¶ 7, 11, 14; PX 195 ¶¶ 7–10; PX 196 ¶ 22; PI Hrg Tr., 3/19/19 Afternoon, 67:5–18; PI Hrg Tr., 3/11/19 Morning, 57–58 (testifying that Chadwick gave property tour and reiterated that the development was debt free). Sometimes sales presentations in Belize would include presentations by local service-providers such as Coldwell Banker Southern Belize (the local office of Defendant Southern Belize Realty), who assured consumers, by advertising their own services, that the Belizean community was ready, willing, and able to satisfy consumer needs. PX 752 ¶¶ 9–10; PI Hrg Tr., 3/11/19 Afternoon, 89:14–22; PI Hrg Tr., 3/11/19 Afternoon, 102:25–103:6; PI Hrg Tr., 3/19/19 Afternoon, 69:20–70:23. Consumers were not always able to visit the specific lots on which they had placed a deposit, often because of terrain issues such as overgrown jungle on uncleared lots or the flooding of unpaved roads. PX 202 ¶ 34; PX 199 ¶ 5; PX 195 ¶ 7.

From the beginning of the sales process, SBE represented to consumers that if they purchased a lot, they would "own" that lot. PX 205 ¶ 16 (Declaration of SBE sales employee: "We said that once a customer purchased a lot, they would own it. We also called everyone who purchased 'owners.'"); PX 203 ¶ 13 (Declaration of SBE sales employee: SBE told prospective consumers "they would own their lot"). As such, after returning to the United States from the tours where they purchased lots, the new "owners" began to receive invoices for monthly payments on the lots (payable to SBE) as well as from a homeowner's association (HOA) for dues in the amount of $100 per month per lot. PX 183 ¶ 39, Att. 21; PX 181 ¶ 40, Att. 10; PX 186 ¶ 34, Att. 26; PX 184 ¶ 48, Att. 42; PX 202 ¶ 39, Att. 32; PI Hrg Tr., 3/11/19 Morning, 77–78 (lot purchaser testifying about invoices for homeowners' association fees). Purchasers were advised that these

payments were subject to a 12.5% Belizean General Sales Tax ("GST"). PX 409; PX 456; PX 457; PX 458; PX 459; PX 460; PI Hrg Tr., 3/11/19 Afternoon, 103:18–104:8, PX 881; PX 882; PI Hrg Tr., 3/11/19 Morning, 68–69 (lot purchaser testifying that he made monthly payments of approximately $3,000 to Eco-Futures in California). SBE explained to purchasers that the GST was charged on all sales of goods and services, which meant that, dating from the purchase of their lot to the final construction of their home, the tax would be applicable. PX 196 ¶ 38 and Atts. 41, 42; PX 456; PX 458; PX 459; PX 460; *see also* PX 457 (representing in marketing materials that GST is "charged on [the sale of] goods and services"); PX 459 (stating, in a "Sanctuary Bulletin" marketing email, that GST "is a consumer tax (12.5%), applied to most goods and services). Customers made these payments to SBE in California and to the HOA's address in Texas, respectively.

The development of Sanctuary Belize, however, began to lag behind the timeline SBE had projected, and as it did, a number of purchasers attempted to mitigate their losses by seeking to sell back their lots to SBE or by suing it. Some owners simply stopped making payments on their lots, as a result of which SBE threatened them with "foreclosure," meaning it would simply take the lots back unless the consumer resumed making monthly payments. That apparently is precisely what some owners intended to happen. PX 462; PX 463; PX 464; PX 186 ¶ 72, Att. 89, ¶ 74, Att. 92, ¶ 75; PX 789 ¶¶ 10–11. Occasionally SBE was willing to buy back a lot from a consumer, but almost always it did so at a loss to the purchaser, never at a profit, and never via a lump sum payment, only through payments made over time. PX 814 ¶ 47; PX 816 at 14; *see also* PX 466 and PX 519 (various buyback and termination agreements). Typically, SBE would undertake to re-market the bought-back lots to new consumers. PX 471; PX 636; PX 637; PX 638; *cf.* PX 816 ¶ 14.

11

In 2016, a group of 200 dissatisfied consumers known as the Independent Owners of Sanctuary Belize ("IOSB") sued SBE in Belize.[7] PX 202 ¶ 46–54, Atts. 17, 31. Since then, dissatisfied owners have filed at least seven actions in California state courts, in general alleging that various SBE entities defrauded them into purchasing lots, luring them on the basis of one or more of the Core Claims. Since SBE's Lot Sale Agreements contain forum selection clauses that require litigation, if any, to take place in Belize, some California courts have dismissed the consumer actions without prejudice at the pleading stage based on those clauses.[8] Other cases in California courts apparently settled before the SBE entities could file motions to dismiss based on the choice of forum clauses.[9] As of this writing, motions to dismiss in California courts based on the choice of forum clauses are pending in two remaining actions.[10]

## II.    Personal Jurisdiction over Luke Chadwick

Except for the Motion to Dismiss filed by Luke Chadwick, the motions to dismiss of all other parties have been denied.[11] Only Chadwick's Motion to Dismiss, partially on the basis of lack of personal jurisdiction, remains. ECF No. 475. Chadwick and the FTC have jointly requested

---

[7] The SBE entities named as defendants in that litigation countersued several IOSB members for defamation. A Belizean court tried the defamation suit before the IOSB suit, and a Belizean judge ruled in favor of SBE. At the defamation trial, the IOSB's counsel apparently ended up giving testimony that in fact favored SBE; he subsequently left the IOSB and joined SBE. Follow-on counsel retained by IOSB, a prominent Belizean lawyer, was found fatally shot in his home, allegedly a suicide. In May 2017, the IOSB's initial counsel negotiated a settlement agreement with the SBE entities that had prevailed in the defamation suit against the IOSB, which he forwarded to the IOSB members. *See* PX 202, Att. 31. While this settlement agreement appears to have ended the Belizean litigation, the number of IOSB members who ultimately agreed to the settlement is unknown.

[8] *See Nelson v. Eco-Futures Development, Inc.*, No. 30-2017-937964 (filed Cal. Sup. Ct. Orange Cty. Aug. 16, 2017); *Fales v. Eco-Futures Development, Inc.*, No. 30-2017-958588 (filed Cal. Sup. Ct. Orange Cty. Nov. 30, 2017).

[9] *See Miller v. Eco-Futures Development, Inc.*, No. 30-2018-9781287 (filed Cal. Sup. Ct. Orange Cty. Feb. 5, 2018); *Mann v. Eco-Futures Development, Ltd.*, No. 30-2017-926591 (filed Cal. Sup. Ct. Orange Cty. June 16, 2017); *Plomaritis v. Global Property Alliance, Inc.*, No. 30- 2015-816793 (filed Cal. Sup. Ct. Orange Cty. Oct. 26, 2015).

[10] *See Whited v. Global Property Alliance, Inc.*, No. 30-2017-937964 (filed Cal. Sup. Ct. Orange Cty. Aug. 16, 2017); *Pomroy v. Eco-Futures Development, Inc.*, No. 30-2018-973773 (filed Cal. Sup. Ct. Orange Cty. Feb. 15, 2018).

[11] *See, e.g.*, ECF Nos. 434 (Memorandum Opinion denying Santos's Motion to Dismiss for failure to state a claim); 257, 261 (Motions Hearing and Order denying, among other motions, Pukke's Motion to Dismiss for failure to state a claim, ECF No. 161).

a hearing on his Motion, but the Court decides the personal jurisdiction issue now on the papers without a hearing.[12]

Personal jurisdiction over a defendant may be general or specific. General personal jurisdiction can be exercised when a defendant has "continuous and systematic general business contacts" with a forum state. *See Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 416 (1984). In that event, the defendant's contacts must be "so constant and pervasive as to render it essentially at home in the forum state." *Daimler AG v. Bauman*, 571 U.S. 117, 122 (2014) (citations omitted). The place of incorporation and the location of a corporation's principal place of business are paradigmatic examples of contacts sufficient to support general personal jurisdiction in a given forum. *Id.* at 137 (citations omitted).

Specific jurisdiction may be exercised over a defendant where "the suit arises out of or relates to the defendant's contacts with the forum." *Id.* at 127 (citations omitted). The present case is clearly one of specific personal jurisdiction inasmuch as it arises out of a specific transaction that the various Defendants, Chadwick included, had with the relevant forum, namely, the United States at large.

Ordinarily, in determining whether a federal court may exercise specific personal jurisdiction over a defendant, the court considers "(1) the extent to which the defendant has purposefully availed [himself or] itself of the privilege of conducting activities in the state; (2) whether the [plaintiff's] claims arise out of those activities directed at the state; and (3) whether

_____

[12] See *infra* n. 4.

13

the exercise of personal jurisdiction would be constitutionally 'reasonable.'" *Carefirst of Maryland, Inc. v. Carefirst Pregnancy Centers, Inc.*, 334 F.3d 390, 397 (4th Cir. 2003).

However, if a statute authorizes nationwide service of process, so long as the assertion of jurisdiction over a defendant is compatible with due process, service of process sufficient to establish personal jurisdiction over the defendant. *See ESAB Grp., Inc. v. Centricut, Inc.*, 126 F.3d 617, 626 (4th Cir. 1997). Accordingly, a statute providing for nationwide service expands a district court's jurisdiction to the entire country, altering the traditional minimum contacts test that focuses on a defendant's contacts with a particular state and becomes "a national contacts test." *See United States v. Batato*, 833 F.3d 413, 423 n.3 (4th Cir. 2016) (citation and internal quotation marks omitted). Because the FTC has statutory authority to effect service of process nationwide, *see* 15 U.S.C. § 53(a), the minimum contacts inquiry focuses on a defendant's contacts with the United States as a whole, rather than a specific state, such as Maryland.

Chadwick argues that he has not had nor does he presently have sufficient minimum contacts with Maryland, which he claims is the forum state in this case. ECF No. 475-1 at 9–10. However, Chadwick's contacts with the United States as a whole—not with a particular state— determine whether the Court may exercise personal jurisdiction over him. As explained earlier, a statute providing for nationwide service, such as the FTC Act, converts the minimum contacts test from one focused on a particular forum state to one focused on a defendant's contacts with the entire country. *See Batato*, 833 F.3d at 423 n.3; *ESAB Grp.*, 126 F.3d at 626. The Court finds that Chadwick had ample minimum contacts with the United States throughout the existence of the Sanctuary Belize Enterprise. He was physically present and active in real estate sales and brokerage in California and Nevada beginning in 2002 and 2005, respectively. ECF No. 475-1 at 4. From 2009 to 2014, he also worked for SBE as the sales manager and as a "Principal," and, until

14

2015, he maintained an office at the same address in Irvine, California as numerous other SBE Defendants. *Id.* at 6–7. Chadwick's personal residence is also located in California. *Id.* at 1.[13]

Chadwick contends that requiring him to appear in Maryland would be overly burdensome, even while acknowledging his residence in California. The Court is not persuaded.

In determining whether it is constitutionally reasonable for a district court to exercise personal jurisdiction over a defendant, courts weigh factors such as

(1) the burden on the defendant of litigating in the forum; (2) the interest of the forum state in adjudicating the dispute; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the shared interest of the states in obtaining efficient resolution of disputes; and (5) the interests of the states in furthering substantive social policies.

*Consulting Eng'rs Corp. v. Geometric Ltd.*, 561 F.3d 273, 278 (4th Cir. 2009).

While litigating in a district other than in the one in which he resides would undoubtedly burden Chadwick to some extent, the Court finds that, insofar as this may be inconvenient, it is not sufficiently burdensome to defeat personal jurisdiction. *Cf. In re Chase & Sanborn Corp.*, 835 F.2d 1341, 1346 (11th Cir. 1988) (stating that "[m]odern means of communication and transportation have lessened the burden of defending a lawsuit in a distant forum"). Further, the Court has already denied an attempt by Pukke to transfer this case to California on similar grounds that litigating there would be more convenient and less burdensome on the SBE Defendants. ECF No. 261.

The other reasonableness factors strongly favor the Court's exercise of personal jurisdiction over Chadwick without violating his right to due process. The District of Maryland has a strong interest in adjudicating the case, given that it traces back to the concealment of the

---

[13] See also the reasons set forth in Section III.H.i, *infra.*

Belizean Parcel from the Receiver in the *AmeriDebt* litigation that was tried here. Although

Chadwick was not personally involved in the *AmeriDebt* proceeding, he knew that Pukke and

Baker had been defendants in that case and were subject to a receivership involving assets in

Belize, *see* ECF No. 475-1 at 5. As such, he could reasonably have foreseen that working with

them on Sanctuary Belize sales in California might lead to further proceedings in the District of

Maryland.

Additionally, the FTC—which represents the public—has a strong interest in obtaining

convenient and effective relief in the District of Maryland, since it initiated the case in this Court

following the alleged concealment by Pukke of property from the *AmeriDebt* Receiver. Since

courts in both Maryland and California have similar interests in resolving disputes efficiently and

furthering social policies, neither of those factors definitively weigh against the reasonableness of

exercising personal jurisdiction over Chadwick in the District of Maryland.

In sum, because Chadwick has had sufficient minimum contacts with the United States,

and the FTC has nationwide power of service of process, it would not violate his due process rights

for the Court do exercise personal jurisdiction over him.

### III.    Analysis

#### *A.  Legal Standards for Preliminary Injunction*

Before granting a preliminary injunction under Section 13(b) of the FTC Act, 15 U.S.C.

§ 53(b), a court must (1) consider the likelihood that the FTC will succeed on the merits of the

case, and (2) weigh the appropriate equities. *AmeriDebt*, 373 F. Supp. 2d at 563 (citing *FTC v.

Food Town Stores, Inc.*, 539 F.2d 1339, 1343 (4th Cir. 1976)). The FTC does not need to

demonstrate the likelihood of irreparable harm in order to obtain a preliminary injunction. Because

its Motion is brought pursuant to a statute that authorizes injunctive relief, irreparable harm is

presumed. *See F.T.C. v. Consumer Defense, LLC*, 926 F.3d 1208, 1212–13 (9th Cir. 2019) (citing *F.T.C. v. World Wide Factors, Ltd.*, 882 F.2d 344, 346–47 (9th Cir. 1989)).

At the preliminary injunction stage, the FTC demonstrates the likelihood of success on the merits if it "'shows preliminarily, by affidavits or other proof, that it has a fair and tenable chance of ultimate success on the merits.'" *AmeriDebt*, 373 F. Supp. 2d at 563 (quoting *F.T.C. v. Beatrice Foods Co.*, 587 F.2d 1225, 1229 (D.C. Cir. 1978)).

In balancing the public and private equities associated with deciding to impose a preliminary injunction, the public interest is given greater weight. *See id.* at 564 (citing *F.T.C. v. World Travel Vacation Brokers, Inc.,* 861 F.2d 1020, 1030 (7th Cir. 1988)). Indeed, the Fourth Circuit has suggested that any potential private injuries that may be caused by granting a motion for preliminary injunction "are not proper considerations for granting or withholding injunctive relief under Section 13(b)." *See id.* (citing *Food Town Stores,* 539 F.2d at 1346).

### B. Legal Standards for Liability on FTC's Claims against Defendants

#### i. Liability for Violations of FTC Act

Section 5 of the FTC Act bars "unfair or deceptive acts or practices in or affecting commerce." 15 U.S.C. § 45(a). An individual may be found liable under Section 5 if it or he

> (1) participated directly in the deceptive practices *or* had authority to control those practices, and (2) had or should have had knowledge of the deceptive practices. The second prong of the analysis may be established by showing that the individual had actual knowledge of the deceptive conduct, was recklessly indifferent to its deceptiveness, or had an awareness of a high probability of deceptiveness and intentionally avoided learning the truth.

*F.T.C. v. Ross*, 743 F.3d 886, 892 (4th Cir. 2014).

As to the second prong, "the degree of participation in business affairs is probative of knowledge." *F.T.C. v. Innovative Mktg., Inc.*, 654 F. Supp. 2d 378, 387 (D. Md. 2009) (quoting

*F.T.C. v. Amy Travel Serv., Inc.*, 875 F.2d 564, 574 (7th Cir. 1989)) (internal quotation marks omitted).

### ii.   Liability for Violations of Telemarketing Sales Rule

In addition to claiming that all the SBE Defendants violated the FTC Act, the agency also alleges that they violated the Telemarketing Sales Rule ("TSR"), which prohibits deceptive telemarketing acts or practices. 16 C.F.R. § 310.3. Among other prohibitions, the TSR forbids sellers and telemarketers from misrepresenting, directly or by implication, "[a]ny material aspect of the performance, efficacy, nature, or central characteristics of goods or services that are the subject of a sales offer," or "[a]ny material aspect of an investment opportunity including, but not limited to, risk, liquidity, earnings potential, or profitability." *Id.* at §§ 310.3(a)(2)(iii), (vi).

The TSR also provides that any person, defined as "any individual, group, or unincorporated association, limited or general partnership, corporation, or other business entity," 16 C.F.R. § 310.2(y), who "provide[s] substantial assistance or support to any seller or telemarketer when that person knows or consciously avoids knowing that the seller or telemarketer is engaged in any act or practice that violates §§ 310.3(a), (c) or (d), or § 310.4" of the TSR has committed a "deceptive telemarketing act or practice" and violated the Rule itself or himself. 16 C.F.R. § 310.3(b). The standard for individual liability under the TSR is the same as the standard for individual liability under the FTC Act. *See* 15 U.S.C. § 57a(d)(3); *see also*, *F.T.C. v. WV Universal Mgmt., LLC*, 877 F.3d 1234, 1240 (11th Cir. 2017) (holding that "by violating the TSR, [the defendant] violated the FTC Act and is subject to its penalties.").

### iii.   Liability as a Common Enterprise

The FTC has alleged that all Defendants, save for AIBL, operated as a common enterprise under the umbrella of "Sanctuary Belize Enterprise" ("SBE"). "[W]here corporate entities operate

18

together as a common enterprise, each may be held liable for the deceptive acts and practices of the others." *FTC v. Grant Connect, LLC*, 763 F.3d 1094, 1105 (9th Cir. 2014); *see also Rowe v. Brooks*, 329 F.2d 35, 39-40 (4th Cir. 1964) (noting that joint ventures operate like a partnership, wherein partners have joint and several liability for losses incurred in furtherance of common enterprise). To determine whether a group of defendants operated as a common enterprise, courts "look to a variety of factors, including: common control, the sharing of office space and officers, whether business is transacted through a maze of interrelated companies, the commingling of corporate funds and failure to maintain separation of companies, unified advertising, and evidence which reveals that no real distinction existed between the Corporate Defendants." *CFTC v. Noble Wealth Data Info. Servs. Inc.*, 90 F. Supp. 2d 676, 691 (D. Md. 2000) (quoting *FTC v. Wolf*, No. 94-5119, 1996 WL 812940, *7 (S.D. Fla. Jan. 31, 1996) (citations omitted). FTC Act liability for members of a common enterprise is joint and several. *See, e.g.*, *FTC v. Pointbreak Media, LLC*, No. 18-61017-CIV, 2019 WL 1650101, *6 (S.D. Fla. Apr. 4, 2019).

### iv. Liability for Monetary Relief under the FTC Act

Once the FTC establishes an enterprise's liability for misrepresentations to consumers pursuant to Section 5 of the FTC Act, the enterprise is liable for restitution if the FTC shows consumer reliance. "[C]onsumer reliance on express misrepresentations" is "presumptively reasonable." *F.T.C. v. Five-Star Auto Club*, 97 F. Supp. 2d 502, 528 (S.D.N.Y. 2000). Reliance is presumed if "(1) the business entity made material misrepresentations likely to deceive consumers, (2) those misrepresentations were widely disseminated, and (3) consumers purchased the entity's products." *FTC v. Loma Int'l Bus. Grp. Inc.*, No. 11-cv-1483, 2013 WL 2455986, at *7 (D. Md. June 5, 2013). As to all the misrepresentations the Court now discusses, there is firm evidence that they were widely disseminated and material, and that many consumers purchased the lots.

19

## C. *Likelihood of Success on the Merits of the FTC's Alleged Six Core Deceptive Marketing Practice Claims*

The FTC submits that it has presented ample evidence that it is likely to succeed on the merits of its FTC Act and its TSR claims against the SBE Defendants, which is to say that it has a fair and tenable chance of succeeding. The Defendants who have challenged the entry of the preliminary injunction, namely Pukke and Baker, disagree. For the reasons that follow, the Court finds that the FTC has met its burden of showing it has a fair and tenable chance of success on the merits as to the FTC Act claims.[14]

The Court considers first the facts that tend to show that SBE misled consumers with respect to each of the six Core Claims the FTC raises, as well as the overarching falsehood that Pukke was not continuously involved as a controlling operative in the venture.

### i. "No Debt" = No Risk

The evidence shows that SBE sales representatives told consumers that Sanctuary Belize had or would have no debt and was therefore a particularly safe investment. PX 814 ¶ 27. They told consumers, repeatedly during telemarketing calls and face-to-face. PX 254 ¶¶ 12-14, 16; PX 196 ¶ 11; PX 204 ¶ 3 Att. 3 at 6; PX 207 ¶ 4 Att. 2; PX 203 ¶ 15; that their so-called "no debt" model was a safer and more reliable way to complete the development than using lender financing. PX 814 ¶ 27; PX 254 ¶ 10; PX 198 ¶¶ 6, 36; PX 186 ¶ 6; PX 187 ¶ 2; PX 181 ¶¶ 6, 13; PX 202 ¶¶ 5, 12; PX 193 ¶ 23; PX 191 ¶ 23; PX 188 ¶¶ 7, 18; PX 184 ¶¶ 5, 15; PX 194 ¶¶ 3, 20; PX 195 ¶¶ 3, 19; PX 182 ¶ 20; PX 183 ¶ 20; PX 196 ¶ 11; PX 255. SBE telemarketers explained to consumers that the no-debt model made the development a safe investment because there was no risk of, for

---

[14] As indicated in Section III.D, *infra*, the Court defers making any finding as to the alleged TSR violations at this time.

20

instance, bankruptcy or foreclosure by a lender, such that there was "absolutely no way" for consumers to lose their money. PX 297 ¶ 45; PX 335 at 28:9–29:8.

The evidence strongly suggests those representations were and are false. The FTC's expert Richard Peiser, the Michael D. Spear Professor of Real Estate Development at the Harvard University Graduate School of Design,[15] testified that, quite to the contrary, the absence of conventional lender financing creates a substantial risk in the development of a planned community, PI Hrg Tr. 55, 3/12/19 am. This is so for two main reasons. First, it is normally "hard or impossible" to have sufficient front-end cash and sustained cash flow thereafter sufficient to fund infrastructure, construction, and operation of large-scale amenities until such time as the amenities have attained a positive cash flow without outside financing. PX 1 ¶¶ 20, 41–42. In consequence, consumers face risks from unpredictable lot sales, erratic cash flow, the pace of home construction, possible delay of projects that require large up-front cash expenditures, and a possible downward spiral in which delays in development further depress cash flow. PX 1 at 1; PI Hrg Tr., 3/12/19 Morning, 55:21–24. The suggestion, of course, is that this is precisely what happened with Sanctuary Belize.

Second, traditional lenders who finance real estate developments actually provide greater security for consumers because they typically undertake underwriting, due diligence, and continuing monitoring functions that reduce the risks for the consumer. PX 1 ¶ 28; PI Hrg Tr., 3/12/19 Morning, 58:13–60:25. Legitimate developers rarely, if ever, employ a "no debt" real estate development model simply because it has such a high risk of failure (in Professor Peiser's

---

[15] Given Professor Peiser's credentials and extensive experience studying and developing planned communities, the Court found him to be a particularly persuasive witness.

21

research and estimation, upwards of 90%). PX 1 ¶ 42; PI Hrg Tr., 3/12/19 Morning, 57:7–15. In the present case, Professor Peiser concluded, the "absence of financing suggests it was unavailable rather than undesired." PX 1 ¶ 29.

Even allowing that some SBE principals, untested in the world of real estate development, may not have understood that the no-debt model was and is in fact risky, they were arguably recklessly indifferent to their deceptions or had an awareness of the high probability of their deceptions and intentionally avoided learning the truth. For the glaring fact was and is that, historically, SBE has actually had to incur debt. It borrowed $4,635,500 from Newport Beach yacht dealer Gordon Barienbrock, PX 816 at 7 (Receiver documenting loan), $2.5 million from Orange County real estate investors Cleo and Violet Mathis through their entity, CVM Corporation, PX 816 at 7 (Receiver documenting loan), and probably more than $1 million from a known Pukke associate, Patrick Callahan, PX 816 at 7 (Receiver discussing likely "loan"). The existence of these debts fortifies the FTC's fair and tenable chance of proving the falsity of SBE's "no debt" claim, even in the face of SBE's questionable claim that "no-debt" only meant that the Reserve was not subject to risks from creditors calling in their debts, which in and of itself is a misleading statement. Since there were creditors, they would most certainly have been at some time or another quite able to call in their loan.

The Court finds these apparent false claims were material to many consumers who chose to invest in Sanctuary Belize. *See, e.g.*, PI Hrg Tr., 3/11/19 Morning, 49–50 (Sanctuary Belize lot purchaser Michael Doran testifying that SBE's "no debt" financing model and purported lower risk were "significant" in convincing him and his wife to purchase a lot because "we obviously want to do something where it incurred the least amount of risk possible for us"); *see also* PI Hrg Tr., 3/11/19 Afternoon, 83:19–84:20 (testimony of Sanctuary Belize lot purchaser Michael

Warren); PI Hrg Tr., 3/19/19 Afternoon, 71:8–14 (testimony of Sanctuary Belize lot purchaser Nancy Cunningham). The FTC has a fair and tenable chance of prevailing on this claim.

## ii. Every Dollar of Revenue Reinvested in Development

SBE telemarketers and principals also told consumers that because of their "no debt" model, every dollar the developer collected from sales lots would go back into the development. *See* PX 254 ¶¶ 20–24 (compiling evidence from seventeen sources showing that SBE made this claim in consumer declarations, telemarketer declarations, SBE scripts, webinars, emails, and other SBE marketing communications). PX 198 ¶ 6, 36; PX 186 ¶ 6, 26: PX 187 ¶ 2; PX 181 ¶ 6, 14; PX 202 ¶ 5, 13; PX 193 ¶ 23; PX 191 ¶ 23; PX 188 ¶ 18; PX 184 ¶ 15; PX 194 ¶ 20; PX 195 ¶ 19; PX 182 ¶ 20; PX 183 ¶ 20; PX 205 ¶ 4, 16; PX 203 ¶ 15; PX 295 at 1; PX 310 at 27:22–28:3. SBE's telemarketers represented that this purported aspect of the development also made investment in the Reserve less risky. PX 205 ¶ 16.

The evidence firmly suggests that those claims were and are also false. The Receiver has confirmed in reports to the Court that SBE used only 14% of consumers' money to cover construction costs while, along the way, always behind-the-curtains, Pukke appears to have diverted about 12.8% of that money, some $18 million, for his own benefit. *See* ECF Nos. 219, 513 (Receiver's Reports). Beyond normal costs spent on developer salaries and marketing, both Professor Peiser and Pukke's own expert, Eric Sussman,[16] testified that the percentage of revenue that should go into development should be more than 30%. Professor Peiser testified that 70-80% of hard costs should be spent on development. PI Hrg Tr., 3/12/19 Afternoon, 77:14-79:19. Mr. Sussman testified that spending 30% of costs outside of SG&A (i.e., costs being put into the

---

[16] The Court found this part of Mr. Sussman's testimony to be especially persuasive.

development of the property) would strike him as a low percentage for the SBE project. PI Hrg Tr., 3/22/19 Morning, 77:7–79:22. But again, the percentage of revenue that went into development at SBE was 14%, far below the levels recommended by either of the experts.

Baker has admitted that SBE diverted funds to pay for his personal living expenses unrelated to the development. PI Hrg Tr., 3/15/19 Morning, 7:18-10:15. Costanzo has confirmed that, while working for SBE, he had reason to believe that Pukke was diverting funds to his own use and that significant sums of money received from lot sales were not being passed on to the development, even while consumers continued to be told that every dollar the developer collected from lot sales was going back into development. PX 814 ¶¶ 32-33. SBE also apparently transferred $4 million to John Vipulis, a Relief Defendant. PX 250 ¶ 8(r); PX 816 at 6.[17]

The record also shows that, in a series of transactions between 2011 and 2015, Relief Defendant Chittenden (Pukke's putative wife and mother of two of his children), and one of the companies she controlled, "Beach Bunny Holdings," sent and received hundreds of thousands of dollars to and from bank accounts in the name of Defendant GPA. PX 250 ¶ 8(c)-(d). Banking records also show that between 2012 and 2015, Chittenden received $402,500.00 in her personal account from GPA. PX 816 at 11, Ex. 9. Chittenden also held nearly $2 million in investments, in various companies, that were funded by entities currently under the control of the Receiver. *Id.* at 11. Chittenden has indicated she had little or no knowledge of these transactions and has stated that, apparently in most instances, her signature was forged. It is a fair inference that Pukke, or someone acting on his behalf, was very likely the hand behind most if not all of the Chittenden transactions.

---

[17] Vipulis, as indicated, has settled his case with the FTC and has paid the funds to the Receiver. *See infra* n. 2.

In two series of transactions, the first completed between July 2012 and March 2014 and the second between May 2014 and March 2018, nearly $700,000 in accounts in the name of Defendants GPA, FDM, and Eco Futures Development were transferred to accounts controlled by the Estate of John Pukke, Andris Pukke's father. PX 250 ¶ 8(e)-(f). The Estate of John Pukke then transferred the money from SBE consumers to various Pukke family members and associates. PX 250 ¶ 8(v)-(w); PX 48 at 9, 15, 39, 67, PX 250 ¶ 8(m), 8(z). Were this not enough, the evidence also shows that SBE funded renovations to Andris Pukke's personal residence in California, including payments made to a local contractor whose invoices contained a memo line referencing Pukke's California address. PX 250 ¶ 8(dd); PX 254 ¶ 74; PX 816 at 6; PX 208 ¶ 8. Other SBE funds went to various expenses that obviously had nothing at all to do with completing the Sanctuary Belize development, including $6,000 for Stanley Cup professional hockey tickets, $1,400 for tickets to an Eagles concert, and $1,200 for tickets to the "Triple Ho Show" music festival, as well as payments to cosmetic dentists whose offices were located near Newport Beach, California. PX 250 ¶ 9: PX 251; PX 250 ¶ 8(i); PX 254 ¶ 102; PX 290; PX 291. The list goes on. The evidence also shows that Pukke, Baker, Greenfield, and Kazazi all had Sanctuary Belize debit cards they used for groceries, gas, restaurants, personal travel, and cash withdrawals. PX 208 ¶ 8.

The claims that every dollar from sales would go back into development, incontrovertibly false, were material to at least some consumers. *See, e.g.*, PI Hrg Tr., 3/11/19 Morning, 59:9–19; PI Hrg Tr., 3/11/19 Afternoon, 99:12–18; PI Hrg Tr., 3/19/19 Afternoon, 70:24–71:5.

The FTC has a fair and tenable chance of prevailing on this claim.

iii.    2-5 Year Completion Timeline

During consumer tours in Belize as early as 2008, SBE employees, including Chadwick and Usher, promised consumers that the Sanctuary Belize development would be completed within

25

a specific time frame: within two years, sometimes within five years. PX 182 ¶ 18 (on a tour in 2013, Chadwick promised "within two years"); PX 195 ¶¶ 7–10 (on a tour in 2008, Usher promised "within two years"); PX 197 ¶ 6 (SBE representatives promised completion within five years). Indeed, many consumers who returned to Sanctuary Belize after buying plots and who expressed concern about the progress of the development "would frequently state that their sales person had told them the entire development would be complete within two to five years." PX 814 ¶ 39. Beginning at least in 2006, SBE provided timelines for completion to consumers of about two to five years. PX 396; PX 397; PX 398. PX 205 ¶ 17. PX 814 ¶ 38. That claim was also important to several consumers and influenced their decisions to purchase. *See, e.g.*, PI Hrg Tr., 3/11/19 Afternoon, 84:21–85:6; PI Hrg Tr., 3/11/19 Afternoon, 99:19–100:15; PX 196 ¶ 40, Att. 21 at 10.

Most definitely, Sanctuary Belize was not finished within two to five years, and it is undisputed that, as of the present, August 2019, more than thirteen years after the first sale occurred, the development is not complete. PX 297 ¶ 72; PX 363; PX 254 ¶ 79; PX 181 ¶ 10; PX 195 ¶¶ 21, 29; PX 188 ¶¶ 22, 25, 43–45; PX 200 ¶¶ 30–32; PX 196 ¶¶ 48; PX 184 ¶ 33. To date, less than ten percent of lot sales have led to completed homes, and several promised amenities are either incomplete, have never been started, or have been totally abandoned. *Compare* PX 816 at 21 (identifying 1,314 lots sold beginning in 2009) with PX 223 ¶¶ 8–11 (considerably fewer than 100 completed homes based on pre-filing analysis); ECF No. 347-2 (Mar. 22, 2019) at 1 (proposed intervenors' filing claiming there are "over 40 completed homes" and "40 in various stages of construction"); DX-AP-01 at 5 (claiming "over 50" homes). It is true that some amenities have been built, including a restaurant, a sundry store, a gas station, a pool, and two bars. PI Hrg Tr., 3/15/19 Afternoon, 86:22–87:11 (listing amenities that had been constructed at Sanctuary Belize); Sussman Expert Report, DX AP 1 at 3–4. But, other promised amenities, e.g. the American-style

26

At this stage, the Court is not required to make a finding as to how much money, more or less, it might take to "complete" the Sanctuary Belize development. Whatever amenities might be counted in order to complete the development and whatever their likely cost would not change the fact that SBE Defendants over a period of some 12 years, appear to have falsely promised that construction would be accomplished in two to five years. The FTC has shown a fair and tenable chance it will succeed on the merits of showing the falsehood of this claim.

iv.    Development of Luxurious Amenities

SBE repeatedly told consumers that the completed development would boast extraordinary amenities comparable to those of a small American city, including infrastructure roughly equivalent to what consumers would expect in the United States. PX 254 ¶¶ 30–54, 83; PX 196 ¶¶ 11:7, 25; PX 200 ¶ 34; PX 198 ¶¶ 17, 34; PX 307 at 22:6–21, 27:5–13, 27:25–28:17, 42:17–19; PX 324 at 44:13–46:23, 35:8–24; PX 181 ¶ 19; PX 183 ¶ 23. Amenities such as these were central to SBE's claims that the lots' value would skyrocket. PX 188 ¶ 21; PX 203 ¶ 12; PX 297 ¶ 23, Att. 10 at 59:12–60:7. Costanzo testified that SBE's sales and video presentations showed consumers that Sanctuary Belize's amenities would include numerous shops, restaurants, condominiums, entertainment venues, and a hotel, as well as an American-style supermarket and American-quality hospital.[19] PX 814 ¶ 34. Since 2008, SBE has signaled no caveats or disclaimers suggesting some amenities might not be built. *See, e.g.*, PX 198 at Att. 3 (Sanctuary Belize "Vision Book"); PX 254

---

[19] As to the American-quality hospital. *See, e.g.*, PX 814 ¶ 36; PX 181 ¶ 24; PI Hrg Tr., 3/11/19 Morning, 85:2–17; DX-AP-344. Pukke's attorneys argued at the Preliminary Injunction hearing that a reasonable consumer would understand that a hospital would have to be approved by the Belizean Government, perhaps with the support of SBE, and that to the extent that Government approval might not have been forthcoming, SBE should not be faulted. Regardless, consumers at some point or points were still promised at least an onsite medical clinic, which has never been completed, if not altogether abandoned. PX 254 ¶ 81. Professor Peiser testified that building an American-quality medical facility in remote Southern Belize would not be economically feasible in any case. PX 1 ¶¶ 71, 282–325.

¶¶ 85–89; PX 277 at 12, 15–16; PX 198 ¶¶ 7:4 at 39, 7:3 at 20, 55, 82, 84, 89, 95, 97; PX 205 ¶ 17:15; PX 186 Att. 3 at 00:53:55–00:54:00, 1:23:05–1:23:30; PX 188 ¶ 21; PX 205 ¶ 17; PX 203 ¶ 10; PX 184 ¶ 6; PX 186 ¶ 9; PX 204 ¶ 3:3 at 5; PX 194 ¶ 4; PX 195 ¶ 4; PX 278. PX 297 ¶ 45; PX 335 at 28:9–29:8 (emphasis added). Specifically, the promised hospital and/or medical clinic have not been built. PX 254 ¶ 81. Nor has any hotel, let alone smaller lodges or "eco-experience hotels" that SBE marketed been built. PX 254 ¶ 87; PX 277 at 15–16; PX 198 ¶ 7:3 at 20, 55, 82, 84, 89, 95, 97; PX 205 ¶ 17:15. PX 254 ¶ 81.

SBE also promised consumers entertainment features, including an 18-hole golf course. Specifically, SBE told FTC professionals posing as consumers that the golf course was "under construction... about 15 minutes away." PX 297 ¶ 23; PX 307 at 34:15–21. No golf course has been built at Sanctuary Belize, PX 254 ¶ 81, although early SBE marketing materials claimed that by 2008 the development would have a golf course. PX 396; PX 624.

Other promised amenities, yet to materialize, have included an international airport and an on-site airstrip. PX 254 ¶¶ 43–45, 86; PX 184 ¶¶ 7, 12; PX 181 ¶ 22; PX 188 ¶¶ 6:2 at 1, 21–22; PX 193 ¶ 27; PX 191 ¶¶ 24, 26; PX 198 ¶ 18; PX 186 ¶ 9; PX 277 at 12; PX 203 ¶ 12; PX 205 ¶¶ 17:14 at 4. PI Hrg Tr., 3/11/19 Morning, 53–54 (lot purchaser testifying that SBE representatives claimed that a private airstrip was being built). There is, however, no airstrip for private aviation within the development. PX 254 ¶ 81. Although construction at one point started on nearby Placencia International Airport, it was never completed. PX 203 ¶ 7. Nevertheless, years after construction had stopped, SBE appears to have held out that the airport would be completed imminently. PX 188 ¶ 22; PX 181 ¶ 22.

SBE has also promoted "Marina Village" as the development's commercial center, including boutique shops, restaurants, cafes, and an American-style grocery store. *See, e.g.*, PI Hrg

29

Tr., 3/11/19 Morning, 51 (lot purchaser testifying that SBE marketed a promised Marina Village); PX 277 at 15–16; PX 183 at 62; PX 817 at 58. PX 188 ¶¶ 23–24; PX 254 ¶¶ 46–49; PX 182, Att. 1; PX 183 ¶¶ 3, 4 Atts. 1, 2; PX 186 ¶¶ 11, 12 and Atts. 5, 6; PX 194 ¶¶ 7, 11–14; PX 195 ¶¶ 7–12 and Atts. 3, 4; PX 196 ¶ 14. SBE has also claimed that other community institutions would be featured in Marina Village, such as a church, a school, and a post office. PX 205 ¶ 17; PX 198 ¶ 7, Att. 3 at 55.

From the beginning Marina Village has consistently been highlighted as a prime selling point to consumers, never accompanied by caveats, disclaimers, or other indications that completion of the amenity was uncertain, never with a suggestion that a complete Village was merely an "aspiration." *See, e.g.*, PX 277. As of today, however, years down the road, there is no "Marina Village" nor is there a downtown commercial core with the promised commercial space housing cafes, bistros, upscale restaurants, boutiques and high-end shopping, a gym, and spa. PX 254 ¶¶ 81, 89; PX 277.

Another marketing promise dwelt upon extensively at the Preliminary Injunction hearing was that SBE would provide a 250-slip "world class" marina. *See* PX 254 ¶¶ 50–53; PX 196 ¶ 14; PX 198 ¶ 7; PX 184 ¶ 6; PX 203 ¶ 10; PX 204 ¶ 3:3 at 17; PX 205 ¶¶ 17:14 at 6, 17:15 at 1–2; PX 257 at 9–10; PX 307 at 13:2–7, 59:22–60:7; PX 186 ¶ 9; PX 191 ¶¶ 1–10 and Att. 2; PX 203 ¶¶ 7–10; PX 653; PX 752 ¶ 10; PX 788 ¶ 8; PI Hrg Tr., 3/11/19 Morning, 51 (lot purchaser testifying that SBE representatives had advertised that Sanctuary Belize would include a deep water marina); PX 183 at 60; PX 817 at 54. PX 297 ¶ 23; PX 307 at 13:5–6. PX 254 ¶ 88; PX 205 ¶ 17; PX 203 ¶ 10; PX 184 ¶ 6; PX 198 ¶ 7, Att. 4 at 39, ¶ 15; PX 186 ¶ 9; PX 204 ¶ 3, Att. 3 at 5. A "world class" marina is one that qualifies for the prestigious Five Gold Anchor certification that The Yacht Harbor Association issues to the world's top marinas. PX 210 ¶ 41; PX 211 ¶ 26; PI Hrg Tr.,

3/22/19 Afternoon, 56:13–18. Although there is some dispute about how many boats the current marina at SBE can presently accommodate, the Court at this stage need only note that it is well short of the 250 slips promised. A Vice-President from IGY, the luxury yacht and marina firm, testified that to "get the marina to 250 slips you would need to triple the size of the existing marina," which would cost a significant amount of money. PX 210 ¶ 40; PI Hrg Tr., 3/22/19 Afternoon, 61:17–62:1. Apart from that, the current structure lacks many features it would need to qualify as "world-class," including but not limited to a boat yard or other repair or maintenance facility, a boat dealership, physical security (other than a guard at the main entrance to the development), and high-end marina-related buildings. PX 211 ¶ 25; PX 210 ¶ 40.

Given SBE's aggressive marketing of all these deluxe amenities to potential lot purchasers over the years and given the considerably less than promised number of features constructed to date, it is clear that the FTC has shown a fair and tenable chance of proving at the merits stage that these material representations violated Section 5 of the FTC Act.

v.   Appreciation in Value

During the tours in Belize, SBE employees would often stress the value of purchasing two lots so that consumers could use the rapid appreciation of the first to make money to pay for the construction of their dream home on the second. PX 188 ¶ 21 (as to two condominiums); PX 297 ¶ 122. PX 186 ¶ 4; PX 184 ¶ 14. PX 814 ¶ 41. For many customers, SBE's claims about lot appreciation were central to its marketing scheme. For instance, an SBE telemarketer told FTC professionals posing as prospective purchasers that, because of the airport, marina, and other amenities, they could expect "around a 300 to 500 percent increase, in three years." PX 297 ¶ 23; PX 307 at 59:12–18. A different SBE telemarketer told undercover FTC investigators "they're [projecting] 250 to 300 percent [appreciation] in the next few years." PX 297 ¶ 20; PX 303 at

54:21–55:1. As late as June 2018, SBE posted marketing material online claiming 400% returns. PX 3 ¶¶ 67–68; PX 155 at 1.

In fact, lots at the Reserve have never begun to appreciate anywhere near as promised, and there was never any basis—none—for SBE to have claimed this. *See, e.g.,* PX 204 ¶ 4, Att. 4 at 27 (SBE employee Charmaine Voss admitted in a text message to an SBE telemarketer that "the claim that the property value will increase by 400% after the airport is built" is "a bunch of horse shit").

The FTC has shown that it has a fair and tenable chance of prevailing on this claim.

vi.   Robust Resale Market

The fact that a substantial number of lot owners have tried to force SBE to buy back their lots and/or have engaged in extensive litigation in the United States and abroad reflects, contrary to SBE's representations, that there have been few opportunities for dissatisfied owners to sell their lots at a profit. PX 297 ¶ 178; PX 466 (most buybacks do not even provide full refunds); PX 184 ¶ 64, Att. 66; PI Hrg Tr., 3/19/19 Afternoon, 78–81. In one instance, consumers who purchased a lot for $119,900 and paid various taxes and HOA fees in the intervening decade agreed to sell their lot for $124,000 on unfavorable terms, including apparently that they finance the sale themselves, because that was the only way to close the sale. PX 194 ¶ 61; PI Hrg Tr., 3/19/19 Afternoon, 78–81. SBE representatives have known that their claims about lot appreciation were false.

In fact, according to record evidence, SBE is alleged to have chilled resale efforts of owners. Some consumers have complained that SBE pushed them to engage Coldwell Banker SB as their sales agent, but said that the company did not evidence a sincere attempt to resell the lots. PX 186 ¶ 68; PX 297 ¶ 139; PX 419. Allegedly, some SBE employees or others acting on their

behalf even tore down "for sale" signs that owners had put up on their properties and prevented or severely limited prospective purchasers from entering the property to view lots owners wanted to resell independently. PX 197 ¶ 27; PX 194 ¶ 58; PX 202 ¶ 71, Att. 29.

Bottom line: the FTC has a fair and tenable chance of prevailing on this claim.

vii.    Liability for Misrepresentations of Core Marketing Claims

Just one widespread material representation, which consumers who purchased lots may be presumed to have relied upon, would establish liability under Section 5 of the FTC Act. But, as just discussed, each Core Claim discussed so far would seem to involve one or more misrepresentations. At this stage of the proceedings, then, on the facts portrayed above, the Court is able to easily conclude that there is a fair and tenable chance the FTC will be able to prove that each core claim was and is false. The Court finds that each of the "core claims" was material. Not only in many instances were they expressly made,[20] several consumers expressly testified that the claims were important to their ultimate decisions to purchase lots. *See* Section III.C, i-vi, *supra*.

### D.  Telemarketing Sales Rule (TSR)

Pukke's attorneys argue that SBE's activities qualify for the exemption to the TSR that excepts sales activity when payment by the consumer is not made until after a face-to-face sales presentation and sales are not completed until after a face-to-face sales presentation. The evidence from the hearing, they assert, shows that almost all purchasers did not pay a dime for their lots until after they had traveled to Belize and inspected them. The non-binding lot reservation fee, the

---

[20] *See In re Thompson Medical Co., Inc.*, 104 F.T.C. 648, 816 (1984) ("Express claims, or deliberately-made implied claims, used to induce the purchase of a particular product or service are presumed to be material."), aff'd, 79 F.2d 189 (D.C. Cir. 1986).

attorneys submit, does not alter the exempt nature of the conduct, because it was still not converted into a partial down payment until after the sale was complete.

Baker does not address the Telemarketing Sales Rule in his Response in Opposition to the FTC's Motion for Preliminary Injunction, *see generally* ECF No. 216, in his Proposed Findings of Fact, *see generally* ECF No. 446, or in his Response to the FTC's Proposed Findings of Fact and Conclusions of Law, *see generally* ECF No. 470.

The FTC, for its part, asserts, albeit without citation to authority, that TSR exemptions should be narrowly construed. *See* ECF No. 445 at ¶ 835.[21] It points out that most customers paid SBE for the Belize tours in advance of their face-to-face visits but did so based on the telemarketing in the United States, not after face-to-face meetings. At the same time, says the FTC, as a result of the telemarketing, the prospective consumer was and is often given a right of first refusal on a lot. And additionally, some consumers who did not attend the tour in Belize bought their lots from the U.S. sight-unseen.

At this stage, the Court believes it is unnecessary to make a finding as to whether Defendants are liable for violating the TSR, and it declines to do so. It suffices that Court is about to conclude that the FTC has met its burden sufficient to enter a Preliminary Injunction against Defendants as to their purported violations of Section 5 of the FTC Act. Whether it will be necessary to decide Defendants' liability *vel non* in regard to the TSR will be reconsidered at the time of the merits hearing.

---

[21] The FTC also points out that the FTC Act "is a remedial statute [that]… should be construed broadly to effectuate its purposes." *FTC v. AT&T Mobility LLC*, 883 F.3d 848, 854 (9th Cir. 2018) (quoting *Tcherepnin v. Knight*, 389 U.S. 332, 336 (1967)). The corollary to this is that exemptions should be construed narrowly so the remedial effect of the statute can reach broadly.

## E. Pukke's Involvement and Liability

The FTC alleges that at all times relevant Pukke (a) has controlled the operations of SBE, and (b) has directly participated in, directed, and/or had knowledge of the totality of deceptive conduct at issue in this case.

As Baker testified, he and Pukke were the original partners in the Sanctuary Belize development when the developer was Dolphin Development, and they continued their partnership after Pukke's eventual settlement with the Receiver in the *AmeriDebt* litigation. PI Hrg Tr., 3/13/19 Afternoon, 12:4–13:14; *see also* PX 358 (identifying original directors and owners of Dolphin); PX 370 (collecting early board of directors minutes for Dolphin, showing Pukke's control and presence); PI Hrg Tr., 3/13/19 Afternoon, 26:18–27:6; *id.* at 10:14–20 (Baker testifying that Pukke was "my partner"); *id.* at 27:4 (Baker and Pukke entered into an "equal partnership"); *id.* at 43:21–24 ("How do I know [Pukke's] the partner? Per our agreement in 2009 where he became my partner"); *id.* at 45:15–20 (describing Pukke as his "partner" in connection with Global Property Alliance, one of the SBE's marketing entities); *see also id.* at 27:13–18 ("[Pukke]—per his suggestion and per his—I would say it was per his—his terms were that it would be considered as sweat equity, that his 30 percent would be considered sweat equity, and that I would hold his shares until such time that he—that the development was, call it, in profit phase."). PX 627; PX 203 ¶ 8; PX 205 ¶ 9.

And, from all appearances, Pukke in fact did control all aspects of SBE's operations, including communications with lot owners about corporate structure, legal affairs, lot ownership structure, dissolution of SBE-related entities, payments for equipment shipped to Belize, review of lot sale contracts, authorization of commissions for telemarketers, dealing with consumers who wanted to sell their lots, dealing with the taxes of SBE entities, and addressing HOA fee disputes.

35

Also: Pukke was involved in making design decisions, choosing office space, making rent payments, deciding raises for SBE employees, and reviewing architectural plans. PX 208 ¶¶ 5–8, 13; PX 429–430; PX 435; PX 438–441; PX 451–454.

The FTC claims that Pukke directed all financial and operational matters for the SBE Defendants while maintaining an ownership stake of at least 29% in the development. PX 816 (Receiver's Report ECF No. 219, Exhibit A at pp. 3–5). The FTC also claims that Pukke directed several individual Defendants to act on behalf of SBE, including Greenfield, Chadwick, and Kazazi. PX 203 ¶ 8; PX 205 ¶ 9; PX 297 ¶ 157, Atts. 156–157; PX 442–443; PX 297 ¶ 326, Att. 349; PX 635; PX 210 ¶ 4 ("Andy Storm," a/k/a Andris Pukke directed that marina management conversations should be with Kazazi).

Although Pukke claims he has had "no role in control or ownership of the Parcel since 2006 at the latest," Pukke's Findings of Fact, ECF No. 448 at ¶ 100,[22] the FTC submits that powerful evidence belies this. Pukke, for instance, countermanded an attempt by John Usher to seize control of the Parcel in 2016, which clearly tends to show Pukke's continued control over the Reserve. PI Hrg. Tr., 3/13/19 Afternoon, 83:17–84:19 (describing meeting in 2016 in which Usher accused Pukke of taking $24 million out of the development); PI Hrg Tr., 3/13/19 Afternoon, 85:4–12 (Baker, on his and Pukke's behalf, travelled to Belize to confront Usher when Usher attempted to wrest total control); PX 836 (email in which Baker recounts his confrontation with

[22] Before referring to what Pukke himself "says" about these allegations, it should be noted that Pukke declined to testify at the Preliminary Injunction hearing, pleading the Fifth Amendment when called to testify (indeed having done the same on deposition and in declining to produce documents). This is a civil proceeding, which would permit adverse inferences as to most if not all the allegations against Pukke. *See Flame S.A. v. Freight Bulk Pte., Ltd.*, 807 F.3d 572, 590 (4th Cir. 2015) (citing *Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976) (holding that, when defendants in a civil case invoke their Fifth Amendment right against self-incrimination, a court may draw "adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them.")). Even so, for present purposes, the Court will consider the arguments made by Pukke's attorneys.

Usher, calling Usher a "thief," and prior email from Usher indicating that Pukke and Baker can run things in Belize directly moving forward); PI Hrg Tr., 3/13/19 Afternoon, 90:13–91:7 (Baker testifying that, following the dispute with Usher, he took a hands-on role in Belize); DX-AP-366 (email exchange among Pukke, Usher, and Baker following the 2016 meeting regarding the plan moving forward, with Pukke and Baker directly controlling activities in Belize).

In addition to maintaining control over the various SBE Defendants, Pukke is alleged to have been heavily involved in the marketing operations related to the Sanctuary Belize development. He provided input on sales presentations given by SBE telemarketers, participated in sales tours in Belize, and negotiated the terms of at least some sales contracts. DX-AP-324 (email from Pukke to a sales manager attaching a sales script, with Pukke writing in the email: "Here it is with a few more tweaks."). Because Pukke personally directed the sales activities, he was almost certainly aware of the content of virtually all the marketing claims those sales activities promoted.

Most notably:

Clearly concerned about the effect of being publicly associated with the Sanctuary Belize development, given his prior criminally fraudulent behavior and expressions of concern by several prospective lot owners, Pukke was at pains to personally instruct SBE staff either to minimize or conceal his involvement with SBE. Brazenly—it is hard to find a gentler term— at different times he operated under the aliases "Andy Storm" and "Marc Romeo" when publicly acting for SBE. PX 203 ¶ 8; PX 485; PX 196 ¶¶ 21-23; PX 207 ¶ 6 Att. 4, 5; PX 210 ¶ 4. For example, during face-to-face negotiations with a marina management company to discuss possible management of the marina being developed at Sanctuary Belize, Pukke was introduced as "Andy Storm." Sometime afterward, the marina management company's representatives who participated in that encounter

37

came to understand that "Andy Storm" was the CEO of SBE. *See* PI Hrg Tr., 3/22/19 Afternoon, 72–73; PX 210 ¶ 4. Then, not without a small dash of drama, the representative of the marina management company testifying at the Preliminary Injunction hearing was asked if he could identify the individual who was sitting in the back of the courtroom, and the witness said that that individual was in fact the man he had been introduced to during the negotiations as "Andy Storm." *See* PI Hrg Tr., 3/22/19 Afternoon, 72:6–10. The Court took judicial notice of the fact that the individual was, indeed, Andris Pukke.

During his participation in sales tours for potential Sanctuary Belize lot purchasers, Pukke would now and again identify himself as "Marc Romeo." PX 207 ¶ 6, Atts. 4, 5; PX 196 ¶¶ 21–23 and Att. 22; PX 207 ¶ 5 and Att. 3 at 1; PX 205 ¶ 5, Atts. 5–8; PX 427 at 155–156 (testimony by Jon Berndsen, a Sanctuary Belize lot purchaser who testified at Pukke's violation of supervised release hearing, *United States v. Andris Pukke*, Crim. No. PJM 10-734, on November 13, 2015 that "Marc Romeo was the person who was making the decision on what would be acceptable and what's not."); PX 196 ¶¶ 21–23.

Other Defendants helped facilitate Pukke's attempts to conceal his identity from consumers. For example, in November 2016, Pukke wrote to Costanzo (himself going by the name Frank Connelly on the email) about the importance of being "more careful" that "only my email shows up, not my name" on external communications. PX 833. Costanzo replied that he would be sure to "take exhaustive measures to create distance [because] careless error [in disclosing Pukke's involvement] could be [a] major setback." *Id.* Baker, as will be discussed in more detail presently, was also aware of Pukke's use of aliases.

38

Pukke's use of the aliases strongly indicates that he knew that disclosing his involvement would deter buyers and, more to the point, that he knew he was engaged in highly questionable marketing tactics. No other deception in Pukke's apparent web of deceptions seems quite as raw.

Pukke's attorneys may dispute the FTC's allegations that he was in control of various SBE Defendants or that he directed and participated in Sanctuary Belize marketing operations. But Baker tells another story. He testified that Pukke became CEO of Sanctuary Belize sales and marketing efforts in or about 2008 and remained in that role until the initiation of the present action by the FTC in 2018. Baker claims that Pukke controlled the marketing and sale of Sanctuary Belize lots to consumers, except for an interlude when Pukke was incarcerated for some eighteen months in connection with the criminal proceeding that grew out of the *AmeriDebt* fraud.[23]

---

[23] In November 2010, Pukke pled guilty to one count of obstruction of justice for concealing from and making false statements to the *AmeriDebt* Receiver concerning multiple assets that should have been turned over to the Receivership estate. *See United States v. Andris Pukke*, Crim. No. PJM-10-734, ECF No. 7 (Signed Plea Agreement). Assets that Pukke pled guilty to concealing from the *AmeriDebt* Receiver included interests in sports gambling websites, bank accounts in Latvia and Lichtenstein, real property in Laguna Beach, California, and interests in Dolphin Development—the original developer of Sanctuary Belize—and Sittee River Wildlife Reserve, a Defendant in the present action. *See id.*, ECF No. 7-1 at 1–5. On May 16, 2011, the Court sentenced Pukke to eighteen months imprisonment and three years of supervised release. *See id.*, ECF Nos. 14, 15.

Pukke was released from custody on September 21, 2012. After his release, but while on supervised release, Pukke petitioned the Court several times for permission to travel to Belize. *See id.* at ECF Nos. 18, 22, 29, 33. While the Court granted one of Pukke's requests to travel to Belize on April 1, 2013, *see id.*, ECF No. 27, it denied all other such requests. *See id.*, ECF Nos. 21, 32, 36.

During that interlude, Chadwick was said to be the one who controlled SBE's marketing and sales operations. Even so, Baker alleges that Pukke and Kazazi still controlled the flow of funds from the SBE Defendants based in California to Eco-Futures Belize, Ltd., the development entity based in Belize. PI Hrg. Tr., 3/13/19 Afternoon, 60:2–67:13, PI Hrg. Tr., 3/14/19 Morning, 115:18–24, 132:19–24; PI Hrg. Tr., 3/15/19 Morning, 5:21–6:5, 6:1–7:3; PI Hrg. Tr., 3/15/19 Afternoon, 21:20–22:7; PI Hrg. Tr., 3/20/19 Afternoon, 72:8–73:14, 75:12; PI Hrg. Tr., 3/21/19 Morning, 52:11–20, 79:3–6, 80:5–13, 98:23–99:2, 109:15–19, 125:24–126:1–16, 130:18–131:20; Baker Dep. Tr., 2/19/19, 102:1–17; 119:25–120:18.

Given the extensive evidence of Pukke's control over SBE, his direction of its marketing strategies, and the deception he and others perpetrated on consumers, not least the concealment of his active involvement in the enterprise, the Court finds the FTC has demonstrated it has a fair and tenable chance that it will succeed on the merits of its claims as to Pukke.

### F. Baker's Involvement and Liability

Baker has held numerous positions of control in several of the entities comprising SBE. From approximately 2003 through 2007, he owned Dolphin Development, LLC—the original

After the Court denied Pukke's fourth request to travel to Belize, the U.S. Probation Office ("Probation") filed a petition asking the Court to find that Pukke had violated the terms of his supervised release by failing to disclose his involvement with, among other entities, Sittee River Wildlife Reserve and Eco-Futures Development, both Defendants in the present case, and also for using the name "Marc Romeo" on corporate disclosure forms related to those entities. *See id.*, ECF No. 38. Pukke countered by moving to dismiss Probation's petition. *See id.*, ECF No. 45. After a hearing on Pukke's violation on supervised release on November 13, 2015, *see id.*, ECF No. 47, the Court ordered Pukke to clarify (a) his use of the name "Marc Romeo" and (b) the extent to which he owned or controlled the various Belizean companies listed in Probation's petition. *See id.*, ECF No. 49. Pukke, through a letter to the Court prepared by counsel, admitted to identifying himself as "Marc Romeo . . . during specific, isolated interactions with prospective lot owners *before* his period of supervised release" but denied that he owned or controlled any of the Belizean entities. *See id.*, ECF No. 50. While the Court stated that it did "not necessarily accept counsel's representation that Mr. Pukke never used the name Marc Romeo during his supervised release," the Court concluded that "with respect to the specific alleged violation in the Petition, there [was] insufficient evidence to support the finding of a violation." *See id.*, ECF No. 51. Accordingly, the Court terminated supervised release as to Pukke on December 9, 2015. *See id.* The Court's decision at the end of the proceeding may well have been ill-founded. Some of the allegations in the Petition on Supervised Release continue to resonate in the present litigation.

developer of the Sanctuary Belize community. Starting in 2003, he was an original Director on the Board of SRWR, eventually becoming Chairman in 2016. PX 358 (Baker as one of the original Directors of SRWR in 2003); PX 370 at 21 (Baker as Director in 2003 seconding Pukke to be SRWR Chairman); PX 568 (Baker as Director in 2004); PX 370 at 24 (Baker as Director in 2005); PX 192 ¶ 3, Att. 24 (Baker as Chairman in 2016). As detailed in section I.A, *supra*, in 2008, Baker negotiated the agreement with the *AmeriDebt* Receiver to purchase the Belizean Parcel for SRWR, raising the $2 million purchase price from third party investor Steven Choi. ECF No. 446, Proposed Findings of Fact by Peter Baker ("Baker Findings of Fact") at ¶ 6. After purchasing the Parcel from the *AmeriDebt* Receiver, Baker turned his attention to developing the Sanctuary Belize community on the property. In 2009, he and Usher formed Eco-Futures Belize, Ltd. ("Eco-Futures (BZ)"), the Belizean corporation that would be responsible for developing Sanctuary Belize. ECF No. 216-1 ¶ 2; PI Hrg. Tr., 3/13/19 Afternoon, 8:16–17, 30:20–24, 34:23–25; 36:1–23, 40:19–20, 41:16–23, 48:23–49:7, 121:21–23; PI Hrg. Tr., 3/14/19 Morning, 113:19–25; PI Hrg. Tr., 3/15/19 Afternoon, 14:11–16:7.

Baker testified that a few months after obtaining control of the Reserve in 2008, he invited Pukke to assist with marketing the Sanctuary Belize development. In the summer of 2008, Baker and Pukke agreed that, in exchange for Pukke assuming control over the Sanctuary Belize marketing and sales operations, Pukke would receive up to 30% "sweat equity" in the companies comprising Sanctuary Belize. PI Hrg. Tr., 3/13/19 Afternoon, 30:25–31:1, 32:24–33:18, 51:2–52:11; PI Hrg. Tr. 3/14/19 Morning, 122:7–123:6; PI Hrg. Tr. 3/15/19 Morning, 4:12–5:20. Baker contends that Pukke assured him that he—Pukke—had not been found liable in *AmeriDebt* and that in the settlement in that case he had admitted to no wrongdoing. PI Hrg. Tr., 3/14/19 Morning, 121:16–19; PI Hrg. Tr., 3/15/19 Morning, 4:12–5:20; PI Hrg. Tr., 3/15/19 Afternoon, 35:11–36:2;

41

PI Hrg. Tr., 3/22/19 Morning, 145:17–21. Baker also claims that his own role in Sanctuary Belize was reduced significantly after the summer of 2008 when Pukke became involved with the development, and that his—Baker's—involvement was minimal from approximately 2008 until 2016, when he became Chairman of the Board of SRWR. PI Hrg. Tr., 3/14/19 Morning, 124:22–125:7; PI Hrg. Tr., 3/15/19 Morning, 57:1–58:12; DX-AP-344; PI Hrg. Tr., 3/22/19 Morning, 144:22–25, 148:7–11; PBX 18 (Second Declaration of Peter Baker) ¶ 8, Ex. 2. During this time period, Baker claims to have been living and traveling back and forth between California and Latvia, visiting Belize only intermittently. *Id.*

But other evidence shows that Baker appears to have been very much involved in the Sanctuary Belize marketing and sales operations during this time. In addition to testifying that he owned Defendant Eco-Futures (BZ), the development company, Baker has stated in an affidavit that throughout this time he also owned Global Property Alliance, Inc. ("GPA"), one of the SBE Defendants responsible for marketing and sales of Sanctuary Belize, even as he continues to assert that Pukke was responsible for those operations. ECF No. 216-1 ¶ 2. Baker also held board positions at SBE Defendants Foundation Development Management, Inc. ("FDM") and Buy International, Inc. ("Buy International") and was the CEO and managing member of Buy Belize, LLC ("Buy Belize"). PX 541; PX 544; PX 688 (Baker listed as CEO of Buy International); PX 538.[24] Further, Baker, individually or through the companies he owned, registered several fictitious

---

[24] Baker contests the FTC's allegations that he owned or served as a director of these entities, asserting that his signature on documents of incorporation for GPA, Buy Belize, and Buy International was forged without his knowledge. Baker Findings of Fact (ECF No. 446) at ¶¶ 24–28. Baker also contends that he was not involved in forming SBE Defendant Eco-Futures Development, Inc. ("Eco-Futures (US)"), which he says was created in October 2016 by Rod Kazazi, who served as the CEO. *Id.* at ¶ 29. Overall, Baker maintains that he was only directly affiliated with Eco-Futures (BZ) and SRWR, neither of which, he says, were involved in marketing or sales. *Id.* at ¶ 31.

business names ("FBN") related to SBE, including "Eco-Futures," "Eco-Futures Belize," "Eco-Futures Development," and "Sittee River Wildlife Reserve HOA."[25]

Continuing:

As SRWR Chairman, Baker attached a history of Sanctuary Belize to the 2016 SRWR Board Meeting Minutes, in which he wrote: "Peter Baker formed Global Property Alliance (GPA) in the US and hired Rod Kazazi, the former Vice President of Finance at American Apparel to head accounting and client concierge. Sales and marketing was lead [sic] by Brandi Greenfield and Luke Chadwick." PX 192, Att. 24 at 13. Baker was a bank signatory for GPA and SRWR, writing in an email in 2016 that the "Companies were in his name." PX 46 at 83 (GPA 5098 account); *id.* at 85 (GPA 5111 account); *id.* at 46 (GPA 5021 account); *id.* at 89 (GPA 5026 account, d/b/a Palmaya Development); *id.* at 101 (GPA 5846 "commissions" account); *id.* at 103 (GPA 6859 account, d/b/a Sittee River Wildlife Reserve); DX-AP-366; PI Hrg Tr., 3/15/19 Afternoon, 22:5–7 (Baker testifying that he wrote this email). Baker at one point also stated and swore to the accuracy of the statement that he was the "Sales Manager of Global Property Alliance Inc. (GPA)" as of 2014. PI Hrg Tr., 3/15/19 Afternoon, 36:13–37:4 (Baker testifying that he had signed a document affirming his role with GPA); *id.* at 38:10 ("I am not denying that I signed it, no.").

In May 2011, Baker signed a lease for office space in Orange County, CA, in his own name, doing business as Eco Futures. Notably, the letter from Baker's broker to the landlord confirmed that the lease was for "my client, *Sanctuary Belize*." PX 161 (emphasis in original). In

---

[25] The Orange County FBN "Eco-Futures" is registered to Baker individually, PX 54. GPA, which Baker admits owning, registered three additional SBE-related FBNs: "Eco-Futures Belize," "Eco-Futures Development," "Palmaya Development," and "Sittee River Wildlife Reserve HOA." PX 55; PX 56; PX 57; PX 58.

November 2012, Baker signed a lease for an office suite leased in the name of GPA, asserting that he was the "President" of GPA. PX 160. An SBE corporate phone directory from this time lists Baker and Pukke together at the top, whereas the rest of the employees are listed below in alphabetical order. PX 455. During this time, Baker also had an official parking spot at SBE's California offices. PX 612.

Baker, moreover, had access to SBE funds, which he used to pay his rent and living expenses even while he says he was trundling back and forth between California and Latvia. PI Hrg Tr., 3/13/19 Afternoon, 10:14–11:4 (describing how he was compensated, including having his rent covered for a $3,000/month townhouse in Newport Beach, California, utilities, food and other personal expenses); Baker Dep. Tr., 2/19/19, 173:5–174:3 (explaining that any statement that he made only $50,000 per year is not accurate and "seems low" because of "things that weren't included in [that estimate] obviously"). Like Pukke, Baker made continuous use of an SBE credit or debit card for personal purchases for himself and his wife. PX 40 (Amazon.com purchase history for Peter Baker); PI Hrg Tr., 3/13/19 Afternoon, 11:8–23 (had use of credit card for Amazon.com purchases); Baker Dep. Tr., 2/19/19, 249:1–21 (confirming that the Amazon.com purchases included personal purchases paid for by the SBE, stating that "99 percent" "[w]ent to Belize for us to use in Belize for our personal needs"). Baker also opened a personal checking account and credit card in Belize, funding the account through transfers of funds from SBE. PI Hrg Tr., 3/13/19 Afternoon, 119:9–120:5 (Baker testifying that this account was funded "from California"); PI Hrg Tr., 3/13/19 Afternoon, 120:14–121:23 (Baker confirming substance of an email exchange in which "Eco Futures Development," with a California address, asserted that Baker was an owner to substantiate wire transfers to his Belizean bank account).

44

In 2016, after commuting between Europe, California, and Belize—though clearly not having relinquished a controlling position in SBE—Baker returned to a more hands-on role in managing the Sanctuary Belize development. When Usher attempted to seize control of the development, Baker along with Pukke reduced Usher's role, and Baker traveled to Belize to assert his and Pukke's control over the enterprise. PI Hrg Tr., 3/13/19 Afternoon, 85:4–12 (Baker, on his and Pukke's behalf, travelled to Belize to confront Usher when Usher attempted to wrest total control); PX 836 (email in which Baker recounts his confrontation with Usher, calling Usher a "thief," and prior email from Usher indicating that Pukke and Baker can run things in Belize directly moving forward); PI Hrg Tr., 3/13/19 Afternoon, 90:13–91:7 (Baker testifying that, following the dispute with Usher, he took a hands-on role in Belize); DX-AP-366 (email exchange among Pukke, Usher, and Baker following the 2016 meeting regarding the plan moving forward, with Pukke and Baker directly controlling activities in Belize). The end result of the dispute with Usher had Baker replacing Usher as both Chairman of SRWR and as Managing Director of Eco Futures (BZ). PI Hrg Tr., 3/13/19 Afternoon, 90:13–16 (became SRWR Chairman in 2016); *id.* at 39:1–11 (took on "Managing Director" role in 2017); PX 192, Att. 24 (2016 SRWR meeting minutes). When Usher subsequently sought to negotiate a new relationship with SBE, it was Baker, along with Pukke, who jointly decided what Usher's newly diminished role within SBE would be. DX-AP-366 (email exchange among Pukke and Baker). Since the FTC initiated the present action, Baker has remained in positions of authority at SRWR and Eco-Futures (BZ).

Despite his protests to the contrary, the evidence strongly suggests that Baker's involvement in Sanctuary Belize marketing efforts since the beginning of the development has been intimate and continuous. He was one of the original marketers of the Sanctuary Belize development prior to the *AmeriDebt* Receivership, having directed marketing activities and having

45

served as the sales contact on marketing materials. PX 611; PX 623. And as early as 2005, he was involved in email communications on sales scripts containing claims that Sanctuary Belize would have a hotel, marina, health center, and equestrian center. PX 362; *see also* PX 634 (Baker email showing there were already lot sales in 2005).

Even as he supposedly took a less active role in SBE and decamped to Latvia in 2009, in a sustained effort to raise additional funds for the development, Baker continued to court potential investors in Europe. PI Hrg Tr., 3/14/19 Afternoon, 124:1–13 (stating that from 2010 to 2016, "I thought to try and get sales marketing or get a company in Europe to—I felt we were missing out on a whole slew of other customers in Europe and I tried, but never materialized getting something going on over there"). PI Hrg Tr., 3/13/19 Afternoon, 9:25–10:12. In 2015, for instance, Baker gave a detailed presentation on Sanctuary Belize to a potential European investor, providing copies of SBE's website and TV campaign. DX-AP-344. Baker's presentation echoed many of SBE's marketing claims, including references to such potential amenities as the marina and hospital, and consisted of promises that the development was expected to be finished within a timeline of three to five years. *Id.* at 9, 21. Baker was also involved in reviewing marketing claims regarding Sanctuary Belize before they could be posted online. DX-AP-343 at 3. More recently, since at least 2017, he has attended and participated in sales tours at Sanctuary Belize, interacting with customers and working to close sales. Baker Dep. Tr., 2/19/19, 134:18–135:22; PX 814 ¶ 24; DX-AP-89 (sales tour spreadsheet identifying "Pete" as one of the closers on a sale and that "Pete" addressed concerns the consumer had regarding the development).

Given his continuous involvement in the web of SBE companies, directly or indirectly, it is hard to conclude that Baker did not know SBE and its people were making any of the six Core Claims the FTC complains of or that he did not know that consumers had significant concerns

about the fact of Pukke's possible involvement in the enterprise. Baker testified that he himself was skeptical and concerned about the representation that every dollar from lot sales was being reinvested in the development. ECF No. 216 at 2–3 (Baker's pleading admitting that Pukke's siphoning of money rendered the "every dollar" claim false). Moreover, as early as 2016, Baker says he suspected Pukke was diverting funds from the enterprise. PI Hrg Tr., 3/13/19 Afternoon, 83:1–84:20 (recounting 2016 allegations he was aware of that Pukke was siphoning money); *id.* at 86:5–21 (Pukke claiming he would address the allegations through an audit, but then never completed the audit); Baker Dep. Tr., 2/19/19, 149:21–151:17 (still not having seen an audit, Baker addressed concerns his wife had that money was being diverted by talking with SBE's accountant in 2018). While Baker has characterized certain of the amenities discussed in SBE marketing materials as only an "aspiration" or "vision" rather than actual promises, that simply has not been true of marketing materials or oral representations by SBE agents, nor does it account for the fact, in sharp contrast to the promises of "no-debt" operations, that financing would actually be needed to finish amenities at the Reserve in timely fashion. PI Hrg Tr., 3/15/19 Morning, 45:4–11 (amenities, such as those in vision book, were just an "aspiration"); DX-AP-344 (presentation provided by Baker seeking financing to be able finish construction of the Marina Village at Sanctuary Belize).

As for rapid appreciation and resale of the lots, although Baker testified to an isolated example of one owner selling a lot for a profit, he also testified that in fact he knew that owners had difficulty selling lots and that few people had resold properties for a significant profit. Baker Dep. Tr., 2/19/19, 344:22–24 ("Oh, it was—there wasn't a lot of people who originally first bought who then flipped for a profit like her."). Baker also admitted that he knew Pukke had used the Marc Romeo alias and that false documents referring to Marc Romeo as a sales manager or SBE

47

officer necessarily were actually referring to Pukke. PI Hrg Tr., 3/15/19 Morning, 67:19–68:10 (Baker admitting he was aware that Pukke used aliases); *id.* at 109:7–13 (the real "[Marc] Romeo was not working with the development. At that time he had switched over from an initial investor to a lot owner only. So he was not involved in the project at all"); Baker Dep. Tr., 2/19/19, 211:1–24 (whenever "Romeo" appeared as actually involved in the development, this was a reference to Pukke under an assumed name).

Baker argues that he has testified under oath and penalties of perjury that filings and bank records showing him having an ownership stake in SBE entities were falsified. That he may say this in no way diminishes the welter of contrary evidence in the record. At a minimum, even if someone else affixed Baker's signature to one or more documents, at this stage at least it can fairly be inferred that, either directly or indirectly, he authorized that to be done or, at a minimum, that he acquiesced to it being done. What is in the record satisfies the requirement at this stage that the FTC has a fair and tenable chance of proving Baker's liability.[26]

### G. *SBE's Liability as a Common Enterprise*

The factors which establish the liability of a common enterprise, *see* Section III.B.iii,[27] *supra*, combine to indicate that the SBE Defendants to a high degree of certainty functioned as such. All SBE entity Defendants have operated from the same address—3333 Michelson Drive in

---

[26] Insofar as Baker has been or may be cooperative and more truthful during the Receiver's efforts to right the ship, *see, e.g.*, PI Hrg Tr., 3/20/19 Afternoon, 62:10–13; 73:7–14; 97:13–24; 98:18–25; 99:15–20, he may yet have a future role to play in connection with the Reserve. That is a matter, however, that rests entirely with the Receiver. At this stage, it suffices to conclude that the FTC has met its burden of showing Baker is properly subject to a Preliminary Injunction.

[27] To determine whether a group of defendants operated as a common enterprise, courts "look to a variety of factors, including: common control, the sharing of office space and officers, whether business is transacted through a maze of interrelated companies, the commingling of corporate funds and failure to maintain separation of companies, unified advertising, and evidence which reveals that no real distinction existed between the Corporate Defendants." *CFTC v. Noble Wealth Data Info. Servs. Inc.*, 90 F. Supp. 2d 676, 691 (D. Md. 2000) (quoting *FTC v. Wolf*, No. 94-5119, 1996 WL 812940, *7 (S.D. Fla. Jan. 31, 1996) (citations omitted).

Irvine, California. PX 816 at 6. All share common control, commingle funds, exchange extensive communications with one another, all share employees. Payments made to one company have been deposited in the bank accounts of others. *See, e.g.*, PI Hrg. Tr., 3/11/19 Afternoon, 105:4–20. Although some entities operated in Belize, they, too, had common employees and there were few, if any, relevant distinctions in their activities. *See, e.g.*, PX 814 ¶ 13. Most importantly, all the Belize-based entities have been answerable to operations in California. PI Hrg Tr., 3/20/19 Afternoon, 71:12–72:6; PX 816 at 6. Bank account records show that the entities transferred funds freely among themselves, maintained bank accounts for other member entities, and deposited checks made out to other member entities. PX 250 ¶ 13 (documenting examples of transfers among the SBE accounts), PX 250; PX 251 (account inventory showing the GPA "DBA" accounts). In his testimony during the hearing, the Receiver explained that it was in fact very difficult to tell which entity an SBE employee worked for, since he found paperwork of several entities spread out on the same desk or nearby desks, and records of multiple entities were interspersed throughout. PI Hrg Tr., 3/20/19 Afternoon, 71:3–6.

To establish that a corporation or common enterprise is <u>liable</u> for deception under Section 5 of the FTC Act, the FTC must prove: (1) there was a representation; (2) "that was likely to mislead consumers acting reasonably under the circumstances"; and (3) the representation was material." *FTC v. Loma Int'l Bus. Grp. Inc.*, No. 11-cv-1483, 2013 WL 2455986, at *3–*4 (D. Md. June 5, 2013); *see also FTC v. Innovative Mktg., Inc.*, 654 F. Supp. 2d 378, 385 (D. Md. 2009). It is "presumptively reasonable" when consumers rely "on express misrepresentations." *FTC v. Five–Star Auto Club, Inc.*, 97 F. Supp. 2d 502, 528 (S.D.N.Y. 2000) (quoting *FTC v. Int'l Computer Concepts, Inc.*, No. 5:94CV1678, 1995 WL 767810, *3 (N.D. Ohio Oct. 24, 1995)). The express material representations likely to mislead consumers in this case are one, some, or all

49

of the previously discussed six Core Claims made by the FTC, as well as the continuing concealment of Pukke's involvement in the project. Although the Court need only find that one representation was material and likely to mislead consumers to hold Defendants liable, the FTC has shown a fair and tenable chance of proving all misrepresentations, for the reasons stated above.

## H. *Defendants Who Have Not Stipulated to the Preliminary Injunction*

Apart from Pukke and Baker, the only individual SBE Defendants who have not stipulated to the entry of the preliminary injunction are Chadwick and Usher. Because the Court has found that there is a fair and tenable chance that the SBE entities are likely to be found liable on the merits, Chadwick and Usher will also be deemed liable if they "(1) participated directly in the deceptive practices **or** had authority to control those practices, and (2) had or should have had knowledge of the deceptive practices." *FTC v. Ross*, 743 F.3d 886, 892 (4th Cir. 2014). For the reasons that follow, the Court will grant the FTC's Motion for Preliminary Injunction as to both of them.

### i. Luke Chadwick

Chadwick has served as a director of SRWR, the nonprofit that controls the parcel on which Sanctuary Belize has been developed. He has also been an owner or officer of SBE Corporate Defendants Prodigy Management Group, LLC ("Prodigy"),[28] Southern Belize Realty, LLC ("SBR

---

[28] Prodigy is a corporate entity through which the SBE Defendants compensated Chadwick. PX 297 ¶ 282; PX 589; PX 590; PX 591. Chadwick controlled Prodigy, as evidenced by a joint venture agreement it undertook with a third party. PX 642.

(NV)"),[29] Belize Real Estate Affiliates, LLC ("BREA (NV)"),[30] and Exotic Investor, LLC ("EI (NV)").[31]

Chadwick was heavily involved in SBE marketing and sales efforts. As a physical presence in California, he managed SBE telemarketers who promoted Sanctuary Belize to prospective consumers. PX 496 (identifying Chadwick as a principal "responsible for the development and implementation of many new sales and marketing initiatives"); PX 814 ¶ 22 (Costanzo affidavit testifying that Chadwick "had direct authority over a number of telemarketers" in California). Consumers have also asserted that Chadwick gave presentations during Sanctuary Belize sales tours, in which he (a) sang the praises of the development's no-debt model as decreasing the risk of an investment, (b) claimed that all revenue from lot sales would be reinvested in the development, (c) promoted the development's luxury amenities, such as a hospital and hotel, (d) asserted that Sanctuary Belize would be finished within two to five years, and (e) declared the ease with which lots could be resold. PX 183 ¶¶ 18–20, 22, 29–30; PX 184 ¶¶ 12, 14–15; PX 186 ¶¶ 25–30.[32] Chadwick also told potential lot purchasers that Pukke was not involved with Sanctuary Belize. As one consumer stated: In response to his question about Pukke's involvement, "Chadwick looked me in the eyes and replied: 'Absolutely not! He is long gone. Anything you see

---

[29] Chadwick incorporated SBR (NV) in Nevis and is the company's sole owner. PX 297 ¶ 244; PX 553; PX 44. SBR (NV) began operating a Coldwell Banker real estate franchise in 2014 in order to manage the secondary resale market in land and homes at Sanctuary Belize. *Id.* SBR (NV) does business as "Coldwell Banker Southern Belize. PX 593.
[30] Chadwick also completely owns BREA (NV), which he incorporated in 2015 to replace SBR (NV) as the Coldwell Banker real estate franchise responsible for marketing the secondary resale market for Sanctuary Belize. PX 297 ¶ 244; PX 553 at 76–136.
[31] Chadwick completely owns EI (NV), also incorporated in Nevis. PX 297 ¶¶ 250–251; PX 558; PX 559. EI (NV) prepared infomercials promoting Sanctuary Belize to an American audience; for example, an SBE telemarketing sales script mentions that "Luke Chadwick just finished shooting the first 3 episodes of his new TV program called the Exotic Investor which highlights Sanctuary Belize." PX 602.
[32] Chadwick's own declaration states that SBE representatives made these marketing claims to prospective lot purchasers during sales tours of Sanctuary Belize. PX 752 at ¶ 10.

on the internet or hear from people that says otherwise is old news and not true.'" PX 186 ¶ 28. At a minimum, it strains belief that Chadwick was not fully aware of Pukke's involvement and concealment of his involvement in SBE.

Accordingly, the evidence strongly intimates that Chadwick participated directly in SBE's deceptive marketing practices and had authority to control them. He knew, or certainly should have known, all about them. His direct misrepresentations to consumers during the webinars was persuasive, which is to say "material." *See, e.g.*, PI Hrg Tr., 3/11/19 Morning, 58:21–23 (Michael Doran, a consumer, testifying that Chadwick "primarily" gave the presentations during the sales tour in Belize); *id*. at 82:2–5 (Doran identifying Chadwick as primary speaker during a webinar); PI Hrg. Tr., 3/12/19 Morning, 17:2–11 (Michael Warren, a consumer, identifying Chadwick as the presenter during a webinar); *id.* at 42:22–43:7 (same). Chadwick also helped perpetuate the deceptive concealment of Pukke's role in the development. PX 493 (2011 email regarding Chadwick setting up email communications with Pukke during Pukke's incarceration); PX 635 (Chadwick writing email in August 2011 stating that "Andi" "asked me to lead" and "I am very clear on what Andi told me and what his expectations are of me. . . . I asked him to confirm my understanding of what was to happen here in his absence and he did.").

ii.    John Usher[33]

The evidence shows that Usher has been involved with various SBE Defendants since at least 2005. He is Director of the Sanctuary Belize Property Owners Association ("SBPOA") and was an SRWR board member until at least 2010. Numerous marketing communications identify Usher as the "chairman," "developer," or "principal" of the development. Although Usher is a

_____

[33] Usher, though duly served with process, has not entered an appearance in this case.

Belizean citizen, he visits the U.S. to conduct SBE business. PX 297 ¶ 254; PX 564. PX 297 ¶ 294; PX 603; PX 192 ¶ 3, Att. 24. PX 297 ¶ 88; PX 380; DX-AP-366. PX 814 ¶ 23. Apparently, it was Usher who suggested that Pukke adopt an alias when doing business with SBE. PX 427 at 277:3–7; *id.* at 278:17–279:1 (Pukke testified, at a hearing on violation of his supervised release, November 13, 2015, that Usher said: "Do me a favor, don't be using your name down here. I'm worried about banks, I'm worried of the government. They are pretty skittish, I'll be honest.").

Not only did Usher have authority to control as the director of SRWR and SBPOA; he led SBE's litigation against American owners in Belize during which SBE falsely denied Pukke's involvement with the project. PI Hrg Tr., 3/19/19 Afternoon, 65:15–25. Evidence of Usher's active perpetuation of at least one material false representation—that of Pukke's involvement—by itself meets the FTC's burden of showing a fair and tenable chance of proving liability as to Usher.

## I. *Availability of Monetary Relief*

The FTC has a fair and tenable chance of showing that it is entitled to monetary restitution from SBE. Once the FTC establishes an enterprise's liability for misrepresentations to consumers pursuant to Section 5 of the FTC Act, the enterprise is liable for restitution if the FTC shows consumer reliance. Reliance is presumed if "(1) the business entity made material misrepresentations likely to deceive consumers, (2) those misrepresentations were widely disseminated, and (3) consumers purchased the entity's products." *FTC v. Loma Int'l Bus. Grp. Inc.*, No. 11-cv-1483, 2013 WL 2455986, at *7 (D. Md. June 5, 2013). "[C]onsumer reliance on express misrepresentations" is "presumptively reasonable." *F.T.C. v. Five-Star Auto Club*, 97 F. Supp. 2d 502, 528 (S.D.N.Y. 2000).

The first requirement for presuming reliance by consumers, and therefore the FTC's entitlement to restitution, is that a common enterprise made material misrepresentations likely to

deceive consumers. The evidence strongly suggests that the SBE Defendants transgressed the Act by making as many as all six of the core marketing claims identified by the FTC as well as by continuously repeating the highly material misrepresentation that Pukke was not involved in the project. *See* Sections III.C.i–vi; III.E, III.F., *supra*.

The Court also finds the FTC has shown the second element required for restitutionary relief in that SBE widely disseminated the six Core Claims. Several manifestations have appeared in telemarketing scripts, webinars, brochures, and other materials. Consumer testimony and the FTC's undercover investigation confirm that these claims were made repeatedly throughout the United States to potential consumers. SBE representatives continuously denied Pukke's involvement to consumers online and even did so in litigation that took place in Belize. As a result of marketing "techniques" such as these, SBE sold more than 1,000 lots, including some sold more than once.

Third, of course, it is clear that many consumers purchased lots at Sanctuary Belize, closing the loop for allowing recovery by way of restitution.

Pukke's argument that consumers have not been harmed because their lot values have remained steady has little relevance at this stage. It is not known, of course, what the present value of the lots in fact may be. But whatever the value may be bears on the amount of restitution Defendants might be required to make. As of now, the issue is whether one or more material misrepresentations were made to prospective and actual lot owners. Under the FTC Act, the FTC has shown it has a fair and tenable chance of prevailing on these claims.

### J. *Equities*

In addition to determining the FTC's likelihood of success on the merits, which the Court finds the FTC has established, the Court is still obliged to weigh the equities of issuing a

54

Preliminary Injunction. *AmeriDebt*, 373 F. Supp.2d at 563. Here over a thousand consumer real estate investments—which is to say lots on the Reserve—will be affected by the issuance or non-issuance of a Preliminary Injunction, including the situations of some dozen or more families that have constructed homes on the Reserve, some of whom live there.

The FTC represents the public interest in this case, which the Fourth Circuit places strong emphasis upon. *See* Section III.B.i, *supra*. The Court therefore gives that factor considerable weight. In contrast, were no Preliminary Injunction to issue, Defendants—including most prominently Pukke—could go about acting in the very ways that the evidence firmly suggests are so profoundly problematic, which is to say, potentially outright fraudulent. If a Preliminary Injunction is not entered, consumers will presumably continue making monthly mortgage payments on their lots in the thousands of dollars as well as dues for homeowner's association benefits that may never be forthcoming or, if they do come, that will only come at a particularly lethargic snail's pace. The Reserve's assets have been largely depleted, in considerable part, it appears, through irresponsible spending by SBE principals, most prominently Pukke. Potentially, new consumers may fall prey to the full gamut of what appear to have been Defendants' historic misrepresentations.

With over a thousand consumers having an interest in the Reserve, some may dislike any plan for management involving a receiver. To be sure, in addition to the consumer witnesses the FTC presented at the Preliminary Injunction hearing who are dissatisfied and feel they were misled by SBE before the FTC and the Receiver entered the picture, Pukke and Baker called witnesses live and through affidavits who testified they were satisfied with the development, including emails to the Receiver indicating similar sentiments on the part of several other consumers. *See, e.g.*, DX AP 11–DX AP 44; ECF Nos. 265-1; 265-2; 265-3; 290-1; 290-2; 290-3; 290-4; 290-5;

290-6; 290-7; 290-8; 318-1; 318-2). But the Reserve and the existing amenities must be responsibly managed. The Reserve has been under the Receiver's management for some eight months, and, all in all, it has done a creditable job maintaining the stability of the development.

On balance, the Court believes that continuing the powers of the Receiver to function *pendente lite* will best protect and preserve the status quo. Subject to modifications along the way, the Court believes the current Receiver is the best bet to keep the development on an even keel until the merits hearing.[34] The equities, therefore, weigh in favor of the grant of a Preliminary Injunction.

In light of the importance preserving as many assets as possible for the final resolution of this case, an asset freeze is also appropriate to ensure "that any final relief is complete and meaningful." *Ameridebt*, 373 F. Supp. 2d at 562. Where the law presumes irreparable harm, as in an FTC enforcement action, the FTC need only establish "a possibility of dissipation of assets." *Id.*, *see also FTC v. IAB Mktg. Assocs., LP*, 972 F. Supp. 2d 1307, 1313 n.3 (S.D. Fla. 2013) ("There does not need to be evidence that assets will likely be dissipated in order to impose an asset freeze."), *aff'd*, 746 F.3d 1228 (11th Cir. 2014). The Court has repeatedly held throughout the pendency of this litigation that there is no tracing requirement for an asset freeze in a

---

[34] On July 9, 2019, the Court held a hearing on the various plans submitted by the FTC, Pukke, Baker, and a group of independent lot owners not party to the case, relative to the management of the Reserve during the pendency of the Preliminary Injunction and through the merits phase of the litigation. After listening to the presentations and argument on each proposed plan, the Court decided that the current Receiver, Robb Evans & Associates, LLC, should continue in place, as Receiver, with full discretion to manage the Reserve, for as long as the Preliminary Injunction remains in effect. The Court directed the Receiver to implement a mechanism for lot owners to present their complaints regarding the management, albeit with limits on the frequency and length of the complaints. The Receiver, in its discretion, may or may not choose to reply to the complaints or suggestions. The Receiver filed its Proposed Order consistent with the Court's instructions at the July 9 hearing on July 18, 2019. ECF No. 524. That same day, the FTC filed a notice in support of the Receiver's Proposed Order. ECF No. 525. On July 29, 2019, the group of independent lot owners not party to the case and Baker each submitted separate comments on the Receiver's Proposed Order. ECF Nos. 534, 535. Replies may be filed by August 5, 2019.

government civil enforcement action (especially at the preliminary injunction stage). *See, e.g.*, *Kemp v. Peterson*, 940 F.2d 110, 113-14 (4th Cir. 1991) ("[S]ince the district court's order was preliminary in nature, pending a final determination of liability, the freezing of funds . . . may be proper without respect to whether those monies are traceable to proceeds or profits and income from the proceeds").

Given the strong evidence of the diversion and dissipation of funds by SBE principals, in particular Pukke's history of diverting and hiding assets and his clandestine role of pulling all the strings for the development, there is a distinct possibility that the Reserve's assets would dissipate absent a Preliminary Injunction and asset freeze.

## IV. Conclusion

The FTC's burden at this stage is less stringent than the relevant standard in a traditional preliminary injunction proceeding. As such, the FTC easily clears the bar, having adduced proof that it has a fair and tenable chance that it will achieve success on the merits. For that reason, the Court will **GRANT** the FTC's Motion for Preliminary Injunction, ECF No. 23.

WITHIN TEN (10) DAYS, THE FTC SHALL SUBMIT A PROPOSED PRELIMINARY INJUNCTION, THE PARTIES SHALL HAVE TEN (10) DAYS THEREAFTER TO FILE WRITTEN RESPONSES, AND THE FTC SHALL HAVE TEN (10) DAYS THEREAFTER TO FILE A REPLY. THE COURT WILL DETERMINE THEREAFTER WHETHER FURTHER ORAL ARGUMENT ON THE ORDER IS APPROPRIATE.

Following the submission of the Proposed Preliminary Injunction and the comments of the parties, a separate Order will **ISSUE.**

August 2, 2019

/s/

**PETER J. MESSITTE**
**UNITED STATES DISTRICT JUDGE**