IN THE UNITED STATES DISTRICT
COURT FOR THE DISTRICT OF
MARYLAND
(Southern Division)

In re Sanctuary Belize Litig.

No. 18 Civ. 3309 PJM

**PRO SE DEFENDANT ANDRIS PUKKE'S REPLY TO THE FTC'S OBJECTION TO MOTION TO STAY**

All parties are unfortunate casualties of the FTC's kamikaze litigation posture, which takes any prospect of settlement off the table by doubling down on a $138 million damages remedy it hasn't the facts to support, the legal authority to pursue, nor this Court the equitable jurisdiction to enforce.  The closest approximation of profits we have in this case is the Receiver's Report, which puts Sanctuary Belize's total profits at $18 million. The FTC has already collected triple that from the settling co-defendants and relief defendants.  Having admitted in other proceedings that Liu's limitation of equitable remedies to net profits applies equally to the FTC acting under 13(b) as it does the SEC, the FTC's factually and legally bereft contempt claims—utterly ignored at trial— and its mendacious effort to evade the unmistakable application of the face-to-face exemption of the Telemarketing Sales Act, do nothing to move the parties toward anything but mutual ruin. Only a Stay, allowing the sides to negotiate a sensible resolution ahead of the three FTC 13(b) cases awaiting the Supreme Court decision next term, will save all parties from the Pandora's Box awaiting *de novo* review on appeal.[1]  Indeed, those three cases will likely strip the FTC of the

---

[1] in the event of a liability determination and damages assessed according to the Court's pretrial, revenues-based damages order that has since been nullified by *Liu.*

power to pursue, and this Court the equitable jurisdiction to enforce, any remedy beyond the "injunctive relief" authorized by Congress. This Court's pretrial damages order runs afoul of *Liu* by failing to even acknowledge, let alone offset, Sanctuary Belize's business expenses from revenues. The FTC's other causes of action are so factually vacuous and explicitly contradicted by its own pleadings, statements, evidentiary record, and formal policy pronouncements, that a liability finding, to say nothing of a $138 million damages award, would be a gross miscarriage of justice and reversible error.

The FTC spent three years building a meticulous case that proves nothing, under any of its liability theories. Proof? Who needs proof when you have 138 million ways to win without an ounce of it? The FTC assumed that the specter of hundreds of millions in damages would force settlement. They had good reason to assume as much, as every defendant settles with that albatross circling overhead. But the remaining co-defendants are outliving the lies told to bury them, thus causing major problems for the FTC, and by screaming at the rain instead of dealing with the weather, for all of the other parties in interest as well.

Everyone from the FTC's top lawyer—the Solicitor General himself—to numerous senior FTC commission members, openly admitted in other proceedings that *Liu's* equitable and jurisdictional limitations are not confined to the SEC; that they **apply equally to the FTC acting under 13(b)**. The FTC knows its 13(b) case has shrunk to zero under *Liu*—the Solicitor General admitted this in court before *Liu* was even decided when, on behalf of the FTC, he argued for a stay of the AMG Case—which is an FTC 13(b) action and a virtual clone of Sanctuary Belize— based on the fact that *Liu* would have a significant impact on the FTC's authority to obtain equitable monetary relief due to the clear "overlap" of the cases and the fact that the securities laws at issue in *Liu* "were analogous" to the FTC's equitable authority under Section 13(b).

2

The question whether Section 13(b) of the FTC Act authorizes district courts to award equitable monetary relief has divided the courts of appeals and would ordinarily warrant this Court's review. The Court recently granted the petition for a writ of certiorari in *Liu* v. *SEC* … to decide whether district courts may award disgorgement to the SEC *under analogous provisions* of the securities laws. In light of the *overlap between this case and Liu,* the Court should hold this petition pending the disposition of *Liu*.[2]

The Solicitor General isn't alone.  Numerous amicus briefs filed by *senior FTC officials* in *Liu* argued that the SEC's ability to obtain disgorgement impacted the FTC's ability to obtain equitable monetary relief under Section 13(b), indeed, that *Liu* threatened to compromise the FTC's ability to enforce the FTC Act entirely: "This *amici curiae* brief is submitted by former FTC senior officials to call to the Court's attention the potentially adverse effect the Court's ruling in this case could have on the FTC's ability to enforce the FTC Act."[3]

The FTC is a victim of its own excess.  Having set out in the early '80s to conveniently bypass the procedural and due process safeguards (notice of wrong doing, issuance of cease and desist order, violation of order) Congress put in Section 19 and other parts of the FTC Act that permit more punitive remedies, the FTC has since turned Section 13(b) from an equitable shield into a punitive sword, adding backward looking monetary penalties to a statute that explicitly limits itself to forward looking "injunctions."  The leverage the FTC gained for itself by threatening gargantuan judgments it had no authority to seek slowly crept into the liability phase as well.  The burden shifting framework that emerged from the FTC's overreach, whereby the FTC gets a presumption of "widespread reliance" and "materiality" for express claims disseminated to a

---

[2] *See* Brief for the Respondent, *AMG Capital Mgmt., LLC v. FTC*, No. 19-508 (filed Dec. 13, 2019) at 4.

[3] *See* Brief Amici Curiae Former Federal Trade Commission Officials In Support of Respondent, *Liu v. SEC*, No. 18-1501 (U.S. filed Jan. 20, 2020) at 2–4 ("This *amici curiae* brief is submitted by former FTC senior officials to call to the Court's attention the potentially adverse effect the Court's ruling in this case could have on the FTC's ability to enforce the FTC Act[.]"); *see also* Amicus Curiae of the New Civil Liberties Alliance in Support of Petitioners, *Liu v. SEC*, No. 18-1501 (U.S. filed Dec. 23, 2019) at 10–12, 19–20.

"significant minority" of consumers meant, in effect, that the FTC never had to actually prove its case; mere allegations got the job done. When defendants settle ahead of trial, that's not a problem. When they don't, it is. That's the predicament the FTC finds itself in here. But instead of taking stock of the factual and legal shortcomings of its case, and the shrinking damages jurisdiction tightening like a noose around its neck, beginning last term with *Liu* and continuing next term with three Section 13(b) cases[4] certified for Supreme Court review, the FTC stampedes on undeterred, like beef in search of a butcher.

This Court need not take the Solicitor General or senior FTC officials' word for it; by its own terms, *Liu* applies to the FTC every bit as much as it does the SEC, for it speaks as much to the jurisdictional limitations of courts sitting in equity as it does the remedial powers exercised by regulatory agencies deriving their power from statutes that strictly define and limit the scope of that power. "No matter the label," holds Liu, district courts enforcing equitable statutory remedies are limited to "profit-based measure[s] of unjust enrichment." The Court reasoned this maxim from two fundamental principles of equity jurisprudence.

First, that equity practice authorizes courts to strip wrongdoers of their ill-gotten "gains." Second, that in order to avoid stripping themselves of equity jurisdiction by transforming equitable remedies into punitive sanctions, district courts must restrict equitable remedies to an *individual* wrongdoer's net *profits* to be awarded to *victims*. This Court should find in those italicized words, three explicit limitations *Liu* imposes on all courts of equity, no matter the three letter agency appearing before them as plaintiff (or as defendant, soon enough): no joint and several liability; no

---

[4] *AMG Capital Management, LLC v. FTC*, No. 19-508 (U.S. Dec. 13, 2019),  *FTC v.Credit Bureau Center, LLC*, No. 19-825 (U.S. Dec. 19, 2019), and *Publishers Business Services, Inc. v. FTC*, No. 19-507 (U.S. Oct. 18, 2019). All that's left to decide in these parallel FTC cases is whether the FTC has the authority to seek *any equitable monetary damages at all*, given that its Congressional statutory authorization speaks only of "injunctive" relief, unlike the broader Congressional delegation of power to the SEC of "other forms of equitable monetary relief" in the "analogous" SEC statute at issue in *Liu.*

damages exceeding profits; and no payment of recoveries to the Treasury Department. These principles, the Court went to great pains to elucidate in its holding, transcend whatever name they happen to go by: "even though that remedy may have gone by different names," the Court wrote, they were singular in their limitation of liability to "profits" or "gains."[5]

The *Liu* Court clearly stated that district courts must deduct business expenses before ordering a disgorgement order, something the district court in *Liu* failed to do, and was ordered to do on remand. In the case at bar, expenses are not even acknowledged, let alone offset against revenues. As such, the Court's pretrial damages order is null and void under *Liu*. But we know from the Receiver that Sanctuary Belize operated at a loss, and the only monies that didn't go to line item business expenses were $18 million dollars that the Receiver claimed the Defendant "diverted." The Defendant says otherwise, but it's a moot point, given that the FTC has already collected roughly triple that from the settling co-defendants and relief defendants based on threats of monetary damages it had no authority to seek in the first instance.

In reality, the FTC's authority hangs on a much thinner reed than the SEC's did in *Liu*, for in the relevant SEC statute, Congress explicitly included "forms of equitable monetary relief" in the statutory language delegating powers to the SEC for its investor protection mandate. Section 13(b), by stark contrast, speaks not a word of "monetary relief" and only of "injunctions," a small, non-monetary subset of the broader equitable relief granted the SEC in *Liu*. All that's left to decide in these parallel FTC cases is whether the FTC has the authority to seek *any equitable monetary*

---

[5] See *Liu,* comparing *e.g.,* 1 D. Dobbs, Law of Remedies §4.3(5), p. 611 (1993) ("Accounting holds the defendant liable for his profits"), with *id.,* §4.1(1), at 555 (referring to "restitution" as the relief that "measures the remedy by the defendant's gain and seeks to force disgorgement of that gain"); *see also* Restatement (Third) of Restitution and Unjust Enrichment §51, Comment a, p. 204 (2010) (Restatement (Third)) ("Restitution measured by the defendant's wrongful gain is frequently called 'disgorgement.' Other cases refer to an 'accounting' or an 'accounting for profits'"); 1 J. Pomeroy, Equity Jurisprudence §101, p. 112 (4th ed. 1918) (describing an accounting as an equitable remedy for the violation of strictly legal primary rights).

*damages at all*.  Probably not, given the Supreme Court's textual statutory analysis and principled holding in Liu.

Stripped of its $138 million damages justification, every step of this litigation since the very inception of the FTC's secret investigation is a violent act, including the *ex parte* TRO, asset seizure, receivership, and injunction, as all were explicitly and necessarily premised on securing a grossly-inflated damages award that *Liu* prohibits the FTC from pursuing, and the district court from enforcing. The reality is that the FTC secured monetary settlements from the settling co-defendants based on the threat of damages it had no authority to even seek, let alone enforce or collect via district court order.  The FTC can no longer invoke years of flawed *stare decisis* across the Circuit Courts of Appeal to exercise powers never granted to it by Congress.  *Liu* put an end to that regrettable era of implied remedies that openly mocked due process and separation of powers, for which Sanctuary Belize stands as a cautionary tale.

The FTC's argument that appeal pending judgement is the proper recourse presumes that harm's yet to be been done in this case.  But this case has a history of violence, against both the Defendants and the lot owners themselves, all of it enabled by the FTC's exercise of punitive measures strictly prohibited by *Liu*.  Indeed, *Liu's* unambiguous and explicit limitation of damages to net profits not only leaves the FTC with no more damages to pursue ahead, but it casts a long and dark shadow over the crooked road behind.

The alleged justification for the draconian pre-trial (and now post trial) remedies evaporated with Liu, along with the gargantuan damages award at risk of dissipation.  And things cannot get better for the FTC. But they can, and probably do, get worse.  Much worse. There is every reason to believe the Supreme Court will revoke the FTC's power to pursue any money damages at all when it rules on *Credit Bureau* and *AMG* (see supra, at 123-234), leaving the US

Treasury to disgorge *its* $38 million of ill-gotten gains back to the settling co-defendants and relief defendants.  The Atlantic Bank depositors who were robbed of their life savings in order to pay the FTC's $25 million extortion demand may still see some justice yet.

**The TSR Claim: The FTC cannot lie its way around the TSR's face-to-face exemption, which applies unmistakably to Defendant's sales and marketing practices.**

The FTC resorts to outright lies under oath and perpetrates a fraud on this Court in its obsessive effort to strip the Defendants of the Telemarketing Sales Rule's **unmistakable face-to-face exemption**.  The Defendants' sales practices fall squarely within the TSR's face-to-face exemption no matter how narrowly it is construed. The FTC argues with the full force of rote repetition that exemptions to consumer protection statutes such as the TSR should be narrowly construed.  The Defendants agree.  Indeed, one would be hard pressed to find a more paradigmatic example of sales practices that fall within both the letter and spirit of the face-to-face exemption than Sanctuary Belize's.  The FTC knew this first-hand from its two-year secret investigation, which sent undercover buyers through the entire Sanctuary Belize sales presentation, top to bottom, ending, as it did, with the insistence on the undercover agents booking a trip to Belize to see the property and project in person and to meet with the development team face-to-face, **prior to executing any contracts or purchasing anything**.  There is not an iota of evidence, as no evidence exists, that the Defendant's ever required a single buyer to sign a purchase contract, or spend a single penny for a homesite, before meeting face-to-face in Belize with the developers. That was the whole idea behind Sanctuary Belize's sales process: once buyers saw the development in person, the place sold itself. And it did.

Despite this first-hand knowledge that SBE was operating—indeed, was designed to operate—precisely within both the letter and spirit of the TSR's face-to-face exemption, the FTC

persisted with a TSR claim anyway. Having done so in bad faith, the FTC went on to elicit trial testimony from several of its own witnesses who in fact discussed in great detail their four-day property tour experience, including specific testimony regarding SBE's private island, where they all privately met face-to-face with the developers, executed purchase contracts and consummated a lot sale.

To leave no doubt, the FTC openly admits the face-to-face exemption applies in a full 25 paragraphs of the Amended Complaint (AC), with an entire section entitled "Tour of the Development in Belize." By way of example only:

- "After the first phone calls, representatives would encourage investors to join a webinar." AC ¶¶ 61-62.

- "The purpose of the webinar was not to close a sale, however, but to encourage potential investors to travel to Belize and investigate the property in person. **Remember, the SOLE GOAL of the call is to get them (to want to go) on the tour!!!!**" proclaimed one script at the top, in underlined bold letters." *Id.*

- "At the end of the webinar, potential investors had the **opportunity** to enter into a non-binding lot reservation agreement and pay between $2,000 and $10,000 to obtain the right of first refusal on a lot." AC ¶ 64.

- "Money was returned if the investor decided, **after touring the development in person**, not to proceed with a purchase. "AC ¶ 64.

- "To **finalize** sales, investors were invited to attend a five-day tour of Belize and The Reserve." AC ¶ 67.

- "Virtually **all investors visited the lot** they had preliminary reserved." AC ¶ 70.

- "During these tours of the property, **investors were able to pose questions and receive more detail on the development.**" AC ¶ 71.

- "After **all of this diligence**, investors were taken to see one of the key features of the development – the private Caribbean island." AC ¶ 81

- "On the island, representatives of The Reserve conducted **in-person, face-to-face negotiations**." AC ¶¶ 81-82, 87.

- "**After these negotiations took place**, a sale price was reached, and an agreement was made." AC ¶¶ 83.

The TSR exempts face-to-face transactions where (1) payment or authorization of payment is not *required* until after a face-to-face sales presentation and (2) the sale is not *completed* until after a face-to-face sales presentation. *See* 16 C.F.R. § 310.6(b)(3) (emphasis added). Sanctuary Belize is a paradigmatic example of sales practices consistent with both the letter and the spirit of the face-to-face exemption to the TSR. It is uncontested that Sanctuary Belize buyers were neither required to sign lot purchase agreements nor pay a single penny toward their purchase before flying to Belize to meet face-to-face with the developers and inspect the land. Indeed, the Sanctuary Belize sales process was designed this way: the lush habitat, the developer's vision for its development into a tropical, eco-friendly master planned community, and the tangible progress toward the realization of that vision were the biggest selling points of all, which had to be personally witnessed to be appreciated. Sanctuary Belize, in other words, sold itself.

The FTC's allegation that, out of thousands of purchasers, some unspecified very small minority purchased lots without a prior face-to-face meeting with the developers in Belize, is irrelevant. Even if true, the FTC does not even allege that they were **"required"** to do so. As in fact, they were not. If some infinitely small number **voluntarily** chose to execute a contract before visiting, that in no way vitiates or even implicates the face-to-face exemption to the TSR, which speaks explicitly of "requirements." Never mind the fact that any contract that was executed prior to touring the property contained specific "back out" clauses which enabled the purchaser to cancel the contract and receive a full refund of any monies paid if they decided to "back out" after touring the property and meeting face-to-face with the developers.

Again, instead of accepting this factual reality, the FTC alleges, incredulously, that optional and refundable lot reservations (never mandatory) and payments for deeply discounted vacations

taken by the overwhelming majority of lot purchasers at reduced and sometimes zero cost (SBE subsidized trips to make them as affordable as possible, and in many cases, paid for the trip entirely—highlighting how much confidence and importance the Defendants put on face-to-face meetings) somehow attaches to and taints the lot sales whose marketing is the subject of this litigation. Defendants were not—indeed were never accused of being in--the lot reservation or vacation business, neither of which are germane to the FTC's TSR or 13(b) claims.

The Defendants were in the business of real estate development and sales. The FTC states that the "substantial lot reservation payments" are "particularly important" because they "change the relationship between the parties" and the consumer becomes "more invested" in the transaction and "more **likely** to complete it." And? How is any of that relevant to the face-to-face exemption? It isn't. What does any of that prove? Nothing. Nothing except the absence of a valid TSR claim. What is particularly important in the FTC's statement however, is not the "change in relationship" or a consumer being "more invested", as those things, whether true or not, are completely irrelevant to the clear language in the exemption, but the words "substantial" and "likely". The FTC is misleading the Court by using the word "substantial" in a feeble effort to skirt the exemption by falsely insinuating that it was a large percentage of the purchase price. The evidence and testimony clearly proved that the **optional** (not required), **fully refundable**, lot reservation payment was not "substantial". The refundable deposits were predominantly $1000. The lot purchase prices averaged over $100,000. Therefore, the deposits were less than 1% of the purchase price, which can hardly be described as "substantial". The FTC's own use of the word "likely" is of equal importance as it proves beyond a doubt that the transactions weren't completed until after the face-to-face meeting in Belize. If something is "likely" to happen, it very obviously hasn't happened yet.

Not content to simply imply coercion, the FTC explicitly and falsely alleges it, under oath, and without an iota of proof: "that it is *undisputed* that they first were *required* to pay SBE thousands of dollars for trips and lot reservation agreements before any face-to-face presentation occurred." See FOF Par 896-897 (emphasis added).  Note how the italicized wording conveniently speaks the same language as the TSR exemption, despite being bold faced lies without a shred of evidentiary support in the record.  Undisputed? It is not only 100% disputed but 100% *refuted.* There's not an iota of evidence that lot reservations were "required."  They weren't.  The FTC is, in other words, trying to trick the Defendants and this Court into a guilty verdict.  So much for the FTC's TSR claim.  It ends as it started:  in bad faith, without a shred of evidentiary support, and as a fraud on this Court.

**The Contempt Claims: The FTC cannot find refuge from Liu in the empty recesses of its contempt claims, which do not rise above the level of insinuation and innuendo.**

Try as it might, the FTC cannot do a factual or legal end run around 13(b)'s strict remedial limitations to net profits imposed by *Liu* on the FTC and this Court.  Thus, the FTC's sudden shift to its bereft contempt claims as an escape route, claiming that they support the FTC's $138 million in damages, even if Liu prohibits it for the 13(b) claims. But the contempt claims were utterly ignored at trial (because they were plead as mere pretexts for a jurisdictional nexus to Maryland and AmeriDebt). There is zero evidence in the record—*nada*—to support any of the contempt claims. The FTC's Proposed Findings of Fact and Conclusions of Law reveal just how bad their contempt case is, even when dressed up in its Sunday best.

The FTC didn't even attempt to prove its contempt case at trial, putting all of its weight behind 13(b), whose bereft six "core claims" of deception—themselves utterly unserious without the record evidence required to prove them (see below) -- are now relegated to mere afterthoughts

under *Liu's* bright line legal damages limitations. Equally absent from the record—and equally ignored at trial—is any factual basis to overcome the unmistakable application of the TSR's face-to-face exemption, which the Court deferred ruling on at the Injunction Hearing and has yet to rule on. A ruling which is critical to this entire case and which the Defendants are looking forward to receiving as soon as possible.

**The Parcel Contempt Claim: The FTC's Insinuations of Collusion and Control Prove Nothing**

Defendants Andris Pukke and Peter Baker *were in jail* when the Receiver traveled to Belize in their attempt to get possession of the property from SRWR. The Defendants were telling the truth the whole time—they never had control of the parcel and had relinquished any interest that they had in it to the Receiver. What greater proof than the fact that they were left to rot in jail when the SRWR and their Belizean attorneys rejected the Receiver's demands to hand over ownership and control of it? In reality, it was the SRWR's legal ownership structure and the market that didn't comply with the FTC's demands, as the parcel sat in litigation limbo for another year with no other interested parties, until none other than Peter Baker, successfully raised $2 million in fresh investment capital from Mr. Stephen Choi, a verified third party, to settle the Receiver's claims on the parcel. A settlement was negotiated between SRWR and the Receiver, the Receiver and the FTC happily accepted the terms, this Court approved the settlement, $2 million was paid to the Receiver and the case against SRWR and the parcel was settled **"fully, finally and forever"**. End of story. In fact, there was specific language in the settlement agreement whereby the Receiver acknowledged the fact that **regardless of any future claims, they were settling "fully, finally and forever"**. Specifically, "The Receiver acknowledges that it is aware that it may hereafter discover claims presently unknown or unsuspected, or facts in addition to or different

from those which it now knows or believes to be true pertaining to the Receiver Claims." The Receiver through this Agreement "fully, finally and forever releases all of the Receiver Claims." (PX781, #9, pg4-5).

Mr. Pukke's subsequent involvement in marketing Sanctuary Belize has zero relevance to the contempt claims. Your Honor oversaw those settlement negotiations and signed the final order, which is **unconditional**. The FTC is literally and admittedly trying to make the Defendants pay not for their defiance of this Court's orders, but reality's defiance of the FTC's mistaken assumptions about both the parcel's legal control and market value.

There was no court order to defy. Even if there were, the Defendants did not defy what they could not defy, locked up and behind bars, thousands of miles away from the scene of alleged defiance.

The FTC alleges, without any evidentiary support, that the Defendant's "contumacious conduct frustrated the object of the Receivership" in some unspecified way, and that "resistance by the SRWR frustrated the Receiver's efforts to sell the parcel for a fair price, which effectively left it with no choice but to sell the Parcel to SRWR for $2 million in 2008." SRWR was a third party over whom the Defendants had no control over whatsoever. It bears repeating, it was SRWR that left the Defendants to rot in jail before surrendering property it had every right, title, and interest in. If SRWR's exercise of its ownership rights in private property "frustrated" the Receiver and the FTC, tough luck. Mr. Pukke nor Mr. Baker had any involvement in the SRWR's decision, or the frustration that it may have caused, certainly not from behind bars where they had absolutely no means of overseas communication and would have in fact done anything in their power to be released from. In fact, after travelling to Belize and meeting with SRWR and its attorneys, the

Receiver confirmed the fact that Mr. Pukke nor Mr. Baker had any control or ownership in the parcel and Mr. Baker was immediately released from his improper incarceration.

The FTC admits that **"even without Baker (or Pukke) the Receiver faced a costly legal quagmire and challenging battle with endless expense with an uncertain outcome as to obtaining control the Parcel. Consequently, the Receiver agreed to sell the Parcel to SRWR for $2 million."** That's the legal structure and the market pulling the strings, not the Defendants. No amount of FTC insistence, insinuation, or false witness can prove otherwise.

The FTC then fast forwards eight years to a 2016 marketing document whose excerpts only confirm the reality that the Defendant's stake in the parcel was severed and that the Receiver sold that equity back to the SRWR through the settlement agreement that was executed and paid for. Any ownership, control, and interest in the parcel that Mr. Pukke had in the past, were in fact severed. This Court signed off on the settlement transaction **without any condition or comment**. There is no evidence behind the FTC's sinister and irrelevant insinuations of puppet mastery, straw men and unseen forces hard at work to thwart this Court's orders or the Receiver's efforts. Here again, the FTC did in fact have a choice: acknowledge the facts and reality and litigate on the merits (assuming any) in Belize, or double down on a seven deuce against a straight flush, hoping against all hope, but at great cost and even greater risk, that the bluff goes uncalled, or undetected. They chose to settle instead of bluff, yet they are now trying to illegally unwind that nearly 15-year old decision through their meritless contempt allegation.

**The Telemarketing Contempt Claim: The FTC's own policy statements prove that the Defendants did not mislead consumers or violate the telemarketing conditions of the AmeriDebt order.**

The FTC's claim that the Defendants are in contempt of the TSR and vague, overlapping telemarketing prohibitions contained in the AmeriDebt Final Order and Settlement (Court Order),

withers under scrutiny, particularly when judged against the FTC's very own standards and statements.  As a preliminary matter, the TSR prohibition in section II (D) of the Court Order fails for the same reason the direct TSR claim fails: the undeniable application of the face-to-face exemption. (See above on pages 11-15).

As to the vague, undefined, and overbroad telemarketing prohibition on pages 7-8 of the Court Order enjoining Defendant from making "misleading" (nowhere defined) "telemarketing statements" (defined so broadly that the act of moving one's lips arguably qualifies) regarding any goods or services whatsoever, what standards are we to apply?  The FTC's definitive guidance on the issues is instructive. For instance, from the FTC's Policy Statement on Deception, we learn that:

> When representations or sales practices are targeted to a specific audience… the Commission determines the effect of the practice on a reasonable member of that group…[A] practice or representation directed to a well-educated group …would be judged in light of the knowledge and sophistication of that group.[6]

We also know from the FTC precisely the audience that the Defendants targeted with their messaging.  The Defendants, according to the Commission's own words at its press conference and in the FTC's Amended Complaint, "specifically targeted small business owners who were largely looking for retirement property."[7]  These were, in the FTC's expert opinion, **"sophisticated consumers who did their due diligence before investing."[8]**  We know from the FTC as well that "during their tours of the property" these "sophisticated consumers who did their due diligence"

---

[6] FTC Policy Statement on Deception, October 14, 1983 at page 3.
  https://www.ftc.gov/system/files/documents/public_statements/410531/831014deceptionstmt.pdf
[7] FTC Press Conference: Court Halts Massive "Sanctuary Belize" Real Estate Investment Scam at 1:47 and 6:50.
https://www.ftc.gov/news-events/audio-video/video/ftc-press-conference-court-halts-massive-sanctuary-belize-real-estate.
[8] *Id.*
https://www.ftc.gov/news-events/audio-video/video/ftc-press-conference-court-halts-massive-sanctuary-belize-real-estate

were "able to pose questions and receive more detail on the development,"[9] and "after all of this diligence, investors were taken to see one of the key features of the development – the private Caribbean island,"[10] where the sales finally took place, after all of the due diligence by the sophisticated consumers had been completed.

Judged by the FTC's own standards and statements, "sophisticated investors who did their due diligence" would not be misled by any of the six core claims, all of which were either correct statements of fact when made, subjective claims, or correctly stated opinions, *none of which are even actionable* according to the FTC's Policy Statement on Deception:

> Certain practices … are unlikely to deceive consumers acting reasonably. Thus, the Commission generally will not bring advertising cases based on subjective claims … or on correctly stated opinion claims…[.]"[11]

Would a sophisticated investor, or a toddler for that matter, be misled by the factually true statement that Sanctuary Belize was not at risk of foreclosure because there were no secured creditors to foreclose on the property, as described in the "no debt" business model?  Unlikely. The fact that the FTC's Harvard economist testified that debt would have reduced risk *where none existed to begin with* should be considered in light of his other testimony in the case, for which he was paid over $100,000, and that projected Sanctuary Belize's completion cost to equal half the GDP of the entire country of Belize!

Would a "sophisticated investor who did his due diligence" be misled by the statement— clearly a subjective statement of opinion by the speaker—that once the amenities were built out, investors could see their lots double in value?  Probably not, if for no other reason that they *did in*

---

[9] AC ¶ 71
[10] AC ¶ 80-81
[11] FTC Policy Statement on Deception, October 14, 1983 at page 4.
https://www.ftc.gov/system/files/documents/public_statements/410531/831014deceptionstmt.pdf

*fact* more than double in value based on the limited resale data presented at trial. Indeed, there was a lengthy side bar on the larger topic of "how returns on real estate investments (ROI's) are calculated" between Mr. Pukke and your Honor, wherein it was clarified that a $10,000 cash investment on a $100,000 lot purchased with 90% borrowed capital does *not* in fact equal a 2x cash-on-cash return when that lot is resold for $200,000; it equals a 20x return (minus the interest paid on the borrowed capital and taxes).

Would a "sophisticated investor who did his due diligence", who flew to Belize to meet face-to-face with the developers and ask questions, and who personally walked the grounds of Sanctuary Belize and inspected his homesite before ever putting his signature on a sales contract or spending a single purchase dollar, be reasonably mislead by *any* of the six "core claims? Not by any objective measure, because by any objective measure, they were either statements of fact, subjective claims, or correctly stated opinions, all of which are permissible according to the FTC's very own guidance on the topic.[12]

The Defendant's position is further advanced by another policy statement by the FTC that is particularly germane to the case at bar. As a matter of policy, the FTC writes that it is reluctant to find statements misleading:

> "When consumers can easily evaluate the product or service...[and] when there is little incentive for sellers to misrepresent...[because they] seek to encourage repeat purchases...[and therefore] market incentives place strong constraints on the likelihood of deception."[13]

As conclusively established above, Sanctuary Belize buyers were all flown down to the project for the express purpose of affording them the opportunity to "evaluate the product or

---

[12] *Id.*
[13] *Id* at 6.

17

service" first-hand, over the course of several days. And if ever "market incentives" constrained the likelihood of deception, they did so here. Indeed, every monthly payment made by Sanctuary Belize buyers to the developers was, in effect, a "repeat purchase" that was much less likely to be made if prior statements by the developer proved to be untrue or misleading. This is a critical point because, as we know, Sanctuary Belize's "no debt" business model *depended upon* repeat purchases in the form of monthly payments in order to fund its operations, amenities, ultimate completion and eventual profit.

In sum, because the six core claims were either subjective claims, correctly stated opinions, or true facts told to sophisticated consumers who did their due diligence, they are not actionable under the FTC's very own policy statement,[14] and did not transgress either the FTC Act or the Court's AmeriDebt Order enjoining Defendant from making misleading telemarketing statements.

## Conclusion

This Court alone holds the fate of all parties in its hands. It can properly Stay the case, pause this slow motion disaster piece until the Supreme Court rules and allow the FTC to reflect on the providence of its litigation posture, creating the possibility—the only possibility—for a resolution that leaves a graveyard's worth of factual, ethical, and legal skeletons in the closet, or it can continue to operate in the FTC's alternate reality, which, make no mistake about it, will ultimately be shattered. If not today, in this Court, then tomorrow, in the next. Reality can only be faked for so long. In the end, the truth always comes out, and justice should always prevail.

---

[14] "Certain practices, however, are unlikely to deceive consumers acting reasonably. Thus, the Commission generally will not bring advertising cases based on subjective claims (taste, feel, appearance, smell) or on correctly stated opinion claims if consumers understand the source and limitations of the opinion."

Although the FTC continues to ignore and deny reality in an effort to keep this dead case alive, they themselves truly know (as they have acknowledged) that Liu has already stripped them of the ability to obtain monetary damages in excess of net profit and that it's only a matter of time before the Supreme Court strips them of the ability to obtain any monetary damages under 13(b) entirely.  As a result, the case at bar, as well as the FTC's future reign of terror on honest businesses under 13(b) are effectively over.  This Court must not allow them to pressure for a rushed decision, through their sudden shift of attention and reliance on factually and legally bereft contempt claims (that were not even brought up in trial), when the Supreme Court is a mere few months away from hearing and making a definitive decision on an issue that is beyond critical to the ultimate outcome of this case.  A Stay is the only way to protect the Defendants and the lot owners themselves from suffering further unjust damages, until the highest court in the land has had the opportunity to speak.

Date: August 20, 2020

Respectfully Submitted:

/s/ Andris Pukke

19