**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

|  |  |  |
|---|---|---|
| | * | |
| | * | |
| | * | |
| | * | |
| | * | |
| *In re* **SANCTUARY BELIZE** | * | |
| **LITIGATION** | * | Civil No. **PJM 18-3309** |
| | * | |
| | * | |
| | * | |
| | * | |
| | * | |

## MEMORANDUM OPINION

August 28, 2020                         **PETER J. MESSITTE**
**UNITED STATES DISTRICT JUDGE**

## TABLE OF CONTENTS

I.   OVERVIEW .................................................................................................... 4

II.  PROCEDURAL BACKGROUND ........................................................................ 7

III. THE FACTUAL SETTING ............................................................................... 11

   A.   The Sanctuary Belize Development ................................................. 11
   B.   The Backstory of Defendant Pukke (including his use of aliases) ............... 18

IV.  LEGAL STANDARDS FOR LIABILITY UNDER FTC ACT AND TSR ................... 24

   A.   Liability for Violations of FTC Act and for Permanent Injunction ............ 24
   B.   Liability for Monetary Relief Under FTC Act ................................... 27
   C.   Liability as a Common Enterprise ................................................. 29
   D.   Liability for Violations of Telemarketing Sales Rule .......................... 30

V.   THE SIX (SEVEN) ALLEGEDLY DECEPTIVE CORE CLAIMS .......................... 33

   A.   Timeline of Claims ...................................................................... 33
   B.   "No Debt" or "Debt-free" = No Risk or Less Risk ............................. 35
   C.   Every Dollar of Revenue Goes Back Into The Development .................. 44
   D.   Development of Luxury Amenities ................................................. 50
   E.   2-5 Year Timeline for Completion ................................................. 56
   F.   Appreciation of Lots in Value ....................................................... 64
   G.   Robust Resale Market .................................................................. 68
   H.   Degree of Pukke's Involvement in SBE ......................................... 72

VI.  LIABILITY FOR MISREPRESENTATION OF CORE CLAIMS .......................... 79

   A.   SBE entities as a Common Enterprise ............................................ 79
   B.   SBE's Liability for Violations of FTC Act and for Monetary Relief ......... 86
   C.   Pukke's Involvement and Liability ................................................. 90
   D.   Baker's Involvement and Liability ................................................. 98
   E.   Chadwick's Involvement and Liability ........................................... 113

VII. LIABILITY FOR TSR VIOLATIONS ................................................................ 131

VIII. DEFAULTING DEFENDANTS ....................................................................... 133

   A.   John Usher .................................................................................. 133
   B.   Global Property Alliance, Inc. ("GPA") .......................................... 136
   C.   Sittee River Wildlife Reserve ("SRWR") ........................................ 136
   D.   Buy Belize, LLC ("Buy Belize") .................................................... 137
   E.   Buy International, Inc. ("Buy International") .................................... 137
   F.   Foundation Development Management, Inc. ("FDM") ........................ 138
   G.   Eco-Futures Development .............................................................. 138
   H.   Eco-Futures Belize, Limited ("Eco-Futures Belize") ........................ 139
   I.   Newport Land Group, LLC ("NLG") ............................................... 139
   J.   Power Haus Marketing ("Power Haus") .......................................... 141
   K.   Prodigy Management Group, LLC ("Prodigy") ................................. 142
   L.   Belize Real Estate Affiliates, LLC ("BREA") ................................... 142
   M.   Exotic Investor, LLC ("EI") .......................................................... 143

N.   Southern Belize Realty, LLC ("SBR")..................................................................... 143

O.   Sanctuary Belize Property Owners' Association ("SBPOA") ................................. 144

P.   Estate of John Pukke............................................................................................. 144

IX.   RELIEF ................................................................................................................................ 146

A.   Injunctive Relief ..................................................................................................... 146

B.   Monetary Relief ...................................................................................................... 156

X.   CONTEMPT MOTIONS ....................................................................................................... 162

A.   Introduction ............................................................................................................ 162

B.   Legal Standard for Contempt Motions ................................................................... 162

C.   TSR Contempt ........................................................................................................ 163

D.   Parcel Contempt ..................................................................................................... 165

E.   Vipulis Loan Contempt .......................................................................................... 172

XI.   CONCLUSION ..................................................................................................................... 178

# I.    OVERVIEW

This Memorandum Opinion constitutes the Court's Findings of Fact and Conclusions of Law in accordance with Rule 52(a) of the Federal Rules of Civil Procedure.

On October 31, 2018, the Federal Trade Commission ("FTC") filed a Complaint in this Court, amended on January 15, 2019, alleging that certain named Defendants, in violation of Section 5(a) of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45(a) and the Telemarketing Sales Rule ("TSR"), 16 C.F.R. § 310.3, were perpetrating a large-scale land sales scam in the Central American country of Belize (formerly known as British Honduras). The primary target of the scheme was and is American-based consumers. The principal Defendants were and are individuals Andris Pukke, Peter Baker, Luke Chadwick, and John Usher, and several corporate entities that the FTC alleges have at all relevant times operated as a common enterprise, which all together are known as Sanctuary Belize Enterprises ("SBE").[1] The Complaint and Amended Complaint sought a Preliminary Injunction, and now seek a Permanent Injunction, restitution, and other appropriate relief. In tandem with its original Complaint, the FTC sought an *ex parte* Temporary Restraining Order freezing assets belonging to various Defendants so that funds might be available for restitution should the Court eventually order that relief. The FTC also

---

[1] The corporate entities remaining in this litigation are Global Property Alliance, Inc., Sittee River Wildlife Reserve, Buy Belize, LLC, Buy International, Inc., Foundation Development Management, Inc., Eco-Futures Development, Eco-Futures Belize, Limited, Newport Land Group, LLC, Power Haus Marketing, Prodigy Management Group, LLC, Belize Real Estate Affiliates, LLC, Exotic Investor, LLC, Southern Belize Realty, LLC, and Sanctuary Belize Property Owners' Association. Other entities named in the Amended Complaint have since settled. The FTC alleges that "the corporate defendants, with the exception of AIB[L], operated, from a shared office at 3333 Michelson, as a common enterprise while engaging in prohibited acts and practices that are the focus of the FTC's action." ECF No. 967.

To be clear, "SBE" refers to the web of individual and Corporate Defendants who own, develop, and run the development formerly known as Sanctuary Bay and Sanctuary Belize, and currently known as the Reserve. As such, when referring to the enterprise, the Court will use the term "SBE" but when referring to the development, the Court will use the term "Sanctuary Belize," as has been the practice in this case.

sought the appointment of a Temporary Receiver to administer the assets subject to the freeze. The Court granted the asset freeze and appointed a Temporary Receiver.

In the course of the proceedings, several Defendants and Relief Defendants, i.e. individuals or entities who were not alleged to have committed wrongdoing, but who purportedly received proceeds of others' wrongdoing as to which they have no legitimate claim, settled the FTC's claims against them.[2] At the start of the proceeding, the Court authorized the non-settling individual Defendants to draw a set amount of funds each month from their own frozen assets in order to cover their living expenses pending trial and directed the Receiver to expend receivership funds to cover certain costs on behalf of these individual Defendants, including the cost of ordering deposition and trial transcripts and the cost of attending the trial on the merits that was held in Greenbelt, Maryland.[3]

The Court held both a Preliminary Injunction hearing and a trial on the merits[4], and received the Parties' Proposed Findings of Fact and Conclusions of Law after both, except that Chadwick did not attend the Preliminary Injunction hearing nor did he submit Proposed Findings of Fact and Conclusions of Law afterwards.

---

[2] None of the non-settling Corporate Defendants alleged to have been part of SBE have ever appeared in this case, despite being duly served. Neither has the Estate of John Pukke, a Relief Defendant, or Usher, despite both being duly served. Accordingly, the Court **GRANTS** the FTC's Motion for Default Judgment as to these Defendants, except NLG.

[3] In addition to the $3,000 per month draw authorized by the Court for each non-settling Defendant, the Court authorized a one-time withdrawal of $30,000 for each active remaining Defendant from his own frozen funds to cover the cost of attending the trial on the merits and/or consulting with counsel. ECF No. 649. The Court also authorized the release of $20,000 from Receivership funds to pay Baker's former counsel. The Court further directed the Receiver to pay the following: costs of deposition transcripts to be provided to each remaining active Defendant, ECF No. 694, plus $5,000 each to Pukke, Baker, and Chadwick to cover airfare and lodging for purpose of attending the trial on the merits, plus $3,000 to cover the cost of trial transcripts to be provided on the same basis that the FTC was to receive them. Hr. Tr. 1/14/20, 178:4-178:12. The transcripts were furnished to Defendants via email.

[4] At the trial on the merits held from January 21, 2020 through February 12, 2020, the Court not only considered the FTC's requested relief of a permanent injunction and restitution, it also heard evidence on the FTC's three contempt motions, as will be discussed.

5

The Court granted the Preliminary Injunction. ECF Nos. 539 and 615.

The Court now **GRANTS**, with minor modifications, the FTC's requested relief of a Permanent Injunction against Pukke, Baker, Chadwick, Usher and the Corporate Defendants who have not yet settled. The Court also **GRANTS** the FTC's requested relief of restitution against all these Defendants and will make their liability joint and several, subject to the qualifications set forth *infra,* Section VI.E. Restitution will be made to the FTC on behalf of consumers in an amount to be discussed *infra,* Section IX.B.

The Court further **GRANTS** the FTC's Motion to Hold Andris Pukke, Peter Baker, and John Usher in Contempt for Deceptive Telemarketing Practices in Violation of the Final Order in *FTC v. AmeriDebt*, 03-cv-317 PJM, ECF No. 266.

The Court **DENIES** the FTC's Motion to Hold Pukke, Baker, and Usher in Contempt for Failing to Turn the Sanctuary Parcel Over to the Receiver, ECF No. 267.

The Court **GRANTS** the FTC's Motion to Hold Pukke in Contempt for Violating the Order Approving Stipulation for Conditional Release of Andris Pukke from Incarceration Subject to Compliance with Court Orders, ECF No. 268.

## II.   PROCEDURAL BACKGROUND

Defendants comprise a web of individuals and corporate entities that, according to the FTC, has directed and controlled what the FTC collectively terms Sanctuary Belize Enterprise ("SBE"), a real estate enterprise which develops and sells lots in the Central American country of Belize.

The primary individual SBE Defendants are Andris Pukke, Peter Baker, Luke Chadwick, and John Usher. Other individual Defendants are Brandi Greenfield, Rod Kazazi, Frank Costanzo, and Michael Santos.[5] The Complaint also named as Relief Defendants[6] Angela Chittenden, Deborah Connelly, John Vipulis, the Estate of John Pukke, and Beach Bunny Holdings, LLC ("Beach Bunny Holdings").[7] Of these individual and Relief Defendants, only Pukke, Baker, Chadwick, Usher and the Estate of John Pukke remain in the case. As far as Usher and the Estate of John Pukke are concerned, they have never appeared in the case despite having been duly served, such that on January 10, 2020 and on January 16, 2020, respectively, the Clerk of the Court entered defaults against them. ECF Nos. 799 and 826. As part of its decision today, the Court now enters default judgments against them as well.

The organizational SBE Defendants include Global Property Alliance, Inc. ("GPA"), Eco-Futures Development, Eco-Futures Belize, Ltd. ("Eco-Futures Belize"), Sittee River Wildlife Reserve ("SRWR"), Buy International, Inc. ("Buy International"), Buy Belize, LLC ("Buy

---

[5] The Court signed a Stipulated Order for Permanent Injunction and Monetary Judgment against the following Defendants on the following dates: Costanzo on November 6, 2019, ECF No. 668; Greenfield on January 8, 2020, ECF No. 788; Kazazi on January 8, 2020, ECF No. 789; and Santos on January 14, 2020, ECF No. 797.

[6] As indicated, a relief defendant is a third-party who is not alleged to have committed wrongdoing, but who allegedly received proceeds of others' wrongdoing as to which the third party has no legitimate claim. *See CFTC v. Kimberlynn Creek Ranch*, Inc., 276 F.3d 187, 192 (4th Cir. 2002) (quotation omitted).

[7] The Court signed a Stipulated Order for Permanent Injunction and Monetary Judgment against Vipulis on March 25, 2019, in which Vipulis agreed to turn over approximately $4.1 million to the Receiver. ECF No. 352. The Court entered a Stipulated Order for Permanent Injunction and Monetary Judgment against Relief Defendant Chittenden and Beach Bunny Holdings on January 14, 2020, ECF No. 796, and Relief Defendant Connelly on November 6, 2019, ECF NO. 668.

Belize"), Foundation Development Management, Inc. ("FDM"), Power Haus Marketing ("Power Haus"), Ecological Fox, LLC ("Ecological Fox"), Belize Real Estate Affiliates, LLC ("BREA"), Southern Belize Realty, LLC ("SBR"), Exotic Investor, LLC ("EI"), Foundation Partners ("FP"), BG Marketing, LLC ("BG Marketing"), Prodigy Management Group, LLC ("Prodigy"), Newport Land Group, LLC, and the Sanctuary Belize Property Owners' Association ("SBPOA," aka "The Reserve Property Owners' Association") (termed the "Corporate Defendants"[8]). Atlantic International Bank, Ltd. ("AIBL"), located in Belize, was also sued for allegedly assisting in the deceptive telemarketing, sales, and development practices of SBE. AIBL, FP, Ecological Fox, and BG Marketing have settled with the FTC[9], but as indicated, the other Corporate Defendants, though duly served, have never entered an appearance in the case such that, on January 10, 2020, the Clerk of the Court entered a Clerk's Entry of Default against them. ECF No. 799. The Court now enters default judgment against each of them except NLG, for reasons that will be stated *infra*, Section VIII.I.

In its Complaint, filed on October 31, 2018[10], the FTC alleged that the individual and Corporate Defendants made six claims (the six "Core Claims") that violate the FTC Act and the TSR: (1) that SBE uses a "no debt" business model to develop Sanctuary Belize, which would make lots in Sanctuary Belize a less risky investment than one in which the developer has to make payments to creditors; (2) that every dollar SBE collects from lot sales would go back into the development; (3) that SBE would finish Sanctuary Belize quickly, either within two to three years

---

[8] For clarity, the Court terms these Defendants as the "Corporate Defendants" to distinguish them from Atlantic International Bank, Ltd.

[9] On September 25, 2019, the Court signed a Stipulated Order for Permanent Injunction and Monetary Judgment against AIBL. ECF No. 607. On November 6, 2019, the Court signed a Stipulated Order for Permanent Injunction and Monetary Judgment against Ecological Fox. ECF No. 668. On January 8, 2020, the Court signed Stipulated Orders for Permanent Injunction and Monetary Judgment against BG Marketing and FP. ECF Nos. 788 and 789.

[10] On January 15, 2019, the FTC amended its Complaint to add Parties. ECF No. 114.

or within five years; (4) that the finished Sanctuary Belize would have all of the amenities expected of an American luxury resort community, including: (i) a hospital staffed with American physicians and nurses near the development; (ii) an emergency medical center near downtown "Marina Village"; (iii) a championship-caliber golf course; (iv) a local airport within the development; (v) a new international airport nearby with direct flights to and from the United States; (vi) a "Marina Village" containing high-end boutiques, restaurants, cafes, an American-style grocery store, an elegant casino, and a hotel; (vii) a 250-slip world-class marina; (5) that Sanctuary Belize lots would appreciate rapidly in value, such as 200% to 300%, within two to three years; and (6) that consumers could realize the rapid appreciation of their lots within Sanctuary Belize because there was a "robust" resale market in which consumers could easily resell their lots should they chose to do so. ECF No. 1. As the crowning misrepresentation, the FTC alleged that the individual and Corporate Defendants violated the FTC Act and the TSR by representing that Defendant Andris Pukke had no meaningful involvement in or with SBE. *Id.*

On October 31, 2018, accompanying the initial Complaint, the FTC filed an *ex parte* Motion for a Temporary Restraining Order, Asset Freeze, Writs *Ne Exeat*, Appointment of a Temporary Receiver, Immediate Access, and Order to Show Cause Why a Preliminary Injunction Should Not Issue. ECF No. 5. On November 5, 2018, the Court held a telephonic hearing with FTC counsel and, after careful consideration, that same evening, entered an Order granting the whole of the FTC's Motion for a Temporary Restraining Order and other relief, ECF No. 13.[11] On November 7, 2018, as authorized by the Court, representatives of the FTC and Receiver entered the premises at 3333 Michelson Drive, Irvine, CA, suspected to be an office shared by multiple

---

[11] The Court appointed Robb Evans and Associates LLC as Receiver to assume control of Defendants' assets. As of March 31, 2020, the Receiver had collected approximately $12.49 million from Defendants, Relief Defendants, income from Sanctuary Belize, and various other sources. ECF No. 956.

individual and Corporate Defendants, and collected a substantial mass of evidence, leading the FTC, on November 15, 2018, to file a Motion for an Interim Preliminary Injunction. The purpose was to extend the terms of the TRO until a more extensive Preliminary Injunction hearing could be held in February 2019. ECF No. 23. On November 19, 2018, the Court considered the FTC's Motion and the responses in Opposition and, after holding a telephonic hearing, granted the FTC's Motion the next day. ECF No. 34. The Court's November 20, 2018 Order scheduled a more extensive Preliminary Injunction hearing to commence on February 11, 2019, later rescheduled to March 11, 2019 due to the Federal Government shutdown. ECF No. 100.

From March 11, 2019 to March 22, 2019, the Court held an extensive evidentiary hearing on the FTC's request for a Preliminary Injunction and, on August 2, 2019, issued a Preliminary Injunction, ECF No. 539.[12] From January 21, 2020 to February 12, 2020, the Court held a bench trial on the FTC's request for a Permanent Injunction and other relief including restitution, and on the FTC's three contempt motions (the "Merits trial"). Based on the evidence presented during the Merits trial, the evidence presented during the Preliminary Injunction hearing[13], and the Proposed Findings of Fact and Conclusions of Law submitted by various parties post-trial and responses in Opposition, the Court now issues this Memorandum Opinion setting forth its Findings of Fact and Conclusions of Law.

---

[12] By Order dated February 24, 2020, the Fourth Circuit, following *pro se* appeals by Pukke and Baker, affirmed the Preliminary Injunction. ECF No. 871.

[13] On January 6, 2020, the Court ordered that "Pursuant to Fed. R. Civ. P. 65(a)(2) and in the interest of judicial economy, all testimony and. exhibits that were received in evidence in connection with the Preliminary Injunction Hearing will be admitted into evidence at the trial beginning January 21, 2020." ECF No. 779.

### III.   THE FACTUAL SETTING

#### A.   *The Sanctuary Belize Development*

Sanctuary Belize (currently known as the "Reserve" and formerly known as "Sanctuary Bay Estates")[14] is a real estate development situated on some 14,000 acres (nearly the size of Manhattan) in the Central American country of Belize, formerly British Honduras.

The development was the brainchild of Joan and Colin Medhurst, Peter Baker's mother and stepfather, who envisioned a central American getaway site set in a pristine nature reserve that would protect the country's jaguars and provide a wildlife corridor from the Cockscomb Basin in Belize to the sea. PI Hrg Tr., 3/13/19 Afternoon, 13:18-14:1. Lacking funds to bring the idea to fruition, the Medhursts asked Baker to help raise capital from his "rich friends," including his high school friend and lacrosse teammate Andris Pukke. Baker 2/19/2019 Dep., 46:12-46:18. It was apparently contemplated that the land would be owned by SRWR and developed by Dolphin Development Company Ltd. ("Dolphin"). Trial Tr., 1/23/20 Morning, 51:5-16.

In 2003, Pukke loaned Dolphin $1.5 million to buy 350 acres to start the contemplated project. PI Hrg Tr., 3/13/19 Afternoon, 11:24-15:10; PX 385. Through Puck Key Investments L-8, LLC, an entity he wholly owned, Pukke held a 60% interest in Dolphin, while Baker and the Medhursts held the remaining 40%. PX 358. Pukke was also a director of Dolphin alongside Baker, as well as Chairman of the company's board. PX 358; PX 370 at 1. Concurrently, Pukke became a director of SRWR alongside the Medhursts, Baker and two other individuals, and loaned SRWR another $1.5 million, which apparently took the form of a loan by Pukke to Dolphin, which then made an unsecured loan to SRWR, which was used to buy 11,755 acres in southern Belize. PX

---

[14] Though Sanctuary Belize is currently called "The Reserve," the Court will refer to it as Sanctuary Belize as has been the practice in this proceeding.

385 at 17:2-11 (the Court's oral findings of fact following Pukke and Baker's 2007 contempt trial recounting the purchase history of the Sanctuary Parcel); PX 370 at 25 (2005 SRWR meeting minutes: lands were purchased with "unsecured loans made by Mr. Andris Pukke"); PX 359; PX 370 at 4 (identifying $3 million "introduced by Mr. Pukke" for the benefit of Dolphin); *id.* at 21 (2003 SRWR meeting minutes: "It was recorded that Dolphin Development Company Limited ("Dolphin") had purchased Regalia and [SRWR] had purchase All Pines and Plenty with [SRWR] funding the acquisition with an unsecured loan from Dolphin. . . . Consideration for the loan is the Reserve's undertaking to transfer such lands to Dolphin or Dolphin's nominee."). In May 2005, SRWR also purchased a nearby five-acre island, currently known as "Sanctuary Caye." PX 378; *see, e.g.*, PX 277 at 13.[15]

At a certain point, Baker, the Medhursts, and Pukke decided that the land, with its lush beaches and exotic flora and fauna, was ripe for development as a resort. They believed it could be effectively marketed to consumers located primarily in the United States. Accordingly, Baker and Pukke—whom Baker considered and considers a "marketing genius"—along with the Medhursts and others including John Usher, a Belizean citizen based in Belize (who eventually became a Manager of Dolphin and Director of SRWR), began to develop and market lots at the project known at the time as Sanctuary Bay Estates. PX 370 (collection of minutes for Dolphin); Baker Dep. Tr., 2/19/19, 123:19-124:1. To this end, these individuals got together and sketched out a master plan subdivision, as well as strategies for possible financing, marketing materials, and

---

[15] In one of its contempt motions (Parcel Contempt) and in its Post-Trial Proposed Findings of Fact and Conclusions of Law, the FTC appears to refer to the accumulated land, not including the island, as the "Parcel." During the *AmeriDebt* proceeding, however, the Receiver contended that it was entitled to assume ownership and control of Sanctuary Bay, including <u>all</u> real and personal property comprising and/or located at Sanctuary Bay. The Receiver based its claim on Pukke's 60% ownership of Dolphin, the developer of Sanctuary Bay and owner in fee of a 350 acre parcel of land, as well as the fact that Pukke had personally loaned Dolphin in excess of $3.6 million total. *AmeriDebt*, ECF No. 686-1.

the like. PX 370. By 2005, appropriate approvals, for the most part, had been obtained from the Belizean Government, and Dolphin sold its first lot in the development. *Id.* From 2005 to date, SBE has sold over 1,000 lots at the Belizean Parcel, including some lots that have been sold more than once. PX 816 at 20-23.

By 2007, for reasons to be discussed, SRWR became the sole owner of the entire Sanctuary Belize development. *FTC v. AmeriDebt*, 03-cv-3317 PJM ("*AmeriDebt*"), ECF No. 686. Over the years, however, multiple SBE entities, including GPA, Eco-Futures Belize, and Eco-Futures Development, were formed, all to the end of developing, operating, or providing sales and marketing for Sanctuary Belize. Of particular note is that most of these SBE entities were more or less continuously housed together in the same suite of offices in Southern California—first at 1401 Dove Street in Newport Beach, then at 1201 Dove Street in Newport Beach, and finally at 3333 Michelson Drive in Irvine. All of the entities shared interchangeable board directors and/or executive personnel (e.g., Baker, Kazazi and Greenfield). Further, as far back as 2005, Dolphin, then several other SBE entities retained, as their Belizean counsel, the same individual, Rodwell Williams, Esquire, of the law firm of Barrow & Williams. (Of interest is that, since 2008, Barrow has been the Prime Minister of Belize).

In or about 2009, Pukke took control of the sales and marketing aspects of the development. Baker Dep. Tr., 2/19/19, 122:23-124:18. As Baker stated, Pukke was "indispensable and irreplaceable;" without him, the operation was "inexperienced and overwhelmed." Baker Dep. Tr., 2/19/19, 123:19-124:1. Almost immediately, Pukke and other members of the team, including Chadwick, pursued an aggressive advertising campaign throughout the United States, using various media, including enthusiastic promotions on such television channels as Fox News and Bloomberg TV. PI Hrg Tr., 3/11/19 Afternoon, 82:8-16. The marketing and sales operation also

maintained websites which consumers could and did navigate, and which urged potential purchasers to submit contact information to SBE in order to learn more about Sanctuary Bay (then Sanctuary Belize, later the Reserve) leading to the possible acquisition of these lots. PI Hrg Tr. 3/11/19 Morning, 48-49; PI Hrg Tr. 3/19/19 Afternoon, 59:9-12; PX 298; PX 399.

The typical marketing format proceeded thus:

Consumers who responded to SBE's initial nationwide marketing efforts would be called by California-based telemarketers. PI Hrg Tr., 3/11/19 Afternoon, 82:17-24; PI Hrg Tr., 3/19/19 Afternoon, 59:17-21; Trial Tr., 1/29/20 Afternoon, 52:24-53:12. SBE operatives coached sales employees to create a sense of urgency and a fear of loss on the part of prospective purchasers, techniques somewhat reminiscent of those used by Jordan Belfort, aka the "Wolf of Wall Street," which is precisely what SBE telemarketers consistently did in their calls with consumers. PI Hrg Tr., 3/19/19 Afternoon, 60:22-61:10; PX 207.1; PX 207.2; Trial Tr., 1/23/20 Afternoon, 8:4-9:5; PX 1375; PX 1482. SBE managers would reprimand SBE salespeople who deviated from the scripts. Trial Tr., 1/31/20 Afternoon, 54:5-55:3.

After capturing the interest of prospective purchasers, invariably by making one or more of several enticing representations to be discussed in detail hereafter, SBE telemarketers urged consumers to participate in a webinar in which a higher-level SBE sales agent would speak with them over the telephone, often simultaneously transmitting to the consumers' computers slick photos and graphics of the development's prime features. PX 307; Trial Tr., 2/6/20 Afternoon, 72:13-73:8 (authenticating PX 307); PX 308; PX 309; PX 310; Trial Tr., 2/6/20 Afternoon, 77:8-21 (authenticating PX 310); PX 336; PX 337; PX 186.3; Trial Tr., 1/28/20, 54:13-24; Trial Tr., 1/31/20 Afternoon, 53:20-54:4. The presenters during the webinars varied, but Chadwick was

especially prominent among them, starring in at least one webinar. Trial Tr., 1/28/20, 55:17-24,

(Chadwick hosting webinar available as PX 186.3).

      After the webinars, many consumers signed up to travel to Belize and tour Sanctuary Belize

in person. The arrangement worked in the following manner. The prospective lot purchasers would

pay their own airfare between their hometowns in the United States and Belize and, for $799 per

person or $999 per couple, they would receive an all-inclusive five day tour of Sanctuary Belize,

including, at no additional cost, lodging at a resort nearby, food, meals, drinks, and internal

transportation. PX 186.12; PI Hrg Tr., 3/11/19 Afternoon, 86:3-87:1; PI Hrg Tr., 3/11/19 Morning,

54-55; PI Hrg Tr., 3/19/19 Afternoon, 62:5-10; Trial Tr., 1/28/20, 69:20-24; Trial Tr., 1/22/20

Morning, 19:4-13; Trial Tr., 1/29/20 Afternoon, 53:2-55:19; Trial Tr., 1/31/20 Afternoon, 66:15-

16; PX 311; Trial Tr., 2/6/20 Afternoon, 79:14-24. Unceasingly, while touting the visit to Belize

to tour Sanctuary Belize over the phone, SBE employees encouraged, and later required,

consumers to sign what they termed "non-binding lot reservation agreements." PX 410; PX 605;

PX 821; PX 821; PI Hrg Tr., 3/11/19 Afternoon, 87:12-23; Trial Tr., 1/31/20 Afternoon, 67:11-

68:15; PI Hrg. Tr., 3/11/19 Afternoon, 87:12-23; Trial Tr., 2/3/20 Morning, 51:4-9. Pursuant to

these pre-visit agreements, before departing the United States, some consumers paid SBE between

$2,000 and $10,000 to obtain a right of first refusal on particular lots. PX 410; PX 205.15; PI Hrg

Tr., 3/11/19 Afternoon, 87:12-88:7; Trial Tr., 1/29/20 Afternoon, 57:11-58:10 (Chadwick

testimony); Anderson Dep. Tr. 140:22-143:23; Trial Tr., 2/3/20 Morning, 51:7-14; Trial Tr.,

1/31/20 Afternoon, 67:11-68:15; Trial Tr., 1/28/20, 68:20-69:13. These deposits were either

credited toward what SBE hoped would be the purchase price of the reserved lot or the purchase

of a second lot, but the arrangement was that the deposits would be refunded if the consumers

decided not to complete the purchase. Trial Tr., 1/31/20 Afternoon, 67:8-68:15 (Reneau); Hogan

Dep. Tr. 138:7-18; Trial Tr., 1/28/20, 69:8-13 (consumer understood that "[i]t's a refundable lot reservation"); Trial Tr., 1/30/20 Morning, 98:14-18 (Chadwick testifying that his understanding was that if a consumer chose not to purchase, their payment for the lot reservation was returned); PI Hrg. Tr., 3/11/19 Afternoon, 87:12-23 (consumer understood that SBE would return his lot payment to him if he chose not to purchase a lot).

At the same time, some consumers agreed to purchase lots outright, either before going on the tour or without ever going on the tour. *See, e.g.*, PX 258 at 11 (SBE marketing script, stating to prospective lot purchasers, "You have 4 choices: . . . Purchase a home site sight unseen (23% of our owners have done this)."); PX 819-828 (emails, lot purchase agreements, and SBE spreadsheets showing that some consumers purchased prior to a tour); PI Hrg Tr., 3/19/19 Afternoon, 61:11-16 (in at least one case a consumer made a $20,000 down payment on a lot and signed a memorandum of sale before visiting the property or meeting with a telemarketer face-to-face); Anderson Dep. Tr. 202:4-203:11 (Q: "So were there lots being sold without a tour in Belize at all? A: Yes."); Trial Tr., 1/31/20 Afternoon, 69:5-14 ("Q: What was the attitude of Sanctuary Belize towards sight unseen purchases? A: Well, that was the new benchmark. It was almost expected for everybody to do that. That's what they really wanted.")

Once prospective lot purchasers flew to Belize, tours there typically gathered together five to ten couples who, as a group, toured Sanctuary Belize, visited lots, and attended sales presentations. Presenters in Belize varied but, over time, Chadwick, Usher, and Costanzo played prominent roles. *See, e.g.*, PI Hrg Tr., 3/19/19 Afternoon, 67:5-18; PI Hrg Tr., 3/11/19 Morning, 57-58 (testifying that Chadwick gave a property tour and declared that the development was debt-free); Trial Tr., 1/24/20, 98:10-13. Consumers were typically encouraged to purchase a second lot on the representation that, given a resale market that SBE employees portrayed as "robust," they

could easily sell the first lot and use the proceeds of that sale to build a house on the second lot. *See, e.g.*, PX 1372; PI Hrg Tr., 3/11/19 Morning, 54:16-22; Trial Tr., 1/28/20, 47:14-48:2; PI Hrg. Tr., 3/11/19 Afternoon, 94:11-95:1; Trial Tr., 1/27/20 131:18-132:4; Trial Tr., 1/31/20 Afternoon, 63:4-15. Many individuals and couples signed contracts for the purchase of lots while in Belize, or shortly after leaving Belize. PX 1432, PX 1445, PX 186.20. The Receiver's Report of Activities for the Period from November 6, 2018 Through February 21, 2019 details 1,314 lots being sold over the course of the years, though some lots, having been repossessed for nonpayment, were apparently sold more than once. PX 816. Since the lots were unimproved, some purchasers made arrangements for the construction of houses. Hrg. Tr., 2/4/19 Morning, 29:16-29:17.

Throughout the sales process—during the initial contacts with prospective purchasers (which is to say consumers) in the United States during the marketing phase, and on the ground in Belize—SBE employees made several of the alleged misrepresentations to the consumers, oftentimes repeating them in an effort to induce the purchase of lots. These representations, which will be discussed in detail, *infra*, Section V, occurred right up to the time the FTC filed this lawsuit in October 2018, and even after that, i.e., until the FTC's representatives and the Receiver's representatives actually entered the premises at 3333 Michelson Drive on November 7, 2018. When the FTC's and Receiver's representatives entered the premises that day, they found sales scripts that included the precise alleged misrepresentations at issue today. Confirming this, the FTC deposed Zarnie Morgan (formerly Zarnie Anderson), a receptionist-turned-salesperson who worked at SBE from 2013 until the filing of this lawsuit, who admitted to making many of these representations using some of the scripts found at 3333 Michelson Drive. Morgan was also recorded on calls with undercover FTC personnel on September 5, 2017, September 11, 2017, and September 19, 2017, during which she repeated some of the very same representations at issue

here. PX 307; PX 315; PX 335. When the FTC recorded a webinar hosted by Costanzo on September 19, 2017, he, too, made many of these representations. PX 337.

For the present, suffice to say that while the vigorous marketing and sales of the SBE lots were going forward full-throttle, development of the project, including completion of the promised amenities, either did not go forward, or did not proceed according to the promised timelines. This left many lot purchasers displeased and dissatisfied.

### B.  The Backstory of Defendant Pukke (including his use of aliases)

The backstory of Pukke's involvement in SBE is of utmost relevance.[16] In 2003, Pukke, his company Debtworks, and a company he helped found, AmeriDebt, were accused by the FTC of masterminding a credit counseling scheme whereby, in essence, he represented to customers throughout the United States that AmeriDebt, as a nonprofit organization, could assist them with their credit problems, and would charge no initial fees. *AmeriDebt*, ECF No. 1. But in fact AmeriDebt did charge initial fees. *Id.* Customers who signed up had to make an initial payment, and then were almost immediately enrolled in debt management plans and charged additional fees, which were collected by AmeriDebt's from-all-appearances-independent-servicing company Debtworks, which in actuality was a profit-making entity owned by Pukke. *Id.* The FTC brought suit against Pukke based upon this apparent deception and, a few months later, individual consumers of AmeriDebt and Debtworks filed a separate class action suit against Pukke, AmeriDebt, Debtworks, and related entities and individuals based on the purported

---

[16] At this point, the Court need not explore in detail Pukke's 1996 plea of guilty to Mail Fraud under 18 U.S.C. §§ 1341-1342, a case involving consumer fraud brought by the United States Attorney's Office in the Western District of Pennsylvania. *United States v. Pukke*, No. 2:96-cr-137 (W.D. Pa.). That conviction, however, has direct implications for Pukke's credibility in both the present and *AmeriDebt* cases.

misrepresentations. *Polacsek v. Debticated Consumer Counseling, Inc.*, 04-cv-631 PJM, ECF No. 1.

Pukke, to be sure, denied liability in both cases. Even so, in one of those not infrequent scenarios in which a litigant denies liability but settles claims against him for an enormous sum and agrees to abide by the strict terms of a permanent injunction, Pukke ended up settling with the FTC on the eve of trial and agreed to make just such a huge restitution to the FTC to be distributed to AmeriDebt consumers. Pukke also agreed to abide by several restrictions specified in a Stipulated Final Judgment and Permanent Injunction ("Stipulated Final Judgment"). *AmeriDebt*, ECF No. 473. Per the Stipulated Final Judgment, Pukke would pay $172 million in restitution, with all but $35 million suspended if (a) he fully paid the $35 million and (b) cooperated with the FTC. *Id.* These payments were to be divided with the class members in the class action suit. *AmeriDebt*, ECF No. 472. The agreement appointed a permanent Receiver, Robb Evans and Associates LLC, to marshal Pukke's assets for the purpose of satisfying his obligations under the Stipulated Final Judgment. *AmeriDebt*, ECF No. 473. The Court signed the Stipulated Final Judgment on May 16, 2006. *Id.*

As part of the Stipulated Final Judgment in *AmeriDebt*, Pukke was obliged to turn over to the Receivership essentially all his assets, the most relevant of which was control and custody of Dolphin based on his 60% interest in Dolphin. *AmeriDebt*, ECF No. 525. Dolphin, it will be recalled, was the development and sales arm of the Sanctuary Bay development, and possessed assets consisting of "ownership, development and related rights in real property located in Belize known as Sanctuary Bay Estates, including related rights and interests in developing and selling lots in the Sittee River Wildlife Reserve and related tangible assets such as equipment that are essential to the development." *Id.* But as it happened, as the Receiver said at the time, Pukke and

19

Baker actually conspired to hide Pukke's interest in Dolphin and Dolphin's assets from the Receiver, as a result of which the Receiver was compelled to move this Court (this Judge) to hold both Pukke and Baker in contempt of court. *Id*. After contempt hearings lasting ten days, the Court found both Pukke and Baker in civil contempt and, among other things, ordered them to turn over all "assets, rights, claims and interests of Dolphin. . . and all proceed thereof, as to which Andris Pukke holds indirectly a majority, 60% controlling ownership interest," simultaneously entering an order vesting the same in the Receivership. *AmeriDebt*, ECF Nos. 571 and 572. Pukke and Baker, however, did not immediately cooperate with the Receiver nor did they comply with the Court's Orders, i.e., to purge their contempt. As a result, on April 30, 2007, the Receiver moved to have both men incarcerated in order to coerce their compliance with the Court's Orders. *AmeriDebt*, ECF Nos. 596 and 597. On May 4, 2007, the Court again found Pukke and Baker in contempt and remanded them to the custody of the U.S. Marshal to be incarcerated. *AmeriDebt*, ECF No. 604. After serving approximately two weeks and one month in custody respectively, Baker and Pukke were eventually released. *AmeriDebt*, ECF Nos. 614 and 622. Their release, however, was conditioned on them cooperating in the turn-over of Pukke's assets to the Receiver, including all rights, claims and interests in and to Dolphin. *AmeriDebt*, ECF Nos. 571, 614, 622.

The Receiver's pursuit of the Sanctuary Parcel did not end there. Almost immediately, the Receiver found itself in a head-to-head contest in Belize with SRWR led by Usher, who contended that the Receiver had no legal, equitable or enforceable creditor or equity interest in the Parcel other than in a small portion of the land. Trial Tr., 1/23/20 Morning, 55:17-56:6, *AmeriDebt*, ECF No. 682. Usher also claimed, in a letter dated April 23, 2007, that the Board of SRWR had met and terminated all development rights and contracts of Dolphin, Sanctuary Bay, Starfish, and Baker "past and future" at a recent board meeting. *AmeriDebt*, ECF No. 596. So things stood until

the Receiver, not relishing a court battle in Belize, found it to be the better part of wisdom to avoid litigating the dispute in Belizean Courts and chose to settle. *Id.* On being paid $2.0 million cash by SRWR, the Receiver agreed to relinquish all rights, claims and interests in and to the Parcel, a sale that was submitted to and approved by this Court. Trial Tr., 1/23/20 Morning, 55:22-56:14; ECF No. 686.

      Fast forward to the present case.

      What the Receiver claims in the present case is that it did not know at the time it settled with SRWR that, in one way or another, Baker and Pukke, without missing a beat, would immediately jump back into the ownership and control of the Parcel, with all the attendant authority, responsibility and activity they had previously exercised. Trial Tr., 1/23/20 Morning, 57:8-59:13; PX 395 (emails between Baker and Greenfield discussing sales tours of Sanctuary Belize scheduled for February 2009, also forwarded to Pukke in 2011); Peter Baker Dep. Tr., 2/19/19, 123:17-124:1 (Baker testifying that Pukke's ownership and involvement was reinstated "[a]s soon as we were ready to go to, call it, start marketing and sales" and describing Pukke as a "partner"). The FTC characterizes this as a sleight of hand by Baker and Pukke because, despite being found in contempt for hiding parts of the Parcel from the Receiver, they still ended up in control of the Parcel.[17]

---

[17] Pukke and Baker say that they arranged for an acquaintance, one Stephen Choi, to put up the $2.0 million purchase money and that he became a part owner in what would become the development company that owned the Parcel. Baker Dep. 108:8-108:13; Trial Tr. 2/4/20 Afternoon, 61:7-61:14. They submit that nothing in any of the Orders issued by this Court in *AmeriDebt* precluded them from involvement with the Parcel. The Receiver's representative, to the contrary, testified during trial that Usher had represented that he was raising the $2 million from relatives and that neither Pukke nor Baker would be involved with the Parcel thereafter. Trial Tr., 1/23/20 Morning, 57:14-59:10. Furthermore, after Baker and Pukke reacquired Long Caye in 2012 through Barienbrock, Pukke in an email crowed: "It's taken some time buddy but we're getting everything they stole from us back!!" PX945

Pukke's conduct in the *AmeriDebt* case and in the Chapter 11 bankruptcy case he filed during the *AmeriDebt* proceeding gave rise to other serious concerns. Even as he was supposed to hand over certain assets to the Receiver, in a related criminal proceeding, Pukke pled guilty before this Court to obstruction of justice under 18 U.S.C. §1503, based on concealment and false statements concerning his interests in entities involved in (i) internet gambling, (ii) his accounts at A/S HansaBanka in Latvia and Valkyr Trust, (iii) his interest in real property located at 69 Emerald Bay in Laguna Beach, California, (iv) his interest in Dolphin, and (v) his interest in SeaSpray Holdings Ltd. *United States v. Pukke*, 10-cr-734 PJM ("*Pukke*"), ECF No. 7. For these misdeeds, the Court sentenced Pukke to 18 months incarceration, followed by a 3-year period of Supervised Release with Special Conditions. *Pukke*, ECF No. 15. Pukke was incarcerated from June 30, 2011 to September 20, 2012.[18]

After Pukke served his jail time, but toward the end of his supervised release period, the Court's Probation Office found cause to believe that Pukke might be violating a condition of his supervised release based on his involvement with the Sanctuary Belize development. In particular, the Probation Officer reported to the Court that on corporate disclosure forms related to Sanctuary Belize, Pukke had been using an alias—Marc Romeo—and that he had failed to disclose to the Probation Office his involvement with, among other entities, SRWR and Eco-Futures Development in 2015. *Pukke*, ECF No. 38. On November 13, 2015, the Court commenced a hearing to determine if Pukke's supervised release should be revoked, at which Pukke and his cohorts, testifying under oath in person and/or by affidavit, sought to convince the Court that Pukke's role in the Sanctuary Belize development was only very minor and that, if he ever used

---

[18] The Parties have stipulated that these dates are accurate. Trial Tr., 1/28/20, 200:4-8.

the name Marc Romeo, he had only done so on a few occasions and then only before he began his supervised release. Hr. Tr. 3/2/16, 273:18-274:23. Chadwick, in particular, filed a sworn affidavit with the Court at the time to the effect that he was "not aware of Andris Pukke using the name Marc Romeo at anytime between 2012 and the present," *i.e.* 2015. *Pukke*, ECF No. 46.

While expressing skepticism as to Pukke's claim that he never used the Marc Romeo alias during his term of supervised release, the Court chose to give him a pass and terminated his supervised release in satisfactory status. *Pukke*, ECF No. 51. But, as the Court will elaborate in the following pages, the irrefutable facts were and are that (a) before he was incarcerated and very much while he was on supervised release and up to the very time of the filing of this suit by the FTC in October 2018, Pukke was not merely a minor player in SBE, he was effectively the Chief Executive Office in control of the entire Sanctuary Belize operation and (b) with the virtually certain knowledge and collaboration of many, Chadwick included—Pukke continued to hold himself out as "Marc Romeo" (and used at least one other alias, Andy Storm) on several occasions and frequently undertook either to deny or minimize to others his role in the development. These deceptions came in the face of express concerns by not a few prospective lot purchasers over whether Pukke, whose history as a felon engaging in consumer fraud had been bruited about in the press, was in any way involved in SBE. SBE employees—again, especially Baker and Chadwick— knew all about this. One prospective purchaser of a lot testified at trial that he asked Chadwick to "look [him] in the eye and tell [him] that Andris Pukke was in no way, shape or form involved with Sanctuary Belize," and Chadwick, now in full-blown denial, unhesitatingly full-on did just that. Trial Tr., 1/28/19 Morning, 78:1-78:5.

## IV. LEGAL STANDARDS FOR LIABILITY UNDER FTC ACT AND TSR[19]

### A. *Liability for Violations of FTC Act and for Permanent Injunction*

Section 5 of the Federal Trade Commission Act ("FTC Act") bars "unfair or deceptive acts or practices in or affecting commerce." 15 U.S.C. § 45(a). Under Section 13 of the FTC Act, the Commission is empowered to sue in federal district court "[w]henever the Commission has reason to believe (1) that any person, partnership, or corporation is violating, or is about to violate, any provision of law enforced by the Federal Trade Commission" and that "in proper cases the Commission may seek, and after proper proof, the court may issue, a permanent injunction." 13 U.S.C. § 53(b).

A deceptive act or practice is established when: (1) there was a representation, omission, or practice; (2) that was likely to mislead customers acting reasonably under the circumstances; and (3) the representation, omission, or practice was material. *FTC v. Loma Int'l Bus. Grp. Inc.*, 2013 WL 2455986, at *3-*4 (D. Md. June 5, 2013); *see also Sw. Sunsites, Inc. v. FTC.*, 785 F.2d 1431, 1435 (9th Cir. 1986); *FTC v. Swatsworth*, 2018 WL 4016312, at *3 (W.D.N.C. Aug. 22, 2018); *FTC v. Moses*, 913 F.3d 297, 306 (2d Cir. 2019).

---

[19] The Court has subject matter jurisdiction over the FTC's claims pursuant to 15 U.S.C. §§ 45(a), 53(b), 57(b), 6102(c), and 6105(b), and 28 U.S.C. §§ 1331, 1337(a) and 1345. As detailed in the Court's Memorandum Opinion Granting the Preliminary Injunction, the Court also has personal jurisdiction over the Defendants since personal jurisdiction in an FTC case is determined based on a defendant's contacts with the United States. ECF No. 539. As the Court has previously ruled, venue in the District of Maryland is proper under 15 U.S.C. § 53(b) and 28 U.S.C. § 1391(b) and (c). Hr. Tr. 3/1/19, 35:15-37:24.

The FTC Act and the TSR (violations of which are violations of the FTC Act) apply extraterritorially. In the 2006 SAFE WEB Act, Congress decreed that the FTC Act applies to acts or practices in foreign commerce that "(i) cause or are likely to cause reasonably foreseeable injury within the United States; or (ii) involve material conduct occurring in the United States." 15 U.S.C. § 45(a)(4)(A). Deceptive marketing to U.S. residents causes or is likely to cause reasonably foreseeable injury here. Additionally, because, as will be seen, SBE entities operated from California as well as Belize and targeted consumers in the United States, extensive material conduct of Defendants occurred within the United States.

As to the first requirement, when there is an express claim, "the representation itself establishes the meaning." *Federal Trade Commission Policy Statement on Deception,* 103 FTC 174 (1984) (appended to *Cliffdale Assocs.*) [hereinafter "FTC Policy Statement"].

As to the second requirement, "the Court must consider whether a representation is likely to mislead a reasonable consumer by viewing the representation as a whole and focusing on the impression created, not its literal truth or falsity." *Loma*, 2013 WL 2455986 at *5. The "test is whether the consumer's interpretation or reaction is reasonable" but the interpretation or reaction "does not have to be the only one." FTC Policy Statement.

As to the third requirement, express representations that are shown to be false are presumptively material. *Loma*, 2013 WL 2455986, at *6; *see also In re Thompson Medical Co., Inc.,* 104 FTC 648, 816 (1984) ("Express claims, or deliberately-made implied claims, used to induce the purchase of a particular product or service are presumed to be material."), *aff'd*, 791 F.2d 189 (D.C. Cir. 1986), *cert. denied*, 479 U.S. 1086 (1987). Misrepresentations concerning certain central characteristics of a product or service, such as anticipated income from a business opportunity, are material and "likely to mislead consumers because such misrepresentations strike at the heart of a consumer's purchasing decision." *FTC v. Freecom Commc'ns, Inc.*, 401 F.3d 1192, 1203 (10th Cir. 2005). Representations with respect to other characteristics of a product or service such as its purpose, safety, efficacy, and cost are also presumptively material. *See Thompson Med. Co.*, 104 FTC at 816; *see also In re Telebrands Corp.*, 140 FTC 278, 292 (2005) (claims are material when they relate to a product's "central characteristics"), *aff'd*, 457 F.3d 354 (4th Cir. 2006).

Once a deceptive act or practice has been established, an individual may be found liable under the FTC Act if he or she:

> (1) participated directly in the deceptive practices *or* had authority to control those practices, and (2) had or should have had knowledge of the deceptive practices. The second prong of the analysis may be established by showing that the individual had actual knowledge of the deceptive conduct, was recklessly indifferent to its deceptiveness, or had an awareness of a high probability of deceptiveness and intentionally avoided learning the truth.

*FTC v. Ross*, 743 F.3d 886, 892 (4th Cir. 2014).

As to the first prong, participation or control "may be indicated by an individual's assumption of duties as a corporate officer, involvement in business affairs, or role in the development of corporate policies." *FTC v. Ross*, 897 F. Supp. 2d 369, 382 (D. Md. 2012), *aff'd*, 743 F.3d 886 (4th Cir. 2014). Authority to control is "evidenced by an individual's ability to review and approve advertisements as well as his or her ability to issue checks, make hiring decisions and personally finance or pay for corporate expenses," whereas direct participation "can be demonstrated through evidence that the defendant developed or created, reviewed, altered and disseminated the deceptive marketing materials" or by demonstrating "[a]ctive supervision of employees as well as the review of sales and marketing reports related to the deceptive scheme." *Id.* at 382-3 (internal citations omitted). A defendant need not be the CEO to "demonstrate authority to control [because] active involvement in the affairs of the business and the deceptive scheme is sufficient." *Id.* at 383.

As to the second prong, "the degree of participation in business affairs is probative of knowledge." *FTC v. Innovative Mktg., Inc.*, 654 F. Supp. 2d 378, 387 (D. Md. 2009) (internal citations omitted). An individual defendant's "pervasive role and authority" in an entity creates a "strong inference" that the individual defendant had knowledge. *FTC v. Commerce Planet, Inc.*,

878 F. Supp. 2d 1048, 1082 (C.D. Cal. 2012), *aff'd in part and vacated in part on other grounds*, 815 F.3d 593 (9th Cir. 2016).

To award permanent injunctive relief against an individual found to have violated the FTC Act, there must be some cognizable danger of recurring violation, a determination made by the Court based on the following factors: (1) defendant's scienter; (2) whether the conduct was isolated or recurrent; (3) whether the defendant is positioned to commit future violations; (4) the degree of consumer harm; (5) defendant's recognition of culpability; and (6) the sincerity of defendant's assurances against future violations. *Loma*, 2013 WL 2455986, at *6 (internal citations omitted); *see also Ross*, 897 F. Supp. 2d at 387; *Swatsworth*, 2019 WL 6481353, at *3 (ordering injunctive relief because defendants were "likely to continue to engage in the activities alleged in the Complaint or otherwise violate the FTC Act"); *FTC v. Lalonde*, 545 F. App'x 825, 841 (11th Cir. 2013) (holding that "in reviewing the grant of a permanent injunction, the test is whether the defendant's past conduct indicates that there is a reasonable likelihood of further violations in the future.") (internal citations omitted).

Injunctive relief may be framed "broadly enough to prevent [defendants] from engaging in similarly illegal practices in future advertisements." *FTC. v. Colgate-Palmolive Co.*, 380 U.S. 374, 395 (1965). In fact, "'the Commission is not limited to prohibiting the illegal practice in the precise form in which it is found to have existed in the past.' Having been caught violating the Act, respondents 'must expect some fencing in.'" *Id.* (citing *FTC. v. National Lead Co.*, 352 U.S. 419, 431 (1957). *See also FTC v. Grant Connect, LLC*, 763 F.3d 1094, 1105 (9th Cir. 2014).

### B. Liability for Monetary Relief Under FTC Act

As previously held by this Court and the Fourth Circuit, in addition to injunctive relief, the Court is authorized to grant consumers financial redress under the FTC Act. *See Ross*, 743 F.3d at

891 (holding that "ordering monetary consumer redress is an appropriate equitable adjunct" to the district court's injunctive power"); *see also In re Pukke,* 790 F. App'x 513, 514 (4th Cir. 2020) (stating "our precedent treats disgorgement as an equitable remedy"); ECF No. 573.[20] This Court, after reviewing case law, determined in an Memorandum Opinion and Order dated October 17, 2019, that restitution in this case would be the "amount consumers paid for real estate lots at Sanctuary Belize less refunds made to consumers." ECF Nos. 631 and 632.

An enterprise is liable for restitution (though the Fourth Circuit has recently used the term disgorgement) only if the FTC shows consumer reliance. *Loma Int'l Bus. Grp. Inc.*, 2013 WL 2455986, at *7. The FTC is "not required, however, to show any particular purchaser actually relied on or was injured by the unlawful misrepresentation." *Freecom Commc'ns, Inc.*, 401 F.3d at 1205. Instead, reliance can be established if "(1) the business entity made material misrepresentations likely to deceive consumers, (2) those misrepresentations were widely disseminated, and (3) consumers purchased the entity's products." *Id.*; *see also Ross*, 897 F. Supp.2d at 387; *FTC v. BlueHippo Funding*, LLC, 762 F.3d 238, 244 (2d Cir. 2014). Consumer reliance on express claims is presumptively reasonable. *FTC v. Five–Star Auto Club, Inc.*, 97 F.Supp.2d 502, 528 (S.D.N.Y. 2000) (quoting *FTC v. Int'l Computer Concepts, Inc.*, 1995 WL

---

[20] As will be discussed *infra*, Section IX.B, The Court is aware that on July 9, 2020, the Supreme Court granted writs of certiorari in *AMG Capital Management v. FTC*, 19-508, and *FTC v. Credit Bureau Center*, 19-825, to determine whether Section 13(b) of the FTC Act authorizes the FTC to demand monetary relief such as restitution on behalf of consumers, and if so, whether there are any requirements or limits on the scope of such relief. The Court is also aware of the Supreme Court's decision in *Liu v. SEC*, 140 S. Ct. 1936 (2020), which reaffirmed the Securities and Exchange Commission's ("SEC") ability to obtain monetary relief such as disgorgement under Section 78u(d)(5) of the Securities Exchange Act of 1934, 15 U.S.C. § 78a *et seq.*, but limited the scope of such relief to "net profits." The Court believes that in the two FTC cases, the Supreme Court will determine that *Liu* is not applicable to Section 13(b) of the FTC Act. In any event, as of now, *FTC v. Ross*, 743 F.3d 886 (4th Cir. 2014), is binding precedent in the Fourth Circuit. If the Supreme Court and/or the Fourth Circuit determines that restitution under Section 13(b) of the FTC Act is similarly limited to "net profits" (and the Court believes it will not), this Court will determine the amount Defendants are liable for on remand, given the limited evidence in the record on that point as of now.

767810, *3 (N.D. Ohio Oct. 24, 1995)); *see also FTC v. Tel. Prot. Agency, Inc.*, 2005 WL 8175124, at *2 (W.D.N.C. Aug. 29, 2005).

### C.  Liability as a Common Enterprise

The FTC has alleged that all Corporate Defendants operated as a common enterprise under the umbrella of SBE, and as such are jointly and severally liable for SBE's misdeeds of Pukke, Baker, Chadwick and Usher and their minions due to their roles in SBE.

Proof of a common enterprise has significant consequences. "[W]here corporate entities operate together as a common enterprise, each may be held liable for the deceptive acts and practices of the others." *Grant Connect* 763 F.3d at 1105; *see also Rowe v. Brooks*, 329 F.2d 35, 39-40 (4th Cir. 1964) (noting that joint ventures operate like a partnership, wherein partners have joint and several liability for losses incurred in furtherance of common enterprise). To determine whether a group of entities operated as a common enterprise, courts "look to a variety of factors, including: common control, the sharing of office space and officers, whether business is transacted through a maze of interrelated companies, the commingling of corporate funds and failure to maintain separation of companies, unified advertising, and evidence which reveals that no real distinction existed between the Corporate Defendants." *CFTC v. Noble Wealth Data Info. Servs. Inc.*, 90 F. Supp. 2d 676, 691 (D. Md. 2000) (quoting *FTC v. Wolf*, No. 94-5119, 1996 WL 812940, *7 (S.D. Fla. Jan. 31, 1996) (citations omitted)). FTC Act liability for members of a common enterprise is joint and several. *See, e.g., FTC v. Pointbreak Media, LLC*, 2019 WL 1650101, *6 (S.D. Fla. Apr. 4, 2019).[21]

---

[21] Even if the Supreme Court were to decide the FTC cases similarly to *Liu*, *Liu* did not address common enterprise liability and instead addressed joint and several monetary liability for individual defendants. Monetary liability of individual defendants will be addressed *infra*, Section IX.B.

### D. Liability for Violations of Telemarketing Sales Rule

In addition to claiming that Defendants, both individual and Corporate, directly violated the FTC Act, the FTC alleges that they violated the Telemarketing Sales Rule ("TSR"), 16 C.F.R. § 310.3, which was promulgated pursuant to the Telemarketing and Consumer Fraud and Abuse Prevention Act, 15 U.S.C. § 6102(b).[22] Among other prohibitions, the TSR states that it "is a deceptive telemarketing act or practice and a violation of this Rule for any seller [in connection with a telemarketing transaction as defined in 16 C.F.R. § 310.2] or telemarketer to engage" in misrepresenting, directly or by implication, "[a]ny material aspect of the performance, efficacy, nature, or central characteristics of goods or services that are the subject of a sales offer," or "[a]ny material aspect of an investment opportunity including, but not limited to, risk, liquidity, earnings potential, or profitability." *Id.* at §§ 310.3(a)(2)(iii), (vi).

The TSR also provides that any person, defined as "any individual, group, or unincorporated association, limited or general partnership, corporation, or other business entity," 16 C.F.R. § 310.2(y), who "provide[s] substantial assistance or support to any seller or telemarketer when that person knows or consciously avoids knowing that the seller or telemarketer is engaged in any act or practice that violates §§ 310.3(a), (c) or (d), or § 310.4" of the TSR has committed a "deceptive telemarketing act or practice" and violated the Rule itself or himself. 16 C.F.R. § 310.3(b).

The standard for individual liability under the TSR is the same as the standard for individual liability under the FTC Act. *See* 15 U.S.C. § 6102; 15 U.S.C. § 57a(d)(3); *see also FTC*

---

[22] To be clear, the FTC alleges that Pukke, Baker and Usher violated the TSR and the *AmeriDebt* Stipulated Final Judgment which prohibited violation of the TSR. The FTC's Motion to Hold Pukke, Baker and Usher in Contempt for violation of the *AmeriDebt* Stipulated Final Judgment, ECF No. 266, will be discussed in Section X.C. Chadwick is only alleged to have violated the TSR in the present case and is not alleged to have violated the *AmeriDebt* Stipulated Final Judgment.

*v. WV Universal Mgmt., LLC*, 877 F.3d 1234, 1240 (11th Cir. 2017) (holding that "by violating the TSR, [the defendant] violated the FTC Act and is subject to its penalties."). A court may impose joint and several liability for a violation of the TSR if "[i]t is impossible to say how much [the defendant] harmed each individual." *FTC v. Lake*, 181 F. Supp. 3d 692, 702 (C.D. Cal. 2016).

Defendants do not dispute that SBE at all relevant times has been a "telemarketer" and "seller" within the meaning of the TSR, or that lot sales in the planned community that is Sanctuary Belize are covered by the TSR. However, they cite to 16 C.F.R. § 310.6(b)(3) which exempts certain telemarketing transactions from the TSR, including "[t]elephone calls in which the sale of goods or services or charitable solicitation is not completed, and payment or authorization of payment is not required, until after a face-to-face sales or donation presentation by the seller or charitable organization." Defendants submit that SBE's telemarketing of lots qualify for this exemption because, typically, consumers traveled or travel to Belize to tour the lots and did not or do not actually purchase the lots until after they meet face-to-face with SBE salespeople and listened to a SBE presentation.

The FTC argues that the language of the exemption must be read to consist of two requirements, both of which must be fulfilled for the exemption to apply, meaning that if either requirement is not fulfilled, the exemption does not apply and Defendants remain subject to the TSR. The two requirements for the exemption to apply, says the FTC, are that (i) "payment or authorization of payment is not required[] until after a face to face sales . . . presentation"; and (ii) the sale "is not completed . . . until after a face-to-face sales . . . presentation." 16 C.F.R. § 310.6(b)(3). Pointing to the first requirement, the FTC argues that consumers were required to make three "mandatory" payments before arriving in Belize—viz., payment to attend the tour in Belize, payment for roundtrip airfare between the consumers' hometowns and Belize City, and

31

payment for lot reservations, which included a right of first refusal on a specific lot and which would serve as part of the consumer's down payment if the lot was ultimately purchased. Second, the FTC argues that some consumers in fact did purchase lots sight unseen, so that some sales were completed before the face-to-face sales presentations in Belize. Finally, the FTC argues that the exemption should be construed narrowly because the FTC Act "is a remedial statute [that] . . . should be construed broadly to effectuate its purposes," *FTC v. AT&T Mobility LLC*, 883 F.3d 848, 854 (9th Cir. 2018), and exceptions to a remedial statute must be narrowly construed, *See Jordan v. Acacia Mut. Life Ins. Co.*, 409 F.2d 1141, 1145 (D.C. Cir. 1969); *see also A. H. Phillips, Inc. v. Walling*, 324 U.S. 490, 493 (1945) (explaining that "exemptions" from "humanitarian and remedial legislation must . . . be narrowly construed"). Since, says the FTC, the TSR is a remedial regulation promulgated pursuant to a remedial statute, exceptions to the TSR should be narrowly construed.

Defendants argue that the exemption applies because SBE encouraged prospective lot purchasers to visit Belize before purchasing, so that contracts to purchase lots were typically not consummated until the individual was on the ground in Belize and, moreover, refunds of lot reservation deposits to non-purchasers were always given when requested.

## V.   THE SIX (SEVEN) ALLEGEDLY DECEPTIVE CORE CLAIMS

Throughout these proceedings, the Court has, to cite Mark Twain, received "an ocean, a continent of evidence" to the effect that SBE misled consumers, i.e. prospective lot purchasers, with respect to the six Core Claims, as well as the overarching falsehood that Pukke had no meaningful involvement in Sanctuary Belize. The Court addresses each Core Claim and the misrepresentation of the degree of Pukke's involvement in SBE.

### A.   Timeline of Claims

Before the Court discusses the individual Core Claims, it is necessary and appropriate to establish the timelines of the representations the FTC alleges were made. For what is clear from the evidence is that virtually all of the deceptive claims made by Defendants during the life of the project were made right up to the time the Receiver and the FTC entered the premises at 3333 Michelson Drive in Irvine, California on November 7, 2018. This is important because Pukke suggests that, since the FTC cannot show the representations were made to all or a great majority of lot purchasers or that they were consistently made over time, the FTC should be put out of court. Baker argues for the same result because he says the FTC cannot prove that any specific alleged misrepresentation was not completely over and done with and had not effectively ceased before the initiation of this lawsuit.

The Court is satisfied that the FTC has demonstrated, through extensive exhibits and testimony, that the specific challenged misrepresentations by SBE were made beginning as early as 2005 and continued up to at least November 7, 2018, the date the Receiver and the FTC entered the Michelson Drive office. Sales scripts found on desks in the office at the time of the entry clearly showed the deceptive claims being made as of that date. Additionally, an undercover FTC employee posing as a prospective lot purchaser testified that, in a series of phone calls in August

2017, various SBE salespeople made one or more of the Core Claims to him. Likewise, the FTC offered designated deposition testimony from Zarnie Morgan (formerly Anderson), who worked for SBE as a salesperson from around 2015 to the day of the Receiver and the FTC entered 3333 Michelson Drive and she testified that the deceptive claims were made.[23]

The timelines are important insofar as the FTC seeks monetary as well as injunctive relief. *See* Section IX.

Section 13(b) of the FTC Act provides that the FTC may bring suit whenever it has "reason to believe" that someone "is violating, or is about to violate, any provision of law enforced by the Federal Trade Commission" and "[t]hat in proper cases the Commission may seek, and after proper proof, the court may issue, a permanent injunction." The FTC has maintained throughout this proceeding that it had such "reason to believe" that Pukke, Baker, Chadwick and Usher were violating the FTC Act when it brought this suit. Baker and Chadwick, citing *FTC v. Shire ViroPharma, Inc.*, 917 F.3d 147 (3d Cir. 2019), insist that there is no evidence that they were individually violating or about to violate the FTC Act as of the date of the filing of the lawsuit, which they submit is a requirement for a claim under Section 13(b) of the FTC Act. Accordingly, they argue that the case should have been and still should be dismissed as a matter of law.

The Court flatly rejects this argument. First, the Court notes that Chadwick made the same argument in his Motion to Dismiss, which the Court denied after finding that the FTC had sufficiently pleaded that Chadwick was violating or was about to violate the FTC Act. ECF No. 574. Second, *Shire* was focused on whether the FTC had sufficiently stated a claim of a violation of the FTC Act. Again, the Court has already ruled that the FTC did state a claim. Third, even if

---

[23] Morgan appeared to be particularly hostile to the FTC so the Court finds her testimony on certain points persuasive.

aspects of *Shire*, a non-binding decision from the Third Circuit, were to apply at this stage of the proceedings, there is abundant evidence that Pukke, Baker, and Chadwick as a matter of fact were violating or were about to violate the FTC Act at the time of the FTC's and Receiver's entry at 3333 Michelson Drive.[24] Based on that evidence, the Court concludes that Defendants were in fact violating or about to violate the FTC Act (Chadwick will be discussed in further detail *infra*, Section VI.E).

In particular, the Court finds that the challenged representations were made continuously from 2011 to 2018—the time period for which the FTC seeks restitution from Defendants, as will be discussed *infra*, Section IX.B. The extent to which the claims were widespread, and the implications of that determination will be discussed *infra*, Section VI.B.ii.

### B. "No Debt" or "Debt-free" = No Risk or Less Risk

Sales scripts found at 3333 Michelson Drive, deposition and in-court testimony of SBE salespeople, in-court testimony of lot purchasers, recorded webinars shown to prospective lot purchasers, and recorded calls between SBE salespeople and FTC personnel posing as potential purchasers amply demonstrate that SBE salespeople—Chadwick, prominent among them—continuously communicated to prospective lot purchasers that Sanctuary Belize had "no debt" or was "debt-free" and was therefore a no-risk or less risky investment than a traditionally financed development. One sales script, for example, directs SBE salespeople to state that "Sanctuary Belize

---

[24] Pukke and Baker have consistently attempted to cite declarations from non-testifying lot owners for the truth of the matter asserted, i.e., to the effect that no or only some of the purported misrepresentations were made to them or, if made, that they did not carry the meaning the FTC ascribes to them. The Court has repeatedly ruled that these declarations, as hearsay, will not be admitted into evidence. *See, e.g.*, ECF No. 946. Baker, moreover, despite a clear directive from the Court before trial that he designate deposition testimony he intended to rely on at trial, relies on undesignated deposition testimony. The Court ruled at trial that it will not consider undesignated deposition testimony. Trial Tr., 2/11/20, 5:25-8:13.

All this said, the Court is able to state with assurance that none of the declarations or undesignated deposition testimony Pukke and Baker ask the Court to consider would in any way change the Court's rulings herein.

has been completely debt-free since the land was first purchased in 2003." PX 257. Further, on a

2017 call between SBE salespeople and FTC personnel posing as prospective lot purchasers, the

SBE salesperson stated that "debt-free means the developer came in and purchased 14,000 acres

in full…so there's no money owing on it." PX 310 at 28. On another undercover call, an FTC

employee asked a SBE salesperson if the developer "still owe[s] to other people or he's completely

debt-free" and the salesperson responded "he's completely debt-free." PX 335 at 29:11-29:14.

Other evidence confirms this claim was made. *See, e.g.*, PX 207.1; PX 255; PX 257; 258; 259; PX

295; PX 296; PX 299; PX 310; PX 335; Anderson Dep. Tr., 11/5/19, 80:8-81:9, 110:14-112:22

(SBE salesperson testifying that the no-debt=less risk claim "was in the script" and that she and

"everyone" on the sales floor made this representation to prospective lot purchasers); Catsos Dep.

Tr., 131:9-132:20, 211:13-212:2 (SBE salesperson testifying that the term "no debt" was used

because the project was "self-funded" and SBE salespeople also represented "that there is very

little risk"); Trial Tr., 1/27/20, 131:4-7, 182:11-183:17 (SBE employee stating that, on tours, she

heard references to "debt-free business model"); Trial Tr., 1/31/20 Afternoon, 55:4-56:9 (SBE

salesperson testifying that she made this representation and never attempted to distinguish between

the types of debt). Lot purchasers also testified this representation was made to them. *See, e.g.*, PI

Hrg. Tr., 3/11/19 Morning, 57:18-58:7 (lot purchaser testifying that in 2011, Chadwick and other

SBE employees told him that the "property was debt free"); PI Hrg. Tr., 3/11/19 Afternoon, 97:6-

9 (lot purchaser testifying that during a webinar in 2013, he was told the development "uses a no-

debt business model, which makes buying a lot in Sanctuary Belize less risky than a Real Estate

investment in which the developer must make payments to creditors *like* banks" (emphasis

added)); Trial Tr., 1/22/20 Morning, 27:21-28:12 (lot purchaser testified that in 2013, Chadwick

told her "[t]here was no debt"). At the Preliminary Injunction hearing, the Receiver's

representative testified that he found documents at 3333 Michelson Drive in November 2018 that included the representation that Sanctuary Belize was "debt free," unlike other developments so that other developments have "a lot of risk associated with investing your money in them," even though "[t]hey are not much cheaper than us and do not have near the security and amenities we do." PI Hr. Tr., 3/20/19 Afternoon, 82:5-18.

Overall, the evidence strongly establishes that the "no debt" or "debt-free" = no risk or less risk representation was and is false for at least two reasons: 1) the development in fact carried debt, both secured and unsecured, and 2) debt-free developments are not less risky than developments with debt; to the contrary, they are substantially more risky.

The Court begins by assuming, for argument's sake, that "no debt" or "debt-free," as Defendants argued at trial and in these filings, can only fairly be construed to mean that the project had or has no debt obligation <u>to a bank</u>, presumably in connection with a loan secured by a lien on the property of the project, which could be foreclosed on in the event of default. It is apparently true that no bank ever made that type of loan to the project. But the fact is that, from the beginning, especially in 2010, SBE sought to obtain just such debt financing from one or more banks and was uniformly turned down. Trial Tr., 1/30/20 Morning, 102:23-103:24. Even well into the marketing of lots, after SBE had for years consistently made the "no-debt" or "debt-free" = no risk or less risk representation, Baker conceded that, in attempting to raise capital for the project, he "didn't care" whether it was accomplished through debt or equity. Trial Tr., 2/7/20, 224:26-225:5.

The truth is this:

Only because it was unable to arrange debt-financing did SBE attempt to transform its lack of success into a positive selling point: i.e., no debt, they began to say, meant, or at least they now claim it to mean, that no bank could ever come in and foreclose on the project; hence an investment

in a Sanctuary Belize lot would be less risky than an investment in a development with secured bank debt that could be foreclosed upon by a bank in the event of default. But Defendants' construction was and is shortsighted in every sense. Secured financing, implying possible foreclosure upon property if a debt secured by a lien on the property is not paid, does not depend on the lender being a <u>bank</u>. Any individual or entity can make a secured loan which, if not repaid, could be foreclosed upon. In fact, one individual, Gordon Barienbrock, lent Sanctuary Belize over $4.2 million secured by a "first deed of trust on the marina property currently known as the 'hotel site[,]' including the eastern bulkhead of the marina and the eastern hill." PX 1763; Barienbrock Dep Tr., 8/21/10, 68:19-69:1; PX 816. Additionally, Cleo and Violette Mathis lent SBE $4 million, of which $2.5 million was secured by Sanctuary Belize's receivables. PX 816; PX 1312; PX 1305; PX 1545.There were secured debts plain and simple, though the lenders were not banks. Yet there is absolutely no indication that Defendants ever sought to revise their "no debt" or "debt-free" = "no risk" or "less risk" claim in light of these facts.

In any event, from the standpoint of a reasonable lot purchaser, the meaning of "no debt" or "debt-free" would hardly be limited to Defendants' interpretation that it meant SBE had no bank loan that a bank could foreclose upon. Defendants seem to believe that only their interpretation is plausible, which simply is not so. Any lender of funds to the project, unsecured or secured, would still hold a debt against the project, so that it was clearly inaccurate and deceptive to say that the project was "debt-free" or had "no debt." Presumably, even an unsecured creditor could seek a judgment lien against the properly that could lead to foreclosure on the project. Indeed, the Receiver reports that another individual, Patrick Callahan, loaned the project over $1 million, apparently unsecured, yet SBE's "no debt" misrepresentation persisted. PX 816.

Further, in direct contradiction to Defendants' contention that "no debt" or "debt free" could only fairly be construed to mean no bank loan which a bank could foreclose on, several lot owners, many of whom were or are business owners, testified that in fact they understood "no debt" or "debt free" literally to mean that the development had no debt of any kind. *See, e.g.*, Trial Tr., 1/22/20 Morning, 28:9-12 (a lot owner who owns multiple houses and a business testifying that "my understanding was it was no debt at all."); Trial Tr. 1/28/20, 48:3-9 (lot owner who had owned a manufacturing business with 70 employees testifying "that was a lot of talk about the no-debt model, that they had absolutely no outside money involved. It was –everything was paid for in full and they were financing it through receivables that they made" who later reiterated, after questioning by the Court, that the representation was that there was "no bank financing and no loans from anywhere"); PI Hrg. Tr., 3/11/19 Morning, 50:10-16, 59:13-19 (lot owner, a defense contractor and former naval officer testifying that developers represented Sanctuary Belize "was debt free so that the money that came from selling of the lots, from the sale of lots was going directly into the development" and that "the property was owned free and clear. So that, you know, there was no chance of the company not being able to pay on that, on that property and therefore, defaulting and you would be left holding the bag because the company had fallen out from underneath you.")

The reasonability of these lot purchasers' understanding of the representation is buoyed by sales scripts and testimony from a SBE salesperson, who told the Court that she definitely meant to convey to prospective lot purchasers that the development had no loans at all, without qualification. Trial Tr., 1/31/20 Afternoon, 70:23-71:12. Further, in her deposition, Morgan, another salesperson at SBE as of the time the Receiver took over, confirmed that she was told the development was "debt-free so there's no money owing on the property. So even if sales slowed,

it wouldn't matter. There was enough in receivable[s] to move forward in putting together everything that [SBE] described." Anderson Dep. Tr., 179:18-181:4. An SBE sales script used with up to twenty clients per day over a three-year period explained that, because there was no debt, "[w]hen you buy in [Sanctuary Belize] not a penny goes to paying a loan - it goes right into the progress of the development." PX 207.1 at 8; Trial Tr., 1/31/20 Afternoon, 64:14-20, 75:19-77:20 (verifying PX 207.1 was used). But again, the fact is that Barienbrock's and Mathis's loans, like any other loan, had to be paid back.

To be sure, Defendants presented witnesses who testified they understood "debt-free" to simply mean that there was no debt owed to a bank that could foreclose on the property. Trial Tr., 84:23-85:14 (lot owner testifying that "they said there was no bank financing, no major loans" and that he understood that "there was not debt to the point of keeping it from being developed"); Trial Tr., 64:8-64:24 (lot owner testifying that "I assumed, no bank debt is what, what they meant."). But while the Defendants and even the FTC presented some witnesses apparently savvy enough to appreciate the traditional role of bank lending in construction projects, a number of potential lot purchasers nonetheless consistently took SBE's representation of no debt literally, precisely as multiple SBE salespeople say they intended them to, and precisely as SBE salespeople themselves understood the situation to be.

The Court "must consider whether a representation is likely to mislead a reasonable consumer by viewing the representation as a whole and focusing on the impression created, not its literal truth or falsity." *Loma*, 2013 WL 2455986 at *5. The "test is whether the consumer's interpretation or reaction is reasonable" but the interpretation or reaction "does not have to be the only one." FTC Policy Statement. Considering all the evidence, the Court has no difficulty concluding that it was and is reasonable for consumers, even sophisticated consumers, to

understand that Defendants' representation, as a whole, was that the development had and would have no debt at all, and was thus essentially risk-free and/or less risky than a development with traditional financing. That, quite simply, was not true.

Apart from a consumer's reasonable understanding of what "no debt" or "debt-free" meant, could it have nevertheless been fairly represented that a development with no debt was less risky than a project that carried secured bank debt? The Court concludes, based on the evidence, that it could not. In this regard, Defendants' suggestion that no-debt should mean "no bank can foreclose" in fact tends to work against them. The involvement of a bank lender actually means less risk to the consumer, not more. The FTC's expert Richard Peiser, Michael D. Spear Professor of Real Estate Development at the Harvard University Graduate School of Design,[25] testified that the absence of conventional lender financing in fact creates a substantial risk in the development of a planned community, PI Hrg Tr., 3/12/19 Morning, 55:21-24. This is so for two principal reasons. First, it is normally "hard or impossible" for a project without conventional lender financing to have sufficient front-end cash and sustained cash flow thereafter to fund infrastructure, construction and the operation of large-scale amenities, a situation which continues until such time as the project achieves a positive cash flow. PX 1 ¶¶ 20, 41-42; PI Hrg Tr., 3/12/19 Morning,

---

[25] Given Professor Peiser's credentials and extensive experience with planned communities, the Court found him to be a particularly persuasive witness. Eric Sussman, Pukke's expert at the Preliminary Injunction hearing, who did not testify at trial, agreed with FTC counsel that "the overwhelming majority of [his] experience [was] dealing with apartment buildings which are rentals, not dealing with land sales to consumers." PI Hrg. Tr., 3/21/19 Afternoon, 58:18-58:21. *See also* DX AP 1 (resume showing limited experience in large-scale developments in emerging markets). Notably, Sussman admitted at the Preliminary Injunction hearing that he was unaware of the Barienbrock loan secured by the land that was to be the Marina Village, which, in the Court's opinion, undercuts several of his conclusions. PI Hrg. Tr., 3/22/19 Morning, 115:2-5.

Sussman, it may be noted, attempted to testify about whether it was reasonable for consumers to interpret certain representations made by SBE in a certain manner, having apparently been retained to "review and evaluat[e] certain allegations made by the FTC" (one of the conclusions he made in his expert report was that Sanctuary Belize is not a "scam"). DX AP 1. But as the Court ruled at the Preliminary Injunction hearing, evaluating the reasonableness of consumers' understanding of the misrepresentations was not a matter for expert testimony, certainly at least not by Sussman. PI Hrg.Tr., 3/21/19 Afternoon, 82:1-82:6; DX AP 1.

56:19-58:12. Accordingly, when there is no outside financing, consumers face serious risks from unpredictable lot sales, erratic cash flow, the pace of home construction, possible delay of projects that require large up-front cash expenditures, and a possible downward spiral in which delays in development further depress cash flow. *Id.*; PI Hrg Tr., 3/12/19 Morning, 59:21-60:25. The point, of course, is that this is precisely what happened with Sanctuary Belize.

Second, as Professor Peiser testified, traditional lenders who finance real estate developments actually provide greater security for consumers, not less, because they typically undertake extensive pre-loan underwriting activity, due diligence, and continuing monitoring functions, all of which reduce the risks for the consumer. PX 1 ¶ 28; PI Hrg Tr., 3/12/19 Morning, 58:13-60:25. Legitimate developers, said Professor Peiser, rarely if ever, employ a "no debt" real estate development model precisely because it has such a high risk of failure (in Professor Peiser's research and estimation, failure rates are upwards of 90%). PX 1 ¶ 42; PI Hrg Tr., 3/12/19 Morning, 57:7-15. In the present case, Professor Peiser concluded the "absence of financing suggests it was unavailable rather than undesired," PX 1 ¶ 29, a fact Defendants themselves have confirmed, Trial Tr., 1/30/20 Morning, 102:23-103:24. The Court also notes that, had there been traditional financing for the development with the attendant continued monitoring functions, the millions of dollars of sales revenue Pukke diverted from the development might have been detected early on and effectively halted before they were siphoned, as will be discussed *infra*, Section V.C.

Even assuming that Pukke and Baker, if not Chadwick, were babes in the woods of real estate financing who did not appreciate that the no-debt model was and is in fact risky, they were at least recklessly indifferent to the unsoundness of the no debt/low risk representation and to the high probability that they were deceiving prospective lot purchasers. But this gives Pukke and Baker a charitable construction they do not merit. The fundamental glaring fact was and is that

Pukke, Baker and Chadwick and their minions consistently put out this no debt/low risk representation as a marketing strategy after their initial efforts to secure debt financing were unsuccessful, and they continued to do so even as the development in fact took on, in marked contrast, not insignificant amounts of debt, secured and unsecured.[26]

The Court finds the misrepresentations that Sanctuary Belize had "no debt" or was "debt-less" and had "no risk" or was less risky were material to many consumers who chose to buy in Sanctuary Belize, many of whom were older and were retired or nearing retirement. *See, e.g.*, PI Hrg Tr., 3/11/19 Morning, 49-50 (lot owner testifying that SBE's "no debt" financing model and purported lower risk was "significant" in convincing him and his wife to purchase a lot because "we obviously want to do something where it incurred the least amount of risk possible for us"); PI Hrg Tr., 3/11/19 Afternoon, 83:19-84:20; PI Hrg Tr., 3/19/19 Afternoon, 71:8-14; Trial Tr., 1/22/20, 27:20-28:19.

Ultimately, this is all that is required—a representation likely to mislead consumers acting reasonably under the circumstances that was material to the consumers. *See Loma Int'l Bus. Grp. Inc.*, 2013 WL 2455986, at *3-*4. The Court concludes that the FTC has shown that Defendants violated the FTC Act by representing that Sanctuary Belize had "no debt" or was "debt-free" and consequently was less risky than a development carrying debt.

---

[26] Chadwick argues that "it would be unprecedented, and defy common sense, to find that [he] was defrauding consumers at Sanctuary Belize by covering up debts that were (according to the economist) actually a *good thing*." ECF No. 993 (emphasis in original). The issue is not whether it would have made sense for Defendants to disclose the existence of any debt, but whether in fact Chadwick and the other Defendants did cover up the debts. And they did. The evidence shows that what was said about the project's "no debt" or "debt-free" status was a misrepresentation, made either with knowledge that it was false or with reckless indifference as to its truth or falsity, always floated in an effort to entice prospective lot purchasers to buy. Chadwick's argument will be further addressed *infra*, Section VI.E.

43

## C.  *Every Dollar of Revenue Goes Back Into The Development*

SBE telemarketers and principals consistently told consumers that, in part because of their "no debt" model, every dollar the developer collected from the sales of lots would go back into the development. *See, e.g.*, PX 295 at 1; PX 310 at 27:22-28:3; Trial Tr., 1/28/20, 49:25-50:12 (lot owner who purchased in 2012 testifying that he was told "all money was being put back into the development"); PI Hr. Tr., 3/11/19 Afternoon, 99:12-18 (lot owner who purchased in 2013 testifying that this representation was made by a SBE salesperson); Trial Tr., 1/22/20 Morning, 28:20-29:5 (lot owner who purchased in 2013 testifying that Chadwick represented to her that all sales revenue "will go back to the project"); Trial Tr. 1/31/20, Morning 66:20-67:13 (Chadwick testifying that, while he does not recall using the exact words "every dollar of lot sales goes back into the development," he knew that SBE salespeople were representing that "the proceeds of lot sales, all of that went back into [the] development" [27]); PX 310 at 27:22-28:3 (transcript of 2017 call with SBE salesperson and undercover FTC employees where the SBE salesperson says "Exactly. That's exactly right" when asked if "every dollar…that you get from sales then. You put back into the project"); Anderson Dep. Tr., 81:10-19, 179:18-181:4 (salesperson who worked for SBE until the filing of this lawsuit testifying that she and other salespeople made this claim).

This claim was and is false. The Receiver confirmed in reports to the Court that SBE used only 14% of sales revenue from lot sales to cover construction costs. *See* ECF Nos. 219, 513 (Receiver's Reports). Even allowing deductions for expenses such as rent, salaries, marketing and maintenance, and so forth, both Professor Peiser and Mr. Sussman testified that the percentage of sales revenue that should go into the actual development of the property should have been more

---

[27] In his Post-Trial Proposed Findings of Fact and Conclusions of Law, Chadwick claims that "there is no evidence that [he] knew of any specific 'every dollar' language used in sales scripts if it was even used during his time as sales manager." ECF No. 993.

than 30%, at least during the last five years. PI Hr. Tr., 3/22/19 Morning, 77:7-79:22; PI Hr. Tr., 3/12/19 Afternoon, 77:14-79:19.

More important, there is, quite shockingly to be frank, incontrovertible evidence that Pukke diverted enormous sums of sales revenue away from the development, i.e., some $18 million or about 12.8% of the total sales revenue, for his own benefit and that of his friends and family. *See* ECF Nos. 219, 513 (Receiver's Reports); Trial Tr., 1/23/20 Morning, 83:3-84:7. One begins with a few simple, yet stunning examples: FTC Forensic Accountant Roshini Agarwal testified that $5,098 was transferred via check card by GPA, Buy Belize, and Eco-Futures to cosmetic dentists in Newport Beach, California (where Pukke lives). Trial Tr., 2/6/20 Afternoon, 15:16-16:6. During his deposition, which was attended by Pukke and Baker, GPA's accountant Andy Dixon stated that expenses of GPA included children's braces and a Harley-Davidson motorcycle. Dixon Dep. Tr., 49:20-50:11. Baker testified that he did not have children and that the Harley-Davidson was purchased for Pukke's brother. Trial Tr., 2/10/20 Afternoon, 32:4-32:17. Agarwal also testified that from 2011 to 2015, GPA wrote checks totaling $54,000 to various individuals named "Pukke," wiring $10,000 to a Kaelin Pukke in three installments from July 22, 2015 through October 20, 2015. Trial Tr., 2/6/20 Afternoon, 29:14-30:4.

The record further shows that, in a series of transactions between 2011 and 2015, Relief Defendant Chittenden (Pukke's putative wife and the mother of two of his children), and one of the companies she controlled, "Beach Bunny Holdings," wired $480,000 to and received $595,000 from bank accounts in the name of GPA. Trial Tr., 2/6/20 Afternoon, 19:3-9. Bank records also show that between 2012 and 2015, Chittenden received $402,500 in her personal account from GPA. PX 816 at 11, Ex. 9. Additionally, Chittenden held nearly $2 million in investments in various companies funded by SBE entities currently under the control of the Receiver. *Id.* at 11.

The Estate of John Pukke, Andris Pukke's late father, was another beneficiary of SBE "largesse," courtesy of Pukke. The FTC presented evidence that the Estate of John Pukke improperly received, for no apparent reason, $830,000 from SBE from June 2011 to November 2018. PX 984 at 6, 15; Trial Tr., 1/23/20 Morning, 83:3-87:17. The Estate then transferred this money—revenue from SBE lot purchases—to various Pukke family members and associates. Trial Tr., 2/6/20 Afternoon, 25:18-25:15. Were this not enough, the evidence also shows that GPA and Eco-Futures Development funded renovations to Andris Pukke's personal residence in California, including payments to a local contractor whose invoices contained a memo line specifically referencing Pukke's California home address. PX 816 at 6; Trial Tr., 2/6/20 Afternoon, 27:22-28:11. This particular diversion of SBE lot revenue totaled over $200,000. *Id.* In fact, the Receiver's representative testified that over $2.8 million total of sales revenue was diverted just to purchase and renovate one of Pukke's houses, some of which was recorded in SBE's books as "Media Spend." PI Hrg. Tr., 3/21/19 Morning, 7:13-9:14.

Nor was Baker above diverting SBE funds himself though, to be sure, to a much lesser extent than Pukke. Agarwal testified that she identified 278 Amazon purchases by SBE entities totaling $19,336.60. Those purchases include Drunk Elephant serums and gels, eyelash conditioner, and an anti-snoring jaw strap, all shipped to "Peter Baker" in Newport Beach, California and paid for by a debit card linked to a GPA bank account. Trial Tr., 2/6/20 Afternoon, 16:13-17:7. Baker claims that these purchases were made for business purposes, which may or may not be so at least as to some, but even assuming some of the purchases were for business purposes, others clearly were not, since Baker admitted the anti-snoring jaw strap, for example,

was actually purchased for his wife.[28] Trial Tr., 2/6/20 Afternoon, 43:20-43:24. Baker also admitted that SBE diverted some funds to pay for his personal living expenses unrelated to the development. PI Hrg Tr., 3/15/19 Morning, 7:18-10:15.

Baker's mother and step-father also benefitted from personal diversions. Agarwal testified that GPA sent wire transfers to the Medhursts in the approximate amount of $600,000 from February 23, 2012 to March 4, 2014. Trial Tr., 2/6/20 Afternoon, 30:5-10.

Other SBE funds found their way into purchases that obviously had nothing at all to do with completing Sanctuary Belize: $6,000 for Stanley Cup professional hockey tickets, $1,400 for tickets to an Eagles rock concert, and $1,200 for tickets to the "Triple Ho Show" music festival. Trial Tr., 2/6/20 Afternoon, 14:6-12.[29]

Then there is the biggest ticket item of all. As the Court will discuss in detail *infra*, Section X.E, Pukke transferred $4 million of SBE funds to John Vipulis, a Relief Defendant. PX 816 at 6.[30] This payment had no legitimate purpose whatsoever linked to SBE's business. Rather, in direct violation of the Court's Order in *AmeriDebt*, it was Pukke's attempt to pay back Vipulis, who had loaned him money to obtain his release from prison in connection with that proceeding.

---

[28] Agarwal testified that Eco-Futures Development also paid $6,822.50 for services to a "snore expert" in Encino, California, though she did not identify who directed that money be sent. Trial Tr. 2/6/20 Afternoon, 15:5-15:14.

[29] During his cross-examination of Agarwal, Pukke attempted to insinuate that these entertainment tickets were legitimate business expenditures. It was and is unclear, however, what business purposes might have been served other than entertainment for Pukke, Baker, or their families and friends. These were smallish expenditures in and of themselves, but still, they were all part of the much larger honey pot. Again: the misrepresentation we are talking about is that every sales dollar would go back into the development.

Pukke also attempted to insinuate that many of these purchases were investments he made on behalf of SBE, such as a house whose value he believed would appreciate. In addition to the fact that his insinuations are not testimony, and that this claim appears to be a post-hoc rationalization given the lack of evidence to support Pukke's claim, purchases and investments were not made in the name of SBE entities, such that the SBE entities would have no claim over them and would not benefit if, say his house, did ultimately appreciate. Trial Tr., 1/23/20 Afternoon, 108:16-20.

[30] Vipulis, as indicated, has settled his case with the FTC and has paid a majority of the funds to the Receiver.

But, as the pitchman says on TV, there is more.

Evidence at trial indicated that funds from Sanctuary Belize lot sales were also used to fund advertising efforts for a real estate development project in Mexico totally unrelated to SBE. Trial Tr., 1/31/20 Morning, 67:23-68:3. Payments from SBE were also made on the loans from Barienbrock, despite SBE's representations that no payments would be made on loans because the development had no loans. Barienbrock Dep Tr., 8/21/19, 259:18-260:7. The list goes on.

Chadwick, who did not personally participate in these diversions of funds, argues that, although he and others did represent in some form to consumers every dollar would go back into the development, he did not know the representation was false because he "didn't see any diversion of actual cash" and "had no visibility" into Sanctuary Belize's financials. Trial Tr., 1/31/20 Morning, 68:10-17; *see also* ECF No. 993. But Chadwick ignores his own testimony that he did see a "diversion of resources" and knew that sales revenue from Sanctuary Belize was being used to fund an unrelated development project in Mexico. Trial Tr., 1/31/20 Morning, 67:23-68:3. And while Chadwick claims he disagreed with this practice and that it was that particular diversion that led him to "transition" out of SBE, at no time did he ever try to stop SBE salespeople from representing to prospective lot purchasers that every dollar would go back into the development, or some variation of it.

At the very least, Chadwick acted with reckless disregard as to the making of this misrepresentation, while undertaking no effort to verify whether it was true. This Chadwick also knew: He knew full-well Pukke's questionable background in dealing with consumers, particularly when Pukke chose him to assume charge of the SBE operation during the period after *AmeriDebt* that Pukke was incarcerated for obstruction of justice for hiding assets from the Receiver and the Government. *See* PX 635 (2011 email from Chadwick to Greenfield noting that Pukke asked him

48

to "lead" while Pukke was in prison); PX 493. Chadwick was one of the most senior employees at SBE, as will be discussed *infra*, Section VI.E, and at all times could have verified or at least questioned the information he and SBE salespeople were falsely disseminating across America. Pukke's diversion of revenues, after all, were not *de minimis* or one-off; they occurred throughout Chadwick's tenure at Sanctuary Belize and totaled in the millions of dollars. As boxing champion Joe Louis once said of an opponent, "He can run, but he can't hide." Chadwick's individual liability will be discussed *infra*, Section VI.E.

The suggestion that all sales revenue would go back into the development was likely to mislead a reasonable consumer. A consumer, sophisticated or not, could certainly be led to believe that, in light of the representation, all sales revenue would be spent on construction costs at the development, or perhaps also on sales and marketing costs, administrative costs, or other expenses related to the development. But in no sense would it have been reasonable for consumers to expect that millions of dollars of revenue from lot sales would be transferred by Pukke to himself, his family and friends, and, in violation of a Court order, or spent on the repayment of a personal loan to Pukke (i.e. the loan made by Vipulis) or invested in real estate projects having no connection whatsoever to SBE, much less spent on personal items such as children's orthodontia, cosmetics, hockey tickets, concert tickets, motorcycles and houses for certain Defendants and their family and their friends. To put it another way, it would have been reasonable for prospective lot purchaser not to expect diversion of these payments.

The express claim that every dollar from sales revenue would go back into development, incontrovertibly false, to at least some consumers, was also material. *See, e.g.*, PI Hrg Tr., 3/11/19 Morning, 59:9-19; PI Hrg Tr., 3/11/19 Afternoon, 99:12-18; PI Hrg Tr., 3/19/19 Afternoon, 70:24-71:5; Trial Tr., 1/22/20 Morning, 28:24-29:5.

49

The FTC has established that Defendants violated the FTC Act by representing that every dollar of sales revenue would go back into the development.

### D. Development of Luxury Amenities

SBE salespeople, including Baker and Chadwick, repeatedly and expressly told consumers that the completed development would boast extraordinary amenities comparable to those of a small American city. That, they promised, meant infrastructure roughly equivalent to what consumers would expect in the United States, such as paved roads, fresh drinking water, wastewater management, electrical service, a stable canal system, and security. PX 307; PX 324 at 20:18-22:10, 35:8-24. At various times, the promised amenities included a hospital, a medical center, a casino, an 18-hole golf course, an on-site airstrip, and a nearby international airport. *See, e.g.*, PI Hrg Tr., 3/11/19 Morning, 53:18-54:12; 61:9-63:15 (lot owner testifying that in 2011, SBE salespeople represented that an international airport just outside of the property, a private airstrip on the property, and a 18-hole championship golf course would all be built); PX 277 (a 2011 "Investment Guide" that described a "18 hold championship golf course" among other amenities); PX 1057 (a 2012 email from Chadwick that was sent to Maya Baker (Peter Baker's sister who was also a SBE employee) and forwarded to a client that includes the representations that SBE had been "approved and permitted" for 14,000 foot airstrip and a 100 key hotel, among other amenities); PI Hrg Tr., 3/11/19 Afternoon, 83:19-84:7 (lot owner testifying that in 2013, he was told that a golf course "was in the plans" at Sanctuary Belize); PX 1366 (Pukke provided edits in 2014 on a sales script that described golf as a potential "important factor" for consumers); PX 183.24 (sales email to existing lot owners in 2014 proclaiming that SBE will build a 30,000 square feet medical center); PX 1183 (sales script proclaiming that there will be a grocery store, a farmer's market, a medical clinic, a spa and fitness center, a first response team, and promising that the

airport will be completed "in the near future"); Anderson Dep. Tr., 11/5/19, 161:21-162:6; 165:10-22 (SBE salesperson testifying that SBE held "team meetings" discussing the hospital, purportedly backed by a Beverly Hills surgeon, and that SBE instructed that this representation was "something that should be told to people" and that she "didn't make [this representation of a hospital] up on [her] own"); PI Hrg. Tr., 3/20/19, 86:3-8 (Receiver's representative testifying that he found scripts at 3333 Michelson Drive that promised a farmer's market, medical clinic, grocery stores, a spa and fitness center, a first response team, and a property management company").

SBE also prominently promoted a "Marina Village" as the heart of the development's commercial center, which would include boutique shops, restaurants, cafes, an American-style grocery store, a church, a school, and a post office. *See, e.g.*, PX 183.3 (marketing material received by a lot owner that advertises a boutique hotel, a casino, a cigar bar, an art gallery, a weekend farmers market and a Belizean bakery); PX 186.3 (Chadwick promising on a webinar that Marina Village "will" have certain amenities); PX 207.1 at 5, 32; Trial Tr., 1/31/20 Afternoon, 64:14-66:1; PX 186.5; Anderson Dep. Tr., 82:17-25, 84:7-84:10, 153:4-153:18 (SBE Salesperson confirming she told consumers that Marina Village will have a grocery store, multiple restaurants, multiple shops, and live entertainment, and that other scripts used by SBE salespeople included similar representations).

Another highly touted amenity, dwelt upon extensively at the Preliminary Injunction hearing, was that SBE would provide a 250-slip "world class" marina. *See* PX 257 at 9-10; PX 307 at 13:2-7, 59:22-60:7; PX 653; PI Hrg Tr., 3/11/19 Morning, 51 (lot owner testifying that SBE representatives had advertised that Sanctuary Belize would include a deep water marina); PX 183 at 60; PX 817 at 54.

These extraordinary amenities were represented to be completed within a definite time frame. *See, e.g.*, PX 1372 (a 2010 sales script promising most amenities will be completed in 3-4 years, with the exception of the golf course, which was planned to be completed in 4-5 years); PX 377 (2017 webinar stating that there is a "2,900-foot private airstrip that we developed, that we have certified"); *see also infra*, Section V.E.

It is clear that, to this day, most of these luxury amenities either do not exist, do not exist as promised or have never been seriously contemplated to exist at all outside of marketing materials and verbal. promises. Trial Tr., 1/23/20 Afternoon, 16:20-17:24 (Receiver's representative testifying that during his visit in October 2019, there was no medical center or hospital on or near the development); Boyajian Dep Tr., 8/25/19, 80:15-81:5, 86:23-25 (SBE salesperson testifying that during his visit in 2017 or 2018, there were no golf courses, hospitals, or hotels on the development). As of today, years down the road, there is still no "Marina Village" as promised, nor is there a downtown commercial core with commercial space housing cafes, bistros, upscale restaurants, boutiques and high-end shopping, a gym, and spa. Trial Tr., 1/23/20 Afternoon, 16:20-17:24; Maya Baker Dep Tr. 104:6-23 (testifying that no hotel existed as of November 2018, but there were six cabanas that were "similar to yurts."); PI Hrg. Tr., 3/11/19 Afternoon, 70:16-71:4; PX 277.

Take the marina:

The Court received testimony during the Preliminary Injunction hearing that a "world class" marina is one that would qualify for the prestigious Five Gold Anchor certification that an organization known as The Yacht Harbor Association issues to the world's top marinas. PI Hrg Tr., 3/22/19 Afternoon, 56:13-18. It is undisputed that the number of slips that exist at Sanctuary Belize today is well short of the 250 slips promised. A Vice-President from IGY, a luxury yacht

and marina firm, testified at the Preliminary Injunction hearing that, to "get the marina to 250 slips you would need to triple the size of the existing marina," which would cost a significant amount of money. PI Hrg Tr., 3/22/19 Afternoon, 61:17-62:1. Apart from that, the current structure of the marina was said to lack many features it would need to qualify as "world-class," including but not limited to a boat yard or other repair or maintenance facility, a boat dealership, physical security (other than a guard at the main entrance to the development), and high-end marina-related buildings. PI Hrg Tr., 3/22/19 Afternoon, 63:1-64:12.

Defendants argue that (1) some or all of these amenities were only aspirational in nature, not definite promises, (2) not all of these amenities were actually promised, or were only promised for limited period of time but were not widespread, or (3) some if not all of these amenities are still in some stage of progress. The Court is unmoved.

First, the evidence presented at trial and during the Preliminary Injunction hearing showed that many of these referenced amenities were definitely promised—they were not merely aspirational. SBE salespeople and marketing materials, in describing the luxury amenities, used such language as "there will be," not tentative language such as "we hope to have." *See, e.g.*, PX 891 (marketing brochure received by a purchaser); PX 337 (transcript of webinar hosted by Costanzo); PX 183.24 (email sent by a SBE Salesperson). Chadwick, recorded in a webinar shown to many prospective lot purchasers, stated SBE was "not a fine print organization. We don't say a whole bunch of things and then, after we disappoint you, say, 'Hey, read the fine print.' We don't do that. You know, we say this is going to be what you expect it to be and if it's not, hey we'll give you your money back." PX 186.3 at 1:34:25-1:34:41. Chadwick even concedes that the representations made were more of the tenor that "ultimately there will be" various amenities. ECF No. 993. In a 2017 exchange between FTC employees posing as buyers and an SBE telemarketer,

the telemarketer stated that the promised amenities would "go forward no matter what." PX 335 at 28:9-29:8.

The misrepresentations as to the amenities were widespread and continuous. For example, SBE salespeople promised prospective lot purchasers a hospital and medical facility starting as early as 2011, and were still making the misrepresentations as of the time the Receiver's and FTC's representatives entered 3333 Michelson Drive in November 2018. *See, e.g.*, PX 205.12 (sales script dated October 7, 2011 that stated there was a "new 120,000 square foot hospital is underway along with a future 100,000 square feet of medical buildings"); Trial Tr., 1/31/20, 56:15-10, 60:7-13) (SBE salesperson testifying that she used PX 205.12 on "many occasions," that prospective lot purchasers "asked often" about the availability of medical care due to their age, and that she told them the hospital would be completed in "two years" in 2012, 2013 and 2014); Trial Tr., 1/22/10, 24:16-17, 26:20 (lot purchaser testifying that in 2013, Chadwick said that a hospital would be built "within a year"); PX 883 (a lot purchaser's 2013 notes from a webinar with a SBE salesperson and a conversation with a SBE salesperson that state "the development will include impressive amenities, such as a hospital staffed with American doctors, an emergency medical center near the downtown 'Marina Village'"); PI Hr. Tr., 3/11/19 Afternoon, 96:18-97:15 (authenticating PX 883); PI Hrg. Tr., 3/11/19 Morning, 81:17-20, 85:2-17 (lot purchaser testifying that in a 2014 webinar, SBE salespeople said that "they were going to build a hospital with government support and they had this doctor group from Newport Beach and Beverly Hills" to staff it); PI Hrg. Tr., 3/11/19 Afternoon, 6:17-8:25 (lot purchaser testifying that he received a Sanctuary Belize Newsletter in 2015, PX 186.5, that said construction of a hospital adjacent to Sanctuary Belize "will be" moving forward and that the financing from "a variety of private sources" had been secured); PX 303 at 58:10-17 (transcript of 2017 undercover call where a SBE salesperson is

representing that a "state-of-the-art hospital" has been "going in"); Anderson Dep. Tr., 86:4 (salesperson who worked at SBE until November 2018 stating that she represented to prospective lot purchasers that SBE would have a medical clinic and that there would be a hospital in or near Sanctuary Belize for a "period of time"); PI Hrg. Tr., 3/20/19 Afternoon, 80:17-81:10, 82:22-84:25 (Receiver's representative testifying that when he entered the premise of 3333 Michelson Drive, he found documents claiming that there would be a 120,000 square foot hospital built near the property soon). Essentially, the same story was told with respect to the other promised amenities.

Despite SBE promising certain so-called luxury amenities, the Court has found no evidence that SBE ever planned to build them, let alone that it was planning to do so within a few years. There is no golf course on the development and, while evidence shows that a golf course is now planned for the nearby Kanantik development, apparently little progress, if any, has been made there. But the point is that representations were originally made to lot purchasers that a golf course would be built at Sanctuary Belize not Kanantik, and that it would be completed within a limited time frame. Then, too, from approximately 2010 onward, promises of both a hospital in or near Sanctuary Belize, staffed with doctors from Newport Beach and Beverly Hills, and a medical center in the Marina Village were made, but neither amenity exists today. In fact, the Receiver's representative testified he has not seen a schedule identifying how or when either a hospital or medical center would be built. PI Hrg. Tr., 3/21/19 Morning, 35:5-35:7; *see also* Barienbrock Dep. Tr., 8/21/19, 257:18-257:20, 258:2-13, 260:24-261:14; Maya Baker Dep Tr., 97:15-97:19; PX 1451. Defendants, for their part, have submitted no such schedule nor have they argued that a hospital or medical center is in the works.

The Court finds that it was reasonable for consumers, both sophisticated and non-sophisticated, to believe that one or more of the referenced luxury amenities would be built and

that they would be built within a limited time frame. The Court also finds that that the promise of these amenities was material to the decisions of many lot owners' to purchase. *See, e.g.*, PI Hrg. Tr., 3/11/19 Morning, 51:3-24; PI Hrg. Tr., 3/11/19 Afternoon, 84:4-7; Trial Tr., 1/22/20 Morning, 26:20-23; Trial Tr., 1/28/20, 59:9-18.

As such, the FTC has shown that Defendants violated the FTC Act by boasting of luxury amenities to be provided, some of which would never be provided either as promised or at all, and by boasting that the amenities would be completed within a certain period of time.

### E.   *2-5 Year Timeline for Completion*

If it were not for one crucial material fact, this perhaps might be a claim as to which the FTC would not prevail. The Court explains.

During consumer tours in Belize as early as 2005, SBE employees, including Chadwick and Usher, began promising consumers that the Sanctuary Belize development would be completed within a specific time frame, viz, within two years, three, or five years. *See, e.g.*, Trial Tr., 1/21/20 Afternoon, 101:20-102:1 (lot purchaser testifying that he was told the development would be completed in "four to five years" in 2005, when Pukke and Baker were selling Sanctuary Bay lots while hiding Dolphin's assets from the Receiver); PI Hrg Tr., 3/11/19 Morning, 60-61 (lot owner testifying that, in 2011, SBE stated that the development would be completed in five years); Trial Tr., 1/28/20, 73:25-74:2 (lot owner in 2012 testifying that he was told the development would be completed in the "two to four year range"); PX 186.3, at 58:30-58:45 (Chadwick, on a recorded webinar viewed by a lot owner in 2012, stating that that the Marina Village should be finished in 2014); PI Hrg Tr., 3/11/19 Afternoon, 84:21-85:4 (lot owner testifying that in 2013 SBE stated that the development "would be complete in two or three years."); PX 183.24 (2014 email to existing homeowners to sell them on another lot proclaiming that the development will

be done in 2 years, "weather permitting"); Catsos Dep. Tr., 145:5-146:10, 146:20-147:16 (SBE salesperson stating that consumers were told in 2013 that a "lion's share of the development" would be completed within "a few years," and that in 2015 consumers were told that the development would be done in "three, three-ish" years); PX 307 at 36:19-37:6 (SBE salesperson promising on an undercover call in 2017 that it will be 100% completed "in the next year or two"); Anderson Dep. Tr., 184:20-187:13 (SBE salesperson testifying that the claim made in the sales office in 2017 was that the development would be done in one or two years and it was "never anything I was told not to say"). When the Receiver's and FTC's representatives entered 3333 Michelson Drive in November 2018, they found sales scripts claiming that the construction of the amenities would be completed within two to five years. PI Hrg. Tr., 3/20/19 Afternoon, 80:11-81:10. Even Chadwick concedes that he and other SBE salespeople told potential lot purchasers that Sanctuary Belize would be completed in two, three, or five years, though he argues that he was gone by the time the "time frame estimates" had "lapsed." Trial Tr., 1/31/20, 69:3-18.

Obviously Sanctuary Belize was not finished within two to five years, counting from the earliest representations beginning in or around 2005. Indeed it is undisputed that, as of the last visit to the project by the Receiver's representative before trial in October 2019, more than thirteen years after the first sale occurred, the development remained incomplete in material respects. Trial Tr., 1/23/20 Afternoon, 16:16-17 (Receiver's representative testifying that when he visited in October 2019, the development was not complete). To date, less than ten percent of lot sales have led to completed homes, and several promised amenities are either incomplete, have never been started, or have been totally abandoned, if indeed they were ever contemplated. *See id.* (Receiver's representative testifying Sanctuary Belize only contained about 40 to 45 completed homes); PX 816 at 21 (identifying 1,314 lots sold beginning in 2009); ECF No. 347-2 at 1 (proposed

intervenors' filing claiming there are "over 40 completed homes" and "40 in various stages of construction"); DX AP 1 at 5 (claiming "over 50" homes).

It is true that some simple amenities have been completed, including a restaurant, a small sundry store, a gas station, a pool, and two bars. PI Hrg Tr., 3/15/19 Afternoon, 86:22-87:11 (listing amenities that had been constructed at Sanctuary Belize); DX AP 1 at 3-4. But, as set forth in the preceding section of this Opinion, other promised luxury amenities, e.g. an American-style hospital or medical clinic, a golf course, and a casino appear to have been abandoned altogether, essentially without any explanation to the consumers who were originally promised them. Trial Tr., 1/23/20 Afternoon, 18:1-19:19. Many roads are still not paved and lack streetlights. *Id.* "Lots of areas" do not have water or power and there are "areas where roads have not been graded." Trial Tr., 1/24/20, 47:15-48:1.

Pukke and Baker's main argument as to this alleged misrepresentation is that the development lagged because of a 2016 lawsuit in Belizean Court brought by an organization known as the Independent Owners of Sanctuary Belize ("IOSB"), led by an individual lot owner named Thomas Herskowitz, who was the subject of much discussion in this case. While Court allows that the 2016 lawsuit and the counter-lawsuit (SBE then sued IOSB for defamation) and the resulting negative publicity likely did affect sales revenue to some extent starting in 2016, the first point to observe is that the lawsuit did not commence until 2016. Defendants do not account for the multi-year delays before 2016 or, to be generous, before 2015. Nor have they satisfactorily explained their continuous representations as to the time of completion, even as the IOSB litigation went forward. Even in 2017, after the IOSB/Herskowitz litigation had been resolved, on a call with undercover FTC employees, an SBE salesperson promised that the development would be completed within a year or two.

58

The short of the matter is that the Court finds the IOSB/Herskowitz issue essentially irrelevant to the timeline claim against Defendants—which, in this regard, is whether Defendants made false representations to prospective lot purchasers that the SBE project would be completed within a 2-5 year timeline. The development, luxury amenities included, could not have been finished as promised regardless of the IOSB/Herskowitz lawsuit. [31]

---

[31] Pukke and Baker have consistently accused IOSB members of conspiring with the FTC to bring this suit, and have accused all lot purchaser witnesses called by the FTC of being IOSB members. But at trial Pukke and Baker cross-examined lot purchasers witnesses called by the FTC at length, and it is clear that several of them were not in fact affiliated with the IOSB. *See, e.g.*, Trial Tr., 1/21/20 Afternoon, 101:13-15 (purchaser testifying that he was "not familiar with [IOSB] at all"). However, even if a lot purchaser was affiliated with the IOSB, the Court finds that IOSB involvement does not per se bear on that person's credibility. The evidence suggests that the IOSB was formed precisely due to dissatisfaction with the pace of development at Sanctuary Belize and SBE's unresponsiveness to lot owners' complaints. *See, e.g.*, Trial Tr. 1/22/20 Morning, 55:10-56:16 (purchaser who had donated funds to IOSB testifying that IOSB was formed out of "desperation" due to the lack of progress). Further, as Chadwick conceded, "members of the IOSB seemed to have different agendas, and some of them were probably quite legitimate, some may not have been." Trial Tr., 1/30/20 Afternoon, 46:9-19.

Despite Pukke's reliance on a judgment from the Belizean Supreme Court that found members of the IOSB guilty of defamation against SBE with malice, PX 1820, that judgment has never been accepted by this Court. This Court specifically invited Pukke to file a motion as to the judgment's potential recognition by the Court, but he never did. As such, this issue was not briefed or discussed in detail but the Court notes that if Pukke desired that the Court recognize and domesticate this judgment, then at the very least, he was obliged to show that the Belizean case involved a "full and fair trial" and that it in no way demonstrated "prejudice" and "fraud." *Hilton v. Guyot*, 159 U.S. 113 (1895). At trial, the Court expressed considerable doubt over the findings by the Belizean Supreme Court, which included a finding that there was insufficient evidence that Pukke was involved with SBE which, as will be discussed *infra*, Section VI.C, is flatly contradicted by overwhelming evidence presented to this Court. Nevertheless, Pukke stated at trial that "the [Belizean] judge placed an injunction on Tom Herskowitz, the IOSB and every single one of their members. The injunction actually holds a penalty of contempt of court, criminal, if they were to restate any of the defamatory statements they made before." Trial Tr. 1/27/20, 23:12-16. However misbegotten the Belizean Court's decision may be, it appears that lot owners who were in some way affiliated with the IOSB may well have been intimidated against testifying candidly in this Court, given their possible exposure to criminal sanctions in Belize.

Pukke's and Baker's attempted Herskowitz defense merits special comment. Both Defendants repeatedly pressed upon the Court a letter Herskowitz sent to his fellow lot owners dated May 3, 2017 in which he retracted his many claims against SBE and "admitted" that the purpose of forming the IOSB was "to wrest control of the project and receivables from the Developer and put it into the IOSB. I admit that in hindsight, I may have exaggerated many concerns in an effort to incite owner dissatisfaction in order to drive support of the IOSB, and its pursuit of litigation for IOSB to become the developer." DX PB 35. Baker represented to the Court that this letter was Herskowitz's true position, Trial Tr., 1/28/20, 167:13-19, while Pukke declared that Herskowitz is "the one who should be on trial here," Trial Tr., 1/29/20, 74:2-75:1.

These statements triggered a careful exploration by the Court of the circumstances surrounding the Herskowitz letter.

During Pukke's cross-examination of the FTC's witness Frank Balluff, a lot owner, Pukke urged the Court to receive the Herskowitz letter for the truth of its contents, arguing that it fell under an exception to the rule against hearsay as a statement against interest, clearly suggesting the bona fides of the document  (Pukke even went so far as to say he

would like very much to have Herskowitz appear as a witness at trial). The Court declined to receive the letter for the truth of the matter since Herskowitz was not called as a witness by Pukke or Baker, and because the hearsay exception for a statement against interest did not apply, given the suspicious circumstances of the genesis of the letter and its apparent lack of "trustworthiness," Fed. R. Evid. 804(b)(3). But the letter was admitted for the fact that it had been received by Balluff.

The letter, as it turned out, was anything but bona fide.

When, during trial on the morning of January 29, 2020, the Court inquired of Baker and Pukke whether there was actually a Settlement Agreement with Herskowitz that compelled him to send this letter, one that contained a non-disclosure clause, Baker feigned ignorance and told the Court that Frank Costanzo handled the legal aspect of the dealings with Herskowitz, not he, while Pukke stated that he did not believe there was a non-disclosure clause because he was "not sure what a Nondisclosure Agreement pertaining to this would even be" and then, as did Baker, stated that Costanzo had handled all the dealings with Herskowitz. Trial Tr., 1/29/20 Morning, 79:10-80:22. At that point, neither the Court nor the Parties had a copy of the Settlement Agreement in hand. The Court therefore immediately directed Baker to call Sanctuary Belize's attorney in Belize during the lunch break and ask him to promptly send a copy of the Agreement to the Court. Just before the lunch break, the Court repeated its request of Baker, and Baker once again said "I have not seen from the documents a nondisclosure" and that the person who "would know is Frank Connelly [Costanzo]," while Pukke again represented that he did not know what a nondisclosure agreement was and "what that even would be as far as…it pertains to the letter." Trial Tr., 1/29/20 Morning, 100:1-101:1.

During the lunch break, however, Baker apparently underwent a sudden conversion and returned to tell the Court that, though he could not reach SBE's attorneys in Belize, he was now aware that former employees had stated that indeed Herskowitz had signed a non-disclosure agreement and that there was a "general release" that contained a non-disclosure clause, the same release given to all IOSB members. Trial Tr., 1/29/20 Afternoon, 2:6-24.

Following Baker's oral representation to the Court, the FTC handed up to the Court one signed and two draft Mediation Agreements, i.e. Settlement Agreements with Herskowitz, one of which was found on Pukke's computer by the Receiver's representative. PX 1583 (email that includes the signed Agreement as an attachment); PX 1584 (a near identical copy of the signed Settlement Agreement that was found on Pukke's computer at 3333 Michelson Drive); PX 1585 (hard copy found at 3333 Michelson Drive of the version found on Pukke's computer). Per the Agreement, Herskowitz not only agrees to send the letter to lot owners, DX PB 35, drafted and/or approved by SBE employees on his letterhead; he also agrees to not disparage Defendants or SBE in any way (paragraph 10(u)), not to appear in any litigation of any type (paragraph 10(l)) and more importantly, not to disclose the existence of the Agreement or any of its terms (paragraph 16). PX 1583. The Agreement also includes as an attachment a draft of a letter to be sent to the Wall Street Journal purportedly drafted by Herskowitz. Id.

And, mirabile dictu! The Herskowitz Settlement Agreement in fact turns out to have been signed on behalf of SRWR and Eco-Futures Belize by none other than Mr. Peter Baker himself, who little more than an hour before had attempted to suggest to the Court that he did not know about and was not in any way involved in the Herskowitz Settlement Agreement. PX 1583.

Then, too, remarkably, Pukke without the least retreat, continued to insist to the Court that Herskowitz in fact had written this letter and that he (Pukke) and Baker "certainly didn't write the letter," before allowing that Costanzo may have aided Herskowitz with the language. Trial Tr., 1/29/20 Afternoon, 7:5-7:23. But a few days later, during Baker's examination by the FTC, Baker conceded that he personally had in fact negotiated the Settlement Agreement with Herskowitz and that Herskowitz had provided Costanzo with a rough draft of the letter to lot owners, that Costanzo had commented on the letter and had then forwarded it to Baker and Pukke, who "would have input," as Costanzo "answers to [Pukke]." Trial Tr., 2/05/20 Afternoon, 105:1-106:3. Baker originally said he was unsure if Pukke had any input on the letters attached to the Agreement, including the letter purportedly drafted by Herskowitz. Trial Tr., 2/05/20 Afternoon, 106:4-106:14. But the FTC then introduced a series of documents impeaching Pukke's and Baker's earlier testimony, the most devastating of which was an email showing that Herskowitz sent his version of his letter to lot owners to Baker, who then forwarded it to "dre" (obviously An-DRE Pukke) at Pukke's email address. PX 1812.

That is because there was a fly in the ointment as big as a buzzard.

Common sense might suggest that a developer's representation that a real estate project—particularly one as substantial as Sanctuary Belize—will be completed in 2-5 years, should not except in extraordinary circumstances, lead to liability under the FTC Act. Lagging sales, a sluggish economy, supply delays, weather conditions, and litigation (private and public) might well intervene to stretch the completion times. But there is a critical feature of this case that compels a different outcome: SBE never had sufficient funds to finish the development, luxury amenities included, in the time promised, even to this day, and it still lacks sufficient funds to do so. Sanctuary Belize could never be completed as promised even assuming revenue for the next five years would be at a historic high. Claiming otherwise is an actionable misrepresentation.

At the Preliminary Injunction hearing, the parties offered competing projections as to the resources that would be needed to complete the development. Professor Peiser, the FTC's expert, estimated that to complete the community as promised (including the hospital, hotel, and

---

Pukke then responded by email that Herskowitz's drafts of the letters to the Wall Street Journal and the lot owners were "joke[s]," as they made it "sound like he lost but was victorious" and "never himself claims anything he said was wrong." *Id.* Pukke also wrote that Herskowitz "must be crazy to think we will pay him a million for him to offer an unapologetic apology." *Id.* Other exhibits introduced by the FTC were similarly damaging to Pukke's and Baker's representations to the Court, and included an email wherein Pukke sends his edits to the draft Herskowitz letter to the Wall Street Journal purportedly drafted by Herskowitz, PX 1805, and another email Pukke sends to Baker and Costanzo that states "I think we need to put specific penalties for violating the gag order," and Costanzo responds that Herskowitz is "basically our bitch everytime someone spouts off." PX 1808. *See also* PX 1801; PX 1803; PX 1809; PX 1811. Again, this across-the-board refutation came after Pukke told the Court that he was not sure what a non-disclosure agreement with Herskowitz would be and after he and Baker suggested he knew nothing about an agreement with Herskowitz and after they insisted the Court should accept the Herskowitz letter for the truth of the matter contained therein.

Given their shellgame over the Herskowitz letter, the Court warned both Pukke and Baker that their in-court statements vis-à-vis the Settlement Agreement bordered on fraud on the Court that might well merit a criminal charge independent of this case, but that, at a minimum, their dissembling reflected very poorly on their overall credibility in this proceeding. The Herskowitz letter and the Settlement Agreement remain in evidence in so far as they bear on the credibility of Baker and Pukke in this proceeding, but they will in no way be considered for the truth of the matter contained in the letter.

commercial center) would cost $613 million, but that even to complete the development with amenities of a caliber well below what was promised would still cost $248 million. PX 1 at 1; PI Hrg Tr., 3/12/19 Morning, 64. Erik Lioy, a partner at the accounting firm Grant Thornton, LLP, the FTC's other expert witness at the March 2019 Preliminary Injunction hearing, estimated that, at most in the next five years, SBE could only afford to spend $87.9 million on development.[32] SBE, on the other hand, has claimed that it "absolutely" had and has the resources to finish the development. PX 310 at 26:18-27:3. Anthony Mock, a builder who often works on Sanctuary Belize (but who was not presented as an expert), [33] estimated that the development could be completed within the next five years at a cost of $32-40 million, though without explanation, he later changed his estimate to $30-$35 million. PI Hrg Tr., 3/15/19 Afternoon, 93:25-94:24, 98:16-21. By "completed," Mock said he meant finishing infrastructure such as roads, electricity, and canals, completing buildings for stores in the commercial area, a marina restaurant and lounge, a gym, a spa, parking, and wastewater treatment facilities, and expanding the marina to 250 slips. *Id*. He did not, however, suggest that the whole package of promised amenities, including luxury

---

[32] Lioy indulged in generous assumptions in reaching an initial estimate of $116 million of cash on hand, including, for instance, that the revenue from SBE's average lot sales for its best sales years would continue over the next five years, and that about $25 million SBE transferred to Belizean accounts over the past seven years would remain available to spend. After considering the Receiver's report, however, Lioy revised his opinion in view of the new information about what actually happened to $25 million in deposits and the fact that SBE had historically spent a far lower percentage of funds on development than he originally thought. Lioy's modified opinion was that SBE could spend between $18.5 and $87.9 million, toward the low end if historic levels of spending went toward development, and toward the high end if a higher percentage of sales revenue were spent on development. PX 875.

[33] Mock is married to Pamela Pukke, Pukke's ex-wife who was a relief defendant in the *AmeriDebt* proceeding. Mock Dep. Tr., 10/10/19, 20:15-20:18. Pamela Pukke has been on Mock's payroll as a part-time employee. PI Hrg. Tr., 3/15/19 Afternoon, 109:6-109:22. Mock apparently worked for SBE as well, had an SBE email address, was copied on SBE sales emails, and apparently had his biography included on Sanctuary Belize's website. PX 1332; PX 1358; PX 1363; PX 910.2. In fact, SBE even paid Mock for work on the Kanantik resort. Mock Dep. Tr., 10/10/19, 35:11-18. Further, Mock's company, ABM Development, was the vendor of lots sold in Bamboo Springs and SBE. Trial Tr., 1/24/20, 51:3-15. SBE entities sold lots in Bamboo Springs prior to becoming owners of the land there. After the transaction to purchase the Bamboo Springs land fell through, some Bamboo Springs lot purchasers were transferred to lots in Sanctuary Belize while other purchasers, as of trial, still had not been transferred to new lots. Trial Tr., 1/23/20, 90:14-21.

amenities, could be completed in that cost frame. He also admitted that some of the numbers he provided were based on numbers provided by Edwin Contreras, Sanctuary Belize's project engineer, and that he himself did not actually know how much some of the amenities might cost, and finally, that he had never built a marina or hotel prior to working on Sanctuary Belize. PI Hrg. Tr., 3/20/19 Morning, 41:25-42:7, 48:7-51:13.

Based on Professor Peiser's estimates of the cost of completion and Lioy's estimate of the anticipated revenue from lot sales, the Court concludes that the development could never have been completed in five years, let alone two or three. Again, the reason is that there has never been sufficient funding. Using the best years of lot sales, Lioy estimated SBE's future revenues. His estimate was completely overwhelmed by the cost of completion of the development, including the promised luxury amenities.[34] The inescapable conclusion is that the project, beginning in 2011 or any time thereafter, was never going to be finished within the promised time frame and that individual Defendants either knew this or acted with reckless disregard as to its falsity by failing to appreciate that they never could deliver the amenities within the promised time frame.

The Court finds that it was reasonable for consumers, both sophisticated and not, to believe that the development would be completed in two to five years. Notably, the Court heard testimony that, at least with one lot purchaser, the developer agreed to a contractual clause stipulating to completion within five years. PX 183.11.

---

[34] Peiser estimated that it would cost $34 million to build the hotel and lodges, $10 million for municipal services, $27 million for a small medical center, $5.7 million for the Marina Village, $10 million for a golf course, and $8.5 million for a simple marina that "wouldn't meet promises." These costs alone, which do not include the cost of many other promised amenities or the cost to elevate some of the amenities to the quality promised, would amount to $95.2 million, more than the $87.9 million Lioy estimated SBE would have available to spend on the development. Trial Tr., 3/12/19 Morning, 80:18-82:6, 87:17-88:8, 91:9-15, 92:7-13.

The Court also finds the promised timeline to have been material to several lot purchasers, many of whom were retired or were nearing retirement when they purchased. *See, e.g.*, PI Hrg. 60:17-61:8, 3/11/19 Morning ("I do remember thinking that, you know, five years was not too long for us."); PI Hrg Tr., 3/11/19 Afternoon, 84:21-85:6; PI Hrg Tr., 3/11/19 Afternoon, 99:19-100:15; Trial Tr., 1/22/20 Morning, 26:12-26:19 (lot owner testifying the timeline was "very important"); Trial Tr., 1/28/20, 76:5-25 (lot owner testifying the timeline was important because he was retired and was "looking for someplace immediately"). The fact that the development was not even near completion in 2018, 13 years after the first promise, and even allowing for a brief time-out for the Belizean litigation, demonstrates that Defendants could not have reasonably completed the project in 2-5 years. The cost of completion far outweighed the sales revenue that could reasonably be anticipated as coming in.

The Court concludes that the FTC has shown that Defendants violated the FTC Act by misrepresenting that the development, promised luxury amenities included, would be completed within two to five years.

### F.  Appreciation of Lots in Value

This is the one Core Claim as to which the Court finds the FTC does not prevail.

Throughout the sales process, SBE salespeople continuously emphasized to prospective lot purchasers that lot values would greatly appreciate. Trial Tr., 1/22/20 Morning, 29:6-11, 29:25-30:14, 52:20-23 (lot purchaser testifying that Chadwick had "suggested" that lots values had already increased 100 percent, and that once the project was done, the lot value would appreciate another 200 percent); Trial Tr., 1/28/20, 47:2-10 (lot purchaser testifying that he was told by a SBE salesperson that "prices had doubled or even tripled since they started selling the lots"); Trial Tr., 1/31/20 Afternoon, 61:16-62:16, 66:3-9 (SBE salesperson testifying that she was instructed to

tell prospective lot purchasers that "their lots would probably double within two or three years" and that "we conveyed that [message] every time"); Anderson Dep. Tr., 90:11-15, 90:19-21, 99:18-100:15 (SBE salesperson stating that lot appreciation and lots increasing in value by 300 percent were parts of the script and that she made lot appreciation claims "with approval"); PI Hrg. Tr., 3/11/19 Morning, 54:16-22 (lot purchaser testifying that he was told "prices would double" once the airport was complete; PX 207.1 at 13, 30, 31 (script); PX 299 at 6:18-20 (SBE salesperson recorded on an undercover call stating that "If you doubled your money in the next three years, I am sure that would put a smile on your face."); PX 301 at 6 (Buyer's Guide, stating, "Those savvy investors took advantage of stellar financing opportunities that empowered them to reap returns of more than 300% over a four-year span."); PX 301 at 8, 15 ("The property values have been escalating significantly, and are projected to increase 250 to 300% in the very near future - So your timing is perfect."); PX 303 at 54:21-55:1 (SBE salesperson telling undercover FTC employees "they're [projecting] 250 to 300 percent [appreciation] in the next few years"); PX 307 at 59:12-18 (undercover call where SBE salesperson promised that because of the airport, marina, and other amenities, they could expect "around a 300 to 500 percent increase, in three years"). PX 1183 (sales script circulated in November 2013 stating that lots had "appreciated approximately 30 percent over the last few years" and that "it will double in value in less than 3 years" which would "put a smile on your face"). As late as June 2018, SBE posted marketing material online claiming 400% returns. PX 155 at 1. The Receiver's representative also found sales scripts at 3333 Michelson Drive in November 2018 claiming the return on investment at Sanctuary Belize could range between 250 and 400%, especially after the promised airport was completed. PI Hrg. Tr., 3/20/19 Afternoon, 82:22-84:25.

In fact, as will be discussed *infra*, Section V.G, lot owners encountered considerable difficulties selling their lots and few lots were sold for any profit at all, much less with 100% or more appreciation. *See, e.g.* PI Hrg. Tr., 3/19/19 Afternoon, 78-81:12 (lot purchaser testifying that she bought a lot for $119,900 nearly a decade ago, paid an additional $22,000 in taxes and HOA fees, and agreed to an offer from a buyer for $130,000 over ten years and she had to agree to provide the financing herself to the buyer because "lots were not selling"). After one couple purchased a lot and defaulted on the lot payments, SBE repossessed the lot and sold it to another lot purchaser for $29,000 less than what the couple had paid. Trial Tr., 2/4/20 Morning, 70:23-71:3, 71:17-23, 92:25-93:11; PX 1761.

It is quite clear to the Court that the statements made by SBE operatives were wholly speculative pie-in-the-sky representations, unquestionably intended to entice purchasers. But the sticking place is whether it was reasonable for the consumers to accept and rely on SBE's representations about the possible appreciation of lot values in connection with their purchases. Though a few prospective lot purchasers may have been told by SBE salespersons something more definite, such as that "prices had doubled or even tripled since they started selling the lots," Trial Tr., 1/28/20, 47:2-10 (emphasis added), even that misrepresentation was imprecise. What kind of lot? Located where in the development? Doubled or tripled since when? In any event, the vast majority of the representations referred to the lot values appreciating by different amounts at some time in the future.

Standing alone, the Court finds that, in the jargon of real estate sales, this was puffery pure and simple.

And, puffery, that is "exaggerated advertising, blustering, and boasting upon which no reasonable buyer would rely" is not actionable under the FTC Act. *FTC v. Direct Mktg. Concepts,*

*Inc.*, 624 F.3d 1, 11-12 (1st Cir. 2010) (citing *Clorox Co. Puerto Rico v. Proctor & Gamble Comm. Co.,* 228 F.3d 24, 38 (1st Cir.2000)); *see also FTC v. Trudeau*, 579 F.3d 754, 765 (7th Cir. 2009) (stating puffery is "ordinarily defined as 'empty superlatives on which no reasonable person would rely'"). Puffery includes promises of "a great investment or an amazing return on . . . money." *Dunn v. Borta*, 369 F.3d 421, 431 (4th Cir. 2004)). *See also Dean v. Beckley*, 2010 WL 3928650, at *4 (D. Md. Oct. 1, 2010) (finding a false representation cannot be an "estimate" under Maryland state law); *Graff v. Prime Retail, Inc.*, 172 F. Supp. 2d 721, 729 (D. Md. 2001), *aff'd sub nom. Marsh Grp. v. Prime Retail, Inc.*, 46 F. App'x 140 (4th Cir. 2002) (finding that "mere puffery or projections" are not actionable under the Securities Exchange Act). However, "'specific and measurable claims' and claims that may be literally true or false are not puffery, and may be the subject of deceptive advertising claims." *Id.*

The other five deceptive Core Claims and the representation that Pukke had no meaningful involvement with SBE were specific, could be determined to be true or false, and could reasonably have been relied on by consumers, as discussed in depth throughout Section V. But the particular representation that there would be appreciation of lot values in the future by various amounts— speculative and irresponsible as it may have been—finds cover, though barely, as "exaggerated advertising," a sales technique not uncommon in the world of real estate marketing, but not of the sort that a reasonable buyer would (or should) have relied on. *See Direct Mktg. Concepts, Inc.*, 624 F.3d at. at 12.

The Court finds that SBE did not violate the FTC Act by representing that the lots would appreciate in value by variable amounts, at some time in the future.

### G.  Robust Resale Market

During the selling of lots, SBE salespeople typically claimed that there was a "robust," which is to say, strong and healthy, resale market for the lots, often adding that lot purchasers could "buy multiple lots and then sell one for a profit and use the cash from that sale to build on another lot." Anderson Dep. Tr., 91:8-21. *See also* Trial Tr., 1/29/20 Afternoon, 118:15-119:15 (Chadwick confirming that the claim was made and that he was not aware of a consumer who actually used the profits from the sale of one lot to build on another lot); PI Hr. Tr., 3/11/19 Afternoon, 9:16-10:10 (lot owner who purchased in 2011 testifying that Chadwick and Bannon created expectations that he could sell his lot and recoup the money after three years); Trial Tr., 1/28/20, 47:20-48:2 (lot purchaser testifying that in a series of conversations from late 2011 into 2012, he was told by a SBE salesperson that it would "probably take a couple years before you could sell it" but by then, "the resale value would be pretty good at that point"); PI Hrg. Tr., 3/11/2019 Afternoon, 85:7-21 (lot purchaser testifying that in 2013, he was told that he could resell his lot and get his money back in two to three years); Trial Tr., 1/22/20 Morning, 30:15-23 (lot purchaser testifying that in 2013, Chadwick told her that "there were a lot of prospects for reselling the lots" because "a lot of people wanted to get in, but they couldn't"); PX 310 at 17:17-18:4 (SBE salesperson representing to undercover FTC employees in 2017 that "you're not going to have a problem whatsoever" reselling the lot). SBE also presented information about Coldwell Banker Southern Belize on the tours to bolster its claim that the lots could be resold. Trial Tr. 133:4-11, 1/27/20; PI Hrg. Tr., 3/11/19 Afternoon, 102:17-103:6 (consumer testifying that he was "very interested" in what SBE said about Coldwell Banker Southern Belize on tour, including "that if we wanted to [re]sell a lot, Coldwell would do it.").

But truth be told, there never was a "robust" resale market and, because of certain barriers erected by SBE itself, there never could be. First, as stated, the resale of lots in fact proved exceedingly difficult for lot purchasers. *See, e.g.*, Trial Tr., 1/27/20, 200:19-201:6 (Voss-Morrison testifying that only two of the fifty or sixty Sanctuary Belize properties Coldwell Banker Southern Belize listed were resold); Trial Tr., 1/30/20 Morning, 49:16-50:11 (Chadwick testifying that it was possible Coldwell Banker Southern Belize never resold any Sanctuary Belize lots); Trial Tr., 1/21/20 Afternoon, 87:5-8 (lot owner testifying that he had attempted to try to sell his lot multiple times without success since 2005); Trial Tr., 1/21/20 Afternoon, 100:14-105:17 (lot owner describing the difficulties he encountered in attempting to sell his lot). The fact that a substantial number of lot owners tried without success to force SBE to buy back their lots and/or had to engage in extensive litigation against SBE in the United States and abroad, clearly reflected, contrary to SBE's representations, that there were few opportunities for dissatisfied owners to sell their lots at all. *See, e.g.*, Trial Tr., 1/21/20 Afternoon, 118:19-120:4 (lot purchaser testifying that, on at least six occasions, he asked the developer to buy the lot back, but they declined to do so at any price); Trial Tr., 1/28/20, 106:6-109:16 (lot purchaser requested buyback in part because he believed SBE had lied to him, but did not receive a real response to his request); PX 186.86; PI Hrg Tr., 3/19/19 Afternoon, 78-81. In one instance, consumers who purchased a lot for $119,900 and paid various taxes and HOA fees in the intervening decade agreed to sell their lot for $124,000 on unfavorable terms, including apparently that they finance the sale themselves, because that was the only way to close the deal. *Id*. In fact, to address owner dissatisfaction with their inability to resell lots in competition with SBE, SBE promised during a webinar that it would stop selling its own lots entirely for a period of years in order to permit owners to sell their lots and obtain the promised profits. PI Hrg. Tr., 3/11/19 Morning, 82:6-84:14. But in fact, SBE never did this. *Id.*

While representations about the future appreciation of lot values may amount to no more than puffery, as just discussed, in the particulars of this case the representation that lots could be resold because the resale market was "robust" was not only express, specific, and determinable; at the very same time SBE salespeople were making this representation, SBE was actively working to undermine and impede resales by lot owners. Charmaine Voss-Morrison, an SBE employee, testified that she was not permitted by SBE to put up "for sale" signs on the lots that purchasers were attempting to re-sell and that, if a sign was put up by her or another realtor listing properties at Sanctuary Belize, the sign would be taken down. Trial Tr., 1/27/20, 150:24-152:8. This was because SBE did not want people to inquire about these lots. *Id.* Voss-Morrison also testified that she could not discuss the lots that were available to be resold during the tours with prospective lot purchasers because "the development's lots had to be for sale first." *Id.* at 152:10-16, 154:3-9. Most importantly, she warned Pukke sometime prior to the IOSB lawsuit that they needed to start reselling lots because "we can't be telling people to buy two and then take your proceeds for one, and we're not able to prove that part of the sales pitch that the telemarketers were telling people." *Id.* at 152:17-153:9. Pukke, however, took no action in response. *Id.* Another SBE salesperson, Pukke's friend Jim Catsos, confirmed that it would not "be easy" for a lot purchaser to resell his or her lot because the developer was still selling lots. Catsos Dep. Tr., 152:24-153:8. As early as 2010, when a lot purchaser listed a property, SBE would not allow realtors onto the property to show the lot unless the lot purchaser was present in person—a difficult feat that essentially blocked the resale of the property considering that this lot purchaser lived in the United States. Trial Tr., 1/21/20, 99:18-100:8.

Even in the early years of the project, before SBE began actively prohibiting the posting of "for sale" signs or actively taking them down, SBE knew that lot owners were having extreme

70

difficulty reselling their lots. Still, without any basis for saying so, they made the representation that there was or would be a "robust" resale market. When one lot purchaser tried to sell his lot in 2011 and 2012, he could not even find a realtor to list his lot for sale. Trial Tr., 1/21/20 Afternoon, 100:9-18. Yet at the same time, SBE salespeople were making the claim that there would be a "robust" resale market. SBE either knowingly or recklessly made this false representation because it set as its priority the selling of its own lots first and knew or should have known that its inventory of lots was too extensive for its lots to be sold out within a few years.

It should also be pointed out that, ironically, some of the lots SBE was selling were in fact lots that had previously been purchased by individuals but had been taken back by SBE and put on the market again (which of course added to SBE's inventory). Interestingly, this was not because of SBE's buyback of these lots. Typically, when the lot owners were not able to resell their lots and make a profit or even recoup any portion of their investment, the lot owners would stop payment and the lots would be simply repossessed by SBE. No credit would be given for the payments the lot purchasers had made to the point of ceasing payment, which were often substantial, sometimes in the six figures. *See* PX 462; PX 463; PX 464; Trial Tr., 1/28/20, 119:15-121:10; PX 186.92; PI Hrg. Tr., 3/20/19 Afternoon, 111:18-113:2 (Receiver's representative describing the default process with SBE). SBE would simply take back the property without accounting for principal or interest payments to date and proceed to market the lot to other prospective lot purchasers. The evidence showed that over 100 lots were repossessed in this fashion, with no money credited to the lot owners. PI Hrg. Tr., 3/21/19 Morning, 17:16-19:14

(Receiver's representative testifying that SBE paid its attorneys to draft 144 default letters); PX 920 (attorney's invoice in Belizean dollars).[35]

The Court finds that SBE's representation that a "robust" resale market for the lots existed was and is likely to mislead a reasonable consumer, sophisticated and not, considering purchase of a lot. It would have been reasonable for a prospective lot purchaser to expect at least a semblance of a resale market for lots, but totally unreasonable for the prospective lot purchaser to expect a developer who was actively working against him by impeding such resales. Or put another way, it would have been reasonable for a prospective lot purchaser to expect that the developer would not work against him. The representation of a "robust" resale market was clearly material to many consumers. *See, e.g.*, PI Hrg. Tr., 3/11/19 Afternoon, 100:20-101:6; Trial Tr. 1/21/20 Afternoon, 90:11-20.

The FTC has shown that Defendants have violated the FTC Act by representing to prospective lot purchasers that there was a robust resale market for lots.

### H.  Degree of Pukke's Involvement in SBE

Why was it important that Pukke's involvement in SBE be denied altogether or represented as being minimal? Short answer: Because in the past, before SBE, Pukke had been found guilty of two felonies at the heart of which was the deception of trusting consumers and of this Court no less. That Pukke might try it again in a development he effectively controlled certainly loomed as a possibility, which would have, should have, and did give pause to prospective lot purchasers before they undertook to buy. As it turned out—and this, of course, is in hindsight—he did try it again. Not only did he help craft and disseminate the multiple misrepresentations to consumers

---

[35] Query, whether these uncompensated take-backs, to the extent agreed to by contract, could be deemed void as a matter of public policy, at least under U.S. law. *See Williams v. Walker-Thomas Furniture Co.*, 350 F.2d 445 (D.C. Cir. 1965).

that the Court has just found to be violations of the FTC Act; among other things he blithely helped himself, his family, and his friends to some $18 million of revenues that he diverted form lot sales. The fact that many lot purchaser's worst fears were eventually realized shows, at the very least, that their fears were reasonable to begin with.

The concealment of Pukke's true relationship with SBE is a sorry tale within a sorry tale.

Obviously concerned about the effect of being publicly associated with the Sanctuary Belize development due to his checkered past, Pukke was at great pains to personally hide and to instruct SBE staff either to hide altogether or minimize his involvement with SBE. Brazenly—it is hard to find a gentler term—at different times he masqueraded as "Marc Romeo" and "Andy Storm" when acting for SBE. And at all relevant times, Pukke, Baker, Chadwick, and SBE operatives knowingly represented to consumers that Pukke had no involvement at all or at least no meaningful involvement with SBE, either by expressly denying his involvement, minimizing his involvement, participating in his charade of using aliases, or flatly omitting the fact of his involvement where one would expect the name of the individual who led the development to be front and center. One SBE salesperson testified that salespeople in general were not permitted to say that Pukke was in charge of the operation and were instructed to "never use the name Andi Pukke in regards to Sanctuary Belize" because SBE did not want prospective lot purchasers "to make the connection between AmeriDebt and Sanctuary Belize." Trial Tr., 1/31/20 Afternoon, 47:24-48:6, 143:21-144:12.

When prospective lot purchasers did inquire about Pukke during the sales process, SBE salespeople and Defendants told bald-faced lies. *See, e.g.*, PI Hrg. Tr., 3/19/19 Afternoon, 65:15-25 (lot purchaser testifying that in 2009, Brandi Greenfield "assured me that Mr. Pukke was not part of the community. In fact, she said that he's not even welcome in Belize, and I believed her");

Trial Tr. 63:25-64:16, 1/28/20 (SBE salesperson "told me that Andris Pukke was no longer involved"); Trial Tr., 1/28/20, 72:3-73:15 (lot purchaser testifying that in 2012 during a presentation in front of other prospective lot purchasers and during private conversations, Chadwick represented that Pukke was not in any way involved). In fact, this same purchaser testified that in 2012, Chadwick "looked me in the eye, shook my hand about the two issues I was concerned about and that was the timeline of the development and the fact that Andris Pukke wasn't involved." Trial Tr., 1/28/20, 142:16-20. When an undercover FTC employee asked about Pukke's involvement on a recorded phone call in late 2017, Costanzo claimed that Pukke's only involvement was that "he runs a marketing company" associated with the development and that "Pukke has no relationship or ownership or control of this development or the property." PX 338 at 8:8-12, 8:22-9:7. As will be discussed *infra*, Section VI.C, these representations were all patently false; Pukke was deeply involved and had plenary authority over essentially all aspects of SBE.

Pukke and others at SBE often used aliases to mask his identity. SBE salespeople were instructed to say "Marc Romeo" (i.e., Pukke) was the head of the development. Trial Tr., 1/31/20 Afternoon, 143:21-144:19. While the real Marc Romeo apparently owned a small equity interest in an SBE entity, at some point before 2010 he converted his interest to lots, departed, and was possibly paid so that Pukke could use his name. Trial Tr., 2/5/20 Morning, 15:1-6. As early as 2010, after an individual asked Chadwick for "Romeo's" cell phone number and email address, Chadwick forwarded the email to Pukke and asked Pukke if he had a "Marc Romeo email." PX 986. Chadwick sent emails to "Marc Romeo" at Pukke's email address in 2012, PX 1193, and referred to Pukke as "Marc Romeo" in emails with others that same year, PX 1206. A webinar hosted by Chadwick and viewed by a lot purchaser in 2012 listed Marc Romeo as a "Principal," as did other presentations given to consumers. PX 186.1; PX 186.3; *see also* PX 296 at 38 (slide

74

presentation given to consumers identifying "Marc Romeo" as "Director of Operations-USA" and "Sales and Marketing"). In 2013, a presentation Chadwick sent to an SBE salesperson to give to prospective lot purchasers that listed Marc Romeo as a "Principal" alongside Chadwick and Usher (referencing the July 2013 tour and listing awards Sanctuary Belize won in 2012). PX 1609. In 2013, an SBE salesperson witnessed Pukke sign a contract under the name Marc Romeo. Trial Tr., 1/31/20 Afternoon, 147:18-21; PX 1602. Pukke was also included on sales emails as "Marc Romeo," emails that copied Chadwick as late as 2013. PX 910.2.[36] Minutes from a 2016 Annual General meeting of SRWR list "Mark Romeo" as a "full member" and state that "Mark Romeo" was appointed a director of SRWR at this meeting. PX 1071.[37] In November 2016, Pukke sent an email to Costanzo (himself going by the name Frank Connelly on the email) discussing the progress of the development and the importance of being "more careful" that "only my email shows up, not my name" on external communications. PX 833. Costanzo replied that he would be sure to "take exhaustive measures to create distance [because] careless error [in disclosing Pukke's

---

[36] As noted *supra*, Section III.B., during the 2015 hearing on Pukke's alleged Violation of Supervised Release, Chadwick filed a sworn affidavit with the Court to the effect that he was "not aware of Andris Pukke using the name Marc Romeo at anytime between 2012 and the present," i.e. 2015. *Pukke*, ECF No. 46. Chadwick may be saying that he knew Pukke had used the alias Marc Romeo, but is suggesting he was ignorant of Pukke's use of the alias during the period when Pukke was on supervised release. Clearly, even this was false. The evidence shows that, when Pukke was on supervised release in 2012 and 2013, Chadwick was fully aware Pukke had used the name Marc Romeo, and even referred to Pukke as Marc Romeo himself. In post-trial filings, Chadwick argues that these emails and the presentation do not show that his statement to the Court in 2015 was "knowingly false," as he may have had "innocent failures of memory." ECF No. 910. However, Chadwick was not testifying on the stand when he made this statement— he submitted a sworn affidavit, presumably drafted with the aid of counsel, in a proceeding intended to help Pukke avoid serving additional prison time by dispelling the notion that Pukke had continued to use the name "Marc Romeo" while on supervised release.

[37] Baker claims that the Romeo referenced in the minutes is the real Marc Romeo, which would make little sense since Baker himself stated the real Marc Romeo had essentially left the development before 2010, and there is no evidence in the record that the real Marc Romeo in fact returned to SRWR in 2016. Trial Tr., 2/5/20 Morning, 12:25-13:21. In fact, in an email sent by Costanzo to Pukke listing SRWR members two months prior, Costanzo explicitly asks Pukke if Romeo was a member "along the way," implying that the real Romeo was no longer a SRWR member. PX 1512. Notably, Pukke, under his own name, was listed as a member of SRWR on the October list but not on the December list. *Id.*

involvement] could be [a] major setback." *Id.* In 2017, Baker sent Pukke an email regarding a list of directors, stating that perhaps they should take Mar[c] Romeo off the list. PX 831.

There is more.

In an effort to keep his involvement under wraps, Pukke posted Sanctuary Belize-related posts on Facebook using SBE Salesperson Morgan's Facebook account. Anderson Dep. Tr., 262:8-274:2l; Trial Tr., 1/30/20 Morning, 22:21-24 (Chadwick admitting Pukke posted information about Sanctuary Belize under Morgan's name on Facebook); PX 1386. Pukke's posts on Morgan's account included a post with Pukke, pretending to be Morgan, denying Pukke's involvement in Sanctuary Belize, because Pukke had "moved on to other projects in other parts of the world," was no longer involved in Sanctuary Belize, and "ha[d] absolutely no control" of Sanctuary Belize. Anderson Dep. Tr., 262:8-274:2l. Anderson stated that she "knew [Pukke] wrote the response." *Id.*

Pukke also hid behind the name Andy Storm as an alias. *See, e.g.*, Trial Tr., 1/23/20 Morning, 73:3-25 (Receiver's representative testifying that Pukke used the alias "Andy Storm," and that he was unaware of any other employee going by the name Andy Storm); Trial Tr., 2/5/20 Afternoon, 84:23-85:7 (Baker testifying that Pukke used the alias "Andy Storm."); PX 1381 at 1 (identifying "Andy Storm" as a sales representative who made a lot reservation); PX 1365 at 2 (identifying "Andy Storm" as the prospector and representative for a consumer who went on tour). Notably, during face-to-face negotiations with a marina management company to discuss possible management of the marina being developed at Sanctuary Belize, Pukke was introduced as "Andy Storm." Sometime afterward, the marina management company's representatives who participated in that encounter came to understand that "Andy Storm" was the CEO of SBE. *See* PI Hrg Tr., 3/22/19 Afternoon, 72-73. Then, not without a small dash of drama, the representative of the

marina management company, testifying at the Preliminary Injunction hearing, was asked if he could identify the individual who was sitting in the back of the courtroom, and the witness said that that individual was indeed the man he had been introduced to during the negotiations as "Andy Storm." *See* PI Hrg Tr., 3/22/19 Afternoon, 72:6-10. The Court took judicial notice of the fact that the individual was, in fact, Andris Pukke.[38]

Chadwick in particular submits that, at most, the testimony of a single lot purchaser at trial was that on a single occasion, in answer to a direct question, Chadwick supposedly told the individual that Pukke was not involved in SBE (Chadwick however, appears to deny the witness's testimony). Chadwick also argues that an SBE salesperson acknowledged that the Marc Romeo alias was used infrequently. His suggestion is that any representation as to Pukke's lack of or minimal involvement in the project was not sufficiently widespread to cause SBE to be held liable for monetary liability under the FTC Act. This is a gross distortion of the evidence, which the Court has just recounted in detail. Over an extended period, Pukke's involvement and role in SBE was actively and continuously misrepresented and/or concealed by multiple SBE personnel. Chadwick had a large speaking role in this deceptive play-acting.

In addition to express misrepresentations regarding Pukke's non- or minimal involvement with SBE, there were also deliberate deletions or omissions of his name from corporate documents and marketing materials, as well as on the tours. This included omitting Pukke's name from SBE documents in several instances in order to not raise suspicions. *See, e.g.*, PX 627, PX 628, PX 629 (not listing Pukke).

---

[38] The Court heard testimony that Pukke's mother is named Stella Storm (she apparently reverted to using her maiden name Storm after divorcing Pukke's father). Trial Tr., 2/5/20 Morning, 71:20-21, 73:1-2. The Court also heard many SBE employees refer to Pukke as "Andi" throughout the proceedings. *See, e.g.*, *id.* (Baker referring to Pukke as "Andi").

At all times throughout SBE's history, it must be remembered, Pukke carried with him a hard-core reputation for commercial flim-flam. The basic and entirely reasonable concern was always that lot purchasers might be loath to invest in a development led by an individual burdened with two felonies, one for mail fraud stemming from a scheme in which he defrauded consumers and one for obstruction of justice, as well as someone who only a few years before had settled with the FTC and consumers in related cases and agreed to pay them millions of dollars. *See, e.g.*, PI Hrg. Tr., 3/19/19 Afternoon, 65:15-25 (lot purchaser testifying that she was "concerned" about Pukke's potential involvement but was assured that Pukke "was not part of the community" and was "not even welcome in Belize"); Trial Tr., 1/28/20, 106:9-108:19 (lot purchaser testifying that, had he known the truth about Pukke's involvement, he would not have purchased the lot).

Pukke a/k/a/ Marc Romeo a/k/a Andy Storm at long last stands exposed.

The FTC has met its burden of proof with respect to SBE's widespread deception as to Pukke's true involvement in SBE transactions, most important his leading role in the enterprise, and has thus shown that SBE violated the FTC Act in this regard.

78

## VI.   LIABILITY FOR MISREPRESENTATION OF CORE CLAIMS

### A.  *SBE entities as a Common Enterprise*

The factors which establish a common enterprise—common control, the sharing of office space and officers, whether business is transacted through a maze of interrelated companies, the commingling of corporate funds, the failure to maintain separation between companies, unified advertising, and evidence which reveals that no real distinction existed among and between several Corporate Defendants—indicate to a high degree of certainty that in this case the non-settling Corporate Defendants, linked to the actions of Pukke, Baker and Usher and others in SBE, were at all times functioning as a Common Enterprise.

These Defendants shared common control and officers. Various combinations of the individual Defendants were or are officers or owners of these companies. For instance, Kazazi incorporated Eco-Futures Development and was its CEO while Costanzo was its Secretary, Baker an owner, and Greenfield signed contracts on its behalf. PX 530; PX 531, PX 409; PX 1237. Baker was GPA's CEO while Greenfield and Kazazi were officers. PX 479. Baker was or is the managing member and CEO of Buy Belize, LLC while Greenfield was or is the registered agent. PX 537; PX 538. Baker and Costanzo hold or have held positions on Buy International, Inc.'s Board. PX 541. Baker was or is the CEO, CFO and sole director of FDM while Costanzo was or is the Secretary. PX 544. Baker and Pukke, through a "handshake agreement," own Eco-Futures Belize while Usher, Chadwick, and Pukke shielded by an alias, have frequently been held out as "Principals" of SBE. PX 564; PX 640; Trial Tr., 2/4/20, 41:19-42:1. At times, Baker, Pukke, Usher, Chadwick all served as Directors of SRWR, of which Baker was Chairman at the time the FTC filed this suit. PX 358; PX 359; PX 603; Trial Tr. 2/4/20 Afternoon, 42:20-42:23. Usher was the director of SBPOA, though it is unclear whether he still is. PX 499. Chadwick was or is the

sole owner of EI, BREA, and Prodigy and through EI, was or is the majority owner of SBR. Chadwick Dep. Tr., 86:9-89:13; PX 553. Baker has described Kazazi as the "CFO of all the California entities," without distinguishing between and among them. Trial Tr., 2/5/20 Morning, 22:17-19.

In addition to sharing control and officers, the non-settling Corporate Defendants frequently shared employees. In his testimony during the Preliminary Injunction hearing, the Receiver's representative explained that it was very difficult to determine which entity a given SBE employee worked for, since at 3333 Michelson Drive, he found paperwork of several entities spread out on the same desk or nearby desks, and records of multiple entities interspersed throughout. PI Hrg Tr., 3/20/19 Afternoon, 71:3-6. SBE salesperson Morgan stated on deposition that she was unsure which company she worked for because it "was kind of all blended in together." Anderson Deposition Tr. 11/5/2019, 58:3-58:19. Another former salesperson, Paige Reneau, testified at trial that she could not distinguish among and between Sanctuary Belize, GPA, Eco-Futures and Buy Belize, nor could she tell which employees worked for which company. Trial Tr., 1/31/20 Afternoon, 41:7-41:13. Voss-Morrison, who purportedly worked for SBR, participated in tours, represented SRWR at least once on a tour, and even signed contracts for Sanctuary Belize lots as the "representative of the Vendor," who was SRWR. PX 1432; Trial Tr., 1/24/20, 162:2-24. Yet another employee, Sandi Kuhns, shuffled between the various entities, such as SBR and GPA, while working at the same 3333 Michelson Drive location. PX 1406; Trial Tr., 1/31/20 Morning, 77:19-77:24 (Chadwick testifying that Kuhns worked for GPA, then went to work for Coldwell Banker out of the Michelson Drive office before returning to GPA). Employees frequently signed emails on behalf of multiple entities.

Even where employees purportedly worked for one particular Corporate Defendant, they were in constant communication with employees of another Corporate Defendant, further blurring the distinctions between and among the companies. For example, in a March 2015 email, a salesperson with a Buy Belize signature line but a Sanctuary Belize email address sent an article about SBR to an undisclosed list of recipients with the words "They are our competition." PX 597. In response, an employee who supposedly worked for SBR, using her Sanctuary Belize email address even though she also possessed a SBR email address, responded "Competition? Hardly. Just remember…ONE TEAM ONE DREAM! ;)." *Id.* (capitalization in original); PX 1406. In a September 20, 2016 email, Pukke himself proclaimed, highlighting in all caps, "WE ARE ALL ONE COMPANY!!! The funds needed to run BOTH operations must come from the lot sale revenue (both down payments and monthly payments)." PX 1383. Pukke then added that the "obvious understanding is that GPA, EF and SRWR's expenses, regard[less] of what they are, are paid through that same pool of revenue," later stressing again in the same email that "WE ARE ALL ONE TEAM and must support each others staff and operations, including financially." *Id.* Baker's sister, Maya Baker, who worked for SBE in Belize, testified on deposition that employees of the entities in California and Belize "communicated regularly" because they were all part of one effort to sell a lot to a potential lot purchaser. Maya Baker Dep. Tr., 24:15-19.

Further demonstrating the lack of boundaries between and among the non-settling Corporate Defendants, payments made to one company were often deposited in the bank accounts of other entities and/or transferred amongst the various entities. *See, e.g.*, PI Hrg. Tr., 3/11/19 Afternoon, 105:4-20 (account records show that the entities transferred funds freely among themselves, maintained bank accounts for other member entities, and deposited checks made out to other member entities); PX 1545 (check written to Eco-Futures Belize but deposited in a GPA

81

account); PX 183.10 (Memorandum of Sale listing the vendor as SRWR but instructing payments to be made to Eco-Futures Belize in Newport Beach); Trial Tr., 2/6/20 Afternoon, 31:9-32:19, 35:5-38:8. Further, GPA maintained bank accounts in the name of SRWR, Palmaya Development, and Eco-Futures Belize. PX 251 (account inventory showing the GPA "DBA" accounts) until at least mid-2017. In addition, up until mid-2016, Homeowner Association dues were paid to SRWR care of "Eco-Futures," and were later remitted to a GPA account. *See, e.g.*, PX 1411; PX 1446; PX 183.22; PX 1915; Trial Tr., 2/6/20 Afternoon, 37:14-38:1. In 2017, SBPOA transferred money collected for HOA fees to Eco-Futures Development. Trial Tr., 2/6/20 Afternoon, 38:3-38:12. Andrew Dixon, SBE's CPA, testified on deposition that, at least in 2016, GPA was the only company with any income and "the only way for these entities to pay expenses, money had to get in there somehow" but the financials were so unorganized and the funds so commingled that "there's just one humongous account that is just kind of the catchall for everything." Dixon Dep. Tr., 77:9-77:20. The Receiver's representative testified at trial that, though lot sales generated a majority of the income, the proceeds from the sales were almost always sent to bank accounts in California, from which expenses in Belize would then be paid. Trial Tr., 1/23/20 Morning, 79:21-80:4; PX 816.

GPA, followed by Buy Belize, LLC, and Buy Belize International, were and are the sales and marketing arms of most of the various organizations, which is to say that the various entities shared unified advertising efforts. *See, e.g.*, PX 83; PX 84; PX 539; PX 540; Dixon Dep. Tr. 80:16-21.

As of the time of the FTC's and Receiver's entry at 3333 Michelson Drive, nearly all of the non-settling Corporate Defendants—GPA, SRWR, Buy Belize, LLC, Buy International, Inc., Eco-Futures Development, Eco-Futures Belize, Newport Land Group, LLC, Power Haus, FDM,

and SBPOA—either were registered to or physically operated out of the same address—3333 Michelson Drive in Irvine, California. *See, e.g.*, PX 479 (Statement of Information for GPA listing its address as 3333 Michelson); PX 523 (Statement of Information for Power Haus listing its address as 3333 Michelson); PX 544 (Statement of Information for FDM listing its address as 3333 Michelson Drive); PX 528 (Eco-Futures Belize received checks at 3333 Michelson); PX 529 (SRWR received checks at 3333 Michelson); PX 531 (Statement of Information for Eco Futures Development listing its address as 3333 Michelson); PX 538 (Statement of Information for Buy Belize listing its address as 3333 Michelson); PX 541 (Statement of Information for Buy International listing its address as 3333 Michelson); PI Hrg Tr., 3/20/19 Afternoon, 62:17-63:11 (testimony that the 3333 Michelson Drive suit, leased by GPA, displayed a "Buy International" sign).

Further, as will be discussed, *infra* Section VI.C, at all relevant times the Belize-based entities have been answerable to operations in California, and ultimately to Pukke and Baker. PI Hrg Tr., 3/20/19 Afternoon, 71:12-72:6; PX 816 at 6.

Chadwick argues that SBR, BREA, EI and Prodigy were not part of the common enterprise, pointing to testimony of the Receiver's representative's during trial that these four entities were "not completely intertwined" with the other non-settling Corporate Defendants, and the fact that, after 2015 at least, the entities did not physically or effectively operate from 3333 Michelson Drive. Trial Tr., 1/23/20 Afternoon, 25:12-27:20. Chadwick submits, that at most there were only "minor, superficial commonalities" between his entities and the other entities and that his entities and the others only had "arms-length commercial transactions." ECF No. 993. Specifically, Chadwick maintains that SBR and BREA, the entities through which he operated Coldwell Banker, were distinct from the others because Coldwell Banker was a legitimate realtor with business not related

to SBE. *Id.* He argues that EI, for instance, was involved in the filming of a pilot for a TV show "completely unrelated to Sanctuary Belize." *Id.*

Chadwick's arguments ring hollow.

Though the four entities Chadwick speaks of may have been less intertwined with the other Corporate Defendants than the other entities were intertwined with one another, they still were and are sufficiently intertwined as to be functioning as part of the Common Enterprise. The Court explains.

Until 2017, SBR and then BREA operated a Coldwell Banker franchise, namely Coldwell Banker Southern Belize, to help Sanctuary Belize resell lots. Trial Tr., 1/30/20 Morning, 49:10-49:12. In fact, Coldwell Banker Southern Belize had the exclusive rights to sell lots in both the Sanctuary Belize and Kanantik developments. Trial Tr. 1/27/20, 49:15-49:22. Furthermore, information about Coldwell Banker Southern Belize was prominently included in presentations to prospective lot purchasers during the Sanctuary Belize tours, where Coldwell Banker Southern Belize employees were "really a big part of the entertainment and sales process of the whole development." Trial Tr. 1/24/20, 160:4-160:24 (lot owner testifying to this effect and stating that Coldwell Banker Southern employee Charmaine Voss-Morrison was a "tour guide" on Sanctuary Belize tours); Trial Tr., 1/27/20, 133:4-133:7 (Voss-Morrison testifying that she was part of the tour). Coldwell Banker Southern Belize not only shared employees with the other Corporate Defendants, Voss-Morrison sent out an email stating that they were "ONE TEAM." PX 597. Coldwell Banker Southern Belize staff in California also worked out of the 3333 Michelson Drive office. Trial Tr., 1/27/20, 134:25-135:2 (Voss-Morrison testifying that California staff who worked for SBR worked out of the Michelson office). In fact, Pukke even had the authority to direct Voss-Morrison to take actions or bar her from taking actions. *See, e.g.*, Trial Tr., 1/27/20, 150:24-152:13.

In addition, the money used to purchase a physical office for Coldwell Banker Southern Belize in Placencia, Belize was apparently provided by GPA. Trial Tr., 1/27/20, 140:7-141:2. The same accountant for GPA also managed payroll for Coldwell Banker Southern Belize. Trial Tr., 1/27/20, 141:11-141:12. Sales leads were shared between the two, Trial Tr., 1/27/20, 142:5-143:7, as were IT resources, Trial Tr., 1/27/20, 144:6-10. Even when BREA took over Coldwell Banker Southern Belize, Chadwick was still listing the 3333 Michelson Drive address on paperwork. PX 553 at 56.

EI was and is similarly intertwined with the other Corporate Defendants. Internal documents show that, as of 2014, EI's email contact was Chadwick's email address at Sanctuary Belize and that, in 2015, bills for EI were sent to Chadwick at 3333 Michelson Drive. PX 558; PX 600. Moreover, EI owned 51% of SBR and then was a member of BREA—two entities that the Court has just explained were intertwined with the Corporate Defendants. Trial Tr., 1/30/20 Morning, 48:5-48:11; PX 553 at 56. During trial, the FTC's forensic accountant testified that over $200,000 was transferred from GPA to Exotic Investor LLC's bank accounts between 2011 and 2014. PX 1912. In addition, the Receiver traced payments totaling $1.3 million from EI to a construction company that funded one of Pukke's personal properties. PX 816. And, although Chadwick asserts that EI was in communication with the producer of a "TV show completely unrelated to Sanctuary Belize" and that the contract was "not for arranging advertising for Sanctuary Belize specifically," the evidence sharply contradicts this. In 2011, Robert Schafnitz, the "Director of Investor Relations" for "Sanctuary Belize[,] An Eco-Futures Development" wrote an email to ten individuals, including "Alicia Long"[39] at a Sanctuary Belize email address, Greenfield at a Sanctuary Belize email address, Mock at anthony@sanctuarybelize.com, "AP,"

---

[39] Alicia Long is one of the names used by Pukke's mother. Trial Tr., 1/27/20, 128:2-3.

presumably Andris Pukke at srwrbelize@yahoo.com, copying Chadwick at his Sanctuary Belize email address, in which Schafnitz described the new show "Exotic Investor" and the impact the show would have on lot sales. PX 560. In addition, an SBE employee carried on the Buy Belize payroll, who listed Eco-Futures Development as her employer, created a Vimeo (a video hosting, sharing and services platform) profile for EI. PX 563.

Prodigy is the entity through which Sanctuary Belize paid Chadwick's commissions. PX 591; PX 1912. As a shell company used to funnel SBE payments to Chadwick, it is nonetheless evidence of yet another intimate link between Chadwick and SBE.

The Court concludes that the non-settling Corporate Defendants, including BREA, SBR, EI and Prodigy, operated as a common enterprise.

### B.  *SBE's Liability for Violations of FTC Act and for Monetary Relief*

i.  <u>SBE Liability for Violations of FTC Act</u>

To remind:

To establish that a corporation or common enterprise is liable for deception under Section 5 of the FTC Act, the FTC must prove that: (1) there was a representation; (2) that was likely to mislead consumers acting reasonably under the circumstances; and (3) the representation was material. *Loma Int'l Bus. Grp. Inc.*, 2013 WL 2455986, at *3-*4. The Court has found that five of the previously discussed six Core Claims challenged by the FTC, as well as the continuing concealment of the degree of Pukke's involvement in the project were material misrepresentations likely to mislead consumers. Therefore, there can be no doubt that all entities in SBE are liable as part of the Common Enterprise (and that Pukke, Baker, Chadwick, and Usher are jointly and severally liable as well, as will be established in the next sections).

86

Pukke argues that any misrepresentations were targeted to a specific group—whom the FTC purportedly identified at a press conference as "small business owners who are largely looking for retirement property"—such that the reasonableness of the understanding of the claims must be considered from their perspective. In support of this position, Pukke cites the FTC's Statement on Deception that declares that "[w]hen representations or sales practices are targeted to a specific audience, the Commission determines the effect of the practice on a reasonable member of that group." This Court, however, has said that "[i]n evaluating a tendency or capacity to deceive, it is appropriate to look not at the most sophisticated, but the least sophisticated consumer." *Loma*, 2013 WL 2455986, at *5 (citing *FTC v. Five-Star Auto Club, Inc.,* 97 F.Supp.2d 502, 532 (S.D.N.Y.2000)).

Moreover, apart from his own say-so. the Court notes that Pukke did not establish at trial that SBE's advertisements were in fact targeted to a specific group, nor indeed did he attempt to offer the video of the FTC's press conference into evidence. In any event, the Court finds this debate to be academic. Throughout the proceedings, there was a plethora of evidence that, from the perspectives of both the small business owner and the least sophisticated consumer, five of the Core Claims and the continuing concealment of the degree of Pukke's involvement in the project were material misrepresentations likely to mislead any reasonable consumer. *See infra,* Section V (including testimony from Frank Balluff, who owned and then sold a business with 70 employees, and Karina Pomeroy, an owner of three stores in Maine selling Alpaca products).

ii.    SBE Liability for Monetary Relief

In addition to being liable for injunctive relief in connection with the five Core Claims the Court has found actionable and the misrepresentation of the degree of Pukke's involvement with SBE, the evidence also establishes SBE's liability for monetary relief.

87

An enterprise is liable for restitution only if the FTC shows consumer reliance, *Loma Int'l Bus. Grp. Inc.*, 2013 WL 2455986, at *7, which can be established if "(1) the business entity made material misrepresentations likely to deceive consumers, (2) those misrepresentations were widely disseminated, and (3) consumers purchased the entity's products." *Freecom Commc'ns, Inc.*, 401 F.3d at 1205; *see also Ross*, 897 F. Supp.2d at 387; *FTC v. BlueHippo Funding*, LLC, 762 F.3d 238, 244 (2d Cir. 2014). The FTC need not prove actual reliance by any particular consumers because requiring such proof "would thwart effective prosecutions of large consumer redress actions and frustrate the statutory goals of the" FTC Act. *FTC v. Figgie Intern., Inc.*, 994 F.2d 595, 605 (9th Cir. 1993). *See also BlueHippo Funding, LLC*, 762 F.3d at 244 (declining to require individual reliance; "Noting the inherent difficulty of demonstrating individual harm in FTC cases, the Eighth, Ninth, Tenth, and Eleventh circuits have applied a presumption of consumer reliance that attaches to potential consumers at the instant of the initial misrepresentation.")

The Court has already found that five of the Core Claims and the concealment of the degree of Pukke's involvement were material misrepresentations likely to deceive consumers. *See supra*, Section V. The Court has also found that SBE's misrepresentations comprising five of the Core Claims and the concealment of the degree of Pukke's involvement were express, so that "consumer reliance on [them]" is "presumptively reasonable." *FTC v. Five-Star Auto Club*, 97 F. Supp. 2d 502, 528 (S.D.N.Y. 2000).

Further, the Receiver's representative has testified that over 1,300 lots have been sold, some more than once, so that the third prong—that the products were purchased—has also been satisfied.

Pukke, Baker, and Chadwick insist that the second prong justifying restitution has not been satisfied because the challenged representations were not widely disseminated. They appear to

suggest that, these representations, if made, were not made to every lot owner, just the few the FTC called as witnesses at either the Preliminary Injunction hearing or at the Merits trial.

This argument is demonstrably at odds with the facts.

Based on the evidence described at length *supra*, Section V, including testimony from purchasers and SBE salespeople, sales scripts, recorded calls between SBE salespeople and undercover FTC employees, recorded webinars, and more, the Court finds that all of these misrepresentations were widely disseminated. There is no requirement that every single purchaser, or even a majority of them, must testify that they heard these misrepresentations, that the misrepresentations were material to them, and that they relied on the misrepresentations. If that were so, sellers could engage in unending material misrepresentations to a number of consumers but could never be called to account until a majority (or whatever fraction Defendants claim is needed) of purchasers could be identified who can say they actually bought into the misleading sales pitches and then be brought to Court to testify. This proposition falls of its own weight and under the weight of case law cited earlier in this section. The fact that some lot owners who testified for Defendants at trial (or even those who executed declarations saying that certain representations were never made to them) does not disprove that misrepresentations were being widely made to other consumers over the years[40].

The Court finds the entities of SBE that comprise the Common Enterprise jointly and severally liable for the monetary relief to be discussed in *infra*, Section IX.B.

---

[40] The Court indulges in a few musings about the declarations of lot owners who Defendants so earnestly claim support their cases. If such individuals say representations were not made to them, did they read all the promotional materials or attend all the webinars (or even a single webinar)? How closely were they reading the materials or listening at the presentations? Do they recall fully what was written or said? Did it even matter to them if certain amenities at one time promised were not going to be provided? There is a good reason why hearsay evidence is ordinarily kept at bay.

### C.  Pukke's Involvement and Liability

The FTC alleges that at all relevant times Pukke (a) has controlled the operations of SBE, and (b) has directly participated in, directed, and/or had knowledge of the totality of deceptive conduct at issue in this case.

To recap, an individual is liable for violations of the FTC Act if he:

(1) participated directly in the deceptive practices *or* had authority to control those practices, and (2) had or should have had knowledge of the deceptive practices. The second prong of the analysis may be established by showing that the individual had actual knowledge of the deceptive conduct, was recklessly indifferent to its deceptiveness, or had an awareness of a high probability of deceptiveness and intentionally avoided learning the truth.

*Ross*, 743 F.3d at 892.

The Court finds that, at all relevant times, Pukke has had authority to control these practices and that he has directly participated in them.

Pukke, as a partner with Baker in the Sanctuary Belize development, was in charge of SBE. He directly participated in the deceptive conduct because he "developed or created, reviewed, altered and disseminated the deceptive marketing materials" and engaged in "[a]ctive supervision of employees as well as the review of sales and marketing reports related to the deceptive scheme." *Ross*, 897 F. Supp. 2d 369 at 382-3 (internal citations omitted). His authority to control is further demonstrated by his heavy involvement in SBE's business affairs and by having the "ability to review and approve advertisements [and] issue checks, make hiring decisions and personally finance or pay for corporate expenses."

Baker testified that he and Pukke were the original partners in the Sanctuary Belize development when the developer was Dolphin, and that they continued their partnership after Pukke's eventual settlement with the Receiver in the *AmeriDebt* litigation, with Baker holding

Pukke's shares for him in Baker's name.[41] *See, e.g.*, PI Hrg Tr., 3/13/19 Afternoon, 12:4-13:14; *see also* PX 358 (identifying original directors and owners of Dolphin); PX 370 (collecting early board of directors minutes for Dolphin, showing Pukke's control and presence); PI Hrg Tr., 3/13/19 Afternoon, 26:18-27:6; *id.* at 10:14-20 (Baker testifying that Pukke was "my partner"); *id.* at 27:3-5 (Baker and Pukke entered into an "equal partnership"); *id.* at 43:21-24 ("How do I know [Pukke's] the partner? Per our agreement in 2009 where he became my partner"); *id.* at 45:15–20 (describing Pukke as his "partner" in connection with Global Property Alliance, one of SBE's principal marketing entities); Trial Tr., 2/5/20 Morning, 58:11-16 (Baker testifying that he "believed [Pukke] to be -- however he wanted to describe, sweat-equity partner, but I believed at the end of this, he would receive -- when the ultimate payout, equity came, he would be a 29 percent beneficiary of it."); Trial Tr., 2/7/20, 210:24-211:7 (Baker owns 29%, Pukke has 29%, Choi has 10%, Bailey has 2%).[42]

Here, too, an "ocean of evidence," including testimony from SBE employees, underscores the fact that Pukke was *de facto* in charge of SBE, while simultaneously he and others at SBE were at great pains to hide his involvement through both oral representations and on paper. *See, e.g.*, PI Hrg. Tr., 3/20/19 Afternoon, 72:8-73:14 (Receiver's representative testifying that every person with whom it spoke, including Baker and Kazazi, described Pukke as being in control of the 3333 Michelson Drive suite); Trial Tr., 1/31/20 Afternoon, 39:2-6 (SBE salesperson testifying she worked for Pukke); Trial Tr., 1/27/20, 124:16-126:3 (Voss-Morrison reported to Chadwick, who

---

[41] Question for Defendant Baker: Why the need to hide Pukke's ownership of the shares?

[42] Pukke filed a post-trial "Motion to Reconsider Default Judg[]ments" on behalf of multiple Corporate Defendants, including the Estate of John Pukke, GPA, Buy International, FDM, and NLG, which in actuality is a response in Opposition to the FTC's Motion for Default Judgment and will be treated as such. Pukke's Motion to Reconsider Default Judgment, ECF No 1005. Pukke attempted to represent the Estate of John Pukke previously, but the Court ponders why he would attempt to oppose default judgment on behalf of the other Corporate Defendants as well unless he has some interest in those entities.

reported to Pukke, and Voss-Morrison never saw anyone ever overrule Pukke); Catsos Dep. Tr., 94:18-96:9 (Pukke hired SBE sales manager who was not sure if he worked for GPA or Buy Belize); *id.* at 117:1-16 ("Andi [Pukke] had no formal role at the company. But if he wanted me gone, I would be gone."); *id.* at 293:10-12 (sales manager testifying that Pukke was his "boss"); Chadwick Dep. Tr., 3/7/19, 148:3-6 ("Andris Pukke" is to whom Chadwick would "report when . . . involved with the sale of lots in Sanctuary Belize"); *id.* at 172:19-173:8 (Chadwick managed SBE during Pukke's incarceration at Pukke's direction); Chadwick Dep. Tr., 9/26/19, 115:10-116:1 (Pukke had the authority to fire employees); Dixon Dep. Tr. 58:13-24 (Pukke was superior to Rod Kazazi); *id.* at 66:22-68:3 (Pukke was Brandi Greenfield's superior); *id.* at 72:19-74:15 (Pukke took ownership distributions that were attributed to Baker for tax purposes); *id.* at 112:3-17 (understood Pukke "was kind of the decision maker" and had a "vested interest" given his involvement in SBE's financials); *id.* at 113:2-21 (SBE's accountant explaining that Pukke's use of Baker as the official owner was Pukke "hiding" his control: "You know, I knew he had an FTC issue. I just presumed, again, that his friends would run all these businesses for him or he'd be involved, but his friends would basically report all the entities. That's it."); Mock Dep. Tr., 10/10/19, 353:22-25 (Pukke provided approval to Mock to build model homes for Sanctuary Belize); Mock Dep. Tr., 10/11/19, 24:7-25:1, 26:11-17 (Pukke maintained an office at SBE's Dove Street location, from which he "was providing instructions and otherwise [was] involved with the Belize operations"); *id.* at 31:12-21 (builder provided Pukke with updates on the completion of the Coldwell Banker Southern Belize offices); *id.* at 232:1-13 (builder testifying that he was unaware of anybody that could be Pukke's boss on any issues); Hogan Dep. Tr., 37:22-38-:17, 39:9-17 (SBE salesperson was hired at Pukke's direction, and he met with Pukke in Pukke's office); *id.* at 182:24-184:6 (SBE salesperson would seek Pukke's approval on issues when negotiating sales);

*id.* at 258:36-259:1 (SBE salesperson testifying that "Mr. Pukke and Mr. Baker were among the people who ran the company"); *id.* at 294:1-12, 295:14- 296:14 (Pukke promoting the sales manager in Belize and directing Brandi Greenfield to send an email to the sales team regarding the promotion); Smith Dep. Tr., 12/9/19, 65:1-66:11 (testifying that "Ultimately, Andris Pukke" determined who got paid what and that he has "no doubt" that Kazazi was subordinate to Pukke); *id.* at 73:19-74:18 (Pukke was in the "C Suite"); *id.* at 78:2-19 ("[I]t appeared evident that Andris gave a lot of direction."); *id.* at 132:3-133:10 (even as to accounts that Chadwick or others were signers on, withdrawals "would have been in consultation with Mr. Pukke"); Barienbrock Dep. Tr., 8/21/19, 71:10-16 ("And I understood that the marketing operation, which I did not loan money to, was being involved. That Pukke was involved with that in sales and marketing."); Maya Baker Dep. Tr. 85:25-86:8 (Baker's sister testifying that Pukke "was still the boss when he was in prison"); Santos Dep. Tr. 44:10-11 (Santos testifying that "Andris Pukke was in charge of the suite," meaning 3333 Michelson Drive, Suite 500); Peter Baker Dep. Tr., 2/19/19, 55:19-56:4 (SBE salespeople would report "ultimately [to] Andris Pukke and Rod Kazazi"); *id.* at 56:12-57:14 (Bill Bannon, the ostensible owner of Buy Belize, "report[ed] to" Pukke); *id.* at 68:20-69:7 ("Mr. Pukke has had an interest since its inception."); *id.* at 91:25-92:1 ("Andris Pukke, to me, is the CEO of the sales and marketing companies."); *id.* at 229:21-230:19 (stating "it was knowledge among the partners that [Pukke] had an ownership stake"); *id.* at 241:21-243:5 (Pukke had control over money that flowed to Belize); Peter Baker Dep. Tr., 10/15/19, 34:14-35:12 ("[Pukke] said he would become the C.E.O. of the company in California, the sales and marketing wing."); Boyajian Dep. Tr. 291:20-292:16 (SBE employee testifying that everything at 3333 Michelson "ultimately flowed back to Andris").

Pukke continuously directed other Defendants to act on behalf of SBE, including Greenfield, Costanzo, Chadwick[43], and Kazazi. *See* Trial Tr., 1/31/20 Afternoon, 42:8-43:2, 95:15-96:10; PX 635; Trial Tr., 1/30/20 Morning, 73:11-21; PX 1269. For instance, after Usher accused Pukke of diverting money from the development, Pukke and Baker forced Usher out as Chairman of SRWR. PI Hrg. Tr., 3/13/19 Afternoon, 83:17-84:19 (describing meeting in 2016 in which Usher accused Pukke of taking $24 million out of the development); PI Hrg. Tr., 3/13/19 Afternoon, 85:4-12 (Baker, on his and Pukke's behalf, travelled to Belize to confront Usher when Usher attempted to wrest total control of Eco-Futures Belize); PX 836 (email in which Baker recounts his confrontation with Usher, calling Usher a "thief," and prior emails between Pukke and Usher describing a potential "buyout" of Usher's interest in the development); PI Hrg. Tr., 3/13/19 Afternoon, 90:13-91:7 (Baker testifying that following the dispute with Usher he took a hands-on role in Belize); PX 935 (email exchange among Pukke, Usher, and Baker following the 2016 meeting regarding the plan moving forward, with Pukke and Baker directly controlling activities in Belize).

Pukke controlled and was in a position to control all aspects of SBE's operations, including handling communications with lot owners about corporate structure, legal affairs, lot ownership structure, dissolution of SBE-related entities, payments for equipment shipped to Belize, review of contracts for the sale of lots, authorization of commissions for telemarketers, dealing with consumers who wanted to sell their lots, dealing with the taxes of SBE entities, dealing with

---

[43] Pukke's *de facto* control continued during his incarceration despite his handing day-to-day control over to Chadwick. Maya Baker Dep. Tr. 80:13-85:3, 85:9-86:8; PX 1055 (email sent by Maya Baker to Peter Baker and Pukke discussing sales strategy while Pukke was incarcerated); PX 635.

customer complaints, addressing HOA fee disputes, making design decisions, choosing office space, making rent payments, deciding raises for SBE employees, and reviewing architectural plans. *See, e.g.*, PX 429; PX 435; PX 438; PX 439; PX 440; PX 441; PX 451; PX 452; PX 453; PX 454; PX 1471; PX 1501; PX 1502; PX 1503; PX 1504; PX 1505; PX 1532 at 46, 92 (design); PX 1341 (the Mariah); PX 1300 (Pukke directing employees not to spend any more time on a particular consumer); PX 1273 (Pukke editing draft of email promoting Eric Hogan to Director of Sales that was to be signed by Greenfield); PX 1317; PX 424 (email from SBE employee to an individual at "benefit mall" about payroll who wrote "I am also still waiting for a reply as to what to do for Andris Pukke (the owner.)"); Chadwick Dep. Tr., 3/7/19, 185:22-186:8, 188:8-10, 188:16-189:1 (Chadwick stating that he would "probably" discuss when consumers complained or threatened lawsuits or regulatory actions with Pukke, though he did not provide a timeframe for when); Anderson Dep. Tr. 241:16-243:5 (SBE salesperson testifying that she would seek Pukke's help in dealing with unhappy clients).

SBE's accountant, Andrew Dixon, also testified on deposition that Pukke and Baker possessed draw accounts, and that Pukke's account was "not typical" because typically, only owners have such an account, and at least on paper, Pukke was not an owner. Dixon Dep. Tr. 112:3-113:21. Pukke himself wrote in an email to Usher and Baker in 2016 to this effect, stating that "I can assure you that I didn't devote 15 years of my life and almost $5mm of personal investment (plus spent a year in jail over it) to be put in a situation where I have no input into how things are being run." PX 932. Finally, what could constitute more compelling evidence of Pukke's control over SBE finances than his ability to divert approximately $18 million of consumer lot payments for his own benefit and that of his family and friends? *See supra*, Section V.C.

In addition to exercising control over all aspects of SBE, Pukke was heavily involved in the marketing and sales operations of the development. The vast bulk of evidence stands in sharp contrast to and totally demolishes the protestation in his filings and at trial that he was just the "marketing guy" and that there was no credible evidence presented in these proceedings that he "directly participated in sales."[44] Pukke often had the final say as to the content of sales presentations given by SBE telemarketers, participated in sales tours in Belize, and negotiated the terms of at least some sales contracts. *See, e.g.*, Catsos Dep. Tr. 197:19-198:410 ("Q. [] If Andris Pukke wanted something changed in a sales pitch, it would get changed; right? A. Yes. Q. So his word was the rule; correct? A. That's fair to say."); *id.* at 115:19-116:14 (sales manager would show scripts to Pukke for approval); *id.* at 197:19-198:10, 198:19-199:11, 200:11-201:19, 202:2-22, 205:9-206:20, 206:25-207:22, 208:1-18, 210:1-212:8 (Pukke approved a script making many of the Six Core Claims); *id.* at 217:16-219:11 (Pukke approved timeline claims); DX AP 324 (email from Pukke to a sales manager attaching a sales script, with Pukke writing in the email: "Here it is with a few more tweaks."); Trial Tr., 1/31/20 Afternoon, 78:12-14 (SBE salesperson stating Pukke frequently gave instructions about sales in meetings with the entire company); Anderson Dep. Tr. 221:23-222:22 (draft script being provided to Pukke for his review); Trial Tr., 1/31/20 Afternoon, 67:2-10 (Pukke had to approve any discounts for tours); *id.* at 67:23- 68:2 (Pukke had to approve any variations to the lot reservation terms); *id.* at 72;15-19 (Pukke had to approve any modification to lot payment terms); PX 442; PX 443 (Pukke approving the pay of SBE employees, including salespeople).

---

[44] Despite his constant assertions that the marketing and sales teams at SBE were distinct, and that he only participated in marketing, Pukke at one point in his Proposed Findings of Fact and Conclusions of Law states that his role was "predominantly sales and marketing." ECF No. 1011 at 89. Which Pukke to believe? *See* Footnote 31.

For this reason, Pukke also either had actual knowledge of or should have had knowledge of the deceptive practices practiced by others. In fact, because he personally directed the sales activities and reviewed sales scripts, he was without a doubt aware of the content of virtually all the marketing claims pertinent to sales activities promoted. Morgan testified on deposition that Pukke "hears everything that's going on with all the team." Anderson Dep. Tr., 263:21-25.

For reasons described *supra*, Section V, Pukke knew full well that the five Core Claims found to be deceptive by the Court plus the representations and omissions as to the level of his involvement in SBE were blatantly false.[45] For instance, given the magnitude of his own diversion of revenue from lot sales, Pukke clearly knew the claim that every dollar of revenue would go back into the development was false. He also knew that the development had taken out loans, secured and unsecured, belying the unending representations by SBE that the project was debt-free.[46] He also had to know or was reckless in not attempting to verify that so-called debt-free real estate developments are not less risky than developments with traditional financing. *See* Section V.B, *supra*. As someone with essentially unfettered control over SBE finances and insight into project costs, Pukke knew or should have known from the outset that, SBE lacked sufficient funding to meet the timeline for completion the development had promised. In later years of the project,

---

[45] From the beginning of this proceeding, in response to effectively all questions asked of him, Pukke has invoked his Fifth Amendment privilege against self-incrimination. Among the questions as to which he claimed the Fifth Amendment privilege were questions bearing on whether he made the six Core Claims or directed others to do so, whether he used aliases, and whether he had any measure of control over SBE—in fact, he invoked the privilege approximately 1400 times. Trial Tr., 2/4/20 Morning, 4:9-11. As such, the Court may draw adverse inferences when "independent evidence exists of the fact to which the party refuses to answer." *U.S. ex rel. DRC, Inc. v. Custer Battles*, 415 F. Supp. 2d. 628, 632 (E.D. Va. 2006) (citing *Doe v. Glanzer*, 232 F.3d 1258, 1264 (9th Cir. 2000)); *see ePlus Tech., Inc. v. Aboud*, 313 F.3d 166, 179 (4th Cir. 2002). Here, the confirmatory evidence is so strong that the Court does not really need to draw adverse inferences to reach the same factual and legal conclusions. However, just to be sure, the Court does draw negative inferences against Pukke in respect of any and all matters as to which he has asserted the Fifth Amendment privilege.

[46] In his 105 page Proposed Findings of Fact and Conclusions of Law, Pukke does not contest that he knew SBE in fact had taken out loans. ECF No. 1011.

despite its continuing inability to meet promised timelines, SBE's misrepresentations as to the timelines for completion were unabated. Given his commanding position in SBE, Pukke knew or at least willfully blinded himself from knowledge that promised amenities were not being built or had been abandoned altogether, in particular because he was copied on emails mentioning the promised amenities. Finally, Pukke knew without question that there was no "robust" resale market for lots because he personally impeded the resale of lots by having lot owners' for-sale signs taken down and by prioritizing the development's own lot sales over lot purchasers' resales. Pukke's crowning deception, of course, was that he continuously concealed the degree of his involvement in SBE from prospective lot purchasers by assuming aliases and instructing others to do the same, going so far as to personally post on Facebook, under the name of another SBE employee, that Pukke was not part of SBE, and by instructing other SBE employees not to use his real name and otherwise to minimize his role in SBE.

Given the massive evidence of Pukke's control over SBE, his direction of its marketing and sales strategies, and the deceptions he and others perpetrated on consumers, not least the concealment of his active and controlling involvement in the enterprise, the Court finds Pukke liable for violations of the FTC Act with respect to the five Core Claims previously discussed as well as the representation that he had and has no meaningful involvement in SBE, as discussed in Section V. Accordingly, Pukke will be subject to both injunctive and monetary relief, which will be joint and several with Baker, Usher, the non-settling Corporate Defendants, and, to a degree that will be discussed, with Chadwick.

### D. Baker's Involvement and Liability

Throughout the life of SBE, Baker has held numerous positions of control in several of the entities comprising SBE. From approximately 2003 through 2007, he owned Dolphin

Development, LLC—the original developer of the Sanctuary Belize community. Starting in 2003, he was an original Director on the Board of SRWR, eventually becoming Chairman in 2016. PX 358 (Baker as one of the original Directors of SRWR in 2003); PX 370 at 21 (Baker as Director in 2003 seconding Pukke to be SRWR Chairman); PX 568 (Baker as Director in 2004); PX 370 at 24 (Baker as Director in 2005). As detailed *supra*, Section III.A, in 2008, Baker negotiated the SRWR Settlement Agreement with the *AmeriDebt* Receiver, raising the $2 million from third party investor Steven Choi. In 2009, Baker and Usher formed Eco-Futures Belize, the Belizean corporation that would be responsible for developing Sanctuary Belize. PI Hrg. Tr., 3/13/19 Afternoon, 8:16-17, 30:20-24, 34:23-25; 36:1-23, 40:19-20, 41:16-23, 48:23-49:7, 121:21-23; PI Hrg. Tr., 3/14/19 Morning, 113:19-25; PI Hrg. Tr., 3/15/19 Afternoon, 14:11-16:7. Though ostensibly holding 70% of shares of Eco-Futures Belize in his own name, Baker actually held some of these shares for others, including Pukke. Trial Tr., 2/4/20 Afternoon, 44:18-46:20. Baker also owned Eco-Futures Development and its successor, GPA. PX 1237 at 3, 11; Dixon Dep. Tr. 80:16-21, 93:1-12; PX 1490; PX 1239 at 15. He was the CEO and 100% owner of Buy Belize and Buy International and served on the board of FDM and received notifications about wires from FDM's bank account. PX 538; PX 544; PX 960; PX 961; PX 962; PX 963; PX 1823.

Curiously during these proceedings, Baker has contested the FTC's allegations that he owned or served as a director of several of these entities, particularly GPA, insisting that his signatures on documents of incorporation for GPA, Buy Belize, and Buy International were forged, and that he was unaware, until the FTC filed suit, that he was the owner of these entities or that they played any role in Sanctuary Belize's sales and marketing. Trial Tr., 2/4/20 Afternoon, 64:1-65:10. For example, Baker testified at trial that he thought GPA was Chadwick's "company because [Chadwick] was running sales." Trial Tr., 2/10/20, 127:5-11. Overall, Baker maintains

that his only direct affiliations were with Eco-Futures Development (the predecessor to GPA), with Eco-Futures Belize and with SRWR, but continues to assert that he was not a control person of any of these entities, and that he "has set forth facts and evidence that will make it impossible for the FTC to prove that he was an owner or control person of any of the California SB[E] Entities (since 2010)." Baker's Proposed Findings of Fact and Conclusions of Law, ECF No. 969. Baker also claims that, starting in 2010, he "separated" from the "management of the office affairs" in order to raise "capital" because Chadwick had superior sales techniques and displaced him, and that he then decamped for Europe, suggesting that he was out of the loop during his time there, only returning to Belize in 2016. Trial Tr., 2/7/20, 172:17-173:25.

When confronted with a specific declaration he submitted to this Court on February 21, 2019, PX 992, in which he claimed to be an owner and officer of GPA, Baker asserted that he was confused and had only "assumed GPA was one of the companies" he owned and, only after the FTC filed suit did he realize it was not Eco-Futures. *Id.* at 66:1-24. He also testified that he thought Buy International "was a commercial only" and that he did not know much about Buy Belize. Trial Tr., 2/5/20, 55:1-24. These denials are nothing short of astonishing.

At trial, the FTC introduced abundant evidence impeaching Baker's testimony regarding his supposed non-knowledge of and non-involvement as to the referenced entities. First, of course, much of the evidence cited in the previous section about Pukke's control of SBE entities also establishes Baker's coordinate control. Specifically regarding GPA, the FTC's evidence included: (1) Baker's 2017 witness statement in the Belizean lawsuit brought by dissatisfied lot purchasers, in which Baker declared, as "Sales Manager" of GPA, that he personally approved the sale of a lot and was responsible for, among other things, the "train[ing] the sales representatives employed by GPA," PX 896; (2) a WhatsApp chat message between "Frank Fearless" (presumably Costanzo)

100

and Baker in which Baker asks Costanzo to send him the 2017 witness statement, PX 1537; (3) a 2014 email between someone identified as the "Development Director" at Sanctuary Belize and Baker, attaching a letter from Baker on GPA letterhead to the United States Embassy in which Baker claimed to be a "principle [*sic*]" and "Director of Sales and Marketing" of GPA, PX 1380; (4) a 2014 email exchange between Baker and Costanzo discussing that letter and Baker's title at GPA, PX 1378; and (5) a series of drafts of SRWR minutes Costanzo sent to Pukke and Baker in 2016 stating that Baker formed GPA in the United States after the *AmeriDebt* litigation and that Baker hired Kazazi, PX 1531; PX 1542; (6) a 2012 email to Baker from an unknown individual that asked if GPA was a fictitious business name for Eco-Futures or a new entity that Baker then forwarded to Kazazi, PX 1830; (7) a 2011 email from the same unknown individual to Baker and Greenfield stating that he drove to the 1401 Dove Street location but the name on the door was "Global…." PX 1854.

The FTC introduced as well Baker's 2016 tax return that listed income he received from GPA as from a S corporation, that Baker admitted he signed, claiming, however, that he did not view the entirety of that document. PX 124l; Trial Tr., 2/5/20 Morning, 20:3-22:6. The FTC also presented a series of tax returns filed by SBE's accountant for GPA, Buy Belize and Buy International which listed Baker as President, CEO, sole shareholder and/or owner of these respective entities, all of which bear Baker's signature, though here, too, Baker claims his signatures were forged. PX 1239; Trial Tr., 2/5/20 Morning, 25:14-27:8, 30:4-12, 37:7-13; PX 1823; PX 1236; Trial Tr., 2/10/20, 189:10-19.

The Court forcefully rejects Baker's forgery claims. At trial, the FTC's evidence showed that Baker was copied on numerous emails regarding taxes in 2014, 2016, 2017, 2018, all of which indicate his ownership interest in GPA. *See* PX 1839; PX 1841; PX 1844; PX 1847; PX 1848. An

October 2018 email shows that Baker was in correspondence with Dixon and Kazazi regarding the completion of a tax return that he has argued had his forged signature. PX 1843; Trial Tr., 2/10/20, 197:6-198:18. When confronted with this evidence, Baker was forced to retreat, allowing that it was "very possible" that he asked someone to sign for him. Trial Tr., 2/10/20, 207:6-10.

Baker also testified that his signature was forged on documents indicating that he had an ownership interest in FDM and that he was not aware of his purported signature or that FDM had anything to do with him before November 9, 2018. Trial Tr., 2/5/20 Morning, 38:3-16. But, again, the evidence clearly refutes this. An email from Kazazi to Baker in 2017 indicates FDM wired $10,000 to Baker's Belizean account and Kazazi told Baker to "let [him] know if [Baker] need[s] anything else." PX 960. Once again, Baker had to retreat, claiming that he did not look at who sent the money because he did not "care who sent it" Trial Tr., 2/5/20, 39:3-20. The FTC also introduced three other emails from Kazazi to Baker that forwarded notifications of cash transfers from FDM totaling over $100,000 to unknown individuals, likely contractors and/or vendors in Belize. PX 961; PX 962; PX 963. Further, an email correspondence in 2016 between Baker and Kazazi shows Baker asking Kazazi to pay his bills and Kazazi forwarding the email to a SBE employee, asking her to process the funds out of a FDM account, and the employee then forwards the email to Baker asking him to confirm the amount. PX 1828. Baker himself forwarded an email with a wire receipt that mentions FDM to AIBL to show AIBL that his credit card bill was paid (by FDM). PX 1827.

But, to finally put Baker's claim of forged signatures to rest, the FTC introduced a 2014 email in which Baker carefully instructs Pukke how to sign his (Baker's) initials, and Pukke responds that he will sign a document for Baker. PX 1850; PX 1851. Similarly, the Court rejects Baker's testimony of his non-knowledge of Buy International and FDM. In addition to the

evidence just described, the FTC introduced an email between Baker and an SBE employee in which the SBE employee tells Baker that a corporate credit card for Buy International has been applied for and that, since Baker was the registered owner of Buy International, his email address was needed to send the approval document for signature. PX 1833.

Decisive evidence also contradicts Baker's testimony that he had nothing to do with the California entities though, given that the Court has found all these entities constitute a common enterprise, the point is academic. In May 2011, Baker signed a lease for office space in Orange County, CA, in his own name, doing business as Eco Futures. Notably, the letter from Baker's broker to the landlord confirmed that the lease was for "my client, *Sanctuary Belize*." PX 161 (emphasis in original). In November 2012, Baker signed a lease for the 1201 Dove Street office leased in the name of GPA, asserting that he was the "President" of GPA. PX 160. An SBE corporate phone directory from 2012-2013 at the Dove Street Office lists Baker and Pukke together at the top, whereas the rest of the employees are listed below in alphabetical order. PX 455.

Baker has admitted, even at times bragged about, his ownership and leadership of the SBE entities in Belize—namely Eco-Futures, Eco-Futures Belize and SRWR. During his second deposition, he stated that he was the "top guy" in Belize: "Let's make it easy for you guys. Was I around when tours were being done? Yes. Was I – was I, call it, talking to people? Did they want to speak to a person in charge? Yes. Was that person in charge of me, of the development, the managing director? People wanted to meet the top guy at the place. I am him. So sure. People wanted to talk to me. I love to talk to them." Baker Dep. Tr., 10/15/19, 335:10-17. Indeed, after returning full-time to Belize in 2016, Baker appointed himself "managing director" of Sanctuary Belize. Trial Tr., 2/4/20 Afternoon, 43:25-44:10, 48:6-13. He and Pukke had discussions over who would be on the SRWR board. *See* PX 831 (discussion of who to place on SRWR board, including

103

discussion that "Marc Romeo" should be removed); PX 935 at 2 (discussion of choosing new board members). Baker openly proclaims that he is in charge of the development, stating at trial, "I run the development." Trial Tr., 2/5/20 Morning, 95:19-20. His sister, Maya Baker, who worked for SBE, as well as SBE employees Morgan and Hogan, all confirmed Baker's claim of preeminence. Maya Baker Dep. Tr. 169:19-170:11 (Peter was the "big boss" and "had the reins in Belize."); Anderson Dep. Tr. 295:9-17 (Baker "ran the development"); Hogan Dep. Tr., 263:25-264:10 (Baker's role was "significant" in Belize, and the "Belize aspect is an important part of the overall operation.").

In addition to being an owner and shareholder of many of the SBE entities, Baker was a bank signatory for GPA and SRWR, and regularly received bank statements for Eco-Futures. PX 46 at 83 (GPA 5098 account); *id.* at 85 (GPA 5111 account); *id.* at 46 (GPA 5021 account); *id.* at 89 (GPA 5026 account, d/b/a Palmaya Development); *id.* at 101 (GPA 5846 "commissions" account); *id.* at 103 (GPA 6859 account, d/b/a Sittee River Wildlife Reserve); PX 1478; PX 1479; PX 1480; PX 1481. He, had, moreover, access to SBE funds, which he used to pay his rent and living expenses even while he says he was trundling back and forth between California and Latvia. PI Hrg Tr., 3/13/19 Afternoon, 10:14-11:4 (describing how he was compensated, including having his rent covered for a $3,000/month apartment in Newport Beach, California, utilities, food and other personal expenses); Baker Dep. Tr., 2/19/19, 173:5-174:3 (explaining that any statement that he made only $50,000 per year is not accurate and "seems low" because of "things that weren't included in [that estimate] obviously"). Like Pukke, Baker made continuous use of an SBE credit or debit card for personal purchases for himself and his wife, *see supra*, Section V.C, and also opened a personal checking account and credit card in Belize, funding the account through transfers of funds from SBE. PI Hrg Tr., 3/13/19 Afternoon, 119:9-120:5 (Baker testifying that

this account was funded "from California"); PI Hrg Tr., 3/13/19 Afternoon, 120:14-121:23 (Baker confirming substance of an email exchange in which "Eco Futures Development," with a California address, asserted that Baker was an owner in order to authorize wire transfers to his Belizean bank account).

In 2016, after commuting between Europe, California, and Belize—though clearly without having relinquished a controlling position in SBE—Baker returned to a more hands-on role in managing the Sanctuary Belize development. When Usher attempted to seize control of the development, Baker along with Pukke, undertook to reduce Usher's role, Baker even travelling to Belize to assert his and Pukke's control over the enterprise. PI Hrg Tr., 3/13/19 Afternoon, 85:4-12 (Baker, on his and Pukke's behalf, travelled to Belize to confront Usher when Usher attempted to wrest total control); PX 836 (email in which Baker recounts his confrontation with Usher, calling Usher a "thief," and Pukke, Baker and Usher discussing buying out Usher's share in SBE); PI Hrg Tr., 3/13/19 Afternoon, 90:13-91:7 (Baker testifying that, following the dispute with Usher, he took a hands-on role in Belize); DX AP 366 (email exchange among Pukke, Usher, and Baker following the 2016 meeting regarding the plan moving forward, with Pukke and Baker directly controlling activities in Belize). The end result of the dispute with Usher had Baker replacing Usher as both Chairman of SRWR and as Managing Director of Eco-Futures Belize. PI Hrg Tr., 3/13/19 Afternoon, 90:13-16 (became SRWR Chairman in 2016); *id.* at 39:1-11 (took on "Managing Director" role in 2017). When Usher subsequently sought to negotiate a new relationship with SBE, it was Baker, jointly with Pukke, who decided what Usher's newly diminished role within SBE would be. DX AP 366 (email exchange among Pukke and Baker).

The evidence convincingly demonstrates that Baker has been involved with Sanctuary Belize sales and marketing efforts throughout. Even prior to the *AmeriDebt* Receivership, he was

one of the original marketers of the Sanctuary Belize development, having directed marketing activities and having been listed as the sales contact on marketing materials. PX 611; PX 623. As early as 2005, he was involved in email communications on sales scripts putting out claims that Sanctuary Belize would have a hotel, marina, health center, and equestrian center. PX 362; *see also* PX 634 (Baker email showing there were already lot sales in 2005). In 2006, Baker also held the title "Director of Sales and Marketing" in 2006. PX 1400; Trial Tr., 1/21/20 Afternoon, 93:24-94:14 (date of document is January 2006, not January 2005). Baker was present on sales tours in at least 2009 and 2010 when the deceptive claims were being made. Chadwick Dep. Tr., 3/7/19, 198:21-199:3, 199:17-200:15.

Even as he supposedly assumed a less active role in SBE starting in 2010 and until 2016, Baker was still involved aplenty. In a sustained effort to raise additional funds for the development, he courted potential investors in Europe. PI Hrg Tr., 3/14/19 Morning, 124:1-13 (stating that from 2010 to 2016, "I felt we were missing out on a whole slew of other customers in Europe and I tried [to attract lot purchasers in Europe], but never materialized getting something going on over there"); PI Hrg Tr., 3/13/19 Afternoon, 9:25-10:12. In 2015, for instance, Baker made a detailed presentation on Sanctuary Belize to a potential European investor, providing copies of SBE's website and TV campaign. DX AP 344. The presentation echoed many of SBE's questionable marketing claims, including references to such potential amenities as the marina and hospital, and consisted of promises that the development was expected to be finished within a timeline of three to five years. *Id.* at 9, 21. Baker was also involved in reviewing marketing claims regarding Sanctuary Belize before they could be posted online. DX AP 343 at 3. In 2016, he wrote to Pukke of his time in Europe, referring to himself in third person, "Wasn't, like, Pete was on the moon.

106

He was active participant and companies were in his name and helped in any [] way he could." PX 935 at 1.

In 2015 and 2016, Baker was heavily involved with managing the negative publicity surrounding Sanctuary Belize and, despite his feigned ignorance at trial, was deeply involved in the Herskowitz fiasco, as detailed in Section V.E, *supra. See also* PI Hrg. Tr., 3/15/19 Morning, 90:8-92:9 (describing relationship with Lark Gould, a woman hired to eliminate negative online articles from search results); Trial Tr., 2/5/20 Morning, 116:11-121:17; PX 933 (email correspondence regarding efforts to combat negative publicity); PX 955; PX 956; PX 957; PX 958; PX 959.

In 2017, Baker sent an email to the Wall Street Journal claiming that Pukke was a "paid employee of the third company that handles our sales and marketing," stating that both the Belizean Court and this Court both "found no issue with the fact that Mr. Pukke's involvement was limited" to being a "paid employee" and that Herskowitz "came clean." PX 948 (Pukke directing Baker to send the proposed letter to the Wall Street Journal, which also threatened to "attack the situation with the same legal vigor that we were forced to use against Mr. Herskowitz and the IOSB")[47]; Peter Baker Dep. Tr., 10/15/2019, 41:14-42:13, 345:6-18; 346:11-347:15; Trial Tr., 2/5/20 Afternoon, 82:15- 84:16; PX 949 (Pukke's initial draft to Baker); PX 1102 (Wall Street Journal article quoting Baker at length). At the end of 2017, Baker emailed Pukke and Costanzo stating they needed to "take out all references of And[i] in a resume Barienbrock sent for use on SBPOA's

---

[47] To be clear, this Court made no such finding. This Court found only that there was "insufficient evidence to support the finding of a violation" of the terms of Pukke's supervised release after the U.S. Probation Office specifically alleged that Pukke, in forms submitted to it, failed to list his positions as officers and/or directors of various SBE entities and failed to list he was a developer of Sanctuary Belize. *Pukke*, ECF No. 51. To be even more emphatic: the Court absolutely did not take "no issue with the fact that Mr. Pukke's involvement was limited" to being a "paid employee of SBE," as Baker claimed in PX 948.

website. PX 1135; Trial Tr., 2/5/20 Afternoon, 74:20-76:18 ("Q: But anyway, you asked that these references be removed, right? A: Yes, I did.").

Since 2017, Baker has faithfully attended and participated in sales tours at Sanctuary Belize, enthusiastically interacting with prospective lot purchasers and working hard to close sales. Baker Dep. Tr., 2/19/19, 134:18-135:22, 136:17-137:8; PI Hrg. Tr., 3/13/19 Afternoon; 101:8-13; Trial Tr., 2/5/20 Morning, 79:11-17; PX 928 (sales tour spreadsheet identifying "Pete" as one of the closers on a sale and that he addressed concerns the consumer had regarding the development).); Trial Tr., 2/5/20 Morning, 85:21-86:6 (Baker confirming that "Pete" refers to him.); PX 1097 at 2; Trial Tr., 2/5/20 Morning, 86:7-89:12 (discussing PX 1097); PX 1098 at 2; Trial Tr., 2/5/20 Morning, 89:14-91:10, (discussing PX 1098); PX 1099 at 2 ("However Pete stated that he spoke with client and feels he overcame the back-out option."); PX 928 (Baker closed sale for Brian and Kari Southard); PI Hrg. Tr., 3/13/19 Afternoon, 101:23-103:2; Trial Tr., 2/5/20 Morning, 85:21-86:6. In this role, Baker had authority to agree on prices for lots. Baker Dep. Tr., 10/15/19, 335:19-336:6; Trial Tr., 2/5/20 Morning, 81:4-16. All the while, Baker has continuously received updates on the status of the sales process and post-tour summaries, as well as emails about sales strategies and tour reports. *See, e.g.*, Trial Tr., 2/5/20 Morning, 81:17-82:21; PI Hrg. Tr., 3/13/19 Afternoon, 101:14-20; PX 927 & PX 928 (post tour email and status report).

Baker was directly involved in managing the tour sales staff and overseeing the budget for the Belizean sales operation, including evaluating time-off requests and commission structures for sales agents operating in Belize. *See, e.g.*, PX 1095; PX 1096; Baker Dep. Tr., 10/15/19, 324:23-325:10 (Baker testifying re PX 1095, stating that he managed and oversaw the sales team's budget); *id*. at 326:18-327:4 (Baker testifying re PX 196, stating that when salespeople needed

108

information on how and when they would be paid he "was in a position of authority" and dealt with those requests and issues).

Based on the foregoing, the Court finds that Baker fulfills the first prong for individual liability under the FTC Act: he clearly had authority to control and at times, participated directly in the deceptive practices.

A few more words are in order as to Baker's knowledge of the deceptive practices described in Section V. There can be no doubt that he knew or should have known they were false, particularly given his extensive ownership of multiple SBE entities and his involvement in SBE. He received marketing materials, emails, and regularly monitored Facebook posts, which often contained the misrepresentations being put out to prospective lot purchasers. Baker Dep. Tr., 2/19/19, 146:15-147:21; *see also* PI Hrg. Tr., 3/13/19 Afternoon, 100:2-17 (Baker testifying that he "periodically" would go to the office in California and that he received marketing materials "[b]ecause I was a partner of the business, and I was concerned about what are you guys doing. So I received the information."); Trial Tr., 2/5/20 Afternoon, 26:11-49:9 (Baker was aware of PX 817, PX 186.5, PX 186.6, and PX 1010 prior to the FTC filing this case); Baker Dep. Tr., 2/19/19, 148:16-148:23 ("Q. But you also received other smaller pieces of marketing is what your just said; right? A. Yes. Yes. Like if they sent out an e-mail that was something related to something, I would get it. Q. So you would be given copies of e-mail marketing that would be sent to consumers; right? A. Yes."); PI Hrg. Tr., 3/13/19 Afternoon, 103:22-104:7 (Baker stating he received the Discovery Belize tour book, followed the Sanctuary Belize Facebook posts, and received newsletters). All these materials featured claims about, inter alia, the development's lack of debt and promised lack of risk, world-class marina, marina village, hospital, hotel, international airport, and golf course. In the run-up to the Wall Street Journal article, Baker, knowing full well what the

negatives about the SBE project were, took part in drafting the response to an unfavorable Wall Street Journal article. He also attempted to eliminate negative online articles about Sanctuary Belize from search results. PX 1529; PX 1528; PI Hrg. Tr., 3/15/19 Morning, 90:8-92:9 (describing relationship with Lark Gould, a woman hired to eliminate negative online articles from search results); PX 933 (email correspondence regarding such efforts). Indeed, Baker was in full combat mode in the IOSB lawsuit and the Herskowitz affair, and vigorously sought to manage the resulting publicity in order to minimize the impact on sales. *See, e.g.*, PI Hrg., 3/13/19 Afternoon, Tr. 90:19-23 ("I was the lucky recipient of getting to deal with the IOSB lawsuit."); PX 467 at 3, 25-27; PX 1532 at 10-20. Baker also contemporaneously confirmed his role in various aspects of litigation against the development, instructing Frank Costanzo, for example to "send me my Babjak witness statement again please," PX 1537 at 1, and telling Brandi Greenfield that "[w]e can't sell Babjaks lot or anybody currently involved in a lawsuit that predates our termination till lawsuits resolved." PX 1534 at 1. Indeed, Baker has admitted that he knew consumers were being told at least some of the claims the Court has found deceptive. *See* Baker Dep. Tr., 2/19/19, 300:12-301:25 (confirming he knew that consumers were told that the development had no debt and that this made the development less risky).

Baker also either knew the representations were false or acted with reckless disregard by making them himself and allowing them to be made by others. At the barest minimum, it would have been reckless for Baker to disregard what was occurring under his very nose, especially given his involvement in SBE at the highest level.

Consider:

Baker knew that the "no debt" or "debt free" = "risk-free" or "less risk" representation was false, because he admits he was aware of the secured Barienbrock loan. Baker Dep. Tr., 2/19/19,

177-23-25. He was also present at the beginning of the newly renamed Sanctuary Belize, when he, Pukke and Chadwick failed to obtain loan financing and contrived the no debt/low risk representation as a marketing strategy in the wake of that failure. He also admitted to a continued quest to obtain debt-financing, even as SBE was telling prospective lot purchasers that no-debt was a positive virtue.

Then, too, as early as 2016, after his marathon of professed ignorance about improper going-ons at SBE, Baker says he suspected Pukke was diverting funds from the enterprise. PI Hrg Tr., 3/13/19 Afternoon, 83:1-84:20 (recounting 2016 allegations that he was aware that Pukke was siphoning money); *id.* at 86:5-21 (Pukke claiming he would address the allegations through an audit, but then never completed the audit); Baker Dep. Tr., 2/19/19, 149:21-151:17 (as of 2018, still not having seen an audit, Baker addressed concerns his wife had that money was being diverted by Pukke). Even before 2016, Baker should have at least engaged in some oversight of SBE's finances, given that he was a co-owner and knew of Pukke's dubious history of financial dealings. But beyond taking his wife to talk to the SBE accountant in 2018, Baker turned a blind eye. And the Court does not overlook that Baker himself, to a limited extent, took part in these diversions, meaning he knew the representation that every dollar of sales revenue goes into the development was false. *See supra*, Section V.C.

Baker also has essentially conceded that many of the once promised amenities do not exist and that there is no current plan to build them. PI Hrg. Tr., 3/13/19 Afternoon, 114:5-115:25 (Baker testifying that the many promised amenities do not exist right now, and that there is no current plan to build many of them, including the hotel, grocery store, condos, and lodges); PX 934 (presentation provided by Baker stating that financing would be necessary to be able to finish

Sanctuary Belize in a timely manner). As such, it is clear that he either knew or acted with reckless disregard in making this claim and in allowing it to be made.

Regarding the claim that SBE would be completed in 2-5 years, considering Baker's role as top man and his level of involvement, the Court can only conclude that he either knew or should have known that the representation was false because there was never sufficient funding to complete Sanctuary Belize and its promised amenities in the time promised.

As for the robust resale market, although Baker testified to an isolated example of one owner selling a lot for a profit, he also testified that in fact he knew that owners were having difficulty selling lots and that few people had resold properties for a significant profit. Baker Dep. Tr., 2/19/19, 344:22-24 ("Oh, it was—there wasn't a lot of people who originally first bought who then flipped for a profit like her."). Baker also responded to an email thread about "for sale" signs being taken down by the development. PX 1094. He admitted that he knew there were allegations that tour signs were being taken down during the tour but concedes that he did not go research these allegations. Trial Tr., 2/5/20 Afternoon, 71:21-73:21.

As much as, perhaps more than anyone, Baker also actively concealed Pukke's ghost role in SBE, as detailed *supra*, Section V.H. In fact, after the IOSB lawsuit in Belize ended, Baker received an SBE press release from Pukke, which included the directive to "make sure all of the reps get this," and to represent that SBE had "been fully vindicated," and which "highlights" the Belizean Court's finding that the "centerpiece" claim of the relationship between SBE and Pukke was "determined to be a lie." PX 1462. Baker, Pukke's partner but in full thrall to Pukke, as always, did just that.

Contrary to Baker's constant proclamations of "innocence" and that this case is a "witch hunt" (a tired phrase), overwhelming evidence in the record demands that Baker, as a partner in

SBE, be held liable for violations of the FTC Act and TSR and be subject to both injunctive and monetary relief. The Court finds Baker jointly and severally liable for the full amount to be discussed in Section IX.B.

### E.   Chadwick's Involvement and Liability

Unlike Pukke and Baker, Chadwick was not involved in the *AmeriDebt* case but joined SBE after the events described in Section III.B, *supra.* Nevertheless, when he officially joined SBE in 2009, he immediately occupied a senior position in the newly renamed Sanctuary Belize. He was engaged as a sales manager to "create a sales process" which included hiring and training salespeople and assisting them in selling lots, personally attending sales tours in Belize. Chadwick Dep. Tr., 9/26/19, 83:11-84:3. He was also engaged in "raising, looking for and certainly trying to obtain capital for the project." Trial Tr., 1/31/20 Morning, 15:9-11. Chadwick's most famous boast was that it was he who "blueprinted the entire sales strategy for Global Property Alliance ("GPA"), and [his] efforts produced at least $150 million in sales." PX 1201 at 2.

Chadwick's senior position in SBE was confirmed early on when Pukke was incarcerated for obstruction of justice in 2011 and 2012 and it was Chadwick who he left in charge. PX 635 at 1 (email in which Chadwick asserts his authority over Greenfield, stating "[Andi] asked me to lead"); PX 493; Chadwick Dep. Tr., 3/7/19, 172:19-173:8; Trial Tr., 1/29/20 Afternoon, 97:15-98:2; PI Hrg. Tr., 3/13/19 Afternoon, 60:11-16 (Baker testifying: "[T]here was a period of a year that Mr. Pukke spent away from the company and he—in that time he put—or directed to be put Luke Chadwick and Brandi Greenfield and I believe Rod Kazazi in charge of the company during that time of his absence.").

Chadwick also served as a director of SRWR for two years, Trial Tr., 2/3/20 Morning, 49:24-50:7, and is still an owner and/or officer of Prodigy, SBR, BREA, and EI. In 2014, he told

AIBL that he had a $10 million equity interest in the Sanctuary Belize development, PX 865, and in a video, while attired in a Sanctuary Belize polo shirt, he identified himself as a "resort owner" in Belize, PX 574.

Most important, Chadwick was deeply enmeshed in SBE marketing and sales efforts. He was, in his own words, the "reputable" public "face" of Sanctuary Belize, appearing in infomercials, starring in a sales webinar, and giving spirited presentations to tour groups in Belize. Chadwick Dep. Tr., 9/26/19, 215:19-216:4. *See also* PX 84 (Buy Belize infomercial with Luke Chadwick); Trial Tr., 1/28/20, 55:17-24 (lot purchaser testifying that Chadwick led the webinar he viewed, which is PX 186.3); PI Hrg. Tr., 3/11/19 Morning, 58:21-23 (Doran, a lot purchaser testifying that Chadwick "primarily" gave the presentations during the sales tour in Belize); PI Hrg. Tr., 3/12/19 Morning, 17:2-11 (another lot purchaser identifying Chadwick as the presenter during a webinar); PI Hrg. Tr., 3/19/19 Afternoon, 69:23-70:1 (lot purchaser testifying that Chadwick seemed to be "in charge of the development"); Trial Tr., 1/22/20 Morning, 25:20-22 (another lot purchaser testifying Chadwick "seemed to be in charge of the project."); PX 260 (video webinar with Chadwick making claims).

In marketing materials, in emails, and in person, Chadwick unceasingly touted himself as a "principal" of the development. *See, e.g.*, Trial Tr., 1/29/20 Afternoon, 45:25-46:20 (Chadwick testimony); PX 495.2 at 1; PX 1198 at 3; PX 186.3; PX 495.3; PX 700. Sales scripts described Chadwick as an owner at the development while SBE employees and marketing materials described him to prospective lot purchasers as the "developer" or "principal" of the development. *See, e.g.*, PX 1183 at 4; PX 186.2; Trial Tr., 1/28/20, 53:17-54:1l; PX 496; PX 186.2. In a sales script Chadwick sent to himself and then to a SBE salesperson, he refers to himself as the "Developer and Partner at Sanctuary Belize." PX 1367. Chadwick admits that he told prospective

114

lot purchasers that he was a "principal of Sanctuary Belize" because he intended to convey that he "had a significant role within the organization." Chadwick Dep. Tr., 9/26/19, 77:16-78:19. But at trial Chadwick attempted to significantly trim his sails, arguing that he only used these titles to take "on a role of responsibility," whereas in fact, he was "operat[ing] above [his] pay grade," Trial Tr., 1/31/20 Morning, 44:4-10. As the Court is about to explain, this characterization grossly distorts the great weight of the evidence.

Internally, Chadwick had unquestionable control over SBE's sales and marketing operation. *See, e.g.*, Maya Baker Dep. Tr. 33:20-34:6 (testifying that "Luke was very much who I answered to in '12 and '13 when I was in the office" and that "he was the boss."); Hogan Dep. Tr. 65:9-66:10, 66:14-24 (Chadwick told Hogan that "[h]e ran everything," that Hogan assumed Catsos reported to Chadwick, and that Chadwick was listed as in charge of the development in an e-mail); Mock Dep. Tr., 10/11/19, 11:4-12:2 (Chadwick directed the layout of the Coldwell Banker construction project); Catsos Dep. Tr. 106:6-107:4 (SBE sales manager testifying that "Luke was the boss of the office" and that "everyone, even myself, you know, would answer to him."); Anderson Dep. Tr. 53:16-54:13, 53:13-56:2 (Morgan testifying that Chadwick may have been an owner of SBE, that Kazazi may have reported to him, and that, at one point, she was the "executive assistant to Luke Chadwick"); Peter Baker Dep. Tr., 2/19/19, 97:18-98:2 (Baker stating he was "sure" Chadwick had "control" over what he was saying on the tours and in the webinars). Chadwick himself admitted that "[p]eople would report to me" regarding the sale of lots in Sanctuary Belize, and that he "did make decisions with respect to sales and development." Chadwick Dep. Tr., 3/7/19, 148:7-8, 148:10-12; Chadwick Dep. Tr., 9/26/19, 77:16-19, 78:1-3. Chadwick also conceded that, for a period of time, he designed sales strategy (which "generally" included determining what claims salespeople should make when marketing lots), trained

telemarketers and sales representatives on how to pitch the lots, had the authority to hire and fire telemarketers, the authority to decide whether to discipline a telemarketer, and the authority to determine telemarketers' compensation. *Id.* at 109:17-111:12; Trial Tr., 1/29/20 Afternoon, 65:8-66:25. Chadwick also negotiated lot purchase agreements with consumers, and had the authority to lower the price of a lot and offer incentives. Trial Tr., 1/29/20 Afternoon, 83:20-85:10; Trial Tr., 2/3/20 Morning, 49:18-23.

The overwhelming weight of the evidence leads ineluctably to the conclusion that Chadwick had authority to control the deceptive practices at SBE, because he was involved in its "business affairs" and had the "ability to review and approve advertisements," and "make hiring decisions." *Ross*, 897 F. Supp. 2d at 382-383. He need not have been the CEO "of [the] company to demonstrate authority to control [because] active involvement in the affairs of the business and the deceptive scheme is sufficient." *Id.* at 383.

Assuming, *arguendo*, that Chadwick did not have authority to control SBE—and the Court emphatically finds that he did have such authority—he still directly participated in the deceptive practices. He reviewed, helped formulate, and disseminated the marketing materials, and personally made or directed to be made the following deceptive representations:

First, he expressly made the claim that the development was debt-free, thus less risky than a development with traditional financing. *See, e.g.*, Trial Tr., 1/22/20 Morning, 28:9-15; Trial Tr., 1/27/20, 37:1-38:8; Trial Tr., 1/28/20, 55:23-24, 62:11-63:19, 75:7-25 (lot purchaser testifying that during a webinar, Chadwick represented that Sanctuary Belize had represented both that it had no bank financing and "no loans from anywhere"); PX 186.3 at 1:06:52-1:08:21, 1:18-38-1:20:44 (Chadwick representing that Sanctuary Belize is "DEBT FREE" with "Zero Encumbrances" with "monthly receivables" and thus the "lowest risk project that I have ever seen or created based on

116

our business model"); Maya Baker Dep. Tr. 101:1-104:5 (testifying that Chadwick directed employees send a sales and marketing package to consumers, which made no-debt and amenities claims); PX 1057 (document being discussed).

Second, Chadwick admits he himself claimed and knew that SBE salespeople were claiming that all proceeds of lot sales would go back into the development. Trial Tr., 1/31/20 Morning, 67:7-13; *see also* Trial Tr., 1/27/20, 37:9-12.

Third, Chadwick personally represented to prospective lot purchasers that there would be numerous luxury amenities at the development. *See, e.g.*, Trial Tr., 1/22/20 Morning, 26:20-27:20 (lot purchaser testifying that Chadwick said there would be a hospital "within a year" in 2013); PI Hrg. Tr., 3/11/19 Morning, 57:18-58:18 (lot purchaser testifying that on tour, there would be an airport); Trial Tr., 1/27/20, 37:22- 38:19 (lot purchaser testifying that Chadwick represented that there would be restaurants, shops, cafes, a golf course, a world-class marina, an international airport, a medical facility, a gym, and a spa); Trial Tr., 1/28/20, 55:23-24, 57:18-24, 59:3-12; PX 186.3 at 53:17-53:59, 59:45-1:00:26 (Chadwick claiming in a webinar that there would be a Marina Village with a 240-room hotel, "all kinds of stores and shops," an airport, and a full-service hospital).

Fourth, Chadwick held out that Sanctuary Belize would be completed within 2 to 5 years. Trial Tr., 1/27/20, 37:13-21 (lot purchaser was told 2-5 years in 2011); PX 186.3 at 58:00-58:43 (Chadwick stating that the Marina Village will be "finished within three years," meaning that it would be completed by the "end of 2014"); Trial Tr., 1/28/20, 55:23-24, 62:7-10, 76:5-25 (Chadwick indicated the Marina Village would be completed within three years, meaning by the end of 2014, and never suggested that the development would take longer than five years to complete after a consumer explained how important the timeline was to him).

Fifth, Chadwick touted the existence of a robust resale market. Trial Tr., 1/27/20, 39:6-10 (lot purchaser testifying Chadwick represented that there would be a healthy resale market, "but if, if they couldn't sell it, they would buy it back"); Trial Tr., 1/22/20 Morning, 30:15-23 (lot purchaser testifying that in 2013, he was told there were "not too many [lots] available" so that "there were a lot of prospects for reselling the lots"); PI Hrg. Tr., 3/11/19 Afternoon, 9:16-10:13 (lot purchaser testifying that Chadwick created the expectation that it would be easy to resell lots and that the properties would "at least double in value.").

Finally, as described in Section V.H, *supra*, Chadwick was a leading actor in the charade to hide the degree of Pukke's involvement in SBE.

In sum, Chadwick, concedes that, except for the robust resale value claim (he stated he could not recall using the term "robust" but "did believe that there would be good demand for the lots"), he made or knew about all of the five Core Claims and the misrepresentation of the degree of Pukke's involvement the Court has found to be violations of the FTC Act and the TSR. Trial Tr., 1/29/20 Afternoon, 98:3-9, 103:23-104:4, 108:8-11, 114:23-115:15; Trial Tr., 1/31/20 Morning, 67:7-13, 72:6-15.

It remains to consider whether Chadwick either had "actual knowledge of the deceptive conduct, was recklessly indifferent to its deceptiveness, or had an awareness of a high probability of deceptiveness and intentionally avoided learning the truth." *Ross*, 743 F.3d at 892.

A brief review of Chadwick's history with SBE shades significant light on this matter.

Chadwick met Pukke and Baker in 2007 through a mutual friend, at a time when Chadwick was "working with another large real estate group" and "finding suitable real estate opportunities for them." Trial Tr., 1/31/20, 13:16-14:3. After a few visits to Sanctuary Belize, Chadwick commenced discussions with Pukke and Baker about what his role with the development would

118

be and decided to leave his old haunt and sign on with SBE. *Id.* at 14:8-23. Chadwick concedes that, before signing onto the project, he researched Sanctuary Bay (as Sanctuary Belize was known then) as well as Pukke's relationship with Sanctuary Bay (apparently he never researched Pukke separately). Chadwick acknowledges that he became aware of Pukke's AmeriDebt troubles, including testimony Pukke gave to Congress about AmeriDebt. Trial Tr., 2/3/20, 43:19-48:7; Trial Tr., 1/31/20 Morning, 19:4-16. But, says Chadwick, his "due diligence" was of a "limited" nature, so that, after discussions with Pukke and Baker and after viewing SRWR's Settlement Agreement with the Receiver, he decided any issues involving Pukke and Sanctuary Belize were "dead and buried." *Id.* at 19:17-21:2. Whereupon he joined the development.

Chadwick would have the Court believe that, when he started at SBE, he thought Pukke only had a minor role in the development, that Baker and Usher were the main players. Trial Tr., 1/31/20, 24:18-25:7. At trial, Chadwick reasserted that when he joined, he believed Pukke was "certainly not calling the shots" and, as such, there was no "concerted effort" to hide his involvement or any shadiness. *Id,* at 25:23-26:9. Instead, according to Chadwick, he saw lots being sold and development occurring and believed that "everything was above board and functioning," as indeed he thought it should be. *Id.* at 40:15-41:15. Chadwick says he saw things start to change after Pukke was released from incarceration in 2012, which, says Chadwick, caused him to begin a slow transition out of Sanctuary Belize, which became final by 2014. *Id.* at 41:16-42:15. In any event, Chadwick maintains that, at all times, any representations he made or allowed to be made to prospective lot purchasers were made in "good faith." PX 993.

Quite simply, the evidence does not support this tale and even if it did, it would not insulate Chadwick from liability. In the first place, his testimony (in the phrase of H.L. Mencken) pulls at the nose of reason. He claims he did not know Pukke had a large role in SBE, but he also concedes

119

he spoke with Pukke and Baker about becoming involved, and did some light background research about the project and Pukke, at a time when SBE only had some four employees in California. Under those circumstances, how could he have reasonably believed that Pukke did not have a significant role in SBE? In 2010, Pukke and Chadwick drafted an email in their efforts to obtain financing that referred to themselves as "my partners and I." PX 720. Further, as detailed in Section V.H, *supra*, starting as early as 2010, Chadwick undertook a leading role in the effort to conceal Pukke's involvement in SBE, such as when he asked Pukke if had a Marc Romeo email address Chadwick could distribute. Why the need to cover up for a minor player in SBE? When Pukke was incarcerated for obstruction of justice, Chadwick took over for him as SBE's day-to-day leader, where Chadwick acknowledges that one of his roles "was to be a reputable face for the organization," because he "understood that Pukke couldn't be a reputable face because of his prior litigation with the FTC." Chadwick Dep. Tr., 9/26/19, 215:19-216:4. As Chadwick told it in October 2012, "someone had to step up and be a reputable 'face' to this organization – a role that **I gratefully accepted."** PX 1202 (emphasis added). In addition, Chadwick clearly had suspicions about SBE's operations, as early as 2011 (i.e. before Pukke was released from incarceration), as evidenced by an email he wrote to Bill Bannon stating "If we are ever to be a first class, successful organization rather than a shady second rate development that is full of empty promises that falls short of people's expectations then we need to start conducting ourselves in such a manner." PX 608. After Pukke served out his term of imprisonment and returned to SBE, Chadwick eagerly took on the role of faithful deputy, drafting an email to Pukke bemoaning the "bullshit antics and used car sales tactics" used by SBE salespeople and the "churn and burn" of clients. PX 1202. He admits in effect that he smelled smoke, but he did little, if anything, about it.

Chadwick's claim that he began his "slow transition" out of Sanctuary Belize, departing in 2014, is also dubious. Significantly, he can give no precise date for his departure since he appears to have been involved aplenty with SBE in 2014. That year he created Coldwell Banker Southern Belize to resell Sanctuary Belize lots. That year he led a webinar addressing complaints from lot purchasers who had been "promised that their lots would appreciate" and believed that the "lots were not appreciating." PI Hrg. Tr., 3/11/19 Morning, 81:17-82:22. That year he spearheaded the response to a negative article about Sanctuary Belize called "Tarnished Dreams" that appeared in TechNewsWorld, PX 1047, which reported that Chadwick "head[s] up our US operation and John Usher heads up Belize operations." PX 1200. Evidence of Chadwick's continued links with SBE into 2015 will be discussed *infra*.

Even if Chadwick truly had no idea that the challenged representations being made were false—the classic empty-head, pure-heart defense—he would still be liable if he was recklessly indifferent to the deceptive nature of any of the representations. *See, e.g.*, *Ross*, 743 F. 3d at 895 (finding that even though "there was some indication that [the defendant] acted in a manner suggesting that she personally did not perceive (or believe) that the advertisements were deceptive, [she] was on notice of multiple complaints about IMI's advertisements"; *FTC v. Lifewatch Inc.*, 176 F. Supp. 3d 757, 780 (N.D. Ill. 2016) ("Plaintiffs also must demonstrate that [the defendant] either knew or should have known about the deceptive practices—though they do not have to prove subjective intent to defraud."); *FTC v. Publ'g Clearing House, Inc.*, 104 F.3d 1168, 1171 (9th Cir. 1997), *as amended* (Apr. 11, 1997) (finding defendant was "at least recklessly indifferent" as to the truth or falsity of representations made by employees by filing a business license at the direction of someone she knew was facing criminal charges concerning telemarketing activities and because she had worked for a predecessor organization that had closed down due to criminal

fraud); *FTC. v. Network Servs. Depot, Inc.*, 617 F.3d 1127, 1140 (9th Cir. 2010) (finding that awareness of customer complaints is a factor in considering whether a defendant is acting with reckless indifference).

Since Chadwick knew throughout his time at SBE that Pukke had had serious continuing troubles with the FTC, that Pukke had been operating behind aliases, that Pukke had been incarcerated, and that there had been customer complaints about Sanctuary Belize, Chadwick was at the very least on notice as to the seriously wobbly nature of Pukke's and SBE's behavior, and was not in a position to turn a blind eye to what Pukke and others in SBE might in fact be up to. Chadwick was the self-proclaimed "face" of Sanctuary Belize and the author of the "blueprint" for SBE's sales and marketing. Even crediting his claim of actual ignorance of the falsity of the deceptive claims would not begin to excuse his reckless indifference to the fact that the representations at issue were false.

But, this said, the inescapable fact is that Chadwick unquestionably had actual knowledge that at least some of the specific Core Claims were false, and knew that the claim Pukke had no meaningful involvement with SBE was a flat-out lie. As boxing champion Joe Louis might have said, "you can run but you can't hide."

Chadwick knew the "no-debt" or "debt-less" claim was false because he was the one who negotiated a series of loans, secured by SBE's receivables, with Violette Mathis in 2013. PX 1545; PX 1305. Further, it can only be concluded Chadwick knew that debt-free developments are more risky than developments with traditional financing. In view of his claim to vast real estate experience (supposedly "an industry in which he spent the previous 20 years building a career," ECF No. 1010), it is inconceivable that he would not know of the dubiety of this proposition. Though Chadwick claims "it would be unprecedented, and defy common sense, to find that [he]

was defrauding consumers at Sanctuary Belize by covering up debts that were (according to the economist) actually *a good thing,*" PX 993 (emphasis in original), the fact remains that SBE had debts—both secured and unsecured—and this fact was withheld from prospective lot purchasers. The sequence of events is important. SBE at first attempted to take on debt; only after that was not successful did the major players, Chadwick included, attempt to make a virtue out of a vice and claim that no-debt was actually a virtue. And when the opportunity to obtain debt eventually arose—witness the Barienbrock and Mathis loans—SBE was quick to take it up. But SBE never amended the claim that the project had no debt and that having no debt was a good thing. Chadwick was present when SBE's initial efforts to raise debt failed, and yet when SBE undertook to market no-debt as a selling point, he never spoke up to disclose to prospective lot purchasers that the project was still seeking debt. The Court concludes Chadwick knew the no-debt, risk free claim was false. But, as indicated, at a minimum, he was recklessly indifferent to the truth of the claim. PX 719, PX 720, PX 1488 (emails showing Chadwick was aware of efforts to obtain financing); Trial Tr., 1/30/20 Morning, 22:25-23:18 (Chadwick testifying that he was aware of efforts to obtain financing, including capitalization efforts by John Mullin).

As described in Section V.C, Chadwick also either knew or should have known not every dollar of revenue was going into the development.

Then, too, Chadwick knew that the claims surrounding the promised luxury amenities and timelines for their completion were false or was recklessly indifferent in making the claims himself and permitting others to make them. Given his admitted "pervasive role and authority" in SBE, it strains reason to conclude that he did not know that certain promised amenities were never going to be built or that they could not be completed within a certain timeframe. He made these claims and allowed others to make them, all of which obviously would have been material to many

consumers. Even if he did not know these claims were false, he was obliged to have undertaken some effort to confirm whether the claims were well-founded before including them in the sales strategy he helped craft. Chadwick was fully aware of complaints by lot purchasers about the delays, but that in no way deterred him from trumpeting the imminent delivery of the amenities or from allowing SBE salespeople to make that claim.

Chadwick also either knew the "robust" resale market claim was false or made the claim and allowed others to make the claim with reckless indifference to its truth or falsity. As top brass at SBE, he had to know that SBE maintained a large inventory of unsold lots that could impact the robustness of the resale market. When he created Coldwell Banker Southern Belize, it was clear for all to see that SBE's lots were not being resold, a fact Chadwick admitted at trial, yet SBE's claims of a "robust" resale market continued unabated. At trial, Chadwick was forced to concede that he was "probably" aware of consumers complaining that Coldwell Banker Southern Belize could not resell their lots. Trial Tr., 1/30/20 Morning, 50:12-18.

Most egregiously, Chadwick had deep knowledge of Pukke's octopus-like involvement in SBE, all the while perpetuating the fiction that Pukke was not a player, much less a leader of the operation. As discussed *supra*, Section V.H, after one individual asked Chadwick for "Romeo's" cell phone number and email address, Chadwick forwarded the email to Pukke and asked Pukke if he had a "Marc Romeo email." PX 986. Chadwick hosted webinars and gave presentations to prospective lot purchasers listing Marc Romeo as a "Principal." *See, e.g.*, PX 186.1; PX 186.3; PX 296 at 38 (slide presentation given to consumers identifying "Marc Romeo" as "Director of Operations-USA" and "Sales and Marketing"); PX 1609 (a presentation sent by Chadwick to an SBE salesperson to give to prospective lot purchasers in 2013 that listed Marc Romeo as a "Principal").

So much for Chadwick's knowledge of and participation in disseminating the misrepresentations.

A further word is in order with respect to Chadwick's joint and several liability with Pukke, Baker, and the Defaulting Defendants (except the Estate of John Pukke).

Chadwick's individual liability for the continuing deceptive representations at SBE is certain, as is his joint and several liability for restitution. What requires further consideration is whether Chadwick's individual liability should be co-extensive with the joint and several liability of Pukke, Baker, and the Defaulting Defendants (except the Estate of John Pukke), in light of Chadwick's argument that he departed SBE in middle to late 2014 and effectively had nothing to do with its operation after that.[48]

The FTC argues that Chadwick should be jointly and severally liable for all payments made by lot owners from 2011 through 2018 because of the deceptive practices of the common enterprise whose sales activities he "blueprinted," which continued through 2018, unless the harm is "'capable of apportionment.'" *FTC v. Lake*, 181 F. Supp. 3d 692, 702 (C.D. Cal. 2016) (quoting *Burlington N. & Santa Fe Ry. v. United States*, 556 U.S. 599, 606 (2009)). According to the FTC, Chadwick bears the burden of "proving that a reasonable basis for apportionment exists" and that, in fact, the harm cannot be apportioned because Chadwick never had a "clean break" with SBE. *Burlington*, 556 U.S. at 614 (citation omitted).

Chadwick submits that the FTC has not carried its burden to prove that his actions caused harm post-2014 and that the Court should assess the reasonableness of the FTC's asserted harm before shifting the burden to him to apportion the harm. Chadwick claims that he left Sanctuary

---

[48] As will be indicated *infra*, Section IX.B, the $138.7 million the FTC seeks in restitution is based on lot payments received by SBE from 2011 to 2018.

Belize in October 2014 and was "transitioned out as a representative of Sanctuary Belize by early 2015." ECF No. 993; Trial Tr., 1/31/20 Morning, 60:20-24; CX 87. According to Chadwick, this fact, if accepted, has at least two consequences. First, he argues that he cannot be held jointly and severally liable for the entire amount the Court might find Pukke, Baker and the Defaulting Defendants (except the Estate of John Pukke) liable for, because he was not part of SBE after mid to late 2014. Second, he argues that under the Third Circuit's decision in *Shire*, discussed *supra*, Section V, he cannot be held liable at all for violations of Section 13(b) because at the time the FTC filed its complaint, he was not "violating or about to violate" the FTC Act.

Chadwick is correct that the Court must first "assess the reasonableness of the FTCs approximation" of harm before "shifting the burden of proof" to him. *FTC v. Verity Int'l, Ltd.*, 443 F.3d 48, 69 (2d Cir. 2006). The FTC makes two arguments in this regard. First, it argues that Chadwick blueprinted the SBE sales strategy that continued in full force and effect until the Receiver's and the FTC's representatives entered 3333 Michelson Drive in November 2018. Second, the FTC submits that, even assuming Chadwick did disengage from SBE in 2014, the harm he caused continued and to this day continues because the lot purchasers he deceived continue to make payments on their lots. For these reasons, the FTC argues, a reasonable approximation of harm caused by Chadwick is the entire $138.7 million.

The Court assesses the FTC's claim for restitution, subject to certain caveats that will be discussed *infra*, Section IX.B. Despite Chadwick's assertions, it is by no means clearly established that he separated from SBE in 2014. Not only has he failed to pinpoint the day he separated, stating it was "in or about late 2014," ECF No. 993; at trial and on deposition, he conceded that he still was involved with SBE in one fashion or another during 2015. Trial Tr., 1/31/20 Morning, 7:7-9, 60:20-24; Chadwick Dep. Tr., 9/26/19, 295:2-4. In fact, evidence of Chadwick's involvement with

SBE after 2015 includes his involvement with Coldwell Banker Southern Belize, which lasted until 2017, and his continued use of the 3333 Michelson Drive office after 2015. *See, e.g.*, PX 663 at 2 (an undated email very likely sent after 2015 indicating Chadwick's presence in the "office").

In addition, it is clear that Chadwick created SBE's sales strategy, and there is no evidence that SBE ever moved away from that strategy, nor indeed that Chadwick ever attempted to move SBE away from his strategy when he supposedly departed. As the FTC points out, many lot purchasers continued to make and may still continue to make payments on lots Chadwick played a deceptive role in selling.

Still, while the FTC has made a strong case as to the reasonableness of holding Chadwick jointly and severally liable for restitution based on revenues from lot sales through 2015, the Court hesitates to find that the FTC's "blueprint" and "continuing-payments-by-consumers" arguments suffice to establish the reasonableness of saddling Chadwick with the full $138.7 million in restitution that Pukke, Baker and the others—who unquestionably continued operating until the Receiver's and FTC's representatives entered 3333 Michelson Drive in November 2018—will be held to. And if Chadwick is not coextensively liable, how should the harm he caused be apportioned?

The Court will return to the reasonableness of the FTC's assessment of the overall harm shortly, *see infra*, Section IX.B. For present purposes, it will be presumed for the sake of argument that the FTC's assessment is reasonable that Chadwick should be responsible for the full amount of restitution it calls for is reasonable.

Given this assumption, the burden then shifts to Chadwick to attempt to apportion the harm. He has not broken out for the Court SBE's revenues from lot sales year by year, nor indeed has he suggested making any other method for apportionments, arguing primarily that the FTC "has not

carried its initial burden to prove that Chadwick's actions as alleged in the Amended Complaint combined with others' to cause consumer harm after 2014." But he adds that the "unbending schedule [of this proceeding] only served to preordain the outcome from Chadwick shouldering such a burden on damages analysis" and goes on to say "it is simply not asking too much for the FTC's expert to have sorted the revenue from sales post-2014." ECF. No. 978.

The Court believes it is possible to apportion Chadwick's liability for restitution, even though Chadwick himself did not map the way at trial. Thus, a breakdown of payments on lots based on the year the lots were sold would be appropriate, such that payments on lots sold before 2016 could be counted as the restitution Chadwick is liable for, whereas payments made on lots sold in 2016 and after could be excluded. The FTC conceded that it had not asked its testifying expert Eric Lioy to do a year-by-year breakdown of lot payments by year of sale. But at trial the Court did ask the FTC for a breakdown of sales by year (meaning sales revenue by year), Trial Tr., 2/12/20, 152:19-153:12, and the FTC has not furnished the breakdown the Court asked for. Instead, the FTC suggests that it was up to Chadwick to do the math himself under the burden-shifting framework. This is rather heavy-handed. Further, the FTC has the data, Chadwick almost certainly does not. It is never too late to do substantial justice. The Court asked the FTC, at the end of trial, for numbers that have not been forthcoming. The FTC will be directed in the Court's Order to furnish them now.

The Court, then, holds that Chadwick is entitled to have lot payments from SBE's sales of lots made from 2016 forward deducted from the amount of restitution that is determined for all other Defendants in Section IX.B. Chadwick will be held jointly and severally liable for payments made from sales of lots he had a hand in, even if payments have been made post-2015, including to 2018. Otherwise the Court finds that the FTC has not provided sufficient evidence that after

2015, Chadwick was involved in making the misrepresentations or had appropriate authority to control the making of them. Holding him liable for the entire amount the FTC asks for in restitution would be inappropriate, though to be sure, his liability will still be substantial.

The FTC is therefore **ORDERED** to provide the total of the lot payments from sales made in 2016 forward and to do so within 30 days of this Opinion. Those amounts will then be credited against the amount of restitution the remaining individual and Corporate Defendants will be held liable for. The net amount is what Chadwick will be held jointly and severally liable for.

On the other hand, Chadwick does not fare as well with the argument that he should not in any way be held liable for violations of Section 13(b) of the FTC Act because, as he argues, at the time the FTC filed its complaint, he was not "violating or about to violate" the FTC Act. Even if the *Shire* case were to apply in this Court[49], and the Court does not need to decide that, on the very day that the Receiver and FTC gained access to the multi-used office on Michelson Drive, they found marketing materials from Kanantik and its operators making claims very similar to the Core Claims found to be violations in this case. *See, e.g.*, Trial Tr., 2/6/20, 114:1-115:7; PX 1012 (Kanantik marketing material describing an airport that will be arriving "soon," describing the resort as "100% debt free" with a "real estate market [that] is booming"). In addition, as just discussed, Chadwick was significantly intertwined with SBE, obtaining sales leads for Kanantik from GPA, the same entity involved in making these claims at Sanctuary Belize, as late as October 2018. *See, e.g.*, PX 973; PX 974; PX 975. Also in 2018, the Kanantik website floated the familiar

---

[49] *See* Section V.A. *Shire* really does not apply to the current stage of these proceedings. In *Shire*, the Third Circuit noted that the FTC "admits that Shire is not currently violating the law. And the complaint fails to allege that Shire is about to violate the law." *Shire*, 917 F.3d at 150. As discussed, this Court has already denied Chadwick's Motion to Dismiss based on *Shire* after finding the FTC had sufficiently alleged that Chadwick was "violating or about to violate" the FTC Act at the time this suit was filed. And as will be shown, the FTC has proven that it had reason to believe and that Chadwick was actually "violating or about to violate" the FTC Act.

sounding claim that it was "debt free" and therefore "incredibly low risk" (despite carrying debt). PX 1635. As late as November 6, 2018, Chadwick coordinated Kanantik tours with SBE that included a tour of Sanctuary Belize. PX 979. These facts and other evidence of Chadwick's continuing entanglement with SBE (i.e. the use of the 3333 Michelson Drive office), while not leading the Court to hold Chadwick liable for the full amount of restitution others will owe during that period, still clearly give reason to believe that, at the time of the filing of the Complaint in this case, Chadwick was "violating" or "about to violate" the FTC Act. Unless he is enjoined, Chadwick would be free to carry forward with very much the same deceptive representations he himself made or oversaw being made during his time at SBE or looked upon with seeming approval after he "departed."

In addition, after 2015, consumers continued (and will continue) to make lot payments on sales Chadwick had a hand in. *See FTC v. Agora Fin. LLC*, 2020 WL 998734, *13 (D. Md. Mar. 2, 2020) (holding the FTC had "reason to believe" that defendants were "violating or about to violate" because they had the ability to re-start the deceptive conduct and because "the harm to consumers [was] ongoing.")

The Court finds Chadwick liable for restitution for SBE's violations of the FTC Act only through 2015 but, given his history and current disposition to engage in the same or similar deceptions, will enjoin him from committing similar violations at Kanantik or any other project he becomes involved with hereafter.[50] The amount Chadwick owes will be the amount the FTC seeks,

---

[50] In saying this, the Court in no way intends to exonerate Chadwick or Kanantik from liability for any violations of the FTC Act he may have committed at Kanantik. The Court, at this juncture, is not saying that Chadwick is prohibited from any involvement with Kanantik, although that remains a strong possibility, *see infra*, Section IX.A.iii. For now, the holding is that he may not, in Kanantik, engage in any misrepresentation of a material fact in the sale of goods and services.

reduced by lot payments made based on sales made post-2015, and will be joint and several with the other Defendants to that extent, as discussed in this Opinion.

## VII.   LIABILITY FOR TSR VIOLATIONS

As both Pukke's former attorneys and the FTC have acknowledged, there is a lack of case law addressing the exemption in C.F.R. § 310.6(b)(3). The FTC's argues in the present case that some consumers did in fact purchase Sanctuary Belize lots sight unseen and as such, the sale was "completed" and payment "required" before a face-to-face meeting, hence the exemption does not apply. Based on the evidence the Court has heard, it does find that some consumers did purchase lots sight unseen, and indeed that SBE salespeople were encouraged to sell lots sight unseen. Trial Tr., 1/21/20 Afternoon, 90:3-97:16 (lot purchaser testifying that he purchased his lot sight unseen and that when he signed the contract, the Developer gave him 60 days to see the property and finalize the purchase); Trial Tr., 1/31/20 Afternoon, 69:5-69:14, 134:22-135:15 (SBE salesperson testifying that consumers did buy lots sight unseen and that it was "almost expected" for salespeople to sell lots sight unseen, and that is what SBE "really wanted" but who also stated that she never sold a lot sight unseen because she "wanted the people to actually get down there and see it for themselves and their own eyes and make the decision there."); Anderson Dep. Tr., 201:1-203:11 (confirming that there was a sales script used in 2016 and 2017 that stated the developer was offering lots sight unseen and testifying that "[s]ometimes there would be clients that would purchase a [lot] unseen"); PX 258 at 11 (SBE marketing script, stating "You have 4 choices: . . . Purchase a home site sight unseen (23% of our owners have done this)"); PX 819-828 (emails, lot purchase agreements, and SBE spreadsheets showing that some consumers purchased prior to a tour); PI Hrg Tr., 3/19/19 Afternoon, 61:11-16 (in at least one case a consumer made a $20,000

down payment on a lot and signed a memorandum of sale before visiting the property or meeting with a telemarketer face-to-face).

It is true that some SBE salespeople minimized the number of lots they sold in this manner. Hogan Dep. 11/6/19, 129:2-129:7 (SBE salesperson agreeing that the number of sight-unseen purchases was "a minority" but "not zero."); Trial Tr., 1/31/20 Afternoon, 134:22-135:12 (SBE salesperson testifying that there "were a few people" that made sales sight-unseen, but that she did not know the numbers).

But the Court is satisfied that as to sales that were concluded sight unseen (perhaps as many as 23%), the sale was unquestionably "complete" and payment "required," which means the exemption does not apply.

The Court therefore finds it unnecessary to decide whether payments prospective lot purchasers made for the tour in Belize, for airfares from their homes in the United States, or for reservations on lots in advance of signing a contract to purchase a lot also preclude application of the exemption. Because liability under the TSR is the same as liability under the FTC Act, the Court concludes that the FTC has proven that Defendants and their operatives violated the TSR by making the five Core Claims found to be misrepresentations by the Court and by misrepresenting the extent of Pukke's involvement in SBE before a face-to-face meeting between the lot purchasers and SBE operatives. Since any monetary recovery for violations of the TSR would be redundant with and subsumed by the restitution the Court will order for direct violations of the FTC Act, the Court also finds it unnecessary to determine the precise amount of lot payments made by lot owners who purchased their lots sight unseen.

## VIII.   DEFAULTING DEFENDANTS[51]

### A.   John Usher

The evidence shows that Usher has been involved with SBE entities and their predecessors since at least 2004.[52] He is currently the Director of SBPOA and Director of Operations of Eco-Futures Belize. PX 46 at 128; PX 499; PX 564. He was a SRWR board member until at least 2013 and its Chairman until 2016.[53] PX 568; PX 603; PX 935; PX 1071; Trial Tr., 2/4/20 Afternoon, 48:6-48:13. Based on a "handshake" agreement with Baker, he is part owner of Sanctuary Belize. PI Hrg Tr., 3/13/19 Afternoon, 21:23-22:14; Trial Tr., 2/7/20, 172:13-172:16. Numerous marketing communications identify Usher as the "chairman," "owner," "developer," or "principal" of the development. PX 564; PX 1183; PX 186.3; PX 186.46. In a September 2016 email to Pukke and Baker, Usher identified himself as their "partner." PX 932. And it was Usher who suggested that Pukke adopt an alias when doing business with SBE. PX 427 at 277:3-7; *id.* at 278:17-279:1 (Pukke testified, at a hearing on violation of his supervised release, November 13, 2015, that Usher

---

[51] Despite the fact that the Court has ruled that Pukke, Baker, and Chadwick are not authorized to represent these entities, ECF Nos. 771 and 772, the Court nonetheless understands the arguments made by them in relation to these entities. But nothing Defendants have said in this regard changes the Court's decisions herein. Interestingly, Pukke attempted to file a Motion on behalf of, GPA, Buy International, FDM and NLG, despite claiming to have no ownership interest or control over them.

In their responses in Opposition to the FTC's Motion for Default Judgment, Baker and Chadwick have also made allegations against the Receiver alleging that the Receiver has not been acting as a neutral party and has not been maintaining the status quo. ECF Nos. 999 and 1001. The FTC and Receiver have both replied. ECF Nos. 1002 and 1003. Chadwick, without leave of Court, has filed a sur-reply. ECF No. 1013. The Court has carefully reviewed these filings (including Chadwick's unauthorized sur-reply) and has determined that Baker's and Chadwick's arguments are without merit.

[52] Although Usher is a Belizean citizen, he visits the U.S. to conduct SBE business. PX 564. PX 603; PX 380; PX 935.

[53] There was considerable evidence at trial suggesting that, at some point, Usher either voluntarily resigned or was forced out as SRWR Chairman. This came after he alleged that Pukke was improperly diverting Sanctuary Belize funds. However, as evidenced by a May 2018 email, Usher's involvement with SRWR continued as late as May 2018. PX 1570.

said: "Do me a favor, don't be using your name down here. I'm worried about banks, I'm worried of the government. They are pretty skittish, I'll be honest.").

Not only does this demonstrate that Usher had authority to control SBE as the director of SRWR and SBPOA; he in fact captained SBE's litigation efforts against the IOSB lot owners in Belize, during which he and SBE falsely and infamously denied to the Belizean Court the true extent of Pukke's involvement with the project. PI Hrg Tr., 3/19/19 Afternoon, 65:15-25. Evidence of Usher's active perpetuation of at least that one material false representation—the degree of Pukke's involvement in the project—is sufficient to confirm his liability in this case.

Usher clearly had actual knowledge of the deceptive practices, particularly the concealment of the degree of Pukke's involvement in SBE. He also either knew or should have known about all the other misrepresentations and of their deceitful nature. Indeed, Usher at one point accused Pukke of diverting $24 million away from the development, so he had to know that the representation that every dollar of revenue claim would be going back into the development was an unadorned falsehood. PI Hrg. Tr., 3/13/19 Afternoon, 83:17-84:19 (describing meeting in 2016 in which Usher accused Pukke of taking $24 million out of the development). On the ground in Belize, Usher knew which amenities were being completed, and which were not, which means he either knew or should have known that some promised amenities were never going to be built or were never going to be built in the promised timeline of two, three or five years. Nevertheless he made contrary representations to prospective lot purchasers during the tour in Belize. PI Hrg Tr., 3/19/19 Afternoon, 67:5-67:18; Trial Tr., 1/22/20 Morning, 25:15-25:19. In fact, in 2018, Usher wrote an email to Pukke and Baker in which he "jotted down a list of activities / projects that I foresee constitut[ing] finish line representing our responsibilities to clients re contracts," a list which significantly did not include many promised luxury amenities, including the hospital,

134

medical center, golf course, casino, and others. PX 1570. As to the other core misrepresentations, Usher was, at a minimum, recklessly indifferent to the veracity of the claims, given his prominent role in SBE, his knowledge and involvement in the *AmeriDebt* proceeding, and his knowledge of Pukke's highly questionable background.

Usher has never appeared in these proceedings,[54] such that on January 10, 2020, a Clerk's Entry of Default was entered against him. ECF No. 799. The FTC has since filed a Motion for Default Judgment against him. ECF No. 990. Given the wide and deep evidence of his violations of the FTC Act and the TSR, the Court **GRANTS** the FTC's Motion for Default Judgment against Usher. He will be jointly and severally liable in an amount co-extensive with Pukke, Baker, all other Defaulting Defendants (except the Estate of John Pukke) and, to a degree to be decided, Chadwick.

---

[54] On November 7, 2018, Usher was served with the original Complaint and Summons via FedEx, which is an approved method of service for residents of Belize under the exceptions to the Hague Convention. ECF No. 467-1. On November 14, 2018, the FTC joined a call with Usher's Belizean counsel who stated that Usher was aware of the FTC's proceeding. *Id.* On December 3, 2018, the FTC sent a courtesy copy of a filing it made to an individual it identifies as U.S. counsel for Usher, Joseph Rillotta, Esquire, of the Washington office of the national law firm Faegre Drinker Biddle & Reath LLP. *Id.* Rillotta confirmed receipt of the filing. *Id.* On December 13, 2018, the FTC issued the Complaint and Summons to the Belizean central authority for service under the Hague Convention. ECF No. 741-1 at 7.

To this day, Rillotta has not appeared nor has he filed any papers in the case on behalf of Usher. The Opinion and Order directing the Clerk's Office to enter default against Usher was also sent to Rillotta by Chambers on the same day they were issued, but there was no response. ECF Nos. 771 and 772. In its July 6, 2020 Motion for Default Judgment against Usher, the FTC represented that it sent the Motion to Usher by FedEx to his last known address and by email to two of his last known email addresses, and to Rillotta by FedEx and email as well. ECF No. 990.

### B. *Global Property Alliance, Inc. ("GPA")*

Despite having been duly served, GPA has not appeared in the proceedings such that on January 10, 2020, a Clerk's Entry of Default was entered against it. ECF No. 799. The FTC has since filed a Motion for Default Judgment against GPA. ECF No. 990.

As discussed *supra*, Section VI.A, GPA was and is part of the common enterprise that is SBE. As such, it is jointly and severally liable for violations of the FTC Act and the TSR the Court has found were committed by SBE. Accordingly, the Court **GRANTS** the FTC's Motion for Default Judgment and default judgment will be entered against GPA in an amount co-extensive with Pukke, Baker, all other Defaulting Defendants (except the Estate of John Pukke) and, to a degree to be decided, Chadwick.

### C. *Sittee River Wildlife Reserve ("SRWR")*

Despite having been duly served, SRWR has not appeared in the proceedings such that on January 10, 2020, Clerk's Entry of Default was entered against it. ECF No. 799. The FTC has since filed a Motion for Default Judgment against SRWR. ECF No. 990.

As discussed in Section VI.A, *supra*, SRWR was and is part of the common enterprise that is SBE. As such, it is jointly and severally liable for violations of the FTC Act and the TSR the Court has found were committed by SBE. Accordingly, the Court **GRANTS** the FTC's Motion for Default Judgment and default judgment will be entered against SRWR in an amount co-extensive with Pukke, Baker, all other Defaulting Defendants (except the Estate of John Pukke) and, to a degree to be decided, Chadwick.

### D.  Buy Belize, LLC ("Buy Belize")

Despite having been duly served, Buy Belize has not appeared in the proceedings such that on January 10, 2020, a Clerk's Entry of Default was entered against it. ECF No. 799. The FTC has since filed a Motion for Default Judgment against Buy Belize. ECF No. 990.

As discussed in Section VI.A, *supra*, Buy Belize was and is part of the common enterprise that is SBE. As such, it is jointly and severally liable for violations of the FTC Act and the TSR the Court has found were committed by SBE. Accordingly, the Court **GRANTS** the FTC's Motion for Default Judgment and default judgment will be entered against Buy Belize in an amount co-extensive with Pukke, Baker, all other Defaulting Defendants (except the Estate of John Pukke) and, to a degree to be decided, Chadwick.

### E.  Buy International, Inc. ("Buy International")

Despite having been duly served, Buy International has not appeared in the proceedings such that on January 10, 2020, a Clerk's Entry of Default was entered against it. ECF No. 799. The FTC has since filed a Motion for Default Judgment against Buy International. ECF No. 990.

As discussed in Section VI.A, *supra*, Buy International was and is part of the common enterprise that is SBE. As such, it is jointly and severally liable for violations of the FTC Act and the TSR the Court has found were committed by SBE. Accordingly, the Court **GRANTS** the FTC's Motion for Default Judgment and default judgment will be entered against Buy International in an amount co-extensive with Pukke, Baker, all other Defaulting Defendants (except the Estate of John Pukke) and, to a degree to be decided, Chadwick.

### F. *Foundation Development Management, Inc. ("FDM")*

Despite having been duly served, FDM has not appeared in the proceedings such that on January 10, 2020, a Clerk's Entry of Default was entered against it. ECF No. 799. The FTC has since filed a Motion for Default Judgment against FDM. ECF No. 990.

As discussed in Section VI.A, *supra*, FDM was and is part of the common enterprise that is SBE. As such, it is jointly and severally liable for violations of the FTC Act and the TSR the Court has found were committed by SBE. Accordingly, the Court **GRANTS** the FTC's Motion for Default Judgment and default judgment will be entered against FDM in an amount co-extensive with Pukke, Baker, all other Defaulting Defendants (except the Estate of John Pukke) and, to a degree to be decided, Chadwick.

### G. *Eco-Futures Development*

Despite having been duly served, Eco-Futures Development has not appeared in the proceedings such that on January 10, 2020, a Clerk's Entry of Default was entered against it. ECF No. 799. The FTC has since filed a Motion for Default Judgment against Eco-Futures Development. ECF No. 990.

As discussed in Section VI.A, *supra*, Eco-Futures Development was and is part of the common enterprise that is SBE. As such, it is jointly and severally liable for violations of the FTC Act and the TSR the Court has found were committed by SBE. Accordingly, the Court **GRANTS** the FTC's Motion for Default Judgment and default judgment will be entered against Eco-Futures Development co-extensive with Pukke, Baker, all other Defaulting Defendants (except the Estate of John Pukke) and, to a degree to be decided, Chadwick.

138

### H.  *Eco-Futures Belize, Limited ("Eco-Futures Belize")*

Despite having been duly served, Eco-Futures Belize has not appeared in the proceedings such that on January 10, 2020, a Clerk's Entry of Default was entered against it. ECF No. 799. The FTC has since filed a Motion for Default Judgment against Eco-Futures Belize. ECF No. 990.

As discussed in Section VI.A, *supra*, Eco-Futures Belize was and is part of the common enterprise that is SBE. As such, it is jointly and severally liable for violations of the FTC Act and the TSR the Court has found were committed by SBE.  Accordingly, the Court **GRANTS** the FTC's Motion for Default Judgment and default judgment will be entered against Eco-Futures Belize in an amount co-extensive with Pukke, Baker, all other Defaulting Defendants (except the Estate of John Pukke), and to a degree to be decided, Chadwick.

### I.   *Newport Land Group, LLC ("NLG")*

Despite having been duly served, NLG has not appeared in the proceedings such that on January 10, 2020, a Clerk's Entry of Default was entered against it. ECF No. 799. The FTC has since filed a Motion for Default Judgment against NLG. ECF No. 990.

As discussed in Section VI.A, *supra*, NLG was and is part of the common enterprise that is SBE. As such, it is jointly and severally liable for violations of the FTC Act and the TSR the Court has found were committed by SBE.  However, before entering default judgment against NLG, the Court notes that one nonparty's claim against frozen assets of NLG needs to be addressed. That nonparty is David Heiman, who has challenged the Receiver's seizure of NLG's assets as being assets of the Receivership, which they became when, approximately one year ago, the Receiver determined that NLG was a Receivership Entity. The Receiver made this determination after finding the financial and actual involvement of several SBE individuals in the

NLG project,[55] that NLG conducted Sanctuary Belize business at 3333 Michelson Drive, and that there were transfers of a considerable amount of SBE funds to NLG for no apparent legitimate business purpose. Accordingly, on Motion of the Receiver filed on May 14, 2019, ECF No. 453-1, served on investors in NLG, including Heiman, ECF No. 453-5, the Court, by Order dated June 21, 2019, approved the Receiver's takeover of NLG assets, which were in the approximate total amount of $3.8 million, ECF No. 507. No objection to the Receiver's Motion or the Court's Order, including by Heiman, was filed in this Court at the time (though Darren Christian, another investor in NLG, apparently submitted an objection to the Receiver, which the Receiver addressed in ECF No. 485).

Heiman, however, as an investor in the NLG venture, despite having been served with the Receiver's Motion in May 2019 and not objecting, appears to have brought suit in California Superior Court to have his personal investment in NLG—some $750,000—returned to him, a sum, he submits, that was and is in no way related to Sanctuary Belize. But the issue is not whether Heiman's or any of NLG's investors intended to invest in a project related to Sanctuary Belize. Clearly, they did not. NLG's ostensible purpose was to develop a project independent of Sanctuary Belize known as Rancho del Mar in Costa Rica, using funds including Heiman's $750,000. Accordingly, the Receiver argued in May 2019 and the Court concluded in June 2019 that NLG assets were fairly a part of the Receivership estate, given the combination of compelling factors including: interlocking relationships that SBE principals such as Pukke (who the Receiver claimed was NLG's owner), Kazazi, Santos, and Greenfield had with NLG; the investment and commingling of substantial SBE funds with NLG funds for no ostensible legitimate business

---

[55] Specifically Pukke (who the Receiver alleges owns and controls NLG), Kazazi, Santos, Costanzo and Greenfield.

reason; the common address and de facto corporate headquarters NLG shared with multiple other SBE corporations at 3333 Michelson Drive in Irvine, California; and NLG's involvement in Sanctuary Belize.[56]

Still, since the California State Court, in deference to this federal proceeding, declined to act on Heiman's petition, this Court is willing at least to give him his day in court. That said, Heiman faces a steep uphill battle to have any portion of his $750,000 investment in NLG returned to him. Even so, the Court will grant Heiman thirty (30) days to file a motion with this Court requesting the return of his $750,000 investment in NLG. The FTC and/or the Receiver may respond within ten (10) days thereafter, and Heiman may reply ten (10) days after that. The Court will thereafter rule on the motion. No hearing will be necessary.

### J.   Power Haus Marketing ("Power Haus")

Despite having been duly served, Power Haus has not appeared in the proceedings such that January 10, 2020, a Clerk's Entry of Default was entered against it. ECF No. 799. The FTC has since filed a Motion for Default Judgment against Power Haus. ECF No. 990.

As discussed in Section VI.A, *supra*, Power Haus was and is part of the common enterprise that is SBE. As such, it is jointly and severally liable for violations of the FTC Act and the TSR the Court has found were committed by SBE. Accordingly, the Court **GRANTS** the FTC's Motion for Default Judgment and default judgment will be entered against Power Haus in an amount co-

---

[56] The Court notes that investments such as Heiman's in NLG were apparently never placed in escrow by NLG. Moreover, in what can only be viewed as yet another astonishing breach of trust, this time to the detriment of legitimate NLG investors, Pukke et al. seem to have diverted over $1 million of NLG funds intended for a project in Costa Rica (including Sanctuary Belize funds commingled with NLG funds) to a real estate development project in the Bahamas, a project clearly unrelated to either the NLG Costa Rica project or Sanctuary Belize. Neither the NLG Costa Rica project nor the Bahamas project, as far as the Court can tell, has ever been completed.

extensive with Pukke, Baker, all other Defaulting Defendants (except the Estate of John Pukke) and, to a degree to be decided, Chadwick.

### K.   Prodigy Management Group, LLC ("Prodigy")

Despite having been duly served, Prodigy has not appeared in the proceedings such that on January 10, 2020, a Clerk's Entry of Default was entered against it. ECF No. 799. The FTC has since filed a Motion for Default Judgment against Prodigy. ECF No. 990.

As discussed in Section VI.A, *supra*, Prodigy was and is part of the common enterprise that is SBE. As such, it is jointly and severally liable for violations of the FTC Act and the TSR the Court has found were committed by SBE. Accordingly, the Court **GRANTS** the FTC's Motion for Default Judgment and default judgment will be entered against Prodigy in an amount co-extensive with Pukke, Baker, all other Defaulting Defendants (except the Estate of John Pukke) and, to a degree to be decided, Chadwick.

### L.   Belize Real Estate Affiliates, LLC ("BREA")

Despite having been duly served, BREA has not appeared in the proceedings such that on January 10, 2020, a Clerk's Entry of Default was entered against it. ECF No. 799. The FTC has since filed a Motion for Default Judgment against BREA. ECF No. 990.

As discussed in Section VI.A, *supra*, BREA was and is part of the common enterprise that is SBE. As such, it is jointly and severally liable for violations of the FTC Act and the TSR the Court has found were committed by SBE. Accordingly, the Court **GRANTS** the FTC's Motion for Default Judgment and default judgment will be entered against BREA in an amount co-extensive with Pukke, Baker, all other Defaulting Defendants (except the Estate of John Pukke) and, to a degree to be decided, Chadwick.

### M. *Exotic Investor, LLC ("EI")*

Despite having been duly served, EI has not appeared in the proceedings such that on January 10, 2020, a Clerk's Entry of Default was entered against it. ECF No. 799. The FTC has since filed a Motion for Default Judgment against EI. ECF No. 990.

As discussed in Section VI.A, *supra*, EI was and is part of the common enterprise that is SBE. As such, it is jointly and severally liable for violations of the FTC Act and the TSR the Court has found were committed by SBE. Accordingly, the Court **GRANTS** the FTC's Motion for Default Judgment and default judgment will be entered against EI in an amount co-extensive with Pukke, Baker, all other Defaulting Defendants (except the Estate of John Pukke) and, to a degree to be decided, Chadwick.

### N. *Southern Belize Realty, LLC ("SBR")*

Despite having been duly served, SBR has not appeared in the proceedings such that on January 10, 2020, a Clerk's Entry of Default was entered against it. ECF No. 799. The FTC has since filed a Motion for Default Judgment against SBR. ECF No. 990.

As discussed in Section VI.A, *supra*, SBR was and is part of the common enterprise that is SBE. As such, it is jointly and severally liable for violations of the FTC Act and the TSR the Court has found were committed by SBE. Accordingly, the Court **GRANTS** the FTC's Motion for Default Judgment and default judgment will be entered against SBR in an amount co-extensive with Pukke, Baker, all other Defaulting Defendants (except the Estate of John Pukke) and, to a degree to be decided, Chadwick.

### O.  Sanctuary Belize Property Owners' Association ("SBPOA")

Despite having been duly served, SBPOA has not appeared in the proceedings and on January 10, 2020, a Clerk's Entry of Default was entered against it. ECF No. 799. The FTC has since filed a Motion for Default Judgment against SBPOA. ECF No. 990.

As discussed in Section VI.A, *supra*, SBPOA was and is part of the common enterprise that is SBE. Accordingly, it is liable for violations of the FTC Act and the TSR the Court has found were committed by SBE. As such, the Court **GRANTS** the FTC's Motion for Default Judgment and default judgment is entered against SBPOA in an amount co-extensive with Pukke, Baker, all other Defaulting Defendants (except the Estate of John Pukke) and, to a degree to be decided, Chadwick.

### P.  Estate of John Pukke

The Estate of John Pukke is the estate of Pukke's late father. By Opinion and Order dated January 3, 2020, the Court held that Pukke could represent his father's Estate only if he could demonstrate that he was the Executor of his father's Estate, that he was the sole beneficiary of the Estate, and that the Estate had no creditors. ECF Nos. 771 and 772. But at the January 14, 2020 Pre-Trial Conference, the FTC argued that the Estate had at least one creditor—viz., the FTC itself—and more importantly, Pukke himself conceded that the Estate had multiple beneficiaries. Hr. Tr., 1/14/20, 196:3-197:7. Thus, in accordance with the case authorities set forth in the Court's Memorandum Opinion of January 3, 2020, the Court determined that Pukke was not eligible to represent his father's estate in these proceedings. Accordingly, on January 15, 2020, the Court directed the Clerk of the Court to enter default against the Estate of John Pukke. ECF No. 826. The FTC has since filed a Motion for Default Judgment against it. ECF No. 990.

The FTC has presented evidence that from June 2011 to November 2018, the Estate of John Pukke improperly received $830,000 from SBE at Pukke's direction. PX 984 at 6, 15; Trial Tr., 1/23/20 Morning, 83:3-87:17, 86:1-87:17. John Pukke had no legitimate claim to these funds, which means that his estate did not either (John Pukke died in 2010). *See also* Trial Tr., 1/23/20 Morning, 89:9-90:9 (Receiver's representative testifying that there was nothing in the receivership records indicating that the receivership entities owed any debt to the Estate of John Pukke).

The Court **GRANTS** the FTC's Motion for Default Judgment and default judgment will be entered in favor of the FTC against the Estate of John Pukke in the amount of $830,000.

145

## IX.   RELIEF

### A.  *Injunctive Relief*

In its proposed Permanent Injunction, the FTC asks that the Court ban Pukke, Baker, Chadwick, Usher and the non-settling Corporate Defendants from "advertising, marketing, promoting, or offering for sale, or assisting others in the advertising, marketing, promoting, or offering for sale of any Real Estate Good or Service,"[57] from telemarketing or from assisting others in telemarketing, and from making misrepresentations similar to the six Core Claims as well as "[a]ny other fact material to consumers concerning any good or service, such as: the total costs; any material restrictions, limitations, or conditions; or any material aspect of its performance, efficacy, nature, or central characteristics." ECF Nos. 967-1 and 990-1. The FTC also proposes that the Court enjoin Pukke, Baker and Chadwick, as well "their officers, agents, employees, and attorneys, and all other persons in active concert or participation," from "engaging in any business or commercial activity" in which Pukke, Baker or Chadwick has consented to or acquiesced to the use of an alias or pseudonym and from "engaging in any business or commercial activity of any sort through the use of nominees, strawmen, or any other manner by which their ownership or control is obscured or hidden. ECF No. 967-1.

To award permanent injunctive relief against a defendant found to have violated the FTC Act, there should be cognizable danger of recurring violation, a determination the court makes based on the following factors: (1) defendant's scienter; (2) whether the conduct was isolated or recurrent; (3) whether defendant is positioned to commit future violations; (4) the degree of

---

[57] At first blush, this clause could be read in the disjunctive, i.e. any Real Estate, any Good, and any Service. But the FTC's Proposed Order explicitly defines the term "Real Estate Good or Service" to mean "any interest in, service related to, or development of, any real estate containing or involving three or more lots or units of any kind." ECF No. 967-1.

consumer harm; (5) defendant's recognition of culpability; and (6) the sincerity of defendant's assurances against future violations. *Loma*, 2013 WL 2455986, at *6 (internal citations omitted); *see also Ross*, 897 F. Supp. 2d at 387.

A permanent injunction serves "twin goals: avoiding repeat violations of and monitoring compliance with the law and the terms of the injunction itself." *FTC v. Direct Mktg. Concepts, Inc.*, 648 F. Supp. 2d 202, 212 (D. Mass. 2009), *aff'd*, 624 F.3d 1 (1st Cir. 2010) (citing *United States v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953)). Thus, injunctive relief may be framed "broadly enough to prevent [defendants] from engaging in similarly illegal practices in future advertisements." *FTC v. Colgate-Palmolive Co.*, 380 U.S. 374, 395 (1965). In fact, "the 'Commission is not limited to prohibiting the illegal practice in the precise form in which it is found to have existed in the past.' Having been caught violating the Act, respondents 'must expect some fencing in.'" *Id.* (citing *FTC v. National Lead Co.*, 352 U.S. 419, 431 (1957); *see also FTC v. Grant Connect, LLC*, 763 F.3d 1094, 1105 (9th Cir. 2014). "Factors that courts may consider in determining whether fencing-in relief is justified in light of a defendant's violation of the FTC Act include: any history of prior violations, the deliberateness and seriousness of the violation, and the degree of transferability of the unlawful behavior to other products." *Direct Marketing Concepts*, 648 F. Supp. 2d at 213.

i. <u>Pukke</u>

Certainly, as far as Pukke is concerned, a permanent injunction that includes a blanket prohibition against engaging in any kind of real estate activity is warranted, given the "cognizable danger of recurring violation" and the need for "fencing-in" to prevent repeat violations and to monitor his compliance with the law. Pukke has been nothing less than the mastermind of SBE's operations and of the many of the deceptive practices attributable to it.

147

His machinations throughout the life of Sanctuary Belize were preceded by a conviction for Mail Fraud under 18 U.S.C. § 1341 & 2 in the United States District Court for the Western District of Pennsylvania in 1996 and his involvement in the massive credit counseling scheme of AmeriDebt, which resulted in a FTC suit and a class action suit brought in this Court, in which he agreed to pay the FTC and class members millions of dollars. The FTC proceeding also caused him to be held in contempt of Court, and led to a criminal conviction and more than a year in prison for obstruction of justice for concealing assets in connection with the *AmeriDebt* proceeding and with a related bankruptcy proceeding. Taken together, these actions give every indication that, if not brought to book here and now, Pukke may soon enough be up to his old practices again.

To recall:

In the present case, Pukke was consistently untruthful about the fact of his involvement in, much less his controlling position, in SBE; more than once he used the alias Marc Romeo and the alias Andy Storm with prospective lot purchasers and third parties (e.g. the marina management company); he helped formulate and circulate multiple misrepresentations to prospective lot purchasers relative to the offering of the lots; he diverted millions of dollars in revenue from the sale of SBE lots to benefit himself, his family, and his friends; and he used significant revenue from Sanctuary Belize lot sales to fund real estate projects totally unrelated to SBE. Even in his post-trial filings, Pukke offers up self-serving assertions totally untethered to evidence presented during the proceeding that make fencing-in appropriate. For example, to this day he claims that "[t]he only witnesses that testified to hearing an alleged false representation were a small group of highly conflicted members of the IOSB, who clearly had ulterior motives or individuals who were improperly influenced by the IOSB." Pukke's Proposed Findings of Fact and Conclusions of Law,

ECF No. 1011. Pukke insists this to be the case, despite the fact that he himself cross-examined FTC witnesses at length about the IOSB, several of whom denied any involvement with the IOSB.

Pukke's deceptive conduct, then, has been recurrent, starting as early as 2005 (in fact, Pukke and Baker were selling lots while *AmeriDebt* was still in progress). The degree of consumer harm is immense—all the ill-gotten revenue from the sale of lots at SBE from 2011-forward. And Pukke is very much positioned to commit similar violations in the future.

All of this is to say, of course, that Pukke has given no assurances against committing future violations. In fact, he vigorously denies that any were committed and denies that the representations were in any way misleading, which implies that he believes everything he and SBE have said in their marketing and sales efforts was legitimate. As far as can be told, Pukke appears quite ready to mobilize identical or similar misrepresentations in his real estate ventures hereafter, as well as in other activities in the future. Unless he is enjoined from making the same or similar representations, there is little to keep him from telling prospective purchasers, for example, in another real estate project that it is "debt-free" and therefore less risky than a project with traditional financing. The same may be said as to a possible assertion that "every dollar goes back into the development." Without an injunction, there is nothing to prevent Pukke from making these representations again, or even diverting millions of dollars of revenue from that project's lot sales to his own benefit and that of family and friends.

Considering the clear transferability of Pukke's unlawful behavior, *see* Section III.B, a permanent injunction prohibiting him from participating in any real estate-related activity of any kind is very much in order.

The question is whether he should be prohibited altogether from engaging in any other specific activity. His history of scheming in connection with credit-counseling businesses of the

type addressed in the Pennsylvania mail fraud and *AmeriDebt* cases unquestionably suggests that a flat prohibition against engaging in credit-counseling services or the like should be included in the injunctive relief. However, the Court notes that the *AmeriDebt* Stipulated Final Judgment already bans Pukke from "engaging in, participating in, or assisting others to engage or participate in[,] credit counseling, credit education, or debt management." *AmeriDebt*, ECF No. 473. The Stipulated Final Judgment form *AmeriDebt* remains fully in effect and is in no way superseded by the Court's Permanent Injunction here. As such, the Court firmly reminds Pukke that he is already enjoined from these activities.

But the Court does not intend to prohibit Pukke from engaging in any other specific commercial activity. What it does seek to do is to ensure that, whatever activity Pukke may engage in (other than real estate and credit-counseling-related activities), that he do so without making any material misrepresentations as to any good or service. Should he continue to do so, he may be called to account by the FTC, in this Court or otherwise, and duly sanctioned.

The Court, however, takes a different view as to Pukke's involvement in telemarketing. As to that, the Court will ban Pukke from any and all telemarketing activity whatsoever, because he has most definitely violated both the TSR, as alleged in the present case, and the *AmeriDebt* Stipulated Final Judgment which prohibits violations of the TSR.

In all other respects, with minor modifications, the Court finds the terms of the FTC's proposed Permanent Injunction appropriate.

ii.   <u>Baker</u>

Baker is a bit of a puzzle. As a sometime resident of Belize, where his mother and stepfather live, but with a California apartment paid for by SBE at least prior to this lawsuit, he appears, over a considerable period, to have poured his heart and soul into trying to make Sanctuary Belize a

success. He often demonstrated an affable (even colorful) persona as he attempted to convince consumers to purchase lots at Sanctuary Belize. But at trial he attempted to portray himself as a bewildered soul, totally unaware of much of what was going on at the project, including professing ignorance of the fact that he was an owner or officer of multiple SBE entities (as the Court discusses in Section VI.D, an ignorance that, at the very least, demonstrates egregious reckless indifference as to what was in fact occurring). Nothing Baker says, however, exonerates him from liability for the serious misrepresentations and excesses that SBE engaged in over the years. Baker, after all, was very much in league with Pukke before, during and after the *AmeriDebt* proceeding, describing him, despite his Olympic record for untrustworthiness, as "a marketing genius." Moreover, Baker, along with virtually all SBE personnel, knew that Pukke, for an extended period, was trading under the aliases Marc Romeo and Andy Storm. He also explicitly and implicitly concealed the fact that Pukke was not only his partner, but that he was effectively functioning as SBE's de facto Chief Executive Officer. Moreover, Baker knew or, at best, was recklessly indifferent to the fact that Pukke was diverting millions of SBE revenues to himself, his family and friends. Indeed, Baker even diverted some SBE funds to himself though, to be sure, to a much lesser extent than Pukke.[58]

Baker, like Pukke, argues that the purported misrepresentations made by SBE either were not made, or if made, did not carry the meaning the FTC ascribes to the words. Regrettably, Baker's credibility before the Court is at a very low ebb, especially in view of his effort to mislead

---

[58] In his Proposed Findings of Fact and Conclusions of Law, Baker argues that "[f]or the FTC to claim that Baker was not allowed to purchase anything at all, is ludicrous" and that "[i]n the positions he held, he should have received great financial reward and live better than just modestly." ECF No. 969.

the Court with respect to his knowledge and involvement in the circumstances surrounding the Herskowitz letter. *See supra*, Section V.E. Taken together, Baker's shenanigans give every indication that, unless the Court enters a permanent injunction against him, he may well continue to make these misrepresentations or similar ones in the future. Because there is "cognizable danger of recurring violation," (*see* Section III), and given the magnitude of the harm that has resulted from his violations and the fact that he admits to no violations and has given no assurances against committing future violations, the Court believes a permanent injunction against Baker is very much in order.

Though a permanent injunction vis-a-vis Baker will also contain some fencing-in, the Court believes that, unlike Pukke, Baker does not merit an indefinite ban from engaging in all real estate activity, whether in Belize or elsewhere. However, a specific prohibition against engaging in any activity involving Sanctuary Belize (or any future incarnation) or Kanantik (or any future reincarnation) is in order. As with Pukke, Chadwick, and Usher, the general prohibition against making material misrepresentations in connection with the sale of any good or any service, real estate included, will hopefully keep him on the straight and narrow as he goes forward with his career.

Still, Baker's too frequent acquiescence and at times, participation, in the questionable activities of SBE, in addition to his violation of the TSR and the *AmeriDebt* Stipulated Final Judgment prohibiting violations of the TSR, call for him to be subject to a flat ban on telemarketing, whatever his future employment may be. In all other particulars, the terms requested

in the FTC's proposed Permanent Injunction, with minor modifications by the Court, as to Baker will be implemented.[59]

iii.    <u>Chadwick</u>

Chadwick says real estate is his life, what he knows best, and that it would be an extreme sanction if he were blocked from participating in the field indefinitely. From all appearances, Chadwick, in his marketing and sales activities with SBE, exhibited a super smooth style that enticed a number of lot purchasers to acquire lots. But the inescapable fact is that in his efforts to sell lots, he made false statements and allowed others to make false statements, at a minimum with reckless indifference as to the falsity but at other times with clear knowledge that the statements were false. It is difficult to overstate one of his most blatant acts of dishonesty, when on one particular occasion, when asked directly by a prospective purchaser, Chadwick "looked (him) in the eye" and denied that Pukke was involved in, much less effectively in control of SBE. Chadwick knew full well that was a lie.

For purposes of considering a permanent injunction and otherwise implementing the terms of the FTC's proposed Permanent Injunction against him, Chadwick's scienter with respect to SBE's offensive conduct has been firmly established. His conduct was continuous and recurrent, not isolated. And the degree of consumer harm caused by SBE's misrepresentation, which has been documented in detail, has been considerable.

Chadwick has at least tried to demonstrate some (albeit very limited) recognition of his culpability, referring to his "regrettable (and regretted) conduct" of going along with the use of an alias for Pukke before 2012, the year Pukke was released from prison. Chadwick's Proposed

---

[59] Baker would perhaps be well-advised to take care in the future about how his name may be used in any activity he may become involved with.

Findings of Fact and Conclusions of Law, ECF No. 993. But this recognition is half-hearted at best. With respect to all the other misrepresentations, he continues to suggest that whatever he did or oversaw was legitimate, and that he was in no way aware of other matters. Still, as just stated, the Court finds it impossible to forget Chadwick's look-him-in-the-eye conversation with a prospective lot purchaser and flat-out denial of Pukke's involvement in SBE in 2012. Then, too, the Court remains gravely concerned over the 2015 sworn declaration Chadwick submitted to this Court in connection with the hearing on Pukke's alleged Violation of Supervised Release, in which Chadwick denied he was aware of Pukke using the alias Marc Romeo between 2012 and 2015. As described in Footnote 36, that declaration was knowingly false and perhaps even now may be susceptible to independent criminal proceedings. But the Court need not go to that extreme.

Thus, while Chadwick has given some assurances that he will not commit violations similar to those he has committed in the past, the Court frankly has doubts about the sincerity of these assurances. His past willingness to ignore or bend the truth with respect to misrepresentations made by him and SBE operatives argues for the issuance of a permanent injunction, with appropriate fencing-in.

The Court notes Chadwick's deep involvement in SBE's close-by neighboring development known as Kanantik, which notably continued to have some connection with the Michelson Drive office in Irvine, California, common to so many of the Corporate Defendants, as late as 2018, when the FTC's and the Receiver's representatives found certain Kanantik promotional materials when they entered 3333 Michelson Drive. Those materials contained representations as to the "no debt" nature of the Kanantik development and the promise of the same kinds of amenities that were made by SBE. *See* Section VI.E. This, most assuredly demonstrates, as far as Chadwick is concerned, the "cognizable danger of recurring violations"

and the "transferability of the unlawful behavior." What would be the message if Chadwick were not permanently enjoined from dealing in misrepresentations such as these at Kanantik?

Still, Chadwick, like Baker, does not need to be precluded from engaging in any real estate activity at all, whether in Belize or elsewhere. But a prohibition against any involvement with the Sanctuary Belize (or its reincarnations) is entirely appropriate. Restricting Chadwick's involvement in Kanantik may well be in order too, as it is for Baker and Usher. But since that matter may become academic soon enough, the Court need not add that prohibition at this time. Accordingly, the Court expressly reserves any ruling with respect to Chadwick's involvement with Kanantik hereafter.[60] Otherwise, it should suffice, as with Pukke and Baker, to prohibit Chadwick from making material misrepresentations in the sale of any good or service.

As for telemarketing activity, as with Pukke, Baker and Usher, Chadwick will be prohibited from that activity wherever his professional pursuits may take him. In all other respects, the Court will with minor modifications, implement the restrictions pertaining to Chadwick set forth in the FTC's proposed Permanent Injunction.

    iv.   <u>Usher</u>

Usher has never appeared in these proceedings despite being duly served, as discussed *supra*, Section VIII.A. As the Court has recounted, Usher was Chairman of SRWR during the *AmeriDebt* proceeding and has been intimately involved in Sanctuary Belize ever since, functioning as a "Principal," leading tours in Belize, even orchestrating the Belizean litigation

---

[60] The Court will address the Receiver's Motion for an Order Approving the Barienbrock and Mathis settlements, ECF No. 895, and the FTC's Motion to Confirm the Receiver's Control over Kanantik, ECF No. 897, separately.

against American lot owners. In fact, the evidence suggests that it was Usher who suggested to Pukke that he use an alias rather than his own name.

As with Baker and Chadwick, the Court finds that a permanent injunction with fencing-in is appropriate for Usher, because there is clearly a "cognizable danger of recurring violation." As with Baker and Chadwick, Usher will not be prohibited altogether from participating in real estate in general, but he will be specifically precluded from participating in Sanctuary Belize or any of its future reincarnations and in Kanantik or any of its future reincarnations. Usher must also not make any material misrepresentation in the sale of any good or any service of any kind or the Court may have occasion to take up his case again. Usher also may not participate in telemarketing of any kind in any activity he may engage in. The Court will implement with minor modifications, all other injunctive relief against Usher proposed by the FTC.

v.    Corporate Defendants

The Corporate Defendants, none of which have appeared in the case despite being duly served and none of which have settled with the FTC, will bear the same fate as Pukke. Based on the evidence, *see, e.g.*, Section VI.A, the Court concludes that a ban on all real estate activity and telemarketing in general, as well as a prohibition against making any material misrepresentation in the sale of any goods and services, is warranted for these Defendants. The Court will implement with minor modifications, all the other injunctive relief against non-settling Corporate Defendants proposed by the FTC.

## B.  Monetary Relief

The Fourth Circuit has said that a court may award "monetary consumer redress" under Section 13(b) of the FTC Act but has not further defined this term. *Ross*, 743 F.3d at 891. This Court, after considering briefing by the Parties and a review of precedent, held in an Opinion dated

October 17, 2019, that "the measure of equitable monetary relief is the amount consumers paid for lots, less any refunds already made to the consumers." *In re Sanctuary Belize Litig.*, 2019 WL 5267774, at *2 (D. Md. Oct. 17, 2019). Further, the Court stated that the FTC has the burden of proving this amount by a preponderance of the evidence and that, once it has done so, the "burden then shifts to the defendants to show that the FTC's figures are inaccurate." *Id.* at *3. Restitution awards, however, "need not be limited to the funds each defendant personally received from the wrongful conduct" if defendants are held jointly and severally liable. *See FTC* v. *Commerce Planet, Inc.*, 815 F.3d 593, 601 (9th Cir. 2016).

At the end of its most recent term, the Supreme Court granted writs of certiorari in the cases of *AMG Capital Management v. FTC*, 19-508, and *FTC v. Credit Bureau Center*, 19-825, to determine whether Section 13(b) of the FTC Act authorizes the FTC to demand monetary relief for violations of the FTC Act such as restitution for consumers, and if so, whether there are any requirements or limits on the scope of such relief.[61] About two weeks prior to granting cert in these

---

[61] Pukke, Baker, and Chadwick have all filed Motions to Stay these proceedings based on the Supreme Court's grant of writs of certiorari in the two cases. ECF Nos. 1004, 1008, and 1010. Their arguments are substantially similar to Pukke's and Baker's arguments in previous Motions to Stay that were denied by this Court, as affirmed by the Fourth Circuit (and are repetitive of arguments made in Pukke's, Baker's, and Chadwick's many other filings). ECF No 709; *FTC v. Pukke*, 795 Fed. Appx. 184 (4th Cir. 2020). Though some precedent suggests that district courts cannot use the Supreme Court's grant of certiorari "as a basis for granting a stay of execution that would otherwise be denied" because grants of certiorari do not themselves change the law, *Schwab v. Sec'y, Dep't of Corr.*, 507 F.3d 1297, 1298 (11th Cir. 2007), as a matter of discretion, the Court concludes that a stay is not warranted. *See United States for use and benefit of Tusco, Inc. v. Clark*, 235 F.Supp.3d 745, 755 (D. Md. 2016) (holding that "whether to stay a case is a decision made in the exercise of discretion by the district court as part of its inherent power to control its own docket") (citations omitted).

Accordingly, Pukke, Baker, and Chadwick's Motions to Stay, ECF Nos. 1004, 1008, and 1010 are **DENIED.**

two cases, the Supreme Court also handed down its decision in *Liu v. SEC*, 140 S. Ct. 1936 (2020), which reaffirmed but limited the SEC's ability in enforcement proceedings to obtain monetary relief, such as disgorgement, pursuant to Section 78u(d)(5) of the Securities Exchange Act of 1934, 15 U.S.C. § 78a *et seq.* This Court allowed supplemental briefing by the Parties on the impact in this case of *Liu* and the Supreme Court's grants of certiorari in the FTC cases, and all Parties submitted such briefing. For his part, Chadwick argues that the Court should ignore Fourth Circuit precedent and look instead to the Seventh Circuit's decision in *FTC v. Credit Bureau Center, LLC*, 937 F.3d 764, 771-86 (7th Cir. 2019) as well as to the special concurrence in the Ninth's Circuit's decision in *FTC v. AMG Capital Management, LLC*, 910 F.3d 417, 426 (9th Cir. 2018) (special concurrence, O'Scannlain, J., joined by Bea, J.). Defendants say these cases prevent the Court from awarding any equitable monetary remedies under Section 13(b) of the FTC Act. But, in making this argument, Chadwick concedes that both *Liu* and *Credit Bureau* are not "controlling law in this circuit." Chadwick's Response in Opposition to the FTC's Motion for Default Judgment, ECF No. 1001.[62] Other courts have also held that *Liu* does not apply to Section 13(b) FTC Act cases, *see, e.g.*, *FTC v. Cardiff*, No. 18-cv-2104 (C.D. Cal. July 7, 2020), ECF No. 388

---

In the same filing as his Motion to Stay, Chadwick challenges the inclusion of two entities EI and Mango Springs in the freeze of his assets implemented by the Preliminary Injunction, arguing (yet again) that the entities should be withdrawn from the receivership. Notwithstanding that the Court held a three week Preliminary Injunction hearing that Chadwick did not attend and an all-day hearing on the terms of Preliminary Injunction where Chadwick was represented by counsel, and the fact that Chadwick did not pursue an appeal of the Preliminary Injunction (his appeal was dismissed by the Fourth Circuit for failure to prosecute, *FTC v. Chadwick*, 19-2387), the Court found and re-affirms its finding that there is ample basis to conclude that EI is part of the SBE common enterprise and that Chadwick is jointly and severally liable for a substantial sum of money. As such, his Motion to Withdraw His Entities from the Receivership and to Unfreeze His Assets is **DENIED**.

[62] Pukke and Baker argue that under *Liu*, a district court in FTC enforcement proceedings can only award net profits and that, since SBE has little or no net profits, there can be no restitution. This is an extremely doubtful proposition and, based on the evidence in this case, it is highly likely that, even if the Supreme Court were to hold that monetary remedies under Section 13(b) of the FTC Act are limited to net profits (this Court does not believe it will), Defendants would still be liable for millions of dollars in restitution. For example, would Pukke's diversion of $18 million of sales revenues to himself, his family and his friends count as "normal business expenses"?

at 8-9. Little more needs to be said, as of now. The Fourth Circuit's decision in *Ross* is binding on this Court and this Court stands by its award of restitution, as determined by the amount consumers paid for lots, less any refunds already made to the consumers.

To the specific numbers, then.

The FTC's expert witness, Erik Lioy, testified that, based on a thorough analysis of bank statements for various accounts, including accounts in the names of Buy Belize, LLC, Buy International, Inc., Eco-Futures Belize, Eco-Futures Development, FDM, GPA, GPA DBA [doing business as] SRWR, GPA DBA Eco-Futures Belize, and Power Haus Marketing from 2011 through 2018, SBE brought in $145 million in consumer payments for lots and for related fees and expended $6.3 million on refunds and buybacks. Trial Tr., 1/31/20 Afternoon, 6:8-11:1; PX 1594. Lioy also testified that, in order to verify this number, he analyzed sales information from SBE's internal accounting software (Lending Pro) and found that total consumer payments for lots based on Lending Pro were only 1.9% lower (he testified this number did not include associated fees). Trial Tr., 1/31/20 Afternoon, 12:11-13:17, 32:11-14. Lioy further noted that, in calculating the $145 million and $6.3 million figures, he made assumptions favorable to the defendants, such as excluding sales before 2011 in the calculation (despite there having been sales as early as 2005), and using multiple sources to calculate refunds, even though SBE's account statements only identified refunds of less than $2 million. *Id.* at 16:23-18:7. Based on this methodology, Lioy calculated the amount consumers paid for lots minus refunds as $<u>138.7 million</u>. *Id.* at 16:15-21. This is the starting point for calculating the amount of restitution due from Defendants.

Defendants take issue with the $138.7 million. First, they argue that this number includes tour costs, and Lioy verified that, indeed, it does. *Id.* at 21:16-24. Second, Defendants argue that

this number also includes taxes paid by consumers and collected on behalf of the consumers, a fact Lioy also confirmed. *Id.* at 21:25-22:2.

The Court agrees with Defendants that tour payments should not be included in the calculation for total consumer lot payments because, strictly speaking, they were not paid towards the purchase price of a lot. The Receiver's report details 1,314 lots being sold over the course of the development, PX 816, and the Court heard evidence that a tour cost $799 per person or $999 per couple. *See supra*, Section III.A. In calculating the appropriate amount to subtract, the Court indulges assumptions favorable to the Defendants. First, it will assume that all lot purchasers went on tour. Second, it will assume that all lot purchasers went on tour as couples. Last, it will ignore the fact that some lot purchasers went on tour before 2011. The Court, of course, heard evidence that contradicts such assumptions. Regardless, the Court has made the calculation based on them and will subtract $1.3 million from the $138.7 million, for a sub-total of $137.4 million.

The Court will also deduct sales taxes from this number. While the FTC has argued that it is seeking "restitution it can return to consumer victims to make them whole," it also refers to "revenue-based equitable relief." ECF No. 985. The Court has previously held that restitution would be awarded in the amount "consumers paid for lots" less refunds. But the Court received evidence at trial that suggested that the General Sales Tax ("GST") paid to the Belizean Government was not included in the purchase price. *See, e.g.*, PX 186.20; PX 1431. Further, though SBE collected the tax on behalf of consumers, sales taxes are not ordinarily considered revenue or part of sales. Even in the cases the FTC cites to define restitution, "sales" or "net revenue" were used to calculate restitution. *See, e.g., FTC v. Stefanchik*, 559 F.3d 924, 931 (9th Cir. 2009); *FTC v. Washington Data Res.*, Inc., 704 F.3d 1323, 1327 (11th Cir. 2013).

The evidence indicated that sales of lots were subject to a 12.5% Belizean General Sales Tax, and that lot payments included this sales tax. PX 409; PX 456; PX 457; PX 458; PX 459; PX 460; PX 881; PX 882; PX 1445; PX 1431; PX 186.20. However, since sales tax went to Belizean authorities and not to SBE, they will not be included in the revenue from sales of lots. Accordingly, the Court will discount the $137.4 million by 12.5%, which reduces the net total of revenue from lot sales to $120.2 million. That amount of restitution, $120.2 million, shall be made by all individual and Corporate Defendants, jointly and severally, save for Chadwick, who will be jointly and severally liable only for the portion of the $120.2 million consisting of payments for lots from sales made between 2011 through 2015, as addressed in Section VI.E.

# X.    CONTEMPT MOTIONS

## A. Introduction

The FTC has filed three separate motions seeking findings of contempt against Pukke, Baker, and Usher for violations of orders issued by this Court in the *AmeriDebt* proceedings. First, the FTC seeks to have all three held in contempt for violating the Stipulated Final Judgment in *AmeriDebt* insofar as they deceptively telemarketed the Sanctuary Belize project ("TSR Contempt"). ECF No. 266. Second, the FTC seeks to have all three held in contempt for failing to turn over to the *AmeriDebt* Receiver the parcel of land that eventually became Sanctuary Belize, in violation of this Court's order in *AmeriDebt* requiring the turnover of certain assets belonging to Pukke ("Parcel Contempt"). ECF No. 267. Third, the FTC seeks to have Pukke held in contempt for repaying a loan to John Vipulis in violation of the Court's order in *AmeriDebt* explicitly prohibiting him from partially or fully replaying that loan prior to satisfying in full the FTC's judgment against him ("Vipulis Loan Contempt"). ECF No. 268.

The Court has previously ruled that, because the remedies sought in all three contempt motions are civil in nature, Defendants were not entitled to a jury trial. ECF No. 634.[63] The Court also decided to defer ruling on the contempt motions until trial on the merits. *Id.*

## B. Legal Standard for Contempt Motions

A finding of contempt requires that the moving party "establish each of the following elements by clear and convincing evidence: (1) The existence of a valid decree of which the alleged

---

[63] The Fourth Circuit agreed with the Court's ruling that the remedies the FTC seeks are civil in nature and that Pukke, Baker and Usher were not entitled to a jury trial. *In re Pukke*, 790 F. App'x 513, 514 (4th Cir. 2020) (holding "we conclude that petitioners are not entitled to a jury trial").

contemnor had actual or constructive knowledge; (2) that the decree was [rendered] in the movant's 'favor'; (3) that the alleged contemnor by [his] conduct violated the terms of the decree, and had knowledge (at least constructive knowledge) of such violations; and (4) that the movant suffered harm as a result." *Schwartz v. Rent-A-Wreck of America*, 261 F. Supp. 3d 607, 612 (D. Md. 2017) (citing *Ashraft v. Conoco, Inc*., 218 F.3d 288, 301 (4th Cir. 2000)); *United v. Ali*, 874 F.3d 825, 831 (4th Cir. 2017).

As a preliminary matter, the Court notes that the injunctions in *AmeriDebt* bound not only Pukke and the other Parties, but anyone "in active concert or participation" with them. Fed. R. Civ. P. 65(d). In the absence of this rule, Parties could "nullify a decree by carrying out prohibited acts through aiders and abettors." *Regal Knitwear Co. v. N.L.R.B*., 324 U.S. 9, 14 (1945); *K.C. ex rel. Africa H. v. Shipman*, 716 F.3d 107, 115 (4th Cir. 2013) (same).

The Court addresses each of the FTC's three motions.

### C. TSR Contempt

As to the FTC's first motion for contempt (TSR Contempt), ECF No. 266, Pukke's Stipulated Final Judgment in *AmeriDebt*, as approved by the Court, said this about telemarking:

> IT IS FURTHER ORDERED that, in connection with the telemarketing of any good or service, Defendants, as well as their successors, assigns, officers, agents, servants, employees, or affiliates, and those persons in active concert or participation with them who receive actual notice of this Order by personal service or otherwise, are hereby permanently restrained and enjoyed from
>
> A. Making, or causing or assisting others to make, expressly or by implication, any false or misleading representation, including but not limited to misrepresenting:
>  . . .
>
> 4. Any aspect of the performance, efficacy, nature, or central characteristics of the goods or services; and
> 5. Any other matter regarding the goods or services

*AmeriDebt*, ECF No. 473.

As clearly evidenced by the language of the Stipulated Final Judgment, this prohibition covered not only Pukke, who was the principal *AmeriDebt* Defendant; it extended to "affiliates" and "those persons in active concert or participation with them who receive actual notice." Because Baker was an active participant in the *AmeriDebt* proceeding—indeed because he, along with Pukke, was held in contempt of Court and incarcerated for violating the Stipulated Final Judgment against Pukke, ECF Nos. 525-1, 571—it can only be concluded that Baker had actual notice of the Stipulated Final Judgment and was and is an "affiliate" and in "active concert" with Pukke. Usher, in *AmeriDebt*, signed documents submitted to this Court in which he admitted his knowledge of Pukke's Stipulated Final Judgment. PX 781 at 2-3. Accordingly, the Court finds that Baker and Usher as well as Pukke were subject to the telemarketing prohibition contained in the *AmeriDebt* Stipulated Final Judgment.[64]

The FTC's contempt motion is predicated upon actions taken by Pukke, Baker, and Usher, either individually or under the common enterprise theory, in connection with the deceptive marketing of lots in the Sanctuary Belize project, which is the subject of the present proceeding. The Court has already found in the present proceeding that Defendants violated the TSR with respect to lot purchases made sight unseen. There was a valid decree in the *AmeriDebt* proceeding of which the alleged contemnors, Pukke, Baker and Usher, had actual knowledge; that decree was rendered in the FTC's favor; Pukke, Baker and Usher violated the terms of the decree with knowledge of such violations; and the FTC on behalf of consumes, suffered harm as a result. Accordingly, the Court finds Pukke, Baker, and Usher in contempt of court for violating the

---

[64] The FTC's motion seeking a finding of contempt based on violations of the *AmeriDebt* Stipulated Final Judgment prohibiting violations of the TSR does not name Chadwick.

Stipulated Final Judgment in *AmeriDebt*. Although the contempt in this instance violates the *AmeriDebt* Stipulated Final Judgment, the injured parties are the lot purchasers in the present litigation who were deceived by Pukke, Baker and Usher's contumacious conduct, such that any compensation would have to be made to them. But because any compensatory remedies for the TSR Contempt would be duplicative of the restitution ordered for violations of the FTC Act in the present proceeding, the Court finds it unnecessary to determine the exact amount of compensation to be paid by Pukke, Baker and Usher for their contumacious conduct. *See supra*, Section VII.

### D. Parcel Contempt

As to the FTC's second motion for contempt (Parcel Contempt), ECF No. 267, on April 20, 2005, the Court entered a Preliminary Injunction Order in *AmeriDebt* which required Pukke and "any other person or entity to transfer or deliver possession, custody and control of" all Receivership Property to the Receiver immediately upon service of the Preliminary Injunction Order and to "fully cooperate with and assist the Receiver in taking and maintaining possession, custody, or control of Receivership Property." *AmeriDebt*, ECF No. 122. Receivership Property was broadly defined as:

> [A]ny Assets, wherever located, that are (1) owned, controlled or held by or for the benefit of Pukke or DebtWorks, in whole or in part; (2) in the actual or constructive possession of Pukke or DebtWorks; (3) held by an agent of Pukke or DebtWorks, including as a retainer for the agent's provision of services to either or both of them; or (4) owned, controlled or held by, or in the actual or constructive possession of, or otherwise held for the benefit of, any corporation, partnership, trust, or other entity directly or indirectly owned or controlled by either Pukke or DebtWorks.

*Id.*

Pukke's Stipulated Final Judgment, approved by this Court on May 16, 2006 provided, among other things, that he would "assign, waive, release, discharge, and disclaim to the

Commission any and all right, title, interest, and claims, known and unknown that either Defendant has or may have in, to or against any and all Receivership Property." *AmeriDebt*, ECF No. 473.

To recount:

One of the principal assets the FTC sought to have turned over in *AmeriDebt* was Pukke's ownership interest in the Parcel, i.e., the land that eventually became Sanctuary Belize that Pukke held through the corporation known as Dolphin. There is no doubt that, at the time of the demanded turnover, the Parcel was, at least in part, owned by Dolphin, in which Pukke held a 60% interest and Baker a 40% interest. *AmeriDebt*, ECF No. 525. During the *AmeriDebt* proceeding, the Receiver took the position that Pukke and Baker were attempting to conceal the nature and extent of Dolphin's ownership interest in and rights to Sanctuary Bay Estates, forerunner of Sanctuary Belize, and that they had even attempted to transfer Dolphin's interests in the project to two other companies owned and controlled by Baker—Sanctuary Bay Limited and Starfish Development Limited. ECF Nos. 525. This legerdemain, the Court found, along with other actions taken by Pukke and Baker, resulted in the Court holding them in contempt on March 30, 2007 and ordering that they forthwith "turn over to the Receiver and deliver possession, custody and control to the Receiver of the Dolphin Development Rights and Proceeds." *AmeriDebt*, ECF No. 571 (the "Turnover Order"). The assets described in the Turnover Order included "any other legal, equitable and beneficial claims and interests held by or for the benefit of Dolphin Development, including without limitation all contract rights, development rights, ownership rights and property rights pertaining to Sittee River Wildlife Reserve." *Id.* The Turnover Order specifically provided that "Pukke and Baker, individually and collectively, shall cooperate fully with the Receiver in connection with the turnover and delivery of possession, custody and control to the Receiver of the Concealed Assets and shall take all steps necessary or convenient to facilitate and effectuate

166

such turnover and delivery of the Concealed Assets." *Id.* As described *supra*, Section III.B, despite the Court's express directive, Pukke and Baker still failed to comply. As a result, in order to force their compliance, the Court ordered their incarceration. ECF No. 604. When additional assets were eventually turned over to the Receiver and after Pukke and Baker pledged to take several steps to comply with the Court's orders, the Court ordered them released from custody. ECF Nos. 613, 614 and 622. Since further steps were required of them, their contempt had not yet been purged. *Id.*

Once the Receiver uncovered Pukke's and Baker's attempts to hide Dolphin's assets, and once Dolphin's interest in the Parcel was re-vested in the Receiver by the Court, the Receiver proceeded on the assumption that Pukke's and Baker's involvement with the Parcel had totally ceased and that, as they claimed, they were in no position to comply further with the Turnover Order. But the skirmish, as it happens, was still not over. Usher, by this time having become Chairman of SRWR, immediately took the position that the Parcel was actually owned in whole or in part by SRWR, not wholly by Dolphin, and that the Receiver could not, based on Pukke's interest in Dolphin, fairly assume that the Receiver was entitled to take possession and control of the Parcel. The Receiver disagreed, strenuously to be sure. But apparently faced with the prospect of what was likely to be highly contentious litigation in the courts of Belize, the Receiver determined to settle.

In order to effectuate settlement of the Receiver's claim to the Parcel, Baker undertook to raise some $2.0 million that could be used to fund the settlement. Baker, it appears, did raise the $2.0 million from an individual named Stephen Choi, about whom (somewhat surprisingly) little has been said during these proceedings. Then SRWR, using the Choi funds, paid the Receiver $2.0 million, in exchange for which the Receiver agreed to "relinquish all rights, claims and interests in and to the Sanctuary Bay Estates development, including all real and personal property

167

comprising or used in connection with the development." *AmeriDebt*, ECF No. 682. Thereafter, on May 5, 2008, the Receiver sent the following notice to all Sanctuary Bay Lot Owners:

>Dear Lot Owner:
>
>We are pleased to report to you that the Receiver has concluded a settlement with the Sittee River Wildlife Reserve ("SRWR") Board of Directors. The Receiver has waived all rights and claims against the. Property and has nothing further to do with the project.
>
>Ownership of all personal and real property is vested in the SRWR. We certainly wish them the best in their development efforts.
>
>Regards,
>
>Robb Evans & Associates, LLC

DX PB 31.

Though, from all appearances, the dispute over the Parcel seemingly came to an end, the FTC takes the position in the present litigation that in fact Pukke and Baker misled the FTC and the Receiver at the time of the settlement by claiming that they could do no more to turn over the Parcel. The truth, says the FTC, is that Pukke and Baker remained in control of the Parcel at all times, with Usher, as SRWR Chairman, merely serving as a "straw man." The FTC alleges that Pukke, Baker and Usher defied the Turnover Order in the following manner:[65]

>Baker, and by extension Pukke, were still in charge. Usher was just the front man with Baker orchestrating the settlement through which rather than turn over the land he convinced the Receiver to accept only a fraction of the Sanctuary Parcel's value. That Pukke and Baker were in fact directing SRWR's behavior is further strengthened by them continuing to run the Sanctuary Belize scheme to this day.

---

[65] The Court also ordered the turnover of Pukke's interest in Dolphin and Dolphin at various other times, including in ECF Nos. 122 (Preliminary Injunction Order), 473 (Stipulated Final Order and Permanent Injunction), 572 (Order Vesting Control and Proceeds of Dolphin in the Receiver), 604 (Order Incarcerating Pukke and Baker), 614 (Stipulation for Conditional Release of Baker, which was Granted in ECF No. 615), 625 (Order Approving Stipulated Release of Pukke).

ECF No. 267.

The FTC cites various items of evidence in support of this argument. The Receiver's representative, Brick Kane of Robb Evans & Associates, testified during the merits trial that Usher had represented to him during the dispute over the Parcel that he was raising the $2 million from relatives and that thereafter neither Pukke nor Baker would be involved. Trial Tr., 1/23/20 Morning, 57:14-59:10. Then, in April 2007, Usher sent letters to the Receiver stating that the SRWR board had met and terminated all rights Pukke and Baker held in the Parcel in the "past and future." PX 1392. But, the FTC points out, according to a 2016 document distributed at a SRWR meeting, after the settlement with the Receiver, Pukke's equity shares in SRWR had in fact been conveyed to Baker and the original core development investors (including the Medhursts), thereby revealing that Pukke's rights in the Parcel had not in fact been terminated in 2007. PX 1071, at 12. The FTC also cites an email Pukke sent to Baker after Pukke and Baker reacquired Long Caye in 2012 through Barienbrock, in which Pukke gloated: "It's taken some time buddy but we're getting everything they stole from us back!!" PX 945.

To recap, contempt requires a finding based on clear and convincing evidence of "(1) The existence of a valid decree of which the alleged contemnor had actual or constructive knowledge; (2) that the decree was in the movant's 'favor'; (3) that the alleged contemnor by its conduct violated the terms of the decree, and had knowledge (at least constructive knowledge) of such violations; and (4) that the movant suffered harm as a result." *Schwartz*, 261 F. Supp. 3d at 612 (D. Md. 2017). "Willfulness is not an element of civil contempt." *Id.* at 612-13 (quoting *Redner's Markets, Inc. v. Joppatown G.P. Ltd. P'ship,* 608 Fed. Appx. 130, 131 (4th Cir. 2015)).

The Court finds that as to Parcel Contempt, the first, second and fourth elements have been met. Pukke, Baker, and Usher had full knowledge of the Turnover Order, which resulted in both

of them being held in contempt of court and jailed, and Usher signed SRWR's Settlement Agreement with the Receiver referencing the Turnover Order. PX 781 at 2-3. The Turnover Order was in the FTC's favor, and if Pukke, Baker, and Usher did in fact violate the Turnover Order, the necessary consequence was that the FTC, more specifically the consumers it speaks for, suffered harm because the Receivership would have been induced by false information to accept a cash settlement worth far less than what the asset was actually worth. The sticking place, however, is the third requirement for contempt, that is, whether the conduct by Pukke, Baker, and Usher in fact violated the Turnover Order.

Baker's argument is (a) that the $2.0 million settlement with the Receiver and the Receiver's notice to the Sanctuary Belize lot-owners fully and finally resolved the matter and acts as a bar to the FTC's contempt motion and (b) that there was and is no prohibition in SRWR's Settlement with the Receiver, as approved by the Court in ECF No. 686, against Pukke or Baker continuing as owners and/or developers of the Parcel, either individually or under a re-organized company.

In support of his argument that all actions related to Dolphin were forever settled, Baker points to the language in Paragraph 9 of the Settlement Agreement, in which the "Receiver acknowledges that it is aware that it may hereafter discover claims presently unknown or unsuspected, or facts in addition to or different from those which it now knows or believes to be true pertaining to Receiver Claims. Nevertheless, it is the intention of the Receiver through this [Settlement] Agreement, to fully, finally and forever release all of the Receiver Claims." PX 781. To be sure, at the same time, Paragraph 8 of the Settlement Agreement somewhat inconsistently states that "the Receiver does hereby forever reliever, release and discharge SRWR and SRWR's agents, associates, partners…directors, other than Pukke and Peter Baker, jointly and severally."

170

*Id.* (emphasis added). It is the savings clause of Paragraph 8 as to Pukke and Baker that the FTC relies on in its present quest to hold Pukke, Baker and Usher in contempt.

In addition, the FTC argues that, since the FTC was not a party to the Settlement Agreement, there are no barriers to its bringing of this contempt motion.

But the critical question is not whether the FTC can bring the claim (it can); the question is whether the FTC has shown, clearly and convincingly, that Pukke and Baker violated the Turnover Order. The Court finds that the FTC has not carried its burden in this regard. There is nothing in the Settlement Agreement or the Turnover Order that prohibits Baker from raising the $2 million to fund the settlement nor does either document address or expressly prohibit his or Pukke's involvement with SRWR following the settlement. Indeed, the Receiver's representative testified at the trial on the merits that there were no restrictions in the Settlement Agreement prohibiting Baker or Pukke from working with SRWR. Trial Tr., 1/23/20 Afternoon, 61:19-62:2. And the reality is this: The Receiver could certainly have included an express written prohibition to this effect into the Settlement Agreement but, quite simply, it did not do so. The Receiver could also have stood and fought against what it perceived to be Pukke's and Baker's slick maneuvers, which it was fully empowered to do in the courts of Belize. But to put it mildly, the outcome in Belize would have been highly uncertain, whereas the time and expense of a court battle there would have been certain and substantial beyond any doubt. Wrapping up the whole matter in exchange for $2.0 million was a not unreasonable resolution of the claim.

Finally, there is this. Though the FTC argues that Pukke, Baker, and Usher violated the Turnover Order by not turning over the Parcel, the FTC has not shown, by clear and convincing evidence, that without a court battle, Pukke and Baker could have in fact, turned over control of the Parcel in 2007. The Turnover Order required that Pukke turn over Dolphin, which at the time

owned development rights in the Parcel. but only part of the land that comprised the Parcel. As for any of Dolphin's rights pertaining to SRWR, those appear to have been based on a loan Pukke made to SRWR through Dolphin. And while there is evidence that Dolphin and SRWR were in many respects intertwined, it is not clear that Pukke and Baker, through Pukke's interest in Dolphin, could have easily prevailed upon Usher and all other Parties involved with SRWR to turn over the Parcel to the Receiver, or indeed that Usher and all other Parties involved with SRWR were legally required to turn over SRWR's interest in the Parcel to the Receiver.

In sum, while the FTC may feel that the Receiver was unfairly played by Pukke and Baker after the Settlement Agreement was executed, only to find Pukke and Baker back at the very same fruit and vegetable stand they operated beforehand, the fact is there was no express prohibition against their doing so. Despite evidence that, verbally at least, Baker and/or Pukke were not entirely candid with the Receiver in 2007 when they proclaimed they could do no more to deliver the Parcel to the Receiver, the evidence overall does not clearly and convincingly justify a finding of contempt with respect to their non-delivery of the Parcel to the Receiver. The Court finds Pukke, Baker and Usher were not in contempt of the Court's Turnover Order in this respect.

### E. Vipulis Loan Contempt

As for the FTC's third motion for contempt (Vipulis Loan Contempt), ECF No. 268, the key facts are these:

In connection with Pukke's incarceration for contempt during the *AmeriDebt* proceedings, Vipulis offered to pay the Receiver the sum of $4.5 million to induce the Receiver and the FTC to

agree to Pukke's conditional release. *AmeriDebt*, ECF No. 622. However, the Stipulation for Conditional Release of Pukke, approved by the Court, provided among other things that:

> The sum of $3,250,000 of the Vipulis Payment shall be considered to be a loan from Vipulis to Pukke ("Vipulis Loan"). The terms of the loan shall be the subject of such separate agreement as Vipulis and Pukke may enter into, if any, provided however that Vipulis agrees to subordinate repayment of the Vipulis Loan to satisfaction in full of the FTC judgment under the terms of the Stipulated Final Judgment. Therefore, Pukke shall not repay all or any portion of the Vipulis Loan to Vipulis until such time as the FTC judgment is satisfied in full under the terms of the Stipulated Final Judgment, as such terms and satisfaction shall be agreed to by the FTC and Pukke or determined by the Court.

*AmeriDebt*, ECF No. 625-1 (approved by the Court in the Order Approving Stipulation for Conditional Release of Andris Pukke From Incarceration Subject to Compliance with Court Orders ("Order Approving Stipulation"), ECF No. 625).

What was the amount that Pukke was obliged to pay the FTC for distribution to consumers before any part of the Vipulis loan could be repaid?

The Stipulation stated the Vipulis Payment should be applied against the $172 million judgment in favor of the FTC but not against the non-suspended $35 million portion of the judgment.

Pukke clearly had knowledge of the Order Approving Stipulation, since it was the Order that released him from incarceration, the Order was in the FTC's favor and, if Pukke did violate the Order, the FTC would clearly suffer harm because the money repaid to Vipulis would not be available for consumer redress. Thus, three of the requirements for a finding of contempt are fulfilled. The Court considers whether Pukke violated this Order.

Despite the Order Approving Stipulation in *AmeriDebt*, it is irrefutable that, since SBE has been conducting its business, GPA, FDM, and Eco-Futures Development made payments totaling $4.26 million to Vipulis. Trial Tr., 1/23/20 Morning, 87:19-89:8. The FTC contends these

payments were repayment of the $3.25 million loan Vipulis made to Pukke to secure his release from custody as a result of his contempt, and are contemptuous because Pukke had yet to satisfy the FTC judgment according to the terms of his Stipulated Final Judgment.

Pukke appears to have painted himself into the proverbial corner on this issue. On deposition, when asked about the circumstances of the Vipulis repayment, more than once he pleaded the Fifth Amendment. As a result, he was blocked from attempting to discuss the transaction at trial. Even so, through his questions to witnesses, Pukke insinuated that the payments to Vipulis were not in fact prohibited by the Order Approving Stipulation, but rather were intended as repayments of a loan made by another individual, Patrick Callahan, who Pukke suggested was Vipulis's business partner. Pukke's suggestion was that he was merely funneling the funds to Callahan through Vipulis. This is pure unadulterated fantasy. Although there was some evidence presented at trial that Callahan had loaned funds to SBE[66], Pukke never referenced a note evidencing a loan by Callahan to SBE, much less one approaching $4.1 million in value.[67] Nor indeed was there any evidence that Callahan and Vipulis were ever partners. Moreover, Pukke's invocation of the Fifth Amendment permits an adverse inference by the Court on this matter, especially where the adverse inference is complemented by other evidentiary considerations. *See ePlus Tech., Inc. v. Aboud*, 313 F.3d 166, 179 (4th Cir. 2002). Adverse inferences are surely in order here. And in any case, Pukke's unsworn insinuations are not evidence.

---

[66] There was some testimony at trial that Callahan had made a loan to SBE, though the precise amount of the loan was not established. PI Hrg. Tr., 3/13/19 Afternoon, 105:20-106:19 (Baker testifying that Pukke had told him there was a loan); PI Hrg. Tr. 3/20/19 Afternoon, 97:9-99:3 (Receiver's representative testifying that Callahan provided a loan to SBE based on information provided by Baker, though the loan does not show up in the accounting records of SBE).

[67] The Receiver's representative testified that, in 2018, he reached out to Callahan, and Callahan's counsel responded in an email that Callahan had "no intention to file a claim for the funds," which implies that any funds Callahan may have loaned to SBE have never been repaid, despite Pukke's insinuations that the $4.1 million was paid to Vipulis to repay Callahan's loan. PI Hrg. Tr., 3/20/19 Afternoon, 99:4-99:20 (testifying about PX 1577).

The real clincher, however, is this. Vipulis, who was named as a Relief Defendant in these proceedings, has settled with the FTC by making a payment of $4.112 million. One would assume, if Vipulis understood that the payments made to him by Pukke were in actuality being made to satisfy a separate loan that his "partner" Patrick Callahan had made to SBE, Vipulis might have resisted repaying such a substantial sum to the FTC. Taken together, these considerations certainly pop Pukke's trial balloon about what the payment to Vipulis was for.

The Court concludes that Pukke did repay the $3.25 million loan to Vipulis which, without more, would raise problems under the Order Approving Stipulation. But Pukke offers one more defense. He was, he says, free to repay Vipulis because the payments were made after he had fully satisfied his judgment to the FTC. This is a fair issue to explore.

The Court, therefore, considers the amount of the judgment Pukke agreed to with the FTC in the *AmeriDebt* proceedings and whether it was satisfied at the time payments were made to Vipulis.

The applicable provision of the *AmeriDebt* Stipulated Final Judgment suspends all but $35 million of the $172 million judgment Pukke agreed to, if he "cooperate[s] fully with the Commission and [is] responsible for preparing, executing, and recording the necessary documents and taking any additional actions the Commission deems necessary or desirable to evidence and effect the assignment, waiver, release, discharge, and disclaimer to the Commission of his right, title, interest, and claims in, to or against the assets constituting Receivership Property and to carry out the purposes of this Order," among other conditions. *AmeriDebt*, ECF No. 473. Pukke suggests that it is the $35 million figure that should apply and, further, that he has in fact fully paid that amount, to wit, $11.46 million to the Internal Revenue Service, $2.97 million dollars to Class Counsel and Plaintiffs in *Polacsek v. Debticated Consumer Counseling, Inc.*, 04-cv-631 PJM, and

$25.35 million to the FTC, a total of $39.78 million, which exceeds the $35.0 million he says he owes on the *AmeriDebt* Stipulated Final Judgment, thereby freeing him to make a repayment to Vipulis.

The FTC takes sharp issue with this contention. It says that the $35 million figure applies only if Pukke "cooperates" with it and, since he did not, it is the $172 million figure that applies. The Court agrees with the FTC. Pukke's non-cooperation with the FTC is emphatically underscored by the fact that, following entry of the Stipulated Final Judgment, he was charged with, and in this Court, pled guilty to, was convicted of, and went to prison for obstruction of justice for concealing assets in *AmeriDebt* as well as in a related bankruptcy case, as discussed *supra*, Section III.B.

These facts conclusively establish the fact of Pukke's non-cooperation with the FTC and trigger the $172 million judgment.

Accordingly, even if all the payments made by Pukke in connection with *AmeriDebt* — $11.46 million to the Internal Revenue Service, $2.97 million dollars to Class Counsel and Plaintiffs in *Polsacek*, and $25.35 million to the FTC—nearly $40.0 million[68]—are taken into account, they fall short of satisfying the $172 million judgment by more than $100 million dollars.

---

[68] The FTC submits that Pukke has only paid approximately $29 million, not $40 million. The FTC calculates this based on the $25.35 million paid to the FTC and $2.97 million paid to Class Counsel and Plaintiffs in *Polacsek*. ECF No. 965. The *AmeriDebt* Stipulated Final Judgment specifically states that if Pukke meets the aforementioned provisions, and if "the Net Monies derived from liquidation of the Receivership Property exceed $35 million, the FTC agrees to accept [$35 million] in satisfaction of its Judgment, and any Net Monies exceeding $35,000,000 shall be turned over to the Pukke Bankruptcy Estate." *AmeriDebt*, ECF No. 473. Net Monies is defined in the Stipulated Final Judgment as "all monies obtained by the Receiver after the Receiver marshals and liquidates Receivership Property and pays all approved compensation and expenses." *Id.* The FTC concedes the $2.97 million paid to Class Counsel and Plaintiffs in *Polacsek* should be credited towards the amount Pukke has paid. ECF No. 965. The Court need not resolve any dispute as to precisely what amount of payments Pukke should be credited with. For present purposes, the Court need only decide that, before receiving credit for any payments he may have made, Pukke's total liability to the FTC is $172 million.

The payment to Vipulis occurred well before that judgment was satisfied which, to this day, has not been satisfied.

The Court concludes that, by knowingly repaying the loan to Vipulis before satisfying the $172 million judgment in favor of the FTC in *AmeriDebt*, Pukke was in contempt of the Court's Order Approving Stipulation.

What remedy should attach to this finding of contempt? As the Court explained in its October 22, 2019 Memorandum Opinion, ECF No. 634, Vipulis settled with the FTC by repaying $4.112 million in March 2019. ECF No. 352. Because the remedy sought in this motion is civil, the FTC cannot recover in excess of the actual loss to consumers caused by Pukke's actions. ECF No. 634. But at trial, the Court heard evidence that Pukke, through SBE, actually made payments to Vipulis totaling $4.26 million. Trial Tr., 1/23/20 Morning, 87:19-89:8. As such, Pukke must account for the difference between the $4.26 million that Pukke, through SBE, paid Vipulis and the $4.112 million Vipulis paid the FTC, approximately $148,000—the exact number to be determined after an accounting.[69]

---

[69] The Court takes no position at this time as to what rate of interest, if any, would be due on this amount. As previously set forth in the Stipulated for Conditional Release of Andris Pukke, the $4.5 million Vipulis transferred to the Receiver in 2007 (which includes the $3.25 million loan at issue here) will be applied towards the $172 million judgment against Pukke in *AmeriDebt*. *AmeriDebt*, ECF No. 625.

## XI.   CONCLUSION

The Court **GRANTS** the FTC's Motion for Default Judgment as to all individual Defendants and as to all Corporate Defendants who were duly served but have never appeared in the case and as to whom the Clerk has entered a Default (except NLG).

The Court finds that the FTC has proven by a preponderance of the evidence that the non-settling Corporate Defendants, as a common enterprise, linked to Pukke, Baker, Chadwick, and Usher, have violated the Federal Trade Commission Act and the Telemarketing Sales Rule and **GRANTS** in the main the FTC's requested relief of Permanent Injunctions as may be finally entered against these Defendants and related relief. The Parties will be sent a draft of the Court's proposed Permanent Injunction and Monetary Judgment and given a brief window to comment on the same.

The Court further finds Pukke, Baker, Usher and the non-settling Corporate Defendants (except NLG) jointly and severally liable for $120.2 million in restitution. Chadwick shall be jointly and severally liable for a portion of this amount, to be determined at a later date.

The Court further finds that the FTC has clearly and convincingly established its Motion to Hold Andris Pukke, Peter Baker, and John Usher in Contempt for Deceptive Telemarketing Practices in Violation of the Final Order in *FTC v. AmeriDebt*, 03-cv-317 PJM, ECF No. 266, and **GRANTS** the Motion.

The Court further finds that the FTC has not clearly and convincingly established its Motion to Hold Pukke, Baker, and Usher in Contempt for Failing to Turn the Sanctuary Parcel Over to the Receiver, ECF No. 267, and **DENIES** the Motion.

The Court further finds that the FTC has clearly and convincingly established its Motion to Hold Pukke in Contempt for Violating the Order Approving Stipulation for Conditional Release

of Andris Pukke from Incarceration Subject to Compliance with Court Orders, ECF No. 268, and

**GRANTS** the Motion.

Separate Orders implementing these decisions and describing next steps will **ISSUE**.

/s/
_____
PETER J. MESSITTE
UNITED STATES DISTRICT JUDGE

**August 28, 2020**

179