**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**(SOUTHERN DIVISION)**

| | |
|---|---|
| *In re* SANCTUARY BELIZE LITIGATION | Case No. 18-cv-3309-PJM |

**DEFENDANT ROD KAZAZI'S OPPOSITION TO THE FEDERAL TRADE COMMISSION'S TURNOVER MOTION, AND REQUEST FOR RELIEF**

Defendant Rod Kazazi ("Mr. Kazazi"), by and through undersigned counsel, hereby submits his opposition to the Federal Trade Commission's Motion for Turnover of Certain Assets Held in Escrow (ECF 1023).  Furthermore, Mr. Kazazi seeks relief from the $144,000,000 judgment it seeks to impose because of its loss of use of $268,873.37 for a period of approximately 8 months during a time period when the federal reserve rate was cut to zero due to the coronavirus pandemic.

## I.     INTRODUCTION

There is no person on Earth who wishes Mr. Kazazi could have met his obligations under the Court's January 8, 2020 Stipulated Order ("Order") at an earlier date more than Mr. Kazazi himself. This case has been a funeral procession of pitch-black clouds raining down on him for several years now, and he agreed to the Order because it offered a workable means to alleviate that gloom. To that end, Mr. Kazazi has been assiduously trying to borrow the funds necessary to make the $268,873.37 payment required of him under the Order both before and after the Court entered the order in January 2020. Unfortunately, the confluence of poor timing

1

regarding his lender and the onset of the historical COVID-19 pandemic scuttled Mr. Kazazi's plan to have the funds sooner.

Despite his efforts and despite these unfortunate events conspiring against him, the FTC now labels Mr. Kazazi contumacious, claiming that he has had the necessary funds all along and should thus be found in contempt and liable for $144,000,000. But the FTC is being disingenuous, and it knows it. The FTC, via its counsel Benjamin Theisman, knew in January when the Order was executed and entered that Mr. Kazazi did not possess the requisite funds and was working on a loan for said monies. Moreover, in follow-up correspondence, Mr. Kazazi updated Mr. Theisman regarding the status of the loan and how the pandemic threw a wrench into Mr. Kazazi's plans. Never once in this correspondence did Mr. Theisman express an understanding that Mr. Kazazi already had the money or demand immediate payment. Instead, he asked Mr. Kazazi to stay diligent and keep him updated. It is amazing how the FTC wholly ignores these facts in its recent pleadings.

This pleading does not refute Mr. Kazazi's obligation to pay $268,873.37. Indeed, the best evidence of Mr. Kazazi's ever present, singular intent to meet this obligation is that he now stands ready to pay this amount, either in cash or via transferring title to his house. Rather, this pleading appeals to the Court's equitable powers and discretion not to carry out the FTC's draconian and meanspirited desire to hold Mr. Kazazi in contempt and bludgeon him with a $144,000,000 judgment which, if imposed, will be a permanent albatross around his neck. Mr. Kazazi is undeserving of such punishment. He wants to and will pay the $268,873.37 amount.

He is merely asking that the Court not destroy his life because events beyond his comprehension prevented him from making a payment eight months earlier.  While there was no meet and confer before the FTC filings, the FTC post filing discussions have indicated a willingness to allow Mr. Kazazi to avoid the $144,000,000 judgment if he makes the $268,873.37 payment **and** turns over his house which has equity in around the same range.  Thus the FTC seeks to extract a 100% penalty for an 8 month late payment.  This is certainly not equity.

## II.    FACTUAL BACKGROUND

### A.    The Order and the Negotiations Leading Thereto

In October and November 2019, Mr. Kazazi and the FTC, via its counsel Benjamin Theisman, discussed a potential settlement of the FTC's claims against Mr. Kazazi. Declaration of Rod Kazazi, attached as Exhibit A, at para. 5.  (See also, Affidavit of David Wiechert, attached as Exhibit B, at paras. 8-15).  During these negotiations, the FTC advised that the settlement would require Mr. Kazazi to transfer all of his assets, including his house, to it. Mr. Kazazi desperately wanted to retain his house because, in addition to it being his only residence, it was purchased and given to him by his parents. Exhibit A, at para. 5.  Mr. Kazazi proposed that, instead of transferring title to the house, he would pay the FTC the present value of the equity in the home. *Id.*  After much back and forth the FTC conditionally agreed and both Mr. Kazazi and the FTC ordered their own appraisals of the home. *Id.*  (See also, Exh. B at para. 10).  It was determined from these appraisals and other

considerations that one of Mr. Kazazi's obligations under the Order would be to pay

$268,873.37. Exhibit A, at para. 5.

The Order provided that Mr. Kazazi was to be adjudged jointly and severally

liable with his codefendants for the $144,000,000 judgment the FTC obtained against

all defendants, but said judgment as applied to Mr. Kazazi would be suspended if he

made the required payments. See Order, ECF 775, at 5-6. Section III (C) states that

the $268,873.37 payment was to be made within fourteen days of entry of the Order,

and that Mr. Kazazi's "counsel holds such funds for no purpose other than the

payments to the [FTC]." *Id.* at 5. This language is inaccurate and not reflective of

then-reality; Mr. David Wiechert, Mr. Kazazi's attorney, did not hold such funds in

his trust account as of January 2020 because Mr. Kazazi did not have the funds then.

Exh. A at para. 6. (See also, Exh. B at para. 16). Unfortunately, neither Mr. Wiechert

nor Mr. Kazazi caught this last second addition to the draft Order supplied by the

FTC when they reviewed the Order prior to execution. Exh. A at para. 6. (See also,

Exh. B at para. 13). That is because they relied on the FTC's representation that no

other changes had been made to a prior draft other than a change in the amount of

monies owed. Exh. B at paras. 11 and 13. In fact, the FTC slipped this language in

while misrepresenting the changes to Mr. Wiechert and Mr. Kazazi. *Id.* at para. 13.

Regardless, as detailed below, the FTC also knew this sentence was inaccurate at the

time the Order was executed and entered. *Id.* at para. 27.

The Court entered the Order on January 8, 2020, thus meaning that, under Section III (C) of the order, Mr. Kazazi's $268,873.37 payment was due by January 22.

### B.     Mr. Kazazi's Efforts to Obtain Funding and the FTC's Knowledge He Did Not Have the Requisite Funds on the Date the Order Was Entered

Mr. Kazazi is not a wealthy man; his only significant asset is his house. Exh. A at para. 7.  He needed to borrow the vast majority of the $268,873.37 amount to make the required payment. *Id.*  (See also, Exh. B. at para. 10).  The FTC was advised that Mr. Kazazi needed to borrow the funds in November 2019 during settlement negotiations. Exh. A at para. 7.  Moreover, Mr. Kazazi, as part of the settlement, submitted to the FTC financial statements that showed that he did not have this $268,873.37 sum. *Id.*  The FTC has never advised Mr. Kazazi that it questioned the accuracy of these financial statements. *Id.*

In November 2019, Mr. Kazazi applied to his friend Farshid Ghamari, a California attorney, for a loan. *Id.* at para. 8.  (See also, Affidavit of Farshid Ghamari, attached as Exhibit C, at para. 3).  Mr. Ghamari asked when Mr. Kazazi would need the money, to which Mr. Kazazi stated sometime in January 2020. Exh. A at para. 8. Mr. Ghamari represented that he should be able to lend Mr. Kazazi the money then. *Id.* However, when Mr. Kazazi notified Mr. Ghamari in January 2020 that he now needed the loan, Mr. Ghamari advised that he was himself in the process of buying a house and thus could not lend money at that time. *Id.* (See also, Exh. C at para 4). Mr. Wiechert, on Mr. Kazazi's behalf, alerted Mr. Theisman via email on January 22

5

about the delay. Exh. A at para. 8. Mr. Theisman did not immediately demand payment under Section III(C).

In early March 2020, Mr. Ghamari stated that he was now in a position to lend the money, and on March 4, he and Mr. Kazazi executed a loan agreement for $250,000 to that end, with Mr. Kazazi's home serving as collateral. Exh. A at para. 9. (See also, Exh. C at para. 5). However, before the money was transferred to Mr. Kazazi, the spread of COVID-19 and the ensuing shutdown orders in California and the United States all but upended the world. Exh. A at para. 9. (See also, Exh. C at para. 6). Like most United States businesses, Mr. Ghamari's firm was adversely impacted by the shutdown and he was no longer able to lend the $250,000. Exh. A at para. 9. (See also, Exh. C at para. 6).

On April 9, Mr. Wiechert sent the FTC an email updating it that Mr. Kazazi was having difficulty in obtaining a loan due to the pandemic. Exh. B at para. 20. On April 15, Mr. Theisman responded via an email to Mr. Wiechert, listing Mr. Kazazi's outstanding obligations under the Order, but nowhere does Mr. Theisman make a demand for immediate payment for the funds purportedly already possessed. *Id.* at para. 21. On April 22, Mr. Kazazi, Mr. Wiechert, and Mr. Theisman participated in a conference call wherein Mr. Kazazi explained that he signed a loan agreement for $250,000 but this deal was delayed due to the pandemic, and that he was willing to give up his house to meet his obligations. *Id.* at para. 22. On May 4, Mr. Kazazi forwarded Mr. Theisman a copy of the $250,000 loan agreement between him and Mr. Ghamari. *Id.* at para. 23. Later, in around late May or early June, Mr. Kazazi and

Mr. Theisman spoke in a telephone call and Mr. Kazazi again advised that Mr.

Ghamari could not lend the money given the ongoing pandemic. Exh. A at para. 11.

Mr. Theisman simply asked Mr. Kazazi to keep him updated. *Id.*

There were several subsequent communications from the FTC which also

evidence its knowledge that neither Mr. Kazazi nor Mr. Wiechert held the

$268,873.37. On May 7, Mr. Theisman emailed a letter to Mr. Wiechert about Mr.

Kazazi's compliance under the Order, but rather than making a demand for

immediate payment pursuant to Section III(C), the letter focused on the FTC's loss

due to Mr. Kazazi's delay in liquidating an investment account. Exh. B. at para. 24.

On June 3, 2020, Mr. Theisman emailed Mr. Wiechert and Mr. Kazazi regarding

payment status, which again did not contain a demand for immediate payment

pursuant to Section III(C). *Id.* at para. 25. Lastly, on August 12, 2020, Mr. Kazazi

emailed Mr. Theisman to again update him regarding the loan, noting that, while Mr.

Ghamari was still willing to lend him money at a later time, he was then unavailable

to lend at the moment given COVID-19's ongoing disruption of his business. *Id.* at

para. 26. Mr. Kazazi then offered to sell his home in order to acquire the funds to

make the $269,000 payment, which Mr. Theisman advised against, citing the

restraining order's proscription of such transfers.  *Id.*

On September 1, 2020, the FTC filed its turnover motion and request that the

Court find Mr. Kazazi and Mr. Wiechert in contempt for not having made the

$269,000 payment and impose the as-yet-suspended $144,000,000 judgment against

Mr. Kazazi. These pleadings came without notice as the FTC did not meet and confer

with Mr. Kazazi or his counsel before filing. *Id.* at para. 27. Mr. Kazazi forwarded these pleadings to Mr. Ghamari along with an urgent plea for the loan. Exh. A at para. 13. Mr. Ghamari represents that he will immediately lend the $250,000, provided that Mr. Kazazi can keep his house since that is the only sufficient collateral Mr. Kazazi can offer in exchange for the loaned monies. Exh. C at para. 8.

Mr. Kazazi has subsequently advised the FTC that he can now immediately pay the $269,000. Exh. A at para. 14. The FTC declined this overture, stating that they not only want the $268,873.37 payment but also his house on top of this amount if they are going to forego the $144,000,000 judgement. *Id.*

Mr. Kazazi thus now appeals to the Court to deny the FTC's charge of contempt and request that the suspended $144,000,000 judgment be imposed.

## III.    MR. KAZAZI SHOULD NOT BE HELD IN CONTEMPT

Mr. Kazazi should not be held in contempt given that he has been diligent in attempting to obtain the necessary funds to make the $268,873.37 payment, both before and after entry of the Order; these funds eluded him due to unforeseen circumstances with his lender and the onset of a once-in-a-century global pandemic. Moreover, he should not be found in contempt because he is presently willing and able to either pay the $268,873.37 or transfer his house to the FTC, thus meaning he is ready to purge the alleged wrong the FTC claims precipitates a contempt finding.

### A.    Civil Contempt Standard

The elements of civil contempt are familiar to this Court, being "(1) the existence of a valid decree of which the alleged contemnor had actual or constructive

knowledge; (2) that the decree was in the movant's 'favor'; (3) that the alleged contemnor violated the terms of the decree, and had knowledge (at least constructive knowledge) of such violations; and (4) that movant suffered harm as a result," and the movant must establish each element by clear and convincing evidence. *Schwartz v. Rent-A-Wreck of America*, 261 F. Supp. 3d 607, 612 (D. Md. 2017) (Messitte, J.). "Substantial compliance" is an affirmative defense to a charge of civil contempt, requiring the alleged contemnor show he "took all reasonable steps to ensure compliance." Id. at 615.

It is paramount to note that civil contempt is both "forward-looking," meaning it is "terminable if the contemnor purges himself of the contempt," and "compensatory," meaning it represents only those "losses sustained by the injured party as a result of the contempt." *Windsor Power House Coal Co. v. Dist. 6 United Mine Workers of Am.,* 530 F.2d 312, 316 (4th Cir. 1976) (internal quotations and parentheses omitted). Thus, civil contempt cannot be found, or must be lifted, if the alleged contemnor subsequently complies with the order he allegedly violated. *Turner v. Rogers*, 564 U.S. 431, 442 (2011) ("[O]nce a civil contemnor complies with the underlying order, he is purged of the contempt and is free.").

## B. Mr. Kazazi Has "Substantially Complied" with the Order under These Extenuating and Historic Circumstances and Is Willing and Able to Cure the Alleged Contempt

Here, Mr. Kazazi can avail himself of the "substantial compliance" defense because he took reasonable steps to comply with the Order under extenuating and historically extraordinary circumstances.

### 1.    Mr. Kazazi's Substantial Compliance with the Order

Mr. Kazazi tried but was stymied in January and then again after March 2020 from obtaining the necessary funds, first by his lender Mr. Ghamari having money tied up in a home purchase and then by the onset of the COVID-19 pandemic that again prevented Mr. Ghamari from having funds available to lend. This was all done with the FTC's knowledge, as Mr. Kazazi apprised the FTC of these developments and continued to update them in April, May, June and again in mid-August. Moreover, in August Mr. Kazazi took the extraordinary step of offering to sell his house in order to pay the FTC, the very house that he tried so desperately to keep just months earlier. His willingness to contravene the primal and sentimental attachments to his residence speaks volumes about his intent to comply with the Order. It cannot be gainsaid that offering to give up one's home in order to comply with a court order is clear evidence that person does not have an iota of contempt for said order.

The FTC's likely retort is that Section III(C) states that Mr. Kazazi already had these funds and they were in Mr. Wiechert's trust account as of the date of entry. However, as demonstrated above, it is incontrovertible that the FTC, via its counsel Mr. Theisman, knew Mr. Kazazi needed to borrow these monies and that he did not have these funds as of the date of entry or any time after. Moreover, never once did the FTC in the follow-up correspondence with Mr. Kazazi and Mr. Wiechert cite Section III(C) and assert a right to immediate payment despite Mr. Kazazi

purportedly stipulating he already possessed the money. That the FTC did not make a demand for immediate payment demonstrates it always knew that Mr. Kazazi needed to borrow the funds and that Section III(C) was never representative of reality nor the parties' mutual understanding. For the FTC to now contend that Mr. Kazazi has had these funds all along and that they reside in Mr. Wiechert's trust account is the very definition of duplicity.

At bottom, this is not a case where Mr. Kazazi ignored his obligations and is now making excuses for disobedient behavior. Far from it. Mr. Kazazi, like so many Americans during these COVID-19-induced trying times, has seen his plans for 2020 dashed and has had to make the best of a bad situation. Mr. Kazazi has taken all reasonable steps under these unforeseeable circumstances to comply with the Order.

## 2.     Mr. Kazazi is Willing and Able to Purge the Alleged Contempt

Even if the Court finds Mr. Kazazi has not "substantially complied" with the Order, it should nevertheless withhold a contempt finding because Mr. Kazazi is ready, willing, and able to pay the $268,873.37, via either cash or via transfer of his home. The FTC's singular ground for contempt is his nonpayment of the $268,873.37. Because he can now meet this obligation and has offered these funds to the FTC, any contempt is perforce purged because he has "compensated" the FTC for its claimed "loss" of the $268,873.37. That the FTC has, at the time of filing, declined to accept Mr. Kazazi's payment does not defeat the notion that Mr. Kazazi can do so at any moment.

Therefore, the Court should not find Mr. Kazazi in contempt of the Order.

**IV.    THE CLEAR BALANCE OF THE EQUITIES WEIGH AGAINST
        IMPOSITION OF THE SUSPENDED $144,000,000 JUDGMENT**

In addition to the contempt charge, the FTC has requested the Court enforce the suspended $144,000,000 judgment against Mr. Kazazi for his failure to make the $268,873.37 payment. Imposition of this judgment would be a lifelong catastrophe for Mr. Kazazi and is uncalled for, both because the equities at play favor against imposition and because such a drastic measure is unnecessary given Mr. Kazazi's above-detailed substantial compliance with the Order and his present readiness and willingness to pay the $268,873.37. Appeal to the Court's equitable jurisdiction is apt given that the instant action was brought under Section 13(b) of the Federal Trade Commission Act, an equitable action. See Order, ECF. 775, at 1*; F.T.C. v. Ross, F.T.C. v. Bronson Partners, LLC*, 654 F.3d 359, 366 (2d Cir. 2011) ("By empowering courts to issue injunctive relief, Section 13(b) invokes the equitable jurisdiction of the court.").

Mr. Kazazi in no way disputes that he is obligated to pay to the FTC $268,873.37 as required by the Order. Indeed, he now stands ready, willing, and able to make this payment. He recently offered this sum to the FTC plus around $6,000 as a good faith interest payment given the eight-month delay – the FTC declined this overture, insisting that he give up his home in addition to this sum. Moreover, neither does Mr. Kazazi dispute that his payment of the $268,873.37 is in arrears by almost eight months.

But what Mr. Kazazi does dispute, vis-à-vis the FTC's motion, is the necessity that this arrearage requires imposition of a cataclysmic, financial life destroying judgment to which he has no real hope of ever paying off and which will be a permanent millstone around his neck. The $144,000,000 judgment would forever destroy Mr. Kazazi's credit, cutting him off from such things as business and home loans that would improve his life. It would also require permanent garnishment of his wages, meaning whatever dollar he earns for the rest of life will be shared with the FTC. And finally, just the stigma of having a $100,000,000 plus judgment against him will forever be a specter haunting him, as it will be visible to any future employers or business partners who ever do the slightest background check on him.

The balance of the equities weighs against such a bleak future. For one, as recited above, Mr. Kazazi has made every reasonable attempt to obtain a loan to pay the $268,873.37. Ever since before the Order was entered Mr. Kazazi has been in close contact with his lender Mr. Ghamari about the loan and was this close to obtaining the funds back in March when he and Mr. Ghamari signed a loan agreement for $250,000, only to then see the COVID-19 pandemic tear that plan asunder, along with many aspects of modern life. Six of the eight months of Mr. Kazazi's arrearage has occurred against this historic pandemic backdrop.

Second, Mr. Kazazi has been transparent with the FTC about all of his difficulties in obtaining a loan. He or Mr. Wiechert have regularly notified the FTC since January 22 of updates regarding the status of the $268,837.73 payment, with the FTC never once demanding immediate payment in response. Thirdly, Mr. Kazazi

offered to sell his house to make the payment back in August, but the FTC advised against it citing the asset freeze (ignoring that it could agree to lift/modify said freeze to make this plan work) – the FTC could have been made whole by now or be well on the way to be made whole if it agreed to this plan back in August. And lastly, the FTC's disingenuity should be taken into account. It has given the Court the false impression that Mr. Kazazi has been truly "contumacious" by claiming that he/Mr. Wiechert have had the $268,873.37 all this time and that Mr. Kazazi has willfully chosen not to make the payment. As this Court is now well apprised, that is simply not the case.

At bottom, Mr. Kazazi readily admits that the $268,837.37 is delinquent. But now he is ready, willing, and able to meet his obligations under the Order. He simply asks the Court not aid the FTC in bludgeoning his future by imposing upon him the $144,000,000 judgment.

Respectfully submitted,

_____

Charles N. Curlett, Jr. (Bar No. 28246)
Steven H. Levin (Bar No.
Rosenbrg Martin Greenberg, LLP
25 S. Charles St., 21st Floor
Baltimore, Maryland 21201
ccurlett@rosenbergmartin.com
Tel: 917-667-0861

*Attorney for Rod Kazazi*

## CERTIFICATE OF SERVICE

**I CERTIFY THAT** on September 29, 2020, I served the foregoing filing, and all related documents through ECF and by email to the following people and entities identified below:

All Federal Trade Commission counsel;

Peter Baker and entities he owns or controls, including Global Property Alliance, Inc., Sittee River Wildlife Reserve, Eco-Futures Belize Limited, Eco-Futures Development, Buy Belize LLC, Buy International LLC, and Foundation Development Management Inc. at peterbakerx@gmail.com;

Gary Caris, James E. Van Horn, and Kevin Driscoll, Counsel for the Receiver, which controls all of the Defaulting Defendants but the Estate of John Pukke and John Usher, by ECF or at gcaris@btlaw.com; jvanhorn@btlaw.com; and kevin.driscoll@btlaw.com;

Luke Chadwick and entities he owns or controls, including Prodigy Management Group LLC, Belize Real Estate Affiliates LLC, Exotic Investor LLC, and Southern Belize Realty LLC, at luketchadwick@gmail.com;

Andirs Pukke and entities he owns or controls, including the Estate of John Pukke, at ekkup@msn.com; and

Bruce Searby, as standby counsel for Luke Chadwick and entities he owns or controls, at bsearby@searby.law.

I further certify that on September 29, 2020, I caused the foregoing filing, and all related documents, to be served by email and methods otherwise specified, to the following people and entities identified below.

John Usher, and the entities he owns or controls including Sittee River Wildlife Reserve, Eco-Futures Belize Limited, and the Sanctuary Belize Property Owners' Association by email at johnusher758@gmail.com, johnusher758@yahoo.com, and cotinga63@gmail.com;

Joseph Rillotta, by email at joseph.rillotta@faegredrinker.com;

David Heiman, by email at David@regencyhomesllc.com;

Global Property Alliance Inc., by email on Counsel for the Receiver and Peter Baker, as well as by email on Brandi Greenfield through her counsel, Cori Ferrentino and Michael King, at cori@ferrentinolaw.com and mking@wintersking.com;

Sittee River Wildlikfe Reserve, by email on Counsel for the Receiver, Peter Baker, and John User;

Buy Belize LLC, by email on Counsel for the Receiver and Peter Baker;

15

Buy International Inc., by email on Counsel for the Receiver and Peter Baker, as well as by email on Frank Costanzo at ecologicalfox@gmail.com;

Foundation Development Management Inc., by email on Counsel for the Receiver and Peter Baker, as well as by email on Frank Costanzo at ecologicalfox@gmail.com

Eco Futures Development, by email on Counsel for the Receiver and Peter Baker, as well as by email on Frank Costanzo at ecologicalfox@gmail.com;

Eco-Futures Belize Limited, by email on Counsel for the Receiver, Peter Baker, and John Usher;

Newport Land Group LLC, by email on Counsel for the Receiver and to Frank Costanzo;

Power Haus Marketing, by email on Counsel for the Receiver and by email on Angela Chittenden though her counsel Wayne Gross, at the following email address: wgross@ggtriallaw.com;

Prodigy Management Group LLC, by email on Counsel for the Receiver, Luke Chadwick, and Bruce Searby;

Belize Real Estate Affiliates LLC, by email on Counsel for the Receiver, Luke Chadwick, and Bruce Searby;

Exotic Investor LLC, by email on Counsel for the Receiver, Luke Chadwick, and Bruce Searby;

Southern Belize Realty LLC, by email on Counsel for the Receiver, Luke Chadwick, and Bruce Searby;

Sanctuary Belize Property Owners' Association, by email on Counsel for the Receiver, and John Usher;

The Estate of John Pukke, by email to Andris Pukke, Executor for the Estate of John Pukke, at ekkup@msn.com;

David Wiechert at dwiechert@aol.com

Frank Costanzo at exologicalfox@gmail.com; and

Brandi Greenfield through her counsel, Cori Ferrention and Michael King, at cori@ferrentinolaw.com; and mking@wintersking.com

Charles N. Curlett, Jr.

16