UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND

|  |  |
|---|---|
| *In re* SANCTUARY BELIZE LITIGATION | Civil No. 18-3309 PX |

**MEMORANDUM OPINION & ORDER**

This matter now comes before the Court in the case of *In re Sanctuary Belize Litigation*, Civil Number 18-3309, which concerns the massive real-estate fraud scheme perpetrated by Andris Pukke and his confederates. The scheme victimized over 1,800 consumer investors for total losses of over $120 million related to hundreds of real property parcels located in Belize (the "Property"). *See Receiver Report of Activities for the Period September 1, 2024, to December 31, 2024*, at 3, 8, ECF No. 1559-3. The lots span 18,000 acres, an area larger than Manhattan and more than six times the size of Ocean City, Maryland.[1] Without recounting the entirety of this tortured litigation, suffice to say that this Court's prior Orders have authorized the Receiver to control, market, and sell the Property as defined in such prior filings to generate proceeds that will be used to compensate the victims. *See* Order for Permanent Inj. & Monetary J. Against Defaulting Defs. John Usher, et al., ECF No. 1112; Final Order Concerning Kanantik, ECF No. 1193; Am. Final Order for Permanent Inj. & Monetary J. Against Defs. Andris Pukke, Peter Baker & Luke Chadwick, ECF

---

[1] *Manhattan Borough, New York County, New York*, U.S. Census Bureau, https://data.census.gov/profile/Manhattan_borough,_New_York_County,_New_York?g=060XX00US3606144919 (last visited May 13, 2025); *QuickFacts: Ocean City Town, Maryland*, U.S. Census Bureau, https://www.census.gov/quickfacts/fact/table/oceancitytownmaryland/PST045224 (last visited May 13, 2025).

No. 1194; Order Implementing Next Phase of Consumer Redress, ECF No. 1446; Order Reforming & Reaffirming the Final Orders, ECF No. 1447.[2]

Throughout the litigation, the Receiver's ultimate objective was to preserve the value of the Property and convert it to proceeds that would be distributed to the victims of the fraud. The Court has previously approved the process by which the Receiver has solicited and accepted bids for final sale. *See* ECF Nos. 1446. That process is ending with the Receiver moving for the Court's approval and order of a final sale. *See* ECF Nos. 1556, 1562.

However, literally at the last minute, a third-party individual and putative investor, Bob Yari, has moved to intervene in this action, asking that the Court reopen the bid process so that his offer may be considered. *See* ECF Nos. 1563, 1564. The Receiver and FTC rightly oppose. And after hearing from the parties and considering the submissions, the Court **DENIES** Yari's motions and **GRANTS** the Receiver's motion for order of final sale.

Pertinent to the pending motions, the Court considers the following facts. The sale process that is the subject of the motions commenced almost two years ago, in June of 2023. ECF No. 1556-2 ¶ 4. By Court order, the Receiver began the arduous task of validating all assets of the Receivership and next widely marketing the Property as one for sale to potential investors. *See* ECF No. 1446. In connection with that process, the Receiver retained the services of the real-estate broker, CBRE. *See* ECF 1556-2 ¶ 4. Most recently, the Receiver, through CBRE, solicited bids for purchase and received six that met preestablished and preapproved criteria. *Id.* ¶ 9.

Of those six, First Belizean Investment Market Limited ("FBIM") emerged as the best bidder, principally because of its 25-year track record of developing thousands of acres in Belize for residential and commercial use. *See* ECF No. 1556-1 at 15–17. Additionally, FBIM offered to

---

[2] On January 23, 2025, this Court was assigned the case after the death of the Honorable Peter J. Messitte.

purchase the Property on an as-is where-is basis, both with a willingness to work with victim investors and with a demonstrated liquidity sufficient to consummate the deal. *See* ECF Nos. 1556 at 3, 1556-2 ¶¶ 12–15.

Once this bid was secured and due diligence completed, the Receiver next moved to the statutory overbid and sales-notice phase. This process required the Receiver to publish again the Property for sale to solicit bids that could potentially compete with that of FBIM. ECF No. 1556-2 ¶¶ 18–21. The notice for soliciting bids was clear: any bid that met specific requirements must have been completed and sent to CBRE before the bidder-qualification deadline at 5:00 p.m. ET on February 25, 2025.

The bid requirements were also clear. To qualify for consideration, the bidder was required to submit by the deadline: (1) a signed purchase-and-sale agreement on the same terms as FBIM but with a purchase price of at least $22,500,000 ($2 million above the contract price reached with FBIM); (2) an earnest-money deposit of $1,650,000; (3) proof of adequate funds to close the sale with detail sufficient to show liquidity; and (4) a questionnaire that disclosed, among other details, any of the bidder's principals or affiliates. *Id.* ¶ 18.

On February 24, 2025, roughly 24 hours before the bid process closed, the putative intervenor, Yari, contacted CBRE to express interest in the overbid process and request the required paperwork. CBRE immediately responded by giving Yari access to the virtual data room which included all relevant bidding information. ECF Nos. 1564-1 ¶ 9, 1567-1 ¶¶ 2–3. The next day, hours before the bid process was set to close, Yari emailed the CBRE representative, First Vice President Brandon Schempp, a completed bidder questionnaire, an executed purchase-and-sale agreement, and an earnest-money deposit agreement. ECF No. 1567-1 ¶ 6. For each document, Yari identified *himself* individually as the sole bidder. He further affirmed that no other "parties

3

. . . [were] sponsoring or participating in the proposed purchase transaction, including [any] direct [or] indirect principals of the Bidder." ECF No. 1564-1 at 14. Missing from the bid requirements, however, was any valid proof of liquidity, that is, proof of Yari's personal ability to consummate the sale.

With just under two hours before the deadline, Yari asked Schempp to confirm wiring instructions so that Yari could wire the earnest-money deposit. ECF No. 1567-1 ¶ 7. Yari made this request even though the wiring instructions had been made available to him in the virtual data room. *Id.* Nonetheless, Schempp repeatedly attempted to call Yari before and after the 5:00 p.m. deadline. *Id.* Yari, for his part, did not respond until 6:58 p.m. but Schempp could not answer his call. *Id.* Yari never wired the necessary earnest-money deposit on the 25th; nor did he submit sufficient proof of funds to qualify as an overbidder. By 7:13 p.m., the Receiver informed Schempp that no qualified overbidders had been identified (including Yari), and the bidding window was closed. *Id.* at ¶ 8.

The next day, February 26, 2025, CBRE received *half* of the earnest-money deposit, $825,000, in connection with Yari's bid, but not from Yari personally. *See* ECF No. 1567-2 ¶ 4. Rather, an entity named JAM Revocable Trust forwarded the funds at Yari's behest. *See id.* The following day, February 27, 2025, CBRE received the other half of the earnest-money deposit by wire, but from a different entity, Six Street Labs Inc., also at the direction of Yari. *See id.* ¶ 5.

Now two days after the bidding deadline lapsed, Yari also forwarded a screenshot of an account statement designed to show proof that Yari had sufficient unencumbered funds necessary to close the deal. ECF No. 1567-1 ¶ 10. The beneficiary on the account, however, was not Yari. Nor was it altogether clear that the accounts listed were free of any encumbrances or otherwise

4

liquid.  *See id.*  Accordingly, on February 28, the Receiver returned the earnest-money funds to their originating accounts.  ECF No. 1567-2 ¶ 6.

On March 10, 2025, the Receiver moved for Court approval of the sale to FBIM.  ECF No. 1562.[3]  Only then did Yari file his pending motion to intervene two days later.  ECF No. 1563.  For the following reasons, Yari's motion is denied, and the Receiver's motion is granted.

The Court begins with the FTC's argument that Yari lacks standing to seek intervention in the sale at all.  ECF No. 1569 at 4.  The Court must reach this question first because as a court of limited jurisdiction, it must satisfy itself of its own authority to hear the case before reaching the merits.  *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 93–94 (1998).  A party retains standing as an intervenor if he has "a personal stake in the outcome of the controversy as to justify the exercise of the court's remedial powers on [his] behalf."  *Town of Chester v. Laroe Ests., Inc.*, 581 U.S. 433, 438 (2017) (cleaned up) (quotation omitted).  This "same principle applies to intervenors of right."  *Id.*  Thus, an intervenor "must demonstrate standing for each claim he seeks to press and for each form of relief that is sought."  *Id.*

To demonstrate standing, the intervenor must show injury in fact that was caused by the parties' conduct and that can be redressed by proper court action.  *See id.* at 438–39; *Norfolk & W. Ry. Co. v. Bhd. of R.R. Signalmen*, 164 F.3d 847, 856 (4th Cir. 1998) ("A court's equitable power to grant injunctive relief is constrained by limitations which are similar in nature to prudential standing requirements.").  In the context of a bidding process, to show injury in fact, the party asserting standing must sufficiently allege that it was "'able and ready' to bid," and that another party's action was the "only barrier to participation . . . on an equal basis."  *See Hierholzer v.*

---

[3] This motion effectively supplants two prior motions filed at the outset of the overbid process, both of which sought the Court's approval of the sale to FBIM.  *See* ECF Nos. 1551 (Jan. 27, 2025) (withdrawn, *see* ECF No. 1557 (Feb. 3, 2025)); ECF No. 1556 (Feb. 3, 2025).

5

*Guzman*, 125 F.4th 104, 114–15 (4th Cir. 2025) (quoting *Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 666 (1993)); *see also City of Jacksonville*, 508 U.S. at 666 ("The 'injury in fact' . . . is the denial of equal treatment resulting from the imposition of the barrier, not the ultimate inability to obtain the benefit."). Although the movant must establish standing, the Court may consider the averments of the movant in the light most favorable to him to ascertain whether he maintains standing to seek intervention. *See In re Endangered Species Act Section 4 Deadline Litig.-MDL* No. 2165, 704 F.3d 972, 975 n.5, 978 (D.C. Cir. 2013) (relying on putative intervenors' affidavits to assess standing).

Yari's averments are sufficient to confer standing. He contends that the Receiver, through CBRE, has thwarted his ability to submit a timely bid on the Property. *See* ECF Nos. 1564 at 4, 7, 1564-1 ¶¶ 13–15. That is to say, Yari avers that he was "able and ready to bid," *see Hierholzer*, 125 F.4th at 115, and the Receiver was the "only barrier to [his] participation," *see id.* If true, Yari has demonstrated sufficient injury in having been cut out of the bid process, and causation insofar as he blames the Receiver as the bad actor. The purported harm is also redressable by this Court. Yari asks the Court to press pause on the sale of the Property for three weeks so that Yari may submit a qualifying bid. *See* ECF No. 1564 at 8. The Court retains the authority to accord such relief. Thus, Yari has demonstrated standing to pursue his motion.

Turning to the merits or Yari's request to intervene, Yari seeks both mandatory and permissive intervention based on the singular proposition that he was wrongly cut out of the bid process. *See* ECF No. 1563. Because the Court sits in equity, the question of intervention "is a matter resting within the sound discretion of the District Judge." *Elkins v. First Nat'l Bank*, 43 F.2d 777, 779 (4th Cir. 1930). Intervention as a matter of right may be considered when "[o]n a timely motion," the putative intervenor "claims an interest relating to the property or transaction that is

the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest." Fed. R. Civ. P 24(a)(2). To succeed, an intervenor of right must show that he: (1) submitted a timely motion to intervene; (2) has a "direct and substantial interest" in the property or transaction at issue; (3) the interest would be impaired if intervention was denied; and (4) the interest is inadequately represented by existing parties. *See Richman v. First Woman's Bank*, 104 F.3d 654, 659 (4th Cir. 1997).

Assuming for the sake of argument that Yari has filed a timely motion, thus satisfying prong one, he fails to otherwise demonstrate a "direct and substantial" interest that would be impaired if intervention were denied. A "direct and substantial interest" requires the intervenor to show that it "stand[s] to gain or lose by the direct legal operation of the district court's judgment." *Teague v. Bakker*, 931 F.2d 259, 261 (4th Cir. 1991). Yari cannot make that showing. Yari has "lost" not because of the Court's ultimate decision, but because he failed to submit a qualifying bid, full stop.

Although Yari complains of CBRE's conduct having thwarted his ability to wire funds before the 5:00 p.m. deadline, the application failed for a host of other reasons, including Yari's failure to: (1) disclose in the application other investor affiliates; (2) show timely proof of liquidity; (3) show sufficient proof of liquidity; and (4) submit, personally as the bidder, the earnest money deposit. Indeed, it was only as part of this litigation that Yari disclosed that his "sourced funds" come from "three investors that include me, Justin Mateen, and Michael Heywood." ECF No. 1564-1 ¶ 19.

As for Yari's singular grounds for intervening — that CBRE supposedly failed to respond to his query about the wiring instructions such that his ability to submit the funds on time was

7

stymied — the evidence suggests otherwise. *See* ECF Nos. 1567-1, -2. Schempp attested to repeatedly attempting to call Yari back before and shortly after 5:00 p.m. on February 25 to no avail. *See* ECF No. 1567-1 ¶ 7. Nor does anything suggest that had contact been made, the outcome would have been any different. Indeed, Yari did not, and perhaps could not, submit the sufficient earnest money deposit at all until two days later, and then not even in his name. Thus, Yari has failed to satisfy his burden of showing that this Court's consideration of the Receiver's motion to approve the sale without his intervention would work any injustice on him.

As for permissive intervention, the Court may grant the request "on timely motion" to anyone who "has a claim or defense that shares with the main action a common question of law or fact." Fed. R. Civ. P. 24(b)(1)(B). In exercising its discretion, the Court "must consider whether the intervention will unduly delay or prejudice the adjudication of the original parties' rights." Fed. R. Civ. P. 24(b)(3). Whether to permit such intervention lies within this Court's sound discretion. *Smith v. Pennington*, 352 F.3d 884, 892 (4th Cir. 2003). The Court may consider such factors as judicial economy, fairness to the parties, and balance of the equities. *See In re Sierra Club*, 945 F.2d 776, 779 (4th Cir. 1991); *cf. Stuart v. Huff*, 706 F.3d 345, 350 (4th Cir. 2013) (finding that the district court "rightly expressed its concern that adding three groups of intervenors would necessarily complicate the discovery process and consume additional resources of the court and the parties").

Yari is ill suited for permissive intervention. Holding the motion for final sale in abeyance, as Yari requests, for him to now submit a qualifying bid when he has not yet done so would waste the time and resources of the Receiver, and thus unnecessarily deplete the assets that the Receiver was tasked to preserve. Further, granting Yari such time seems patently inequitable to other non-qualifying bidders, of which there was at least one whose bid had been rejected as insufficient for

8

similar reasons. *See* ECF No. 1567-1 ¶ 9. Last, and most importantly, what Yari did put together inspires little confidence that he should be accorded additional time, especially when balanced against the risk that granting Yari's motion could jeopardize the solid, well-vetted, favorable offer of FBIM. ECF No. 1567 at 5, 12. Because the requested delay would likely not produce a better outcome for the victims than that which is presently before the Court, the Court will not permit Yari to intervene.[4]

Accordingly, the Court **DENIES** Yari's motion to intervene, ECF No. 1563, and **DENIES** Yari's motion to seek relief from the Receiver's request for final approval of sale, ECF No. 1564.

May 13, 2025

/s/
_____
**PAULA XINIS**
**UNITED STATES DISTRICT JUDGE**

---

[4] At the hearing, Yari suggested a third kind of "equitable intervention," is available, relying on *Holland v. Florida*, 560 U.S. 631 (2010). Mots. Hr'g (May 12, 2025); *accord* ECF No. 1573 at 5. Yari's argument is misplaced. The Supreme Court referred in *Holland* to "equitable intervention" not of a third-party intervenor but as related to a court's equitable power to toll limitations in a habeas action, thereby intervening "to meet new situations . . . and to accord all the relief necessary to correct . . . particular injustices." *Holland*, 560 U.S. at 650 (quoting *Hazel–Atlas Glass Co. v. Hartford–Empire Co.*, 322 U.S. 238, 248 (1944)); *see also Dickerson v. U.S. Steel Corp.*, 582 F.2d 827, 831–34 (3d Cir. 1978) (first, assessing a claim of "equitable intervention" under Rule 24(b)'s permissive-intervention framework, and then, in the alternative, finding "no support for an extension of the plenary power of the district court" to adjudicate the claims of non-parties). *Holland*, therefore, provides no alternate bases for granting intervention.